# EXHIBIT B
EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR STAY PENDING APPEAL

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **RECLAIM IDAHO**, an Idaho Political Action Committee; **LUKE MAYVILLE**<br><br>Plaintiffs,<br><br>v.<br><br>**BRADLEY LITTLE**, in his official capacity as Governor of Idaho; **LAWERENCE DENNEY**, in his official capacity as Idaho Secretary of State; Defendants. | Case No. 1:20-cv-00268-BLW<br><br>**DECLARATION OF LUKE MAYVILLE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

I, Luke Mayville, having first been duly sworn upon oath, declare as follows:

1. My name is Luke Mayville, and I am a Co-founder of Reclaim Idaho, the other plaintiff in this case.

2. I have served as a volunteer leader and organizer for Reclaim Idaho since spring 2017, when I co-founded the organization in my hometown of Sandpoint. My role with Reclaim Idaho

Declaration of Luke Mayville-                            p.1

includes setting strategic priorities for the organization, fundraising, communicating with media, writing opinion columns, drafting initiative proposals, and traveling the state to recruit volunteers and leaders. I am an academic by training and was most recently employed by Columbia University as a postdoctoral fellow and lecturer in the fields of History and American Studies. I have also held teaching and research positions at Yale University and American University. In 2016, I published a book on the political thought of President John Adams.

3. Reclaim Idaho is a grassroots movement designed to protect and improve the quality of life of working Idahoans. Reclaim organizes to pass citizens' initiatives and to elect candidates who believe in strengthening public schools, protecting public lands, and extending healthcare to working families.

4. Reclaim filed an "Invest in Idaho" K-12 educational funding initiative with the Secretary of State in the fall of 2019. If put on the ballot and passed, this initiative would invest $170 million in education in Idaho.

5. Reclaim was operating on the model of organizing that it had successfully used during the Medicaid expansion drive, a model of organizing we had begun to develop in 2017.

6. That year, we filed a Medicaid Expansion initiative—a proposal that eventually qualified for the ballot with well over the 56,000 signatures required. Several additional advocacy groups contributed to signature collection in the final months of petitioning, but the vast majority of required signatures were collected by Reclaim Idaho volunteers.

7. Moreover, Reclaim Idaho volunteers easily surpassed Idaho's requirements for geographic distribution by collecting signatures from more than 6% of registered voters in well over 18 of Idaho's 35 legislative districts.

Declaration of Luke Mayville- p.2

8. We attribute the success of our Medicaid signature drive to a highly effective and labor intensive model of organizing.

9. In the early stages of the effort, members of our statewide team visited over 20 counties and worked to recruit volunteers and organize those volunteers into county-based teams. This method of organizing didn't yield large numbers of signatures during the early months of the drive, but it did build strong, well-trained teams capable of scaling up the operation exponentially during the final few months before the deadline.

10. By mid-March, with just six weeks left before the deadline, we had collected fewer than half of the required signatures. But we were able to accelerate the rate of signature collection rapidly in the final weeks.

11. One factor in particular contributed to our ability to ramp up signature collection in the final stretch: the sense of urgency brought about by the impending deadline. With the deadline looming, our most active volunteers grew more committed and more efficient in their work, and hundreds of new volunteers joined the effort for the first time. (The motivating effects of the looming deadline was compounded by changing weather. In the final stretch, just as volunteers were growing more motivated, the weather warmed up and enabled them to collect signatures much more effectively.)

12. In my own observations and studies of different signature-drive models, I have found that the motivating effect of a looming deadline is especially important for grassroots drives that rely mainly on volunteers. When signature drives rely mainly on paid-signature gatherers, the final stretch of a signature drive is not much different than the early months. Throughout the drive, petitioners are motivated by the wages they earn. In contrast, grassroots campaigns stand to

Declaration of Luke Mayville- p.3

benefit enormously from the highly motivating sense of urgency that kicks in during the final stretch of time before a deadline.

13. The model of organizing we developed during our Medicaid drive prepared us well to capitalize on the sense of urgency during the final weeks of the effort. By investing time and resources during the early months in volunteer-recruitment and team-building, we were well-poised in the final stretch to absorb hundreds of new volunteers and scale up our work dramatically.

14. When we began the signature drive for our "Invest in Idaho" K-12 funding initiative, we made every effort to replicate the success of our Medicaid drive. Beginning in September 2019—over one month before our petition was approved for circulation by the Idaho Secretary of State, organizers visited counties in every region. They recruited volunteers, organized them into county-based teams, and trained them with effective signature-gathering tactics.

15. Our rate of signature collection was low during the first several months, comparable to what it had been during our Medicaid signature drive. By February 15th, we had collected an estimated 15,000 signatures—roughly one quarter of the signatures needed to qualify the initiative.

16. But in the weeks that followed, as the deadline began to loom on the horizon, our rate of signature collection accelerated dramatically. Our most active volunteers grew even more committed and efficient in their work. Hundreds of new volunteers were motivated by the impending deadline to join the effort.

17. During the four weeks between mid-February and March 12th, we more than doubled our total number of signatures from 15,000 to over 30,000. We progressed from zero legislative

Declaration of Luke Mayville-          p.4

districts qualified to 5 districts qualified and 7 additional districts within a few hundred signatures of qualification.

18. On March 12th, the day before the first case of COVID-19 was confirmed in Idaho, we were significantly ahead of where we had been by that same date during our Medicaid drive two years earlier.

19. On March 13th, the first case of COVID-19 was confirmed in Idaho and Governor Little declared a state of emergency in order to prevent the spread of the coronavirus. It was on that date that it became apparent to our team that we would need to take significant steps to adapt to changing circumstances.

20. On that same day, we sent an email newsletter to all supporters with the following guidelines:

- *Stay home if you are exhibiting any symptoms of illness.*

- *Avoid approaching anyone that is symptomatic of illness for a signature.*

- *Practice excellent hand hygiene before and after collecting signatures. Carry a small bottle of hand sanitizer if possible.*

- *Wipe down clipboards before and after a signature gathering shift.*

- *Avoid shaking hands or direct physical contact when collecting signatures.*

- *We recommend adopting a "KEEP THE PEN" policy. In an effort to reduce transmission of germs, volunteers should carry packages of "disposable" pens. If the signer doesn't have a pen of their own, simply allow them to keep the pen. Our campaign is committed to providing pens and/or reimbursing volunteers for the cost of pens.*

21. We also notified volunteers that we would be transitioning toward more outdoor signature-collection activities, considering that staying outdoors would reduce the risk of the airborne spread of germs.

Declaration of Luke Mayville- p.5

22. That week, the CDC issued guidelines for individual and community organizations operating under conditions of "minimal to moderate" spread of COVID-19. Those guidelines included:

- Reduction of in-person activities, especially for organizations with individuals at increased risk of severe illness

- Cancellation of large gatherings of 250 or more people

- Implementation of personal protection measures such as staying home when sick, handwashing respiratory etiquette, and cleaning frequently touched surfaces daily

23. Over the next five days, between March 13th and March 18th, we observed a dramatic escalation of the public health risk. Relevant developments during those days included:

24. On the evening of Friday, March 13th, we received an email from retired Idaho appellate Judge Karen Lansing—one of our most active and committed volunteers—notifying us that she was suspending her efforts to gather signatures. She wrote:

> *I feel that my commitment and desire to gather signatures for this critical initiative directly conflicts with my obligation as a citizen to practice social distancing to protect my fellow Idahoans. I appreciate the suggestion that use of disposable pens and frequent cleaning of clipboards would reduce the risk of disease transmission. Those measures undoubtedly would help, but it is not possible for anyone to sign the petition without touching the page as they write, so it seems to me that the risk substantially remains. As important as the initiative is, I reluctantly conclude that it is outweighed by my responsibility to avoid possibly putting others at risk.*

Judge Lansing's email was the first of many similar messages sent to us from volunteers from all around the state.

25. Guidelines from the CDC and other public health authorities made clear that the health risk posed by the coronavirus was especially severe for older adults. This fact weighed heavily on our decision-making, considering that the majority of Reclaim Idaho's most active volunteers are retirees over the age of 60.

Declaration of Luke Mayville-              p.6

26. On Saturday, March 14th, Meridian Library District announced that all libraries were closing operations due to the coronavirus. Likewise, the City of Boise closed all libraries on Monday, March 16th, and in subsequent weeks libraries would close across the state. On Tuesday, March 17th, DMV offices closed in Ada and Canyon counties. This was highly significant because libraries and DMVs had proven to be the most promising public locations for volunteers to collect signatures.

27. On Sunday, March 15th, the CDC recommended cancellation or postponement of all gatherings of 50 or more. Most dramatically, the CDC also began recommending a six-foot "social distancing" rule which quickly became a widespread norm of behavior.

28. As I would later explain in an April 9th interview with *CityLab* [1], our organization struggled over those five days to adapt to rapidly changing circumstances. As a last resort, we considered setting up "drive-through" signature collection stations. (We had recently learned that the Save Our Schools Arizona initiative—an initiative that would eventually suspend operations due to the pandemic—was experimenting with drive-through signature-gathering). But it quickly became clear that in-person signature gathering of any kind was simply too hazardous in the midst of a deadly pandemic. The announcement of the six-foot rule made this especially clear.

29. As I would later explain in my interview with *CityLab* :

*We were trying to adapt with the guidelines as they grew more and more stringent…But once the six-foot rule settled in, it just became impractical. It also became clear at that*

---

[1] CityLab describes itself on its web site as "a partnership between Bloomberg Philanthropies, the Aspen Institute and The Atlantic, CityLab is the preeminent meeting of city leaders and the top minds in urbanism and city planning, economics, education, art, architecture, public sector innovation, community development, and business — convened with the goal of creating scalable solutions to major challenges faced by cities everywhere."

Declaration of Luke Mayville- p.7

*point that any continuation of a signature drive would put volunteers and the wider public at risk.*

30. On Monday, March 16th, having concluded that in-person signature gathering would be too great a public health risk, we decided to appeal to Governor Brad Little with a request for the authorization of electronic signature gathering. We sent an email newsletter inviting supporters to sign our online petition to the Governor.

31. The text of the newsletter included the following:

*This pandemic is obstructing the ability of every Idahoan to participate in the ballot initiative process…In the interest of safeguarding the health of the public and protecting the constitutional rights of Idahoans, we're calling on Governor Brad Little to exercise his executive powers to authorize temporary online petitioning for Idaho ballot initiatives.*

32. As soon as supporters signed the petition online, they were then prompted with an opportunity to email the Governor's office and ask the Governor to authorize electronic signature collection.

33. That same day, Reclaim Idaho Executive Director Rebecca Schroeder corresponded via email with Andrew Mitzel, a member of the Governor's staff. When Mitzel directed Schroeder and Reclaim Idaho to bring our request for electronic signature capabilities to the Idaho Secretary of State, Schroeder immediately made contact via email with the Secretary of State's office. The Secretary of State's office then claimed, in reply, that "there is no statute allowing electronic signatures for petitions in Idaho Statutes 34 Chapter 18," and that they were therefore unable to take action. When Schroeder then brought this information to Mitzel and the Governor's office, Mitzel replied as follow:

*Given our intense focus on spending as much time and resources on protecting the health and safety of the broader population, the Governor's Office has no intention of taking executive action on this matter.*

Declaration of Luke Mayville- p.8

34. Later that day, in a public statement given to BSU Public Radio, the Governor's Press Secretary Marissa Morrison Hyer said "Idaho statute does not allow for the suspension of rules regarding the physical collection of signatures, even in times of emergency."

35. Upon learning that the Governor did not intend to take action, we made one last attempt to save the signature drive. I contacted Representative John Gannon and asked him to propose legislation in the Idaho House of Representatives that would temporarily adjust Idaho's ballot initiative rules. The following day, Rep. Gannon reported to me that he shared a legislative proposal with at least one member of majority leadership, but that he was unable to find support for the bill. In his judgment, there was no legislative path forward for the proposal.

36. By Wednesday, March 18th, we determined that we had exhausted all avenues of action. Neither the Governor, the Secretary of State, nor the Legislature were willing to take action, and there were no available tactics for collecting in-person signatures while also preserving the safety of our volunteers and the wider public.

37. That morning, we sent the following message to our supporters via email newsletter and social media:

> *After carefully reviewing the latest recommendations of public health authorities, we have concluded that it is no longer safe for volunteers to engage in the face-to-face interactions that are necessary for effective signature gathering. In order to protect the health of our volunteers and the wider public, we are calling on all Reclaim Idaho volunteers to suspend signature collection until further notice.*
>
> *We do not make this decision lightly. Tragically, the coronavirus pandemic brought our signature drive to a standstill at the exact moment when we'd built our strongest momentum. Thanks to the hard work of volunteers across the state during the past month, our campaign cleared 30,000 signatures—more than we'd collected at this stage of the Medicaid Expansion campaign.*
>
> *But health and safety must come first. There is simply too much at risk to take chances.*

Declaration of Luke Mayville-    p.9

38. Governor Little's proclamation of a stay-at-home order was issued on March 25th. That order remains in partial effect today and remained in full effect through April 30th, which coincidentally was the final day before the official signature-gathering deadline on May 1st.

39. Our decision to suspend operations was based on our assessment of the risks of signature gathering in the midst of a pandemic.

40. The stay-at-home order exacerbated the risk and made signature-gathering impossible.

41. Reclaim Idaho has invested time in developing a model for an online signature-collection plan that will allow the initiative campaign to obtain sufficient and verifiable signatures of Idaho electors. Our plan will enable the county clerk offices to verify electronic signatures in a process that closely resembles the normal verification process. In order to reduce the burden on county clerks, we plan to submit all signatures currently in our possession that have not yet been verified in order to give county clerks time to process these signatures prior to the time period when electronic signatures will need to be processed. We estimate this total amount to be approximately 20,000 signatures.

42. Moreover, our plan will not impose significant additional burdens on the Idaho Secretary of State. The following email, sent to me by Deputy Secretary of State Jason Hancock on Wednesday, June 3rd, clarifies that the Secretary of State is not involved in verifying the validity of signatures, but only in counting them in order to determine whether the petition includes the requisite number of signatures statewide and the requisite number of signatures in 18 districts:

> *Since the county clerks, individually, are not in a position to know whether or not the petition includes the requisite number of valid signatures statewide, or the requisite number of valid signatures in at least 18 legislative districts, these tasks are performed by the Secretary of State after the various county clerks submit their reports showing the signatures that were submitted to them that they were able to verify.*

Declaration of Luke Mayville- p10

43. Furthermore, we are prepared to reduce the additional burden on the Secretary of State by immediately providing them with 10,593 signatures that have been verified already by county clerks.

44. Attached to this affidavit are slides that show how the electronic signature process would work. It will be under a contract with DocuSign, the country's leading company for execution of electronic signatures on legal documents.

45. Regarding the reliability of DocuSign as a system for collecting authentic signatures, the following information has been published by DocuSign, Inc.:

- In 2017, DocuSign was officially certified by the Federal Risk and Authorization Management Program (FedRAMP), a government-wide service that vets technology providers for security and risk. DocuSign is now used by 800 federal, state, and local government agencies, including the Federal Communications Commission (FCC), the state of North Carolina, the Nevada Department of Transportation, and 400 California cities.

- DocuSign is used by Fortune 500 companies and global financial institutions including T-Mobile, Apple, Aetna, VISA, and Prudential Financial.

- More than 775,000 documents are signed using DocuSign each day, yet only in 2-3 instances have DocuSign documents been challenged in court. DocuSign maintains a court admissible certificate of completion that provides proof of the signing process – including who signed what, when and where – for all parties in the transaction. A DocuSign electronic signature is more enforceable than a wet signature because of the court-admissible evidence it contains.

- Unlike wet signatures, e-signatures also come with an electronic record that serves as an audit trail and proof of the transaction. The audit trail includes the history of actions taken with the document, including the details of when it was opened, viewed and signed. Depending on the provider, and if the signer agreed to allow access to their location, the record will also show the geolocation where it was signed. If one of the signers disputes their signature, or if there's any question about the transaction, this audit trail is available to all participants in the transaction and can resolve such objections.

- As an additional layer of authentication, DocuSign signatures include certificates of completion, which can include specific details about each signer on the document, including the consumer disclosure indicating the signer agreed to use e-signature, the signature image, key event timestamps and the signer's IP address and other identifying information.

- Once the signing process is complete, all documents are digitally sealed using Public Key Infrastructure (PKI), an industry-standard technology. This seal indicates the electronic signature is valid and that the document hasn't been tampered with or altered since the date of signing.

46. Working with DocuSign, Reclaim Idaho has developed a plan to comply with Idaho's requirements for state initiative petitions, with additional safeguards to ensure that signatures are those of the persons whom they purport to be. The model will work as follows:

- Reclaim Idaho will establish a dedicated website for on-line signature collection.

- The landing page will ask for support to place the issue on the ballot to increase funding for K-12 education. The page will provide a link for the person to read the full text. It will notify persons that only Idaho registered voters are permitted to sign.

- If the person elects to proceed, they will enter their name, voter registration address, city or zip code, the last 4 digits of their social security number, and their email address.

- They will hit 'next' and be directed to a PDF of the petition that looks exactly like the paper version except that: 1. It will have only one signature line, 2. It will have fields for the last 4 digits of their SSN and the county where the elector resides, and 3. The circulator statement will have additional wording due to the on-line nature. All of the fields will populate from the information provided by the person on the prior page and they will be asked to confirm the information and authorize the placing of their signature on the petition. If they do, a cursive version of their signature will be affixed to the signature field or they can choose to draw their own signature electronically. Either way, the signature is legally binding, complying with the ESIGN Act. The document will be a self-contained single signature complete part-petition.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON this 5th day of June 2020.

/s/Luke Mayville

Declaration of Luke Mayville-    p12

## SIGN OUR OFFICIAL PETITION TO INCREASE FUNDING FOR K-12 EDUCATION. IT ONLY TAKES A COUPLE OF MINUTES.

DUE TO COVID-19, WE ARE COLLECTING SIGNATURES ELECTRONICALLY TO QUALIFY OUR K-12 INITIATIVE FOR THE BALLOT, AND WE NEED YOUR HELP!

PLEASE FILL OUT THE FORM BELOW. AFTER YOU FILL OUT THE FORM, YOU WILL BE REDIRECTED TO A SITE WHERE YOU WILL SIGN THE OFFICIAL PETITION.

**Name** *

First Name    Last Name

**Street Address** *
Where you're registered to vote

**City or Zip Code** *

**Date** *

**County** *

**Last 4 Digits of SSN**
This helps the county confirm your identity to verify your signature.

**Email** *

I AM A REGISTERED IDAHO VOTER AND I WANT TO SIGN THE PETITION TO INCREASE FUNDING FOR K-12 EDUCATION

Declaration of Luke Mayville-    p13





Declaration of Luke Mayville- p14





Declaration of Luke Mayville- p15





Declaration of Luke Mayville- p16



Declaration of Luke Mayville- p17