# EXHIBIT H

REPLY IN SUPPORT OF EMERGENCY MOTION UNDER
CIRCUIT RULE 27-3 FOR STAY PENDING APPEAL

1      **UNITED STATES DISTRICT COURT**

2          **DISTRICT OF IDAHO**

3   RECLAIM IDAHO, an Idaho          ) Case No. 1:20-cv-00268-BLW
    political action committee,      )
4   and LUKE MAYVILLE,               ) **MOTION HEARING**
                                     )
5              Plaintiffs,           )
                                     )
6          vs.                       )
                                     )
7   BRADLEY LITTLE, in his official  )
    capacity as Governor of Idaho,   )
8   and LAWERENCE DENNEY his         )
    official capacity as Idaho       )
9   Secretary of State,              )
                                     )
10             Defendants.           )
    _____ )

11

12          **TRANSCRIPT OF VIDEO CONFERENCE PROCEEDINGS**
            **BEFORE THE HONORABLE B. LYNN WINMILL**
13            **TUESDAY, JUNE 23, 2020; 2:00 P.M.**
                  **BOISE, IDAHO**

14

15  **FOR PLAINTIFFS**
        Deborah Ferguson
16      Craig H. Durham
        FERGUSON DURHAM, PLLC
17      223 N. 6th Street, Suite 325
        Boise, ID 83712
18

19  **FOR DEFENDANTS**
        Robert A. Berry, Deputy Attorney General
        Civil Litigation Division
20      OFFICE OF THE ATTORNEY GENERAL
        P.O. Box 83720
21      Boise, ID 83720-0010

22  Proceedings recorded by mechanical stenography, transcript
    produced by computer.
23  _____

24          **TAMARA I. HOHENLEITNER, CSR 619, CRR**
            FEDERAL OFFICIAL COURT REPORTER
25      550 WEST FORT STREET, BOISE, IDAHO  83724

2

```
1                        I N D E X

2                    JUNE 23, 2020

3
     Date       Proceeding                                  Page
4

5    6/23/20   Motion Hearing
               Argument by Ms. Ferguson........................  6
6              Argument by Mr. Berry........................... 19
               Argument by Ms. Ferguson........................ 32
7              Argument by Mr. Berry........................... 35
               Court's comments and ruling..................... 37
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S

 2                        June 23, 2020

 3        (Roll call taken.)

 4            THE CLERK:  The Court will now hear Civil Case 20-268,

 5   Reclaim Idaho vs. Bradley Little.

 6            THE COURT:  All right.  Counsel --

 7            Jamie, I assume I'm unmuted; is that correct?

 8            THE CLERK:  Yes, Judge.

 9            THE COURT:  I think she's always wanted the ability to

10   mute me, and Zoom has given her the opportunity.

11            Counsel, good afternoon.  This is the time set for the

12   hearing on oral -- and oral argument on Plaintiffs Reclaim Idaho

13   and Luke Mayville's motion for preliminary injunction against

14   the Defendants Idaho Governor Brad Little and Secretary of State

15   Lawrence Denney.

16            Counsel, I think we will give each of you 20 minutes

17   total for argument, and reservation of time for rebuttal is, of

18   course, permitted.

19            I should point out, Counsel, I -- I may try to rule

20   from the bench because time is of the essence.  We started

21   working on a decision but, obviously, could not draw any final

22   conclusions.  It was more a matter of just familiarizing myself

23   with the law.  And I think I have successfully done that up to

24   this point.

25            So if possible, I intend to rule from the bench, but
```

1    there will be a written decision issued regardless because of

2    the public interest in this matter.  I think any member of the

3    public should be able to access the Court's decision, no matter

4    which way I come down.

5         For anyone who may have joined us late, let me remind

6    you that you must keep your phone on mute.  Ms. Gearhart has the

7    ability to mute you, but I notice people popping in, and it

8    looks like your phones -- I can hear some background.  So I'm

9    assuming there are still some people out there whose phones are

10   not on mute.

11        So please do that, and only unmute your phone if you

12   have been called upon to address the Court.  Even if you have

13   something you want to say, it's not going to be permitted; only

14   the attorneys will be allowed to argue today.

15        Counsel, I understand that there is -- well, I

16   understand that Ms. Ferguson will be arguing for the plaintiff

17   and Mr. Berry for the defense.

18        I'll give you some preliminary views on -- that I have

19   on this matter; not that it's an indication of a final decision

20   at all but simply to note -- in fact, Ms. Henderson and I were

21   discussing this case last week, and I was a little bit skeptical

22   of the plaintiffs' claims.  And frankly, I think I had forgotten

23   my own handling of the case involving the initiative process

24   and -- that went up on appeal to the Ninth Circuit.

25        I had forgotten those standards of law.  But in

5

1     general, the initiative process, once the state agrees to offer

2     it, is subject essentially to the same rules and standards that

3     would apply to an election process. It invokes or involves the

4     same First Amendment issues: the right to participate in the

5     government, to petition the government, and simply participate

6     in the electoral process.

7           So from that point of view, I -- I think the

8     Ninth Circuit's decision in I think it's the *Angle* case provided

9     us the framework.

10           Counsel, we're still having problems. Particularly

11    someone whose phone number ends in 095 keeps coming through. If

12    you would either mute your phone or else just terminate the

13    call, because it is disrupting our ability to proceed.

14           Okay. So I think beyond that, there is probably not

15    too much need to address the issue. I know standing is a matter

16    of concern, so you may want to address that. I think the other

17    serious issue is whether this is a substantial or severe

18    restraint on the initiative process.

19           So my mind is open. I -- I've gone back and forth on

20    this. It is a -- always a challenging issue. I was surprised

21    by the number of cases that have arisen just in the last two

22    months on this very issue in courts around the country.

23           I guess that's -- all right. Now we have a phone

24    ending in 152 which is coming through. So please mute your

25    phone, everyone. And if you don't, we'll have to not allow

6

1    anyone from the public to participate and hear the discussion.

2            All right.  So with that, Ms. Ferguson, I'll hear your

3    argument.

4            MS. FERGUSON:  All right, Your Honor.  I'm going to

5    stand up because I have never done an oral argument sitting.

6            THE COURT:  You do not have to.  I'm not going to -- I

7    actually debated whether to put my robe on or not.  I finally

8    decided I should.  But this -- don't feel the need to stand; but

9    if you want to, you can as well.

10           MS. FERGUSON:  Okay.  I feel a little more on my feet

11   that way, so I think I will.

12           Your Honor, Reclaim Idaho is a grassroots movement of

13   Idaho volunteers.  And they are seeking, as you know, reasonable

14   accommodation from the Court to protect their core political

15   speech, a fundamental right under the First Amendment which is

16   entitled to (inaudible) of protection by the court in our

17   democracy.

18           And since the filing of this expedited preliminary

19   injunction, the virus's grip on Idaho and the world has only

20   become more severe.  In Ada County just yesterday, the CDH

21   announced a 500 percent increase in cases in the past three

22   weeks, Stage 4 being rolled back to Stage 3.  And we know now

23   the virus is being spread in -- by community transmission, not

24   from just the outside world.

25           So we have had over 120,000 Americans die because of

7

1    this disease, which is truly horrific.  And I –– and there is a

2    reason, of course, that we're not in your courtroom as we

3    normally would be and are, instead, here participating

4    electronically.  And that's the same reason that no in-person

5    signatures-collecting is possible at this time.

6              THE COURT:  Ms. Ferguson, let me ask a couple

7    questions.  It really goes to the end –– probably what you're

8    going to talk to at the end of your argument; that is remedy.

9    Adding 48 days or whatever the number is you've requested is

10   probably not going to change a whole lot standing by itself.

11             Is that fair to say?

12             MS. FERGUSON:  Yes.

13             THE COURT:  Okay.  So –– and then, of course, that

14   does two things.  One is it does strike a question of remedy,

15   but it also may call into question whether this is really caused

16   in any way by the state or is simply an act of God that –– you

17   know, stuff happens.  And if it happens in the middle of an

18   election, that's unfortunate, but that's what occurs.

19             Now, I'm not suggesting that's my approach.  But how

20   do you respond to that argument that the problem here ––

21   although, again, the defendants argue it was your failure to be

22   proactive and anticipate issues.  But even putting that aside,

23   how do you respond to the fact that this is the result of a

24   coronavirus, nothing the governor or the secretary of state did

25   or did not do?

8

1          MS. FERGUSON:  Well, certainly, it is the result of a

2    coronavirus.  And it's required an incredible response both of

3    the government and of its citizens.  And that's the reason

4    Governor Little issued a proclamation to allow the May primaries

5    to proceed for the first time in the state's history with

6    (inaudible) polling places.

7          So I think it is -- it's certainly both a combination

8    of -- with the government restrictions.  And we are not critical

9    of those restrictions.  In fact, I want to take just a moment to

10    say we applaud his leadership, that he was protecting -- he

11    declared an extreme emergency and shut down life as we knew it,

12    but he did it in order to protect our lives.  So that's --

13    that's commendable.

14          But there is -- our democracies allows these core

15    fundamental rights regardless of a public health emergency.  And

16    what we need to do instead of just saying, "Okay, we'll do

17    elections but we're going to snuff out the initiatives," is

18    to -- this is also a core political speech and a right that

19    is -- should be given the highest level of protection.

20          So what we need -- and I certainly will get to this in

21    detail -- is the remedy of how do we address what I think are

22    clear First Amendment constitutional violations of Reclaim's

23    right in this context to exercise core political speech.

24          And the fact that the governor recognized it in the

25    context of an election, and Your Honor mentioned in opening

1    remarks that these rules apply both to initiatives and

2    elections, he has recognized it by his proclamation and the

3    importance of it.  So we're saying this is also, you know,

4    extremely important, and it should be entitled to the same

5    protections.

6        You know, so I think we have to look at the state

7    action here and the coronavirus and -- and what the state has

8    done.  This would be strictly construed against the state, and

9    we have to -- that's a very hard standard for the state.  Is the

10   state narrowing -- narrowly tailoring its response?  And I'd

11   say, no, it's not a narrow tailoring; it's no tailoring at all.

12   They have just refused to engage in -- in any kind of reasonable

13   accommodation for Reclaim.  And that -- you know, that is just

14   unacceptable, unlawful.

15       Now, I -- I want to talk about the diligence of

16   Reclaim Idaho, because I think that it -- it goes to that

17   standard, and it also goes to remedy.  They have shown

18   extraordinary diligence in their pursuit of this initiative to

19   Invest in Idaho's K through 12 education.  We have dubious

20   distinction of being the bottom of the barrel in the country,

21   50th place for the amount we spend per capita on our children,

22   their public school education.

23       So this diligence, I think it's best -- it's -- a good

24   framework to consider it is in three separate stages:  What did

25   Reclaim Idaho do initially before COVID changed our lives?  What

1       did it do once it arrived in Idaho?  And what is it doing now?

2               So with that framework, I would say before COVID, we

3       have provided to the Court sworn declarations with great detail

4       of the amazing efforts that they've put forward to bring this

5       initiative.

6               They have assembled literally an army of Idaho

7       volunteers.  Unlike most initiatives in the country, these are

8       not paid collectors.  These are dedicated volunteers who are

9       doing this for all the right reasons.  And they doubled their

10      signature collection from February to March.  They went from

11      15,000 to over 30,000.

12              And I think that a very compelling data point is if we

13      look at their track record and their extraordinary actions in

14      getting the Medicaid expansion on the Idaho ballot, I asked

15      Mr. Mayville to go back and tell me:  Where were you with that

16      successful initiative back in mid March?

17              And he said:  With this initiative, we were further

18      along.

19              So I think the evidence of diligence is really

20      overwhelming.  And there is a very important point here that I

21      think otherwise might escape notice.  And that is momentum in

22      this initiative with volunteers means everything.  If you had

23      paid gatherers, you might look at one month being relatively

24      equivalent to the other because it's just a matter of them

25      wanting to earn the money to get the signatures for the

1    paycheck.

2         Here, it's a matter of commitment, dedication, and

3    momentum is -- is everything.  And the Court needs to understand

4    that in crafting a remedy that those last seven weeks were

5    absolutely crucial for the success of this initiative that had

6    already come so very far.

7         So let's go to the next stage.  What happened and how

8    did Reclaim respond when the virus arrived?  Well, like everyone

9    else, we didn't know really what COVID was about, and they

10   immediately adopted precautions to protect their volunteers and

11   the public -- masks and gloves and whatnot.

12        And when it seemed that even that might not be enough,

13   they feared for the life of the initiative.  Their executive

14   director, Rebecca Schroeder, went to and contacted the

15   governor's office, had repeated contact, four contacts with a

16   senior advisor of the governor and basically was shuttled off

17   early on to go ask the secretary of state.

18        They were shut down there.  They went back to the

19   governor.  They were shut down with any reasonable

20   accommodations.  They even tried at that point, since the

21   legislature was still in session, the idea that -- Mr. Mayville

22   said:  Maybe I could draft a proposed bill and to see if we

23   could get any reasonable accommodations on that front.  That was

24   quickly shut down by -- and they weren't interested in

25   entertaining it.

1          They realized, at some point then, the danger to the

2     public to continue to circulate among it and collect signatures

3     was just far too great.  It was also too great for the

4     volunteers, that army of volunteers, primarily senior citizens,

5     who are -- you know, have extra exposure and risk of death from

6     COVID.

7          So once that became clear, it really forced a

8     suspension.  This occurred after the governor had

9     initiated -- declared a state of emergency and then extreme

10    emergency.  And then there was the shelter in place, and that

11    became a misdemeanor to try to -- to attempt to collect

12    signatures or to leave our homes during those many weeks.

13         And so that brings us to:  What's Reclaim doing now?

14    And there was a real tone of criticism from the state in its

15    brief that Reclaim should have brought this lawsuit sooner.

16         And I would -- I would say this can't be viewed in

17    some bubble or isolation.  This is being brought during the

18    middle of the pandemic and the shutdown.

19         Like the courts, our law office here was closed, and

20    Mr. Durham and I worked from our respective homes at makeshift

21    offices.

22         I was contacted by Mr. Mayville on a weekend as he

23    described the situation of the initiative, and there was a big

24    ask:  In the middle of this pandemic, while you're working from

25    home, already trying to just patch through our clients and

1    cases, would you take on a big case, would you put your other

2    cases aside for a few weeks, and would you do it pro bono?

3    So we -- we thought this -- that we should, that their

4    diligence and perseverance in this matter was remarkable, and we

5    saw the justice of their cause.  But I don't think there should

6    be any criticism that the case wasn't filed sooner.

7    The real heart of the case, as the Court had mentioned

8    in those opening statements that Your Honor made, is I think the

9    remedy and how the Court will correct this violation.

10   You know, we have proposed, really, three different

11   paths forward.  And one -- and it's the simplest -- and that is

12   the Court could order the state to accept the signatures already

13   collected by instituting lower standards, at a 2 percent rate of

14   registered voters rather than 6.

15   THE COURT:  Let me ask about that.  I understand that

16   you had submitted roughly 11,000 ballots -- or excuse me --

17   11,000 certified signatures as of -- was it March 18th when you

18   ceased collecting them -- and that you had another 20,000 that

19   had not yet been certified.

20   MS. FERGUSON:  Verified; right.  Yes.

21   THE COURT:  All right.  So the -- typically, what is

22   the certification rate -- successful certification rate?  Is it

23   80 percent?  90 percent?  What was it for that 11,000 that were

24   submitted, do you know?

25   MS. FERGUSON:  Okay.  Close to 80 percent, which is

1    considered, for initiatives, very high.  And what --

2            THE COURT:  Let me just go ahead and ask so I can

3    follow up, because your time is kind of limited.

4            So using that, we would assume there might be then

5    16,000 signatures on top of the 11,000.  So that would be

6    roughly 27,000, which is almost exactly half of what you need.

7            MS. FERGUSON:  Well, no, Your Honor.  The -- let me

8    make the distinction.  The -- the 11-some thousand were already

9    verified.  And so that -- that's a firm, good number.  And so we

10   would apply the ones that would be filtered through that might

11   be some falloff on those that had been collected but not yet

12   verified, the 23-, 24,000.

13           THE COURT:  We're on the same page, because I added

14   11,000 to 80 percent of 20,000, or 16,000 --

15           MS. FERGUSON:  Yes.  Thank you.

16           THE COURT:  -- and came up with roughly -- I shouldn't

17   test my math here, but roughly 25-, 26- -- 27,000, which would

18   be just about half, because you need 55,000 statewide and then,

19   of course, broken down by counties as well.

20           MS. FERGUSON:  Yes.

21           THE COURT:  So we're -- by your estimation, we're

22   roughly halfway there; correct?

23           MS. FERGUSON:  Yes.

24           THE COURT:  Okay.  I just asked that because I'm

25   trying to get some sense of how much damage -- just directing

1      the state to accept the existing submissions as sufficient, what

2      that would do, but it would be basically requiring the state to

3      cut the requirement in half?

4          MS. FERGUSON:  It would.

5          But I think what I would like to interject in that

6      regard is Idaho already has one of the most onerous and

7      difficult initiation processes in the country.  So this is

8      not -- and that's because -- I don't want to get too down deep

9      in the weeds here -- but that's because the -- it is based on

10     the percentage of registered voters and not on the voters who

11     had cast ballots in the previous election.  So that's a much

12     bigger pool to get 6 percent from.

13         And also, I think what's crucial here -- and I don't

14     know that some of the other courts who have ruled on this issue

15     have grasped it -- is that there is a tremendous increase in

16     signature gathering in the -- the final month, the final six

17     weeks; and even more so here, where we have a unique

18     signature-gathering group of volunteers instead of, you know,

19     paid circulators.

20         So, you know, I think the state may come back and say:

21     Well, to just accept the signatures, you know, is a pass.  But

22     it is -- I would say it is hardly a pass.  This is -- it's

23     justified by the extreme diligence that Reclaim Idaho has

24     already shown and their proven track record of getting this

25     done, the fact that they were on a total trajectory to make this

1      goal.  And under this -- this possibility of remedy, we're not

2      putting any additional burden on the state.

3            And it certainly, with 33,000 collected signatures,

4      shows way more than just a modicum of support.  33,000 Idahoans

5      have asked to see this on the ballot so it could be the subject

6      of debate and -- and political conversation.

7            THE COURT:  Ms. Ferguson, you've used 16 minutes of

8      your time.  And I'm -- I'm thinking maybe I was unfair in that

9      time allocation.  We may need to just give you more time, to

10     both sides.

11           But if we expand it to 25 minutes, I -- if there

12     is -- I just want to give you fair warning.  If you want to

13     reserve some time, you can do so.  Is there anything -- and also

14     give you fair warning that maybe we ought to make sure we

15     address the law as well.

16           I'm pretty familiar with the facts.  I have read

17     fairly carefully everything that's been submitted.  So

18     applying -- you know, I've suggested using the *Angle* standard

19     from the Ninth Circuit but applying that -- and you pretty much

20     addressed the first prong, which is kind of a comparison of the

21     diligence shown.  The second is the limitation on --

22           MS. FERGUSON:  Right.

23           THE COURT:  Yeah.  So could you address that?

24           MS. FERGUSON:  Yes.

25           So the burden being severe, it's kind of ironic

```
1       reading these -- these cases, reading Angle and other cases

2       about initiatives when they arise in the context of the

3       government, state legislatures making it more difficult and then

4       the courts grasping -- you know, looking at, you know, how

5       severe is this burden.

6               Well, we have got a totally different paradigm here.

7       I mean, the burden with the stay-at-home order subject to

8       criminal misdemeanor penalties is -- is absolute.

9       It's -- it's -- it's severe.  So I don't think there is

10      any -- any doubt that this has inflicted just an incredible

11      burden and really made it impossible for Reclaim Idaho to

12      continue to get this important initiative on the ballot.

13              THE COURT:  All right.  One of the comments that were

14      made in the briefing was that the governor did not make an

15      exception for First Amendment activities.

16              I guess I was a little skeptical whether that would

17      have made any difference because just people -- well, I mean,

18      maybe it's belied by the fact that people were willing to go out

19      and protest, obviously, after the Black Lives Matter issue

20      arose.  But it's a little bit different to collect signatures

21      than to take to the streets to protest something as dramatic as

22      what occurred in Minneapolis.

23              (Inaudible) had exempted First Amendment activity from

24      his stay-at-home order?

25              MS. FERGUSON:  In all candor, no.  I don't think so.
```

1    I think that -- but I think the important take-home message is

2    that these volunteers shouldn't have to choose between their

3    physical safety and perhaps their life or expressing their First

4    Amendment rights.  I think there -- there should be a reasonable

5    accommodation made for these extraordinary circumstances, and we

6    don't have to have one or the other.

7         THE COURT:  One other question:  In terms of

8    irreparable harm, you know, it's -- I guess I'm echoing a

9    Chicago Cubs fan:  Wait until next year.

10        You know, why can't we just wait until 2022?  Being

11   from -- an ISU fan, the Idaho State Bengals pretty much we say

12   that every year as well.  But why not wait until 2022 and pick

13   up the mantle then?  Why does that not kind of undermine your

14   argument that it's irreparable injury that you're suffering?

15        MS. FERGUSON:  Well, it is irreparable because it's a

16   violation of our constitutional rights.  And that just

17   inherently is.  And this is an extreme -- a severe violation, an

18   extreme burden.

19        In terms of, on a practical matter, why not wait until

20   the next general election, two more years, this is a -- an issue

21   that Reclaim volunteers feels incredibly passionate about, as --

22   as witnessed by their diligence.  And the governor is already

23   talking about cuts that will take place, education.

24        So if we're already in last place in the country, we

25   feel that the need for this initiative is more pressing now than

1    ever.  And the response should not be, you know, like some of

2    our favorite sports teams, let's wait until next year.

3           THE COURT:  And I guess thinking about my analogy and

4    how bad the analogy was, assuming that you're successful in

5    getting it on the ballot, it passes, and it, in fact, has the

6    effect of law, presumably it will change the funding for

7    education and all the children attending school.  And delaying

8    that by two years means a -- two classes will leave the Idaho

9    public schools without the funding that your group thinks should

10   be made available.

11          So I assume maybe that's part of the argument, as

12   well, is the loss of a few years is a real loss for children of

13   Idaho.

14          MS. FERGUSON:  That's -- that's correct.  All -- all

15   children of Idaho who attend public schools K through 12.

16          THE COURT:  All right.

17          MS. FERGUSON:  And I think I will just reserve my

18   time.  I think I have about 5 minutes remaining.

19          THE COURT:  Yes, you do.  That's great.

20          All right.  Then, Mr. Berry.

21          MR. BERRY:  Thank you, Your Honor, Counsel.

22          You know, as a starting point, I just wanted to go

23   back up to the signature verification.  There was a question

24   about how many signatures would be rejected or accepted.  And

25   Phil McGrane has a different point of view.  If you look at

1    paragraph 10 of his declaration under Docket 8-1, it's

2    approximately 30 to 40 percent of signatures are typically --

3    typically rejected.  I just wanted to clarify that.

4         And also, in regards to this 2 percent, there was no

5    discussion about the geographic requirement as well.

6         THE COURT:  There was in the briefing.  I just

7    couldn't remember what it was.  I think they had completed the

8    percentage on five counties and had some nine more but felt they

9    were within a few hundred.

10        MR. BERRY:  Correct, Your Honor.

11        THE COURT:  I don't know the details, but I'm aware of

12   generally what the record shows.

13        MR. BERRY:  Yeah.  And I think -- I think five of

14   those were in Ada County, so with those legislative district

15   seats.  And I think there were a few up in northern Idaho, as

16   well, Boundary and Bonner.

17        So I think those are the ones that claim to have been

18   completed.  So, again, that's just -- the geographic scope is

19   out there, is a requirement.

20        So I thought maybe, Your Honor, if it may please you

21   just to kind of give you a brief overview of the facts as the

22   state sees them and then just kind of go into argument there.

23   I'll welcome any questions throughout this time.

24        But as a starting point, so really this process didn't

25   get started until October 25, 2019.  The state doesn't dictate

1    when these initiatives may start and when the collection --

2    signature-collection process begins.  They do provide a generous

3    18 months in which they can collect.

4          So -- and again, the window here which they gave

5    themselves is only six months starting from October 25th through

6    about May 1st.  And their declarations are that they back-load

7    everything so that they try to increase their efforts closer to

8    the deadline.  So that's what the declarations have stated.

9          But then I think in our briefing, what we tried to

10   point out, based upon the declaration of Mr. Mayville, the

11   volunteers, and the team members, is that by March 18th, they

12   had given up their efforts to -- with the petition process.

13         So there's been some direction at the governor's

14   office on communications that were made March 16th.  So if you

15   look at the declaration, basically the Exhibit A to that

16   declaration, it shows that there were a few emails the morning

17   of March 16th.  But really, there were no phone calls, there

18   were no letters, and there were just kind of some oblique

19   references to requesting a meeting with the governor.

20         In it, there is some reference to (inaudible)

21   signatures; but, you know, it's a lot different than what we

22   have been presented in this case through the complaint and the

23   preliminary injunction.  This is a more detailed plan of what

24   they want, what they seek.

25         And so, you know, our contention -- and we submitted a

1    supplemental declaration by me today.  If you look at the Nevada

2    case -- and I will butcher the name of the secretary of state

3    there, so I'll just call it "the Nevada case," but it's the

4    Cegavske case.

5            If you look at the demand that they made there -- it's

6    Docket 125 -- you know, it's very detailed, it's very specific.

7    They cite authority.  They cite the specific relief they are

8    requesting.  And that was completely absent here.

9            I mean, again, all that we had was a few email

10   communications on March 16th to the governor's office and one

11   email to the secretary of state, who said he did not have

12   authority to alter the deadlines.

13           THE COURT:  Well, let me ask some questions on that.

14           First of all, you are not suggesting in any way that

15   the plaintiffs could have envisioned the pandemic coming down

16   the road?

17           You know, I -- I will tell you that it blindsided the

18   courts to some extent.  We -- I think we were a little slow on

19   the uptake as well.  But when we did start, I think we did

20   everything right from that point forward.

21           So you're not suggesting somehow that -- that the

22   plaintiffs' constitutional rights are forfeited because they

23   didn't act with complete diligence by requesting the full 18

24   months to solicit the ballots or the signatures or waiting as

25   they had on the Medicaid initiative to kind of back-load?  I

1     mean, the Constitution doesn't turn on that too much, does it?

2     I mean --

3            MR. BERRY:  No, Your Honor.

4            THE COURT:  -- there has to be some reasonableness in

5     the diligence that they have shown.  But if they have done it

6     successfully in the past, why would they think they needed to do

7     something different in this case?

8            MR. BERRY:  I guess the answer would be twofold.

9            I think the *Arizonans* case that we referred to, I

10    mean, it did cite the failure to take full advantage of the 18

11    months.  And that, true, the pandemic was not foreseeable; but

12    nevertheless, the Court was critical in that case of their

13    efforts to collect all their signatures.

14           THE COURT:  But -- but there is no reason to think,

15    under the facts of this case, that the plaintiffs were doomed to

16    failure; there is no way they were going to collect these names

17    by the deadline given their past track record.  I mean --

18           MR. BERRY:  Well, I can't say that.  I mean, there is

19    that old adage for stocks that past performance is no degree of

20    future success or future performance.  So I can't say that they

21    would have been successful.

22           I mean, this has been, I guess, their second

23    initiative process.  But before the deadline issues, I can't say

24    whether or not they would have been successful or not.

25           THE COURT:  All right.

1          MR. BERRY:  So what I kind of -- I think really, to go

2     back -- to go back to our laches argument, the two elements that

3     we've cited to are unreasonable delay and prejudice.  And in it,

4     you know, by March 16th, they knew that they were stopping their

5     efforts.

6          If you look at all the cases that we cited and they

7     cite, all of those plaintiffs filed TROs and preliminary

8     injunctions before the deadline expired to submit signatures.

9          So here, I mean, we're -- we're at a completely

10    different state.  All of those cases were prospective relief.

11    This is retroactive relief.  So they do claim that they didn't

12    have money to -- to hire an attorney at that time, and that's in

13    the Docket 9-2 paragraph 7 of the Mayville declaration.

14         But if you look at Docket 2-4, paragraph 20, they had

15    $17,000 that were available that they weren't using because they

16    had stopped their efforts.

17         So -- and another point, too, in the supplemental

18    declaration that Phil McGrane filed today by email, there is a

19    letter dated April 9th, 2020, and they asked Ada County not to

20    verify the signatures.

21         So, again, they had asked the counties to stop their

22    efforts to verify.  And so this is five weeks post deadline.

23    And now to go to the prejudice prong, you know, the state is

24    still planning for an August election and a November 3rd general

25    election.  So those -- those efforts are still ongoing.

1          And as Mr. McGrane notes, the difference here between

2     a normal petition is that May and June are very quiet, and so

3     that they are able to staff the signature verification; whereas

4     here, you know, they are still trying to prep for these

5     elections.

6          So we're -- my -- my hope is that we have good, safe,

7     clean elections.  And I don't want that to be fouled up.  So --

8          THE COURT:  Well, but clean, safe, don't we also want

9     to make sure that -- I mean, the point of elections,

10    particularly with the initiative process, is to encourage a

11    meaningful election in which people engage in ideas.  And if we

12    can have a good, safe, and clean election and one which will

13    allow ideas to be discussed in the public square by way of the

14    election process, then why shouldn't we?

15         MR. BERRY:  Well --

16         THE COURT:  Particularly in addressing the pandemic.

17         I'm not suggesting we throw all the rules out.  But

18    when we're facing a pandemic which nobody could foresee, nobody

19    knows what the future is going to hold, why can't we proceed and

20    honor the First Amendment rights of the participants and still

21    have a good, safe, clean election?

22         MR. BERRY:  Well, as -- you know, I can only point out

23    the difficulties in how the elections will be conducted if this

24    initiative process moves forward as requested by the plaintiffs.

25    So basically, it's a wholesale modification of the statutory

1      regime that's in place.

2              THE COURT:  Well, it is.  But one other option is just

3      simply to direct the state, since the plaintiffs were on track

4      based on their past performance to obtain the signatures, just

5      certify it and put it on the ballot.

6              We don't have to do anything wholesale.  We just make

7      that change where the Court reduces the percentage to

8      accommodate the First Amendment interests, and then all the

9      other schedule goes off without a hitch.

10             MR. BERRY:  Well, they still have to verify the

11     signatures.  They still have to verify that they're registered

12     voters.  There still is ongoing efforts that would be required

13     of the state.

14             And I take it, Your Honor, that's -- you're referring

15     to the Utah case?

16             THE COURT:  Yes.

17             MR. BERRY:  Okay.  So, I mean, those efforts would

18     still need to be ongoing.  And in that case, you know, they did

19     not -- the court I think reduced the percentage, but it did not

20     make a decision whether or not there were enough votes to be

21     certified to proceed to the election.

22             And so I don't know where we're at on this case

23     given -- it looks like there is 11,000 plus 20,000, which you

24     mentioned earlier.

25             THE COURT:  I think they said it was more like 23,000.

1    But regardless, they're not -- they don't have 55,000.  But

2    assuming a 70 or 80 percent certification rate, they are going

3    to be roughly half, I would guess, where they need to be.

4         MR. BERRY:  Your Honor, you also mentioned some

5    standing concerns that you had at the beginning of the argument.

6    And I think as we've noted, you know, the action here that

7    occurred by Reclaim Idaho predated any action by the governor or

8    the secretary of state.

9         So they stopped their actions and initiative efforts

10   before any action by the state.  And so in order to have a

11   First Amendment violation, you do have to have a state action.

12        And if you look at the declaration of Mr. Mayville,

13   the supplemental one, at paragraph 17 through 22, he even

14   mentions that.  Even if the deadline were to be extended in that

15   the in-person signature requirement were to be reinstated, they

16   would not do that because of the COVID-19 pandemic.

17        So again, it's not anything that the state did.  But

18   given their statements by Mr. Mayville, the volunteers, and the

19   team leaders and subsequent statements by Mr. Mayville, you

20   know, the action here is due to COVID-19 and not to anything

21   that the state has done.

22        THE COURT:  Well, it's true.  But, you know, the same

23   thing could be said of a hurricane that wiped out all of the

24   normal processes for handling elections.  And if it is possible

25   for the state to modify its processes and allow the election to

1    go forward, wouldn't the First Amendment require and, in fact,

2    convey standing upon a voter who was deprived of a chance to

3    vote because of a hurricane?  And why is this any different?

4          If there is an option available to address a situation

5    which would otherwise kind of disenfranchise either a voter or

6    an initiative promoter from being able to exercise their First

7    Amendment rights, shouldn't the state be required to adopt

8    whatever process would, in fact, enable the state to protect

9    those constitutional rights?

10         MR. BERRY:  So I think it depends upon the process

11   that you're talking about.  There's been multiple processes that

12   the plaintiffs have suggested to the Court.

13         Again, you know, by Constitution, the legislature gets

14   to set forth what the processes are for the initiative.  And if

15   one of the suggested things that have been proposed by the

16   plaintiffs are this electronic signature, you know, that's a

17   process that's not been contemplated by statute that would --

18   that would be a wholesale rewriting of what Idaho has relied

19   upon since 1933.  So --

20         THE COURT:  Well, I understand that.  But hasn't the

21   governor been willing -- and I don't recall precisely.  We dealt

22   with this a month ago or so on extending the time for requesting

23   absentee ballots.  But, you know, the governor's order just

24   allowing a primary election to go forward by write-in ballots --

25   or excuse me -- absentee ballots and allowing -- again, maybe

1    you can correct me here, but I thought even the process of

2    online registration was a little -- was again some concessions

3    made.

4            Hasn't the governor been able and willing to make some

5    changes in the statutory process to account for the COVID-19

6    pandemic?

7            MR. BERRY:  I'm not fully certain.

8            I mean, so what he -- so the way I understand it,

9    Your Honor, is we have already got an existing title.  It's

10   Chapter 10 Title 34 that, you know, basically allows for

11   absentee ballots.  So I think he was able to fold -- use the

12   existing authority to fold the primary into that.

13           THE COURT:  But he eliminated in-person voting?  And I

14   could be wrong.  I thought that's what happened during the

15   May -- or the primary election.

16           MR. BERRY:  Well, I know that people could still

17   do -- there were certain locations where they could do in-person

18   voting, but you're right.  There were less -- there were less

19   places where people could do it in person.  It was strongly

20   encouraged to go all absentee.

21           THE COURT:  Okay.

22           MR. BERRY:  So -- and the other thing, too,

23   Your Honor, if you look at the supplemental declaration of

24   Mr. Hancock, he does point out, you know, that there is

25   different authenticating factors that the state used to get the

1     absentee ballots.  You know, they used four authenticating

2     factors: social security, date of birth, driver's license

3     number.  And then once that request came in, then a mail-in

4     ballot was sent to the voter, and then the voter had to

5     physically sign their signature and return it to the clerk.

6          So there is four authenticating factors that the state

7     used to make sure that fraud did not occur.  And again, that's

8     one of the bigger issues with this whole new system with

9     DocuSign.  There is only perhaps one authenticating factor, and

10    that's social security number.  All the other information is

11    public information.

12         So it's -- it's not contemplated by statute.  It's a

13    wholesale revision of how the state has operated the initiative

14    since '33.

15         THE COURT:  Mr. Berry, let me -- there is also one

16    other major difference here.

17         In the electoral process, we're talking about

18    verifying that someone actually is who they say they are and to

19    make sure that they -- that the vote that is being cast is

20    legitimate.

21         Here we are talking about signatures on a process to

22    put something on the ballot.

23         MR. BERRY:  Yes.

24         THE COURT:  Doesn't that -- and the worst thing that

25    can happen is that something ends up on the ballot that maybe

1    shouldn't have.  The people are allowed to vote; they can vote

2    it up, they can vote it down.

3           Isn't there a lot less risk in terms of our processes

4    and kind of the commitment we have to the statutory framework

5    that would apply in a straight-up election issue?  Because all

6    we're talking about is placing something on the ballot.

7           MR. BERRY:  You are talking about placing something on

8    the ballot, and the primary vehicle in which the state has

9    authenticated that the people who are signing to get that on the

10   ballot has been the signature process for almost 100 years.

11          So, you know, that is one of the mechanisms in which

12   the state does ensure that, you know, there is integrity in the

13   initiative process.  So that's -- frankly, DocuSign is not

14   clear.  There is issues that we have identified of signatures --

15   electronic signatures not being counted.

16          So -- so, I mean, to your point, though, Your Honor,

17   yes, the initiative process is to -- an attempt to get

18   legislation to the people through the initiative process.

19          THE COURT:  Okay.

20          MR. BERRY:  So, Your Honor, I started at 2:27.

21          THE COURT:  I lost track of the time, we were having

22   so much fun.  I thought --

23          MR. BERRY:  Is it possible to reserve just perhaps

24   some small rebuttal or --

25          THE COURT:  Yeah.  I'll give you a couple minutes to

1    respond to whatever Ms. Ferguson may come up with.

2              MR. BERRY:  Okay.

3              THE COURT:  All right.  Ms. Ferguson.

4              MS. FERGUSON:  Your Honor, I want to spend a little

5    time just talking about the state action that creates the

6    standing here, and it -- there's several prongs to it, I think.

7              It's the combination of the coronavirus and the state

8    strictly enforcing its statute.  And if the state was going to

9    make reasonable accommodations in the midst of this global

10   pandemic, you know, that would be a different story.  But there

11   hasn't -- that hasn't occurred.

12             And plus, although Reclaim did not hire a

13   silk-stocking law firm to write a long demand letter of the

14   governor or the secretary of state, there is clearly a request

15   that was made with very articulate language about the fact that

16   their constitutional rights to perpetuate this initiative were

17   being violated.

18             And so basically, Reclaim asked the governor, Reclaim

19   asked the secretary of state, and they said no.  So this also

20   creates, I think, the standing.

21             And other cases have found state action on less or

22   similar activities of the state here.  I'm thinking of *Fair Maps*

23   or *Shawarma Media*.

24             And further, the -- the dates -- the emergency order

25   went into effect on the 18th of March.  So I think all of those

1    things prove that we have -- we have standing as a plaintiff,

2    and there was, in fact, state action.

3         The -- I want to clear up a fact.  There was one --

4    there was no -- Your Honor was correct in that there was no

5    in-person voting in the primary election.  Perhaps the confusion

6    is being caused by the fact that if someone wanted an absentee

7    ballot, they could go in person to obtain it.

8         So there is a little bit of personal contact if, you

9    know -- but no open polling places.

10        And I think Your Honor brought up an important point

11   about -- with the initiative process, it is different than

12   something appearing -- voting on -- just voting on the ballot.

13   And the Supreme Court picks up on this in the *Meyer* case and

14   says it is -- the threat of fraud or corruption is more

15   attenuated at the signature and gathering stage of an initiative

16   than it is when you're talking about fraud right at the ballot

17   box.

18        Because it is -- clearly, if -- what we want here --

19   Reclaim is asking for the right to get this on the ballot to

20   have public discourse about it and people to make up -- the

21   citizens to vote it up or down depending on their own

22   preferences.

23        The -- some of the statistics about verification

24   rates -- and my colleague mentioned that 30 to 40 percent are

25   rejected, per his declaration.  That isn't the case with

1    Reclaim.  Their -- their verification correctness rate is in the

2    80s.  And the reason that is so is that they spend a few hundred

3    dollars a month for an app, and that's on every volunteer's

4    phone.  And after they collect signatures, they can go home,

5    they can enter the data into the application online to verify

6    the signer's address and the fact that they are a registered

7    voter.

8         And if Reclaim sees that they have collected

9    signatures that aren't going to pass muster, they strike them

10   then.  But by doing this, taking this extra diligence and extra

11   responsibility in their own process with these good volunteers,

12   they get rid of a lot of the flack.  So they don't have a 30, 40

13   percent rejection rate.

14        The -- you know, a small point and it's that -- I

15   think -- and maybe this is a matter of nomenclature, but

16   Ada County didn't ask or -- Reclaim, through its field director,

17   didn't ask Ada County to stop verifying petitions.  What I found

18   sort of questionable about the declaration is what it -- what it

19   didn't say.

20        It appears, even though Reclaim had been delivering

21   signature petitions to Ada County Clerk since November of last

22   year, they made deliveries in November, December, January,

23   February, and March.  And when April rolled out and we're in the

24   midst of the pandemic, it appears that they haven't even begun

25   the verification process, despite the fact that they have

1  had -- they have now 10,000 -- approximately 10,000 signatures

2  they hadn't begun verifying.

3          So I would just say:  I know they are busy.  I know

4  they are good people and fine public servants.  But if they have

5  not engaged in the process for six months, I don't think that

6  should be pushed back on -- on Reclaim.  It wasn't Reclaim's job

7  to verify them.

8          Does Your Honor have any questions of me?

9          THE COURT:  No.  That's fine.  Thank you.

10          MS. FERGUSON:  Okay.  Thank you.

11          THE COURT:  Mr. Berry.

12          MR. BERRY:  Thank you, Your Honor.

13          So I guess, you know, I just -- if you look at the

14  evidence that's been submitted by the plaintiffs, you know,

15  there really -- there is -- there is no further evidence on what

16  they did post March 16th to further their petition.  The

17  deadline passed.

18          And again referring to this email from Ashley Prince,

19  who is the field director, you know, on April -- on April 9, she

20  says:

21          "Due to the remaining time available to us per Idaho

22          election code, we will not meet the deadline to

23          qualify this petition for the 2020 ballot.  Under the

24          circumstances, we are not asking the Ada County

25          Elections Office to validate signatures we have

1             received from our campaign."

2             So that's really the only communication between March

3      16th, when they decided to suspend their petition, and then from

4      the time that we get notice of this lawsuit.

5             So that's -- that's one thing.

6             And then I guess I want to go back to this we

7      didn't -- there was no accommodation.  Again, if you look at the

8      emails that were submitted -- and I apologize, Your Honor; I'm

9      blanking on her name, but it's at Docket 2; I think it's

10     Schoefield -- you know, there is no explicit request.  And you

11     contrast that with the Docket 125 from the Nevada case -- which,

12     again, is very explicit, very clear in the relief that they are

13     seeking -- and it's directed straight to the secretary of state,

14     not to some other staffer.

15            So the relief there is direct, and I think it's

16     meaningful in what they are trying to ask and what are they

17     trying to get done.

18            So -- and I go back to Mr. McGrane.  Mr. McGrane has

19     been the clerk for a long time.  He may not have been the

20     Ada County Clerk.  He was at least within the office prior to

21     that, and he has a lot of experience in how these initiatives

22     are handled and how they are verified and whether or not they

23     will pass muster.

24            So I would defer to our county clerk who has the

25     experience in handling the elections on that.

1         And again, this is one of those -- I know you liken

2    this to a hurricane, Your Honor, but they knew the deadline was

3    coming; they stopped.  And I have always been under the

4    impression that when rights are at issue, you don't sleep on

5    those rights.  You fight for them and you try to protect them.

6         So now that we are five weeks past the deadline, it --

7    it -- again, it goes to the harm now that will be caused to

8    other election officials throughout the state to have to verify

9    and handle a potential recount -- or a petition while they are

10    preparing for the August and November elections.

11         So that's -- that's the closing, Your Honor, that I

12    would offer.  I do feel that Mr. McGrane has put forth the harm

13    that would happen throughout the state should the relief be

14    granted.  And certainly, to alter the signature deadline in a

15    manner that isn't contemplated by statute is extraordinary.

16         THE COURT:  All right.  Well, thank you, Counsel.

17         Bear with me for a minute.  I think I really do need

18    to rule from the bench.  Time is of the essence in this case

19    almost like no other, because there are so many things that have

20    to be done between now and the fall election to have this put on

21    the ballot.  It's the kind of thing that just simply can't wait.

22         Now, for that reason, I am going to rule from the

23    bench.  However, we are going to try to issue a written decision

24    by sometime later in the week, which will hopefully address some

25    of the more technical issues that I'm not going to be able to

1    address here on the record.

2         First, I'm not going to spend any time going through

3    the background of what occurred here.  The record is well

4    developed that the parties have submitted, including even

5    matters submitted earlier today.  So I think I'm going to just

6    jump right into it.

7         We will spend more time in the written decision we

8    issue laying out the facts.  But let me just indicate that I

9    have read, I think, everything that has been submitted.  And so

10   I think I am prepared to rule.

11        The first issue is the one of standing, and that is

12   the plaintiffs -- whether the plaintiff has met its burden of

13   establishing that it suffered an injury-in-fact that is an

14   invasion of a legally protected interest which is concrete and

15   particularized, actual or imminent, and not conjectural or

16   hypothetical; that the injury is fairly traceable to the

17   challenged action; and third, that it is likely as opposed to

18   merely speculative that the injury will be redressed by a

19   favorable decision.

20        I think the first and third elements are clearly

21   established here.  The only serious question is whether the

22   injury -- that is, the inability to complete the initiative

23   process -- is fairly traceable to the challenged action.

24        I think that while certainly the state -- the

25   defendants have made, I think, a valiant argument in that

1    regard, I think it is clear that the plaintiffs were collecting

2    signatures until the COVID-19 pandemic hit, and this made it

3    impossible to collect signatures in person.

4         The evidence also shows, absent a preliminary

5    injunction, that the plaintiff will be unable to get the

6    initiative on the ballot in November.

7         Moreover, if the Court were to grant either of the

8    remedies sought -- either extend the submission deadline and

9    accept electronic signatures or simply certify the initiative as

10   it has already been submitted -- that this would redress the

11   injury.

12        Now, of course, there is no question that the COVID-19

13   pandemic is at the root of all that occurred here. But what I

14   think is equally clear is that the governor and the secretary of

15   state -- you know, and I'm not going to fault them. They simply

16   stood on the statutory requirement. They may have felt that it

17   was their statutory and constitutional duty to do so. But it's

18   also clear that they have felt the -- that it was appropriate

19   and necessary to modify some of those election procedures in the

20   face of the COVID-19 pandemic.

21        So they clearly understood they had the ability to

22   address a problematic statutory requirement in the face of a

23   pandemic when necessary to protect a voter's right to exercise

24   their electoral franchise. Nothing less, I think, would be

25   required in the context of the initiative process.

1      As I noted at the outset, the state is under no
2    constitutional duty to provide an initiative process.  But when
3    the state does, as it has done in Idaho through a constitutional
4    provision, then it must provide that in a way which safeguards
5    the First Amendment rights of those who would participate in
6    that process.
7      And given that, I think it is clear that a request was
8    made.  It may not have been made as resolutely as the defendants
9    would argue.  But nevertheless, it is clear that a request was
10   made of the secretary of state and the governor's office to make
11   accommodations that would allow them to again exercise this
12   constitutional right.  And therefore, I think that does
13   constitute or satisfy the second prong of the standing
14   requirement.
15     Now, turning then to the other constitutional -- or
16   the other requirements that the Court has to address here, the
17   motion is brought under Rule 65; and as such, the Court has to
18   be convinced that there are four factors that have been
19   satisfied.
20     First, there must be some likelihood that the party
21   seeking the preliminary injunction will succeed on the merits of
22   the claim; second, the party seeking the injunction must show
23   that they will suffer irreparable harm absent the injunction;
24   third, the probability that granting the injunction will cause
25   substantial harm to others must be minimized; and fourth, there

1    must be some public interest advanced by the issuance of the

2    injunction.

3           Now, I have stated that as four requirements, which is

4    really a misnomer because no one factor is dispositive, but it

5    outlines the four factors that have to be considered.  And of

6    course, the Court must recognize that the injunction, and

7    injunctive relief generally, is an extraordinary remedy that

8    will only be granted if the plaintiffs show that circumstances

9    clearly demand it.

10          I would say that the second, third, and fourth

11   requirements are not as significant.  I think -- in this case, I

12   think what is clearly -- well, I don't want to say "not as

13   significant."  I don't think they are subject to much dispute.

14          The first requirement, whether or not the plaintiffs

15   are likely to prevail on the merits, I think is hotly contested;

16   and therefore, that's where I will spend most of my attention.

17          Although the courts generally have applied in the

18   electoral context the -- I'll call it the "Anderson verdict

19   framework" from two U.S. Supreme Court decisions.  I think in

20   this case, where we're talking about the initiative process, a

21   better standard is that which was adopted by the Ninth Circuit

22   in the *Angle* decision, and it was also adopted by Judge Du in

23   the District of Nevada in the *Fair Maps Nevada* case.

24          In *Angle*, the Ninth Circuit explained that the Supreme

25   Court has identified two ways in which restrictions on the

1    initiative process can burden core political speech.

2         First, regulations that restrict one-on-one

3    communications between petition circulators and voters; and

4    second, regulations that make it less likely that proponents

5    will be able to get enough signatures to place an initiative on

6    the ballot.

7         Now, it is somewhat interesting that the first of

8    those two is really not at play because the COVID-19 pandemic

9    has made it -- has probably done more to restrict one-on-one

10   communications than anything else.

11        But what is clearly at play is the second requirement

12   that the regulations must not make it less likely that the

13   proponents will be able to get enough signatures to place the

14   initiative on the ballot.

15        The Ninth Circuit in *Angle* also made clear that strict

16   scrutiny under the First Amendment must be applied when, first,

17   the proponent of the initiatives have been reasonably diligent

18   as compared to other initiative proponents and, second, when the

19   restrictions significantly inhibit the proponent's ability to

20   place an initiative on the ballot.

21        Now, that also -- at least the first of those two

22   requirements also runs directly into the defendants' laches

23   argument.  And so my comments on that really apply to both; that

24   is, did Reclaim Idaho demonstrate reasonable diligence in

25   collecting signatures.

1     I'm going to find that they were.  Now, I understand
2     that an argument can be made that they could have started 18
3     months earlier, that they back-loaded the process and intended
4     to really focus their activities in the last few months before
5     the deadline.

6          But I don't think the Constitution requires that
7     individuals exercising their First Amendment rights have to act
8     in a particular way, that they are precluded from
9     procrastination or that they must act in some object -- well,
10    almost subjectively reasonable manner by undertaking the process
11    very early and diligently and aggressively pursuing it early in
12    the allotted time.

13          Here, Reclaim had a track record.  They had
14    successfully pursued an initiative concerning the Medicaid and
15    the Affordable Care Act issue, which, frankly, was probably less
16    politically popular than an effort to obtain adequate funding
17    for Idaho's public schools.

18          They actually were ahead of the pace this time around
19    than they were when they sought approval or to get on the ballot
20    the issue of the Medicaid issue.  They had, I think, 5 districts
21    out of the 18 required legislative districts, had -- the
22    standard there had been met.  Seven additional districts were
23    very close.  They were probably at roughly 55 percent of what
24    they needed to obtain the required signatures and put it on the
25    ballot.  But, of course, all of that is a little uncertain

1    because they weren't allowed to complete the process.

2          So -- and it's true they did voluntarily stop before

3    the governor required it, but so did the federal court, so did

4    most law firms.  Everyone recognized that the pandemic was here.

5    I don't think anyone who was reasonable waited for the

6    governor's action, because we all knew that's what the governor

7    would do.

8          And so I think from that point of view, there is

9    really no reason to fault the plaintiffs for failing to be

10   reasonably diligent in pursuing the signatures as they did in

11   this case.

12         Then the second issue is whether the processes in

13   place as required by statute significantly inhibited the

14   plaintiffs' ability to place the initiative on the ballot.  And

15   I think the answer quite clearly is yes for this year, but it

16   would not be true for 2022.  And I'll try to circle back and

17   we'll talk about whether that fact bears upon the irreparable

18   harm requirement.

19         This case is about this election cycle, and that's all

20   I intend to talk about.  What I think is clear is that the

21   COVID-19 pandemic threw a wrench into the works.  It has also

22   created tremendous uncertainty.

23         Just, I think, today or maybe yesterday, the governor

24   announced that at least in Ada County, they are reverting back

25   to Stage 3 because of a spike in positive tests in that area.  I

1      know that Southeast Idaho has been affected by a similar spike,

2      and it is possible that we'll see these areas move backwards.

3           The point is that there has been a severe impact on

4      the plaintiffs' ability to obtain signatures.  And there was a

5      way out.  It was possible for the state, similar to what they

6      did in terms of moving the primary election, to complete

7      absentee ballots.

8           And actually, that is my recollection, as well, from

9      the hearing I had on that here about a month ago; that, indeed,

10      the movement was completely away from in-person balloting to

11      absentee ballot exclusively.

12           And the ability to make those kind of modifications, I

13      think, signifies that the state has that obligation when it is

14      necessary to protect a First Amendment issue which has been

15      adversely affected by circumstances beyond anyone's control.

16      Whether it's a hurricane or a pandemic, I think the legal

17      principles are the same.

18           Now, that doesn't change the fact that the state does

19      have a significant regulatory interest in how it conducts its

20      elections and what requirements it may impose on the initiative

21      process.  But those statutory requirements and regulatory

22      interests have to give way when I think there is a

23      constitutional issue at stake.  And that's what the Supreme

24      Court and the Ninth Circuit has indicated is involved in the

25      initiative process.

1          So since the state had the ability and, in fact, had

2     demonstrated that through the way it had conducted the most

3     recent primary election, there -- I think there has been

4     a -- there is a likelihood of success on the merits for the

5     plaintiffs; and therefore, some remedy has to be considered.

6          Addressing the other requirements under Rule 65, I

7     would indicate that clearly the irreparable harm standard -- we

8     had the discussion during oral argument about why not wait until

9     2022.  And I think the real answer lies in the fact that the

10    plaintiffs want -- seek a change in the law concerning the

11    funding of public education.  And this is one of those instances

12    where one could say that justice delayed would be justice

13    denied, or perhaps a constitutional delay in protecting a

14    constitutional right is a true denial of that right.

15         Two classes, presumably, two years -- a delay in this

16    process by two years will affect tens of thousands of Idaho

17    students, which has been the plaintiffs' concern here.  And

18    therefore, it strikes right at the heart of their advocacy under

19    the First Amendment.

20         The third requirement, I see no real harm to others,

21    as we discussed here.  This is not an issue in which I am

22    compelling in any way that the state approve what the proponents

23    of the initiative seek.  I am simply indicating that their

24    rights to have something placed on a ballot for the Idaho

25    citizens to vote on is -- is what needs to be protected.  And

 1       that will do harm to no one.

 2              And then finally, is there a public interest advanced

 3       by the issuance of the injunction?  I think that answer is

 4       clearly yes, really for the same reasons.

 5              So that really brings us to the issue of what remedy

 6       would be appropriate.  I've thought about that, obviously in the

 7       abstract since I didn't know how I would rule until after I

 8       heard oral argument.

 9              I am disinclined to tell the state how to run the

10       elections or the initiative process so as to comply with the

11       First and Fourteenth Amendment.  But I do think the First and

12       Fourteenth Amendment does provide some restrictions on what the

13       state can do in governing that process.

14              I have thought that simply extending the deadlines

15       would be an answer, but the uncertainty of the COVID-19 pandemic

16       makes that a -- no solution at all, really.

17              So I think there are really two possible solutions:

18       simply certify that the proposition based on the evidence in the

19       record that the plaintiffs were well on their way to obtaining

20       the necessary signatures and were, in fact, ahead of the pace

21       that they were on in their successful efforts to get the

22       Medicaid funding issue on the ballot, that the proposition just

23       needs to be certified and put on the ballot.

24              And again, realize that this is really a

25       limited -- would be a limited remedy since it would simply put

1    something on the ballot and do nothing more than that.

2         The other alternative is to permit online solicitation

3    for another -- I think it was 48 days -- whatever the number of

4    days were between the cutoff and the date in which they stopped

5    soliciting and allow online solicitation, collection, and

6    certification of signatures similar to the manner suggested by

7    the plaintiffs.

8         But frankly, I find that more problematic because I

9    think it does force the court to run the elections, run the

10   initiative process for the state, which I'm reluctant to do.

11        But I also understand that the state may have

12   reasons -- perhaps the relationship between the governor and

13   secretary of state and the legislature may be such a compelling

14   reason -- that they would -- that they would prefer to undertake

15   that substantial effort as opposed to simply allow

16   certification.

17        So what I'm going to order is that the state will be

18   given the choice, which they must exercise by week's end, to

19   either simply certify the initiative or inclusion on the general

20   election ballot or extend by the same number of days that we

21   discussed earlier -- I want to say 48 days -- and then allow

22   online solicitation, collection, and certification of signatures

23   similar to the manner suggested by the plaintiffs.

24        I wish it were possible to just extend the date and

25   still require in-person certification.  But as I noted, I don't

1    think that would be any remedy at all given the uncertainty and

2    the ongoing effects of the pandemic.

3              So that will be my decision, Counsel.  We will issue a

4    written decision hopefully more articulate than I have been able

5    to be here and will cover some of the other issues that I either

6    didn't talk about or just touched upon briefly in announcing my

7    decision.

8              I generally prefer to have time to write and reflect.

9    But in this case, I don't think that's going to be possible, at

10   least soon enough to get the parties started.

11             So that will be my decision.

12             Any questions, first of all, from the plaintiffs,

13   Ms. Ferguson?

14             MS. FERGUSON:  When you said, Your Honor, week's end

15   is the deadline, so Friday by 5 o'clock?

16             THE COURT:  That's what I had in mind.

17             MS. FERGUSON:  Okay.  Thank you.

18             THE COURT:  Mr. Berry?

19             MR. BERRY:  Nothing from me, Your Honor.

20             THE COURT:  All right.  Well, Counsel, that will be my

21   decision.  As I said, we will issue something in writing here

22   forthwith.

23             I do want to make one comment.  I don't fault the

24   governor or the secretary of state for taking the approach they

25   did.  As I noted early on, they have a constitutional obligation

1    to enforce the laws of the state; they chose to do so.  But in

2    this case, doing so brought them in conflict with, I think, the

3    plaintiffs' First Amendment rights.

4         And so from that point of view, I want it clearly

5    understood I am not criticizing the governor or secretary of

6    state.  I am simply acknowledging that their exercise of their

7    state constitutional duties as they understood them

8    unfortunately resulted in a situation that I think interfered

9    with the plaintiffs' First Amendment right to participate in the

10   initiative process.

11        Before I conclude, I always inquire of my law clerk to

12   see if there is anything I have overlooked.

13        Ms. Henderson, was there anything else?

14        LAW CLERK:  Judge, will you be expecting something to

15   be filed within the docket reflecting the choice on Friday?

16        THE COURT:  Yes.  Thank you.  That's a good point.

17        I think by Friday, if you would submit something

18   indicating the state's choice here so that we have a complete

19   record, I think that's a very good point.

20        MR. BERRY:  I'll file it as a notice, Your Honor.

21        THE COURT:  All right.  Thank you.

22        Ms. Gearhart, anything else that I overlooked?

23        THE CLERK:  Not that I can think of, Your Honor.

24        THE COURT:  All right.  Well, thank you, Counsel.  A

25   fascinating, challenging legal issue.  And I compliment both

1    counsel for the fine way that you both in writing and orally

2    advocated for your clients' position.

3              All right.  We will be in recess.

4         (Proceedings concluded at 3:15 p.m.)

```
 1                          REPORTER'S CERTIFICATE

 2

 3

 4          I, TAMARA I. HOHENLEITNER, CSR, RPR, CRR, certify that

 5      the foregoing is a correct transcript of proceedings in the

 6      above-entitled matter.

 7

 8

 9

10

11

12

13

14      /s/  Tamara I. Hohenleitner               06/26/2020
        _____          _____
15      TAMARA I. HOHENLEITNER, CSR, RPR, CRR      Date

16

17

18

19

20

21

22

23

24

25
```