**Case No. 20-35584**

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

RECLAIM IDAHO, et al.,
Plaintiffs-Appellees,

vs.

BRADLEY LITTLE, et al.,
Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Idaho
D.C. No. 1:20-cv-00268-BLW
(Winmill, B.L., Presiding)

---

## OPENING BRIEF OF APPELLANTS LITTLE AND DENNEY

---

LAWRENCE G. WASDEN
ATTORNEY GENERAL

BRIAN KANE
Assistant Chief Deputy

STEVEN L. OLSEN
Chief of Civil Litigation Division

ROBERT A. BERRY, ISB NO. 7442
MEGAN A. LARRONDO, ISB NO. 10597
Deputy Attorneys General
Statehouse, Room 210, Boise, ID 83720
Telephone: (208) 334-2400
Fax: (208) 854-8073
Counsel for Appellants Bradley Little and Lawerence Denney

July 17, 2020

## DISCLOSURE STATEMENT

The Appellants are the Governor and the Secretary of State for the State of Idaho. No disclosure statement is thus required.

# TABLE OF CONTENTS

JURSIDICTIONAL STATEMENT ..................................................... 1

ISSUES PRESENTED FOR REVIEW .............................................. 1

RELEVANT STATUTORY PROVISIONS ...................................... 3

STATEMENT OF THE CASE ........................................................... 3

    I.    Idaho's Initiative Process was carefully legislated to ensure
          voter confidence and prevent fraud ...................................... 4

    II.   Reclaim Idaho chose to give itself a limited amount of time to
          collect the required number of signatures ........................... 7

    III.  Reclaim Idaho began collecting physical signatures on petitions
          with Idaho's anti-fraud measures incorporated in the document
          and implemented by the petition circulator ........................ 8

    IV.  Reclaim Idaho voluntarily suspended its campaign in mid-March
          due to the Coronavirus pandemic and before any state action
          inhibited signature gathering ............................................. 11

    V.   Had Reclaim Idaho obtained sufficient signatures, a statutory
          process to inform voters and instill confidence in the election
          would have begun in May 2020 and continued until absentee
          ballots are printed in September 2020 ............................... 12

    VI.  Idaho responded to the Coronavirus pandemic for the health
          and safety of its citizenry ................................................. 14

    VII. Reclaim Idaho unreasonably waited over two months and
          until after the deadline to submit its collected signatures to
          file its lawsuit .................................................................. 15

SUMMARY OF THE ARGUMENT ................................................ 19

STANDARD OF REVIEW .............................................................. 21

ARGUMENT .................................................................................. 21

I.    By judicial fiat, the district court eliminated Idaho's chosen
      initiative process, deadlines, and anti-fraud laws, and replaced
      them with a plan and protocol designed and implemented by a
      political action committee ............................................... 21

II.   The district court abused its discretion by granting Reclaim
      Idaho's request for injunctive relief, as it did not apply the
      appropriate legal standard and erred in concluding Reclaim
      Idaho was likely to succeed............................................... 27

      A.  The district court erred as a matter of law in granting
          mandatory injunctive relief without applying the
          appropriate standard.................................................. 27

      B.  The district court erred as a matter of law in concluding
          that Reclaim Idaho was likely to succeed, much less that
          the law and facts clearly favored its position............................. 28

          1.  The district court erred in finding reasonable diligence ...... 31

              a.  The district court based its reasonable diligence
                  determination upon Reclaim Idaho's best estimate of
                  when to start, instead of considering the
                  statutory scheme .......................................... 31

              b.  The district court erred in discounting that Reclaim
                  Idaho voluntarily chose to stop its efforts on
                  March 18, 2020 ............................................ 33

              c.  Reclaim Idaho's delay cost it its ability to seek
                  relief, as they filed a complaint seeking retroactive
                  injunctive relief ............................................ 35

          2.  The district court erred as a matter of law in finding a
              severe burden.................................................... 38

a. The district court erred as a matter of law in faulting the State for not taking action, and should have analyzed the State's regulations in play during the timeframes.................................................................. 40

b. The district court erred in finding a burden attributable to the State between March 16, 2020 and at least March 25, 2020............................................................ 41

c. The district court erred as a matter of law when it failed to analyze the Order to Self-Isolate as a constitutionally sound public health order, even if it had the effect of limiting certain activities, such as signature gathering ................................................. 42

d. The district court failed to account for the fact that Idaho had incorporated CISA guidance as part of its Orders to Self-Isolate.................................................... 44

3. The district court erred as a matter of law in implicitly concluding that Idaho's anti-fraud measures requiring in-person signatures, circulator certification of the signatures, and county clerk verifications, do not survive strict scrutiny ....................................................... 45

III. The district court abused its discretion in consideration of the other preliminary injunction factor................................................................ 47

A. The district court's irreparable harm analysis was based on the flawed premise that Reclaim Idaho had a right to be on this year's ballot....................................................... 47

B. The district court's consideration of the balance of equities and public interests failed to account for the harm to the State in enjoining its carefully crafted initiative process, and the public interest in enforcement of the Legislature's laws..... 48

C. The balance of equities did not favor Reclaim Idaho, as it sat on its rights, and the district court erred in not applying laches .......................................................... 49

CONCLUSION ................................................... 53

STATEMENT OF RELATED CASES ............................................. 54

CERTIFICATE OF COMPLIANCE.................................................. 55

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) .............................................. 19

*Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012) ................................ *passim*

*Arizonans for Fair Elections v. Hobbs*, No. CV-20-00658-PHX-DWL

    2020 WL 1905747, (D. Ariz. Apr. 17, 2020) ......................................... 30, 34

*Burdick v. Takushi*, 504 U.S. 428 (1992) .......................................... 45

*Clements v. Fashing*, 457 U.S. 957 (1982) ....................................... 36

*Coal. for Econ. Equity v. Wilson*, 122 F.3d 718 (9th Cir. 1997) ..................... 48

*Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001) .............................. 49, 50

*E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984 (9th Cir. 2006) ... 20

*Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214 (1989) ...... 22, 45

*Fair Maps Nev. v. Cegavske*, No. 3:20-cv-00271-MMD-WGC,

    2020 WL 2798018 (D. Nev. May 29, 2020) ......................................... 26, 46

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) ...................................... 27

*Green v. Mansour*, 474 U.S. 64 (1985) ........................................... 35

*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082

    (10th Cir. 2006) ...................................................................... 29

*In Re Mayfield*, No. 16-22134-D-7, 2016 WL 3958982

    (Bankr. E.D. Cal. Jul. 15, 2016) ............................................................ 23

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ................................ 16, 42

*Jenness v. Fortson*, 403 U.S. 431 (1971) ......................................... 22

*Jones v. Markiewicz-Qualkinbush*, 892 F.3d 935 (7th Cir. 2018) .................... 47

*Libertarian Party of Wash. v. Munro*, 31 F.3d 759 (9th Cir. 1994) ................. 31

*Little v. Reclaim Idaho*, No. 20A18 (U.S. Jul. 14, 2020) ................................. 19

*Lyons v. City of Columbus*, No. 2:20-cv-3070, 2020 WL 3396319

    (S.D. Ohio, Jun. 19, 2020) ...................................................... 51

*Marijuana Policy Project v. United States*, 304 F.3d 82 (D.C. Cir. 2002) ...... 29

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,

    571 F.3d 873 (9th Cir. 2009) .................................................. 27

*Maryland v. King*, 133 S. Ct. 1 (2012) ............................................ 48

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) ............................... 29

*Molinari v. Bloomberg*, 564 F.3d 5872 (2d Cir. 2009).................................... 29

*Morgan v. White*, No. 20 C 2189, 2020 WL 2526484

    (N.D. Ill. May 18, 2020) ....................................................... 33, 34

*Morgan v. White*, No. 20-1801, 2020 WL 3818059 (7th Cir. 2020) ............... 34, 47

*Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008)............................................ 31

*New Motor Vehicle Bd. of Cal. V. Orrin W. Fox Co.*,

    434 U.S. 1345 (1977) ........................................................... 48

*Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019 (9th Cir. 2016) ....... 32

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .......................................... *passim*

*Republican National Committee v. Democratic National Committee* ("*RNC*")

    140 S. Ct. 1205 (2020)......................................................... 16

*S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613

    (U.S. May 29, 2020) ............................................................ 42

*Sinner v. Jaeger*, No. 3:20-cv-00076, 2020 WL 3244143

    (D.N.D. June 15, 2020)......................................................... 34

*Stanley v. Univ. of S. Cal.*, 13 F.3d 1313(9th Cir. 1994) ................................. 27

*Storer v. Brown*, 415 U.S. 724 (1974) ............................................ 32

*Thompson v. Dewine*, 959 F.3d 804 (6th Cir. 2020)........................................ *passim*

*Ulaleo v. Paty*, 902 F.2d 1395 (9th Cir. 1990) ................................. 36

## CONSTITUTIONAL PROVISIONS

IDAHO CONST. art. III, § 1 .................................................................. 4, 5

## STATUTES

28 U.S.C. § 1292(a)(1) ......................................................................... 1

28 U.S.C. § 1331 ................................................................................... 1

52 U.S.C. § 20302 ........................................................................... 6, 13

Idaho Code § 34-603 .......................................................................... 13

Idaho Code § 34-909 ............................................................................ 6

Idaho Code § 34-909(1) ................................................................. 13, 25

Idaho Code § 34-1003 ........................................................................ 13

Idaho Code § 34-1801 ............................................................ 9, 23, 46

Idaho Code § 34-1801A ........................................................................ 5

Idaho Code § 34-1801A(2) ................................................................... 9

Idaho Code § 34-1802(1) ................................................ 5, 7, 12, 31

Idaho Code § 34-1802(2) ................................................................. 6, 12

Idaho Code § 34-1802(3) ................................................................. 6, 12

Idaho Code § 34-1802(4) ................................................................. 6, 12

Idaho Code § 34-1805 ........................................................ 5, 6, 7, 12

Idaho Code § 34-1806 ........................................................................ 12

Idaho Code § 34-1807 ............................................................... 5, 9, 10

Idaho Code § 34-1808 ........................................................................ 12

Idaho Code §34-1812A .............................................................. 6, 12, 25

Idaho Code § 34-1812B .............................................................. 6, 13, 25

Idaho Code § 34-1812C ........................................................................ 6

Idaho Code § 34-1812C(1) .................................................................. 13

Idaho Code § 34-1812C(2) .................................................................. 14

**RULES**

Fed. R. App. P. 4(a)(1)(A) ................................................................. 1

9th Cir. R. 28-2.7 ............................................................................. 3

## JURISDICTIONAL STATEMENT

Plaintiffs ("Reclaim Idaho") claimed the district court had subject matter jurisdiction under 28 U.S.C. § 1331. Defendants ("the State") challenged the district court's jurisdiction with respect to Reclaim Idaho's request for retrospective relief,[1] and reiterate that issue on appeal. The district court entered its order directing mandatory relief against the State on June 30, 2020. [ER 001.] This followed its earlier order on June 26 granting Reclaim Idaho's motion for a preliminary injunction. [ER 035.] On June 30, the State filed a notice of appeal from both orders. [ER 036.] The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(A). This Court has jurisdiction over appeals of interlocutory orders granting injunctive relief. 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED FOR REVIEW

a.     Whether the district court erred as a matter of law by granting mandatory injunctive relief that fundamentally changes Idaho's initiative laws in the midst of the election process.

b.     Whether the district court abused its discretion by granting Reclaim Idaho's request for a preliminary injunction and mandatory relief:

---

[1] The State raised this issue in its notice to the court. [ER 058.]

(a)    by giving Reclaim Idaho an additional 48 days, from July 9 to August 26, 2020, to collect signatures for its initiative, even though the statutory deadline to collect signatures ended on April 30, 2020; *or*

(b)    by permitting Reclaim Idaho to collect and verify electronic signatures through a company it hired, even though Idaho law expressly requires in-person signatures that are verified by a circulator and then by a county clerk.

c.    Whether the district court erred as a matter of law:

(a)    by violating the state of Idaho's sovereign immunity by granting injunctive relief based on past events, at a time when there was no ongoing state action violating any federal law;

(b)    by failing to apply this Court's standard for mandatory injunctions;

(c)    by finding that state officials violated Reclaim Idaho's First Amendment rights in the past, even though Reclaim Idaho voluntarily suspended its initiative campaign due to a pandemic, not due to any state action, and any subsequent, temporary public health orders did not require suspension of initiative campaigns; or

(d)    by failing to properly analyze Reclaim Idaho's First Amendment claims, because the court focused on a brief, six-week period, rather than the entire 18 months available to gather initiative signatures; the court failed to determine whether a reasonably diligent initiative proponent who used the

entire 18 months could have qualified an initiative; and the court failed to determine whether Idaho's initiative regulations satisfy strict scrutiny.

The State raised its concerns to the district court in its opposition to Reclaim Idaho's motion for preliminary injunctive relief, and in its notice to the district court. [*See* ER 051-064; ER123-141.]

## RELEVANT STATUTORY PROVISIONS

The relevant statutory authority is filed in a separate addendum. 9th Cir. R. 28-2.7.

## STATEMENT OF THE CASE

This appeal challenges a federal district court's preliminary injunction orders that seize control of Idaho's initiative process and delegate the vast majority of the State's and county officials' constitutional and statutory authorities that ensure the integrity of the election process to a political action committee promoting an initiative petition for the ballot. The district court fundamentally altered Idaho's initiative laws, and eviscerated the anti-fraud measures the State's elected representatives determined are a vital part of that process.

The district court gave Reclaim Idaho, a political action committee, a 117-day extension of the statutory deadline to collect signatures in favor of its initiative petition that were due to be filed on May 1, 2020, the day after the deadline for signature-gathering. The length of this extension is the product of Reclaim Idaho's

decision to wait until long after that May 1 filing deadline had passed to file suit, and for the court to grant Reclaim Idaho a 48-day extension to collect additional signatures, starting July 9, 2020. In addition, in contravention of state law, the district court orders allow Reclaim Idaho to collect signatures electronically, under a process and protocol created by Reclaim Idaho and the private company, DocuSign, which Reclaim Idaho selected and is compensating. The court ordered the State to accept those signatures, even though the State is unable to verify them as required by law.

In granting this relief, the district court enjoined an unspecified swath of State laws governing the initiative process; discarded an almost century-old principle of Idaho law requiring in-person collection of petition signatures, as well as legislative policy judgments regarding fraud prevention; granted equitable relief to a party whose injury was entirely self-inflicted; and ignored the irreparable harm that the State and the public interest are sustaining in the form of loss of public confidence in the electoral system, voter confusion, and the "near impossib[ility]" for Idaho's election officials to prepare for and conduct fair, free, and safe elections in August and November during a once-in-a-century pandemic.

## I. Idaho's initiative process was carefully legislated to ensure voter confidence and prevent fraud.

Idaho's constitution provides that legal voters may initiate legislation and cause it to be submitted to the vote of the people at a general election. IDAHO CONST.

art. III, § 1. The conditions and manner for initiatives are set by the representatives of the people of Idaho elected to its legislature. *Id.* The legislature has prescribed the initiative process is set out in chapter 18 of title 34, Idaho Code.

Idaho's initiative process starts with submission of an initiative petition to the Secretary of State, which is then reviewed by the Attorney General and the Division of Financial Management, where a ballot title and fiscal impact statement, respectively, are developed. Idaho Code §§ 34-1804, 34-1809, 34-1812. Once the petitioner receives the fiscal impact statement and ballot title, the petitioner has *up to* 18 months to collect the requisite number of signatures; the petitioner can voluntarily shorten that process if the petitioner *chooses* to start it closer to a general election year. Idaho Code § 34-1802(1). The deadline for signature-gathering for a particular election year is April 30. *Id.*

Idaho also requires an initiative proponent to obtain signatures from legal voters that show support both across districts and at a statewide level. Idaho Code § 34-1805. Idaho requires that petition circulators collect these physical signatures in-person. *See* Idaho Code § 34-1807.

To ensure integrity of the initiative process, Idaho has certain anti-fraud measures in place. *See* Idaho Code §§ 34-1807; *see also* Idaho Code § 34-1801A. County clerks play a role in this process, as they receive the signature sheets from the initiative petitioner no later than May 1 and verify the signatures on the sheets to

be those of qualified electors. Idaho Code §§ 34-1802(2), 34-1807. The county clerks have 60 days to complete their task, which must be finished no later than June 30. Idaho Code § 34-1802(3). Once verified, initiative petitions with the requisite number of signatures must be filed with the Secretary of State not less than four months before the election at which they are to be voted upon, *i.e.*, during the first week in July for a November election. Idaho Code § 34-1802(4).

But the submission of the initiative petition to the Secretary of State is not the end of the road. Idaho also wants to ensure its voters can be informed of upcoming initiatives through a voters' pamphlet. Idaho Code § 34-1812C. As part of that pamphlet, the Secretary of State is required to include arguments for and against, as well as rebuttals, that are obtained through a process that begins on July 20 and ends on August 1. Idaho Code §§ 34-1812A; 34-1812B; 34-1812C. The Secretary of State is also tasked with creation of a sample ballot, which must be provided to the counties in the first week of September, and the counties are in turn required to print and mail absentee ballots by mid-September. Idaho Code § 34-909; *see* 52 U.S.C. § 20302.

The district court's order was issued in the middle of this process, has disrupted it, and replaced the State's approach with a court-created process.

**II.  Reclaim Idaho chose to give itself a limited amount of time to collect the required number of signatures.**

Reclaim Idaho is no stranger to Idaho's initiative system. It placed an initiative on the 2018 general election ballot. [ER 013].

Aiming to place a new initiative on the ballot for the general election in 2020, Reclaim Idaho chose to wait until the end of August 2019 to submit its petition to the Secretary of State. [ER 149 ¶ 5.] That choice had a major consequence: when Reclaim Idaho received its ballot title and fiscal impact statement in October 2019, it had only until April 30, 2020 to obtain signatures. Idaho Code § 34-1802(1); [ER 149 ¶ 5.]. By operation of Idaho Code § 34-1802(1), Reclaim Idaho could have had up to 18 months to collect signatures if it had submitted the initiative petition to the Secretary of State in 2018 or earlier in 2019, or later in 2020 if it had sought to place the initiative petition on the ballot for the 2022 general election.

Reclaim Idaho received its ballot title in October 2019.  [*See* ER 149 ¶ 5.] Because of its choice to submit the initiative petition late in the process, it left itself just a little more than six months to collect the signatures. [ER 149 ¶ 6.]

Reclaim Idaho needed to collect a certain number of signatures, meeting two separate numerosity requirements. First, Reclaim Idaho had to obtain from at least 18 of the state's 35 legislative districts signatures from six percent or more of the qualified electors *in each district* during the last general election. Idaho Code § 34-

1805. Second, Reclaim Idaho had to obtain signatures from these 18 legislative districts amounting to six percent or more of the qualified electors *in the state* during the last general election. *Id.* For Reclaim Idaho, that meant collecting at least 55,057 valid signatures. [ER 012.]

### III.  Reclaim Idaho began collecting physical signatures on petitions with Idaho's anti-fraud measures incorporated in the document and implemented by the petition circulators.

Reclaim Idaho proceeded to collect signatures. [ER 014.] As noted above, Idaho has implemented certain anti-fraud measures to ensure that eligible voters actually sign a petition—and know they are signing the petition. The Idaho Legislature has made clear its concern over incidents of fraudulent practices and fraudulent signatures being placed upon initiative petitions:

> STATEMENT OF LEGISLATIVE INTENT AND LEGISLATIVE PURPOSE. The legislature of the state of Idaho finds that there have been incidents of fraudulent and misleading practices in soliciting and obtaining signatures on initiative or referendum petitions, or both, that false signatures have been placed upon initiative or referendum petitions, or both, that difficulties have arisen in determining the identity of petition circulators and that substantial danger exists that such unlawful practices will or may continue in the future. In order to prevent and deter such behavior, the legislature determines that it is necessary to provide easy identity to the public of those persons who solicit or obtain signatures on initiative or

referendum petitions, or both, and of those persons for whom they are soliciting and obtaining signatures and to inform the public concerning the solicitation and obtaining of such signatures. It is the purpose of the legislature in enacting this act to fulfill the foregoing statement of intent and remedy the foregoing practices.

Idaho Code § 34-1801.

Idaho requires that an initiative proponent collects certain information to allow the verification of the electors' signatures (and to be in substantially the form prescribed by the statute). Idaho Code § 34-1801A(2). A petition must capture the signature; printed name; residence street and number; city; date; and legislative district for each voter who signs. *Id.*

Consistent with the Idaho Legislature's concerns about fraud, the petition form seeks to ensure that qualified voters are signing. That form begins with a warning that it is a felony for a person to sign with any name other than his own; to knowingly sign his name more than once; and to sign the petition when he is not a qualified elector. *Id.* It also makes clear that by signing the document, he or she is confirming that they personally signed the petition, that they are a qualified elector of the state of Idaho, and that the residence and legislative district are correctly written after their name. *Id.*

Idaho's anti-fraud measures also require the person circulating the petition and collecting the signatures to ensure no fraud is being perpetrated on the State. *See*

Idaho Code § 34-1807. Idaho requires petition circulators to verify on the face of each sheet of the petition containing signatures, through an affidavit (in substantially the form presented by the statute), that: (i) he or she is a resident of the state and at least 18; (ii) every person who signed the petition signed *in the circulator's* presence; (iii) he believes that each signer stated his or her name, address, and residence correctly; and (iv) he believes each signer is a qualified elector of Idaho and a resident of a particular county. Idaho Code § 34-1807.

Likewise, when the signatures are submitted to the county clerk, the clerk must verify that the signatures are those of qualified electors of a particular legislative district and must certify that through an affidavit. *Id.* Such process is "laborious" for the clerks. [ER 144 ¶ 10.] The clerk and his or her staff ensure "that each signature is valid; that the signer is a registered voter; and that if a registered voter, the correct address was used." *Id.* Verification of the signature requires comparing the signature on the petition to the signature on the voter registration card. [ER 145 ¶ 17.] About 30 to 40 percent of the signatures submitted for verification are rejected. [ER 144 ¶ 10.]

Reclaim Idaho's current process does not follow or adhere to these processes.

**IV.    Reclaim Idaho voluntarily suspended its campaign in mid-March due to the Coronavirus pandemic and before any state action inhibited signature gathering.**

Even though Reclaim Idaho had until April 30, 2020 to collect signatures, it voluntarily suspended its campaign on March 18, 2020 due to its concerns about COVID-19. [ER 187 ¶ 30.] At that point, Reclaim Idaho had collected 10,593 verified signatures. [ER 190 ¶ 43.] It asserts that it had also collected an additional 20,000 signatures that still need to be verified. [*See* ER 127.] (Again, it is estimated that only 60 to 70 percent of the signatures submitted for review are verified.) [*See* ER 144 ¶ 10.] In April, Reclaim Idaho instructed the county clerks not to continue with the process of verifying signatures because it had suspended its campaign due to its concerns about COVID-19. [ER 113; ER 117.]

Reclaim Idaho tried only briefly to figure out a way that it felt comfortable collecting signatures during the COVID-19 pandemic before suspending its campaign. [ER 113-118.] A Reclaim Idaho staffer emailed a member of Governor's Little's staff on March 16, 2020 requesting a meeting between Reclaim Idaho's founder and the Governor to discuss "the safest way to move forward with the ballot initiative." [ER 161, ¶ 3; ER 165.] Except for the chain of emails on March 16, Reclaim Idaho made no other communications with the Governor's office. [*Id.*] The Secretary of State's office was emailed once that same date about electronic

signature gathering and it correctly informed Reclaim Idaho that there was no statute allowing electronic signatures. [ER 156 ¶¶ 3-4; ER 158-59.]

**V.  Had Reclaim Idaho obtained sufficient signatures, a statutory process to inform voters and instill confidence in the election would have begun in May 2020 and continued until absentee ballots are printed in September 2020.**

Although Reclaim Idaho suspended its campaign in March and directed county clerks to stop verifying signatures in April, had it actually collected sufficient signatures, an important process would have carried out from April through September, in preparation for the November 3 general election. The following table summarizes that process:

| Event # | Description | Date | Authority |
|---|---|---|---|
| 1 | Last day for Reclaim Idaho to collect signatures. | April 30, 2020 | Idaho Code § 34-1802(1) |
| 2 | Last day for Reclaim Idaho to submit to the county clerks signed initiative petitions. | May 1, 2020 | Idaho Code § 34-1802(2) |
| 3 | Last day for county clerks to verify signatures. | June 30, 2020 | Idaho Code § 34-1802(3) |
| 4 | Last day for initiative petitions to be submitted for filing with the Secretary of State. | July 6, 2020<br><br>*July 3 was a holiday | Idaho Code § 34-1802(4) |

| Event # | Description | Date | Authority |
|---|---|---|---|
| 5 | Secretary of State ensures that submission meets requirements, and if so files petition; if not, rejects petition. | | *See* Idaho Code §§ 34-1805, 34-1806; *see also* Idaho Code § 34-1808 |
| 6 | Last day to file an argument for or against a filed initiative. | July 20, 2020 | Idaho Code § 34-1812A. |
| 7 | Secretary of State selects one argument for and one argument against the initiative measure. | | Idaho Code § 34-1812A. |
| 8 | Secretary of State immediately sends opposing arguments to each argument author. | | Idaho Code § 34-1812B. |
| 9 | Last day for authors to submit rebuttals to the Secretary of State. | August 1, 2020 | Idaho Code § 34-1812B. |
| 10 | Last day for Secretary of State to submit sample ballots to county clerks. | September 7, 2020 | Idaho Code § 34-909(1). |
| 11 | Last day for Secretary of State to certify ballot questions to county clerks | September 7, 2020 | Idaho Code § 34-603. |
| 12 | Last day for county clerks to print absentee ballots. | September 14, 2020 | 52 U.S.C. § 20302; Idaho Sec'y of State Dir. 2015-1 [ER 154.] |

| Event # | Description | Date | Authority |
|---|---|---|---|
| 13 | Last day for county clerks to mail absentee ballots requested prior to 45 days before the election. | September 21, 2020 | Idaho Code § 34-1003 |
| 14 | Secretary of State must print voters' pamphlet with complete initiative and a copy of the arguments and rebuttal for and against the measure. | September 25, 2020 | Idaho Code § 34-1812C(1) |
| 15 | Secretary of State must mail or distribute copies of the voters' pamphlet to each household in the state, and to county clerks. | | Idaho Code § 34-1812C(2) |

## VI. Idaho responded to the Coronavirus pandemic for the health and safety of its citizenry.

With the onset of the COVID-19 pandemic, Idaho's Governor declared a state of emergency on March 13, 2020. [ER 015.] On March 25, 2020, the Governor issued an Order to Self-Isolate (referred to by the district court as the "stay-at-home order"). [ER 065-71; *see* ER 015.] That order was amended and extended on April 15, 2020. [ER 072-82; *see* ER 016.] The Order to Self-Isolate (as amended) was ultimately rescinded by the Stay Healthy Order dated April 30, 2020, effective May 1, 2020. [*See* ER 016.]

**VII.    Reclaim Idaho unreasonably waited over two months and until after the deadline to submit its collected signatures to file its lawsuit.**

Reclaim Idaho took no legal action when: (1) it stopped its initiative campaign on March 18; (2) it let the deadline for collection of signatures on April 30 pass; *and* (3) the Order to Self-Isolate was in effect.  Instead, Reclaim Idaho waited until June 6 to file its complaint with the district court. [ER 202.] It also filed an expedited motion for a preliminary injunction. [ER 177.]

Governor Little and Secretary of State Denney ("the State") opposed Reclaim Idaho's motion for injunctive relief, giving notice to the court of their concern that Reclaim Idaho wanted the district court "to aggressively invade the Idaho Legislature's constitutionally-created authority and create a signature-gathering alternative that is nowhere contemplated by the Idaho Constitution or Code and that has never even been introduced for legislative consideration." [ER 171.]

The district court conducted a hearing on June 23, 2020, and issued a written order on June 26 granting Reclaim Idaho's motion for preliminary injunction, directing the State to choose one of two options: (1) certify the signatures *and* "place [Reclaim Idaho's] initiative on the November 2020 ballot for voter consideration"; *or* (2) "allow Reclaim Idaho an additional 48-days to gather signatures through online solicitation and submission." [ER 034-35.]

The State responded to this order noting it could not accept either option: the initiative had not met the required percentage and geographic distribution requirements, and electronic signature gathering was not allowed statutorily and would, if mandated by the district court, "be extremely disruptive to the State's preparation for the August and November elections." [ER 053.] The State requested a stay of the injunction because of multiple concerns with the merits: the district court's proposed remedies would undermine the State's established compelling interests as recognized by *Purcell v. Gonzalez*, 549 U.S. 1 (2006), and again in *Republican National Committee v. Democratic National Committee* ("*RNC*"), 140 S. Ct. 1205 (2020); State action did not cause any burden Reclaim Idaho suffered due to the pandemic; the Orders to Self-Isolate were validly promulgated orders under *Jacobson v. Massachusetts*, 197 U.S. 11 (1905); the Orders to Self-Isolate incorporated Cybersecurity and Infrastructure Security Agency ("CISA") guidance, permitting election-related activities to continue; the court had not applied standards applicable to issuance of mandatory injunctions; the court had granted retrospective relief, in violation of the Eleventh Amendment; and there was no showing or claim that the total 18-month period for signature gathering was impermissibly burdened, or that Reclaim Idaho had a First Amendment right to be on this year's ballot. [*See generally* ER 051-064.]

Rather than address the State's concerns, the court reiterated its prior order's analyses, reiterated its proposed remedies, and denied the stay. [ER 005-06.] Reclaim Idaho filed a motion to enforce the injunction, and the district court directed "the State to immediately begin implementation of the remedy originally requested by the Plaintiffs – online solicitation and acceptance of signature." [ER 003.] It ordered the parties to meet and confer on July 2 to try to agree to a process and protocol, and if nothing came about by July 9:

> Reclaim Idaho may implement an industry standard process and protocol [to collect electronic signatures]. Such process and protocol must ensure the highest available standards are used to verify a signer's identity, legislative district, and the authenticity of the signature.

[ER 003-04.] No agreement was reached. [ER 046.]

On July 9, the State informed the court of the lack of agreement and its multiple concerns with the new election rules the court created: (1) there was no indication that the "signature" data collected by DocuSign or Reclaim Idaho would be used to verify the authenticity of the signatures, and Reclaim Idaho intended to withhold that information from the county clerks; (2) the non-party county clerks had been placed in a legally untenable situation, since they had to comply with Idaho's anti-fraud statutes for verification but would not be given actual signatures or even the data Reclaim Idaho was collecting; (3) the system invited opportunities

for fraud and abuse; (4) highly personal information, such as the GPS location and last four digits of the social security number, was being obtained by Reclaim Idaho when it was not required for physical signatures; (5) information Reclaim Idaho was collecting may be subject to a public records request; (6) the online form and language did not comply with Idaho law; *and* (7) Reclaim Idaho's new system had not allowed the State to evaluate concerns, including cybersecurity. [ER 043-46.]

Reclaim Idaho subsequently informed the district court that it was launching a website, whereby a visitor would be asked for "their name, voter registration address, city and zip code, last 4 digits of their social security number, and their email address." [ER 040.] After entering this information and clicking "next," the person is directed to a PDF of the initiative petition. [*Id.*] Once there, the person enters the last four digits of their social security number and the county where they reside. [*Id.*] But the person does not sign the petition, instead a computer-generated cursive "signature" is placed on the petition. [*Id.*] DocuSign captures the person's IP address, GPS location, and the time the person signed the petition. [ER 041.] Although Reclaim Idaho has represented that these data and the last four digits of the social security number are "well above industry standards for authentication," it refuses to provide these data to the county clerks or Secretary of State, nor is DocuSign or Reclaim Idaho using that data to verify signatures. [*Id.*]

The State filed this appeal on June 30, 2020. [ER 036.] It sought an order staying the district court's injunctive relief, but this Court denied that request in a divided opinion. [9th Cir. Dkt. 14-1.] Judge Callahan dissented. [9th Cir. Dkt. 14-2.] Citing *Purcell* and *RNC*, Judge Callahan concluded that the State had "made a substantial showing that the district court exceeded its authority by awarding relief that effectively rewrites Idaho's election laws, particularly its law designed to protect against fraud in the initiative process." [9th Cir. Dkt. 14-2 at 1.] Judge Callahan also concluded that "appellants … have made a substantial showing that the appellees failed to act with the necessary diligence to trigger the heightened standard of review applied by the district court." [*Id.* (citation omitted).] Finally, quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018), and *Purcell*, Judge Callahan concluded that the remaining factors supported granting a stay as well. [9th Cir. Dkt. 14-2 at 2.]

On July 14, the State filed an emergency stay application in the Supreme Court. *See* Emergency Appl. For Stay, *Little v. Reclaim Idaho*, No. 20A18 (U.S. Jul. 14, 2020). That application is pending.

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court and vacate its orders granting mandatory injunctive relief to Reclaim Idaho.

The district court exceeded its authority and violated Supreme Court precedent by fundamentally altering Idaho's initiative laws in the midst of the election process. It gave Reclaim Idaho the right to gather additional signatures well after the signature-gathering period closed, much like giving a voter the right to cast a ballot long after Election Day. By doing so, it eliminated critical steps Idaho has created in the initiative process, such as verifying signatures and educating voters about items on the ballot. Perhaps even more troubling, the court effectively enjoined application of Idaho's anti-fraud provisions by authorizing the initiative proponent, along with its hired contractor, to create its own rules for gathering and then verifying electronic signatures.

The district court erred in a multitude of other ways as well. It granted injunctive relief not to prevent any *ongoing* State action, but to remedy the State's alleged past failures to ameliorate the difficulties Reclaim Idaho encountered in gathering signatures during the COVID-19 pandemic. The court failed to properly apply this Court's standards, both for issuing mandatory injunctive relief and for evaluating alleged burdens on initiatives under *Angle*. The court ignored Reclaim Idaho's lack of diligence and held the State responsible for Reclaim Idaho's failure to qualify its initiative for the 2020 ballot.

The district court erred as a matter of law. It abused its discretion in granting mandatory injunctive relief designed to give Reclaim Idaho special dispensation to

get its initiative on this year's ballot. And in so doing, it placed a near impossible burden on State and county officials to responsibly deliver a fair, free, and safe election to Idaho voters this November.

## STANDARD OF REVIEW

A district court's preliminary injunction is reviewed for abuse of discretion. *See E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006) (citation omitted). The district court's "interpretation of the underlying legal principles is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Id.* (alterations and citation omitted). The scope of the injunctive relief is also reviewed for an abuse of discretion; a district court's use of "an erroneous legal standard" or clear error in its factual findings that form the decision require the injunctive relief to be vacated. *United States v. Schiff*, 379 F.3d 621, 625 (9th Cir. 2004).

## ARGUMENT

I.  **By judicial fiat, the district court eliminated Idaho's chosen initiative process, deadlines, and anti-fraud laws, and replaced them with a plan and protocol designed and implemented by a political action committee.**

The district court has fundamentally altered Idaho's initiative laws while the process is ongoing. It has allowed Reclaim Idaho to design its own anti-fraud measures, without ensuring the requisite anti-fraud certifications from circulators; without ensuring that the non-party county clerks can complete their statutory

function of actually verifying signatures; without ensuring voters can receive arguments for or against the initiative; and without ensuring there is even sufficient time for the Secretary of State and the non-party county clerks to discharge their duties to ensure a free, fair, and safe election.

This is reversible error. When a federal court examines a state's electoral system, the Supreme Court has repeatedly and clearly instructed district courts that they may not alter state election procedures in a way that could fundamentally alter the nature of the election and cause voter confusion, particularly close to or in the midst of an election. *See Purcell*, 549 U.S. at 4-5; *RNC,* 140 S. Ct. at 1207; *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018).

This wholesale alteration of Idaho's initiative process inflicts irreparable harm on the State, and it undermines the public's interest and confidence in a sound, predictable election system that incorporates anti-fraud measures.

Idaho's initiative system and its anti-fraud measures are important, for the reasons summarized by the U.S. Supreme Court.

Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government.

*Purcell*, 549 U.S. at 7. States have a compelling interest in preventing fraud and protecting the integrity of their elections. *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989) (citations omitted) ("A State indisputably has a compelling interest in preserving the integrity of its election process. … We have also recognized that a State may impose restrictions that promote the integrity of primary elections."). They can also require significant showing of support for an initiative petition. *Cf. Jenness v. Fortson*, 403 U.S. 431, 442 (1971).

Thus, in *Purcell*, the Supreme Court vacated a Ninth Circuit order that enjoined Arizona election law 33 days before an impending election because court orders that alter elections, particularly those issued close to an election, "can themselves result in voter confusion and consequent incentive to remain away from the polls." 549 U.S. at 4-5.

The district court's orders have fundamentally altered and rewritten the State's initiative and election laws. They eviscerated the State's legislatively enacted procedures for ensuring integrity and for balancing the voters' voices throughout the State. The Idaho Legislature enacted this process based on legislative findings of past occurrences of fraudulent and misleading signature-gathering practices, past placement of false signatures on initiative petitions, and difficulties "in determining the identity of petition circulators." Idaho Code § 34-1801.

In direct contravention of the Idaho Legislature's intent and concerns, the district court's orders allow the entire signature collection process to be completed anonymously using the internet. The authenticity of a "signature" (in reality, a computer-generated approximation of a generic cursive signature) will be determined solely based on a few data points that a person chooses to type into a computer. There is a grave risk that this system, which the district court ordered to be developed hastily over the course of nine days, [*see* ER 004], will be defrauded, either by a well-intentioned person entering data for multiple family members or friends, or by a hacker or computer program entering swathes of false data. *See In Re Mayfield*, No. 16-22134-D-7, 2016 WL 3958982, at *2 (Bankr. E.D. Cal. Jul. 15, 2016) (refusing to accept DocuSign signatures due to "the ease with which a DocuSign affixation can be manipulated or forged"). Worse, although Reclaim Idaho has stated it will collect sensitive personal data that it argues could be used to verify signatures, it refuses to use those data to verify signatures, to provide that data to the county clerks to perform their statutory duty of verification, or to even provide that data to the Secretary of State's office. [*See* ER 041.]

And what of the requirements in Idaho Code § 34-1807 with respect to circulators who "collected" the signatures? The district court's order effectively erases them by not requiring Reclaim Idaho to abide by the form of the petition, or the warnings to persons signing the petition. In fact, there is no petition circulator in

the form envisioned by the Legislature anymore.  The initiative petition now exists on a website with no need for any human contact (virtual or otherwise) for a person to sign the petition. Anyone who forwards, shares, posts, or copies the link must be considered a "circulator."  How can the "circulator" note that the petition was signed in his or her presence? What affidavit can Reclaim Idaho or DocuSign offer to ensure that fraudulent signatures were not captured? And what of the county clerks? What can they verify? And how can they discharge their legal duty to verify when they will have mere days during a busy period preparing for upcoming elections? These are unanswered questions caused by the district court's decision to jump into the initiative process at the last minute.

The district court's order has interfered with the State's and county clerks' abilities to insure an orderly and reliable election process. The Secretary of State must submit sample ballots to the counties by Monday, September 7, 2020. Idaho Code § 34-909(1). But under the district court's order, Reclaim Idaho has until Wednesday, August 26, 2020, to collect signatures.  [*See* ER 004.] Presumably, it will need to submit those signatures to county clerks for verification no later than Thursday August 27. The county clerks, besides verifying the signatures to the best of their ability, must still return the signatures to Reclaim Idaho, which in turn must submit the verified initiative signatures to the Secretary of State, presumably no later than September 3. In short, the district court's orders have taken from the county

clerks a 60-day period of time to verify signatures, and given them no more than a week—a near impossible task. [*See* ER 143 ¶ 7.]

The district court's orders will also likely mean that no arguments for or against the initiative, as well as corresponding rebuttals, will be received or printed by the Secretary of State in the voters' pamphlet. This is because it will not be clear until September 3 or 4 whether Reclaim Idaho's initiative petition has qualified for the ballot—more than a month after the statutory deadline for all arguments to be submitted, forwarded to opposing parties, and rebuttals received. *See* Idaho Code §§ 34-1812A, 34-1812B.

The district court, though "sympathetic" to the resources it would take to "verify" the additional signatures ([ER 032]), completely ignored the timeline of events that Idaho law deems essential to a fair election. It instead saw this simply as an extension of time and a new method of collecting signatures. In reality, the orders have effectively erased Idaho's chosen anti-fraud laws, and Idaho's chosen timeline, substituting it with one that serves only to allow Reclaim Idaho to place its initiative on the ballot.

Additionally, one of the cases cited with approval by the district court expressly refused to do away with the in-person signature requirement. *Fair Maps Nev. v. Cegavske*, No. 3:20-cv-00271-MMD-WGC, 2020 WL 2798018 (D. Nev. May 29, 2020). Like here, the plaintiffs there "ask[ed] the Court to order the

Secretary to set up a system for collecting and verifying signatures offered to support an initiative petition electronically, for the first time, immediately." *Id.* at *16. Applying the *Purcell* principle and "before even getting to the strict scrutiny analysis, the Court note[d] that the *Purcell* principle counsels against the Court intervening at all when it comes to the In-Person Requirements." *Id.* Here, the court below should have followed *Purcell* and not changed Idaho's requirements.

**II. The district court abused its discretion by granting Reclaim Idaho's request for injunctive relief, as it did not apply the appropriate legal standard and erred in concluding Reclaim Idaho was likely to succeed.**

### A. The district court erred as a matter of law in granting mandatory injunctive relief without applying the appropriate standard.

The district court required the State to grant Reclaim Idaho 48 more days to collect signatures and required the State to permit Reclaim Idaho to collect electronic signatures under its own terms. [ER 004.] Mandatory injunctions order a "party to 'take action.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citation omitted). "[A] mandatory injunction 'goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored.'" *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)) (footnote omitted). Courts should deny requests for mandatory injunctions "'unless the facts and law clearly favor the moving party.'" *Id.* (quoting *Stanley*, 13 F.3d at 1320). To put it

differently, the "burden here is doubly demanding: Because [the plaintiff] seeks a mandatory injunction, [they] must establish that the law and facts *clearly favor* [their] position, not simply that [they are] likely to succeed." *Id.*

Although the district court granted mandatory relief, it did not apply the applicable standard discussed above.2 In particular, it did not analyze or explain why the standard requiring the law and facts to *clearly favor* Reclaim Idaho's position was met. Rather, the district court applied the general *Winter* factors, concluding that "Reclaim Idaho is likely to succeed on the merits of its claims" [ER 031] and reiterating in another order that "the Court concluded that Plaintiff had established it is likely to succeed on the merits" [ER 006]. Although the State should have prevailed under this standard as well, because the district court granted mandatory relief, it erred by not applying the test for mandatory injunctive relief.

**B.    The district court erred as a matter of law in concluding that Reclaim Idaho was likely to succeed, much less that the law and facts clearly favored its position.**

There are multiple reasons why the district court erred as a matter of law in concluding that Reclaim Idaho had a likelihood of success on the merits. The court

---

2 The State contended in its opposition to Reclaim Idaho's motion for preliminary injunctive relief that "Plaintiffs seek to change the status quo, not preserve it," and proceeded to analyze the *Winter* factors. [ER 131-40.] When the district court made clear it was granting mandatory relief [*see* ER 035], the State filed a notice that expressly pointed out to the district court that it had not applied the appropriate standard [ER 057-58].

ignored the State's statutory scheme in deciding Reclaim Idaho was reasonably diligent. Likewise the district court erred in finding a severe burden during the time from March 18, 2020 until at least the date of the Order to Self-Isolate went into effect (March 25, 2020). As admitted by Reclaim Idaho's counsel upon questioning from the district court, whether the Order to Self-Isolate had an exception for First Amendment activities would not have made any difference. [ER 109; Tr. 17:13-25.] Even when the Order to Self-Isolate went into effect, the district court erred by failing to consider whether any limitation on Reclaim Idaho's First Amendment rights was justified as a result of the pandemic. Nor did the district court explain why Idaho's in-person signature requirement did not survive strict scrutiny. And to top it off, the district court failed to apply this Court's mandatory injunction standard in reaching its decision. Each of these reasons justify vacating the district court's mandatory injunctive relief.

The district court applied this Circuit's *Angle* framework. [*See* ER 025 (citing *Angle v. Miller*, 673 F.3d 1122, 1132 (9th Cir. 2012)).]. The State notes a Circuit split and contends that the appropriate framework the district court should have applied was to consider non-discriminatory initiative regulations—especially those at issue here dealing with initiative procedures—as subject to at most rational basis

— 29 —

review.3 The State reserves this argument before the panel because in this Circuit one panel cannot overrule a decision of another panel, save for an intervening decision by the U.S. Supreme Court that undercuts "the theory or reasoning underlying the prior circuit precedent in such a way that the cases are irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc).

Under the *Angle* framework, the district court first determines whether the restrictions on the initiative process (1) "restrict one-on-one communication between petition circulators and voters" *or* (2) "make it less likely that proponents will be able to garner the signatures necessary to place an initiative on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Arizonans for Fair Elections v. Hobbs*, No. CV-20-00658-PHX-DWL, 2020 WL 1905747, at *8 (D. Ariz. Apr. 17, 2020) (quoting *Angle*, 673 F.3d at 1127). The test for the second category is "whether a 'reasonably diligent initiative campaign could have secured a place on the ballot despite the challenged regulation." *Id.* (quoting *Angle*, 673 F.3d at 1133).

---

3 *Compare Angle with Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006) (en banc) (citations omitted) ("[T]here is a crucial difference between a law that has the 'inevitable effect' of reducing speech because it restricts or regulates speech, and a law that has the 'inevitable effect' of reducing speech because it makes particular speech less likely to succeed.); *Molinari v. Bloomberg*, 564 F.3d 587, 599-602 (2d Cir. 2009) (citing *Walker*, 450 F.3d at 1100) (remaining citations omitted); *Marijuana Policy Project v. United States*, 304 F.3d 82 (D.C. Cir. 2002) (cited by *Walker*, 450 F.3d at 1100).

Here, the district court erred in its determination of reasonable diligence.

1.   <u>The district court erred in finding reasonable diligence</u>.

The district court found that "Reclaim Idaho was reasonably diligent in collecting signatures." [ER 028-29.] It did so after rejecting the State's position that reasonable diligence required consideration of the fact Reclaim Idaho had up to 18 months to collect signatures, and not just the little more than six months it chose. [ER 028.] The court found the State's argument unpersuasive, and instead based its decision upon when Reclaim Idaho's data previously showed it would work for a campaign: "Reclaim Idaho began collecting signatures as soon as their data from a previous successful campaign suggested they do so. Once the group started its drive, there is no real argument to diligence in effort." [*Id.*]

> a. *The district court based its reasonable diligence determination upon Reclaim Idaho's best estimate of when to start, instead of considering the statutory scheme.*

The district court's reliance on Reclaim Idaho's *estimate* of when it was best for it to start its initiative campaign, rather than the statutory scheme's allowance of up to 18 months to collect signatures, is contrary to the Ninth Circuit's established legal principle that should have guided the district court's analysis. The Ninth Circuit in *Angle* noted its consideration of the burden on plaintiffs like Reclaim Idaho had to be measured against "the entire statutory scheme regulating ballot access[.]"

— 31 —

*Angle*, 673 F.3d at 1133 (quoting *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008)) (remaining citation omitted).

Had the district court used the statutory scheme, it would have accounted for the fact that an initiative proponent had a choice of when to start the initiative process, so as to maximize the 18 months the statutory process affords them to then collect signatures. A reasonably diligent initiative proponent could have ensured that they used the entire 18 months prior to April 30 of the year of the next general election to obtain signatures. *See* Idaho Code § 34-1802(1).

Moreover, the fact that Reclaim Idaho successfully obtained sufficient signatures in an initiative campaign for the last general election is evidence that a reasonably diligent initiative proponent can obtain sufficient signatures under the statutory scheme. *Cf. Libertarian Party of Wash. v. Munro*, 31 F.3d 759, 763 (9th Cir. 1994) (citing *Storer v. Brown*, 415 U.S. 724, 742 (1974)) ("This historical experience strongly suggests that Washington's ballot access regulations do not severely burden the constitutional rights of minor parties or their candidates."), overruled on other grounds by *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019 (9th Cir. 2016).

Instead of looking at the statutory scheme as a whole, the district court incorrectly based its diligence determination upon when Reclaim Idaho itself *estimated* it would need to focus its efforts on collecting signatures. This is a guess

by an initiative proponent as to when they can be most successful at collecting signatures with the resources they have. But this does not take away from the fact that Idaho gives up to 18 months to collect signatures, and that it is the initiative proponent who chooses how much time they have to collect signatures. The district court's analysis allowed Reclaim Idaho to unilaterally modify a generous State statute into a more burdensome one and then gave it the benefit of the burden that it created! This is not the test that this Court has endorsed.

Reclaim Idaho's "one size fits all" estimate not only assumed that the electorate would respond in largely identical fashion to a wholly different policy issue but also that the signature-gathering environment would remain the same—i.e., that there would be no significant unanticipated disruptions such as, for example, health emergencies that would negatively affect the number of signature gatherers or access to electors. Reclaim Idaho thus bore the risk that its estimate might prove incorrect based upon the underlying assumptions. In short, it rolled the dice and lost.

> b. *The district court erred in discounting that Reclaim Idaho*
> *voluntarily chose to stop its efforts on March 18, 2020.*

The district court also rejected the State's contention that Reclaim Idaho had brought harm upon itself by voluntarily discontinuing its campaign prior to the issuance of any Order to Self-Isolate. [ER 028.] But given that Reclaim Idaho was

seeking urgent, if not emergent, mandatory relief, the district court should have considered whether Reclaim Idaho caused its own harm. *Morgan v. White*, ___ F.3d at ___, No. 20-1801, 2020 WL 3818059, at *1 (7th Cir. 2020) ("One important question, when a plaintiff seeks emergency relief, is whether the plaintiff has brought the emergency on himself.").

Here, Reclaim Idaho's decision to voluntarily suspend its campaign on March 18, 2020, caused itself harm, as there was no State order or directive that forced it to stop collecting signatures. This decision followed the first major decision that also brought Reclaim Idaho's emergency upon itself: choosing to start the initiative process so as to leave itself about six months to collect signatures, when it could have had up to 18 months to collect signatures. It also brought harm upon itself by waiting more than two and one-half months to actually bring the lawsuit, well after the deadline had passed for signatures to be collected and submitted, and well after the Order to Self-Isolate had been rescinded.

These facts are relevant to the district court's considerations of considering Reclaim Idaho's late request for preliminary injunctive relief. For the Seventh Circuit, it was one reason to sustain the denial of the *Morgan* plaintiffs' requests for injunctive relief. *Morgan*, 2020 WL 3818059, at *1 ("Plaintiffs had plenty of time to gather signatures before the pandemic began. That's a good reason to conclude that they are not entitled to emergency relief."); *see also Morgan v. White*, No. 20 C

2189, 2020 WL 2526484, at *3 (N.D. Ill. May 18, 2020) (explaining it was faulting the plaintiffs for not acting quicker to gather signatures in the 18 months available to them, and commenting, "Plaintiffs could have begun the petition process months ago but most chose not to do so, and Morgan's efforts appear to be thin."). Likewise, a federal district court for North Dakota faulted the plaintiffs before it, who sought to get a proposed constitutional amendment on the November 3, 2020 general election ballot, because they had a year to gather signatures, but did not file their paperwork until late in the game, and thus left themselves little more than two months to collect signatures. *Sinner v. Jaeger*, No. 3:20-cv-00076, 2020 WL 3244143, at *6 (D.N.D. June 15, 2020) (footnote omitted) ("NDVF's predicament is largely attributable to its own delay."); *accord Arizonans for Fair Elections*, 2020 WL 1905747, at *12 ("All of this strongly suggests that, had Plaintiffs simply started gathering signatures earlier, they could have gathered more than enough to qualify for the ballot before the COVID-19 pandemic started interfering with their efforts.").

> c. *Reclaim Idaho's delay cost it its ability to seek relief, as it filed a complaint seeking retroactive injunctive relief.*

The lynchpin of Reclaim Idaho's Complaint for Declaratory Judgment and Preliminary Injunction ("Complaint") is its allegation that the Order to Self-Isolate "made it impossible to collect signatures within the time period prescribed by statute[.]" [ER 211 ¶ 47.] But once the Order to Self-Isolate (as amended) was

— 35 —

rescinded effective May 1, 2020, there was no continuing State action that could be said to be violating federal law. Because Reclaim Idaho sued Defendants in their official capacities, under *Ex parte Young*, 209 U.S. 123, 155-56 (1908), it was required to seek prospective relief with respect to the State action allegedly violating federal law while it was *ongoing*.

The Order to Self-Isolate was rescinded more than a month before Reclaim Idaho filed its Complaint. [*See* ER 016.] The Complaint seeks relief from an alleged violation that ended May 1, 2020. This is retrospective relief. The Supreme Court has been clear that such relief is impermissible against State officials when sued in their official capacity. *See Green v. Mansour*, 474 U.S. 64, 68 (1985) (citations omitted). Granting Reclaim Idaho time it allegedly lost because of the Order to Self-Isolate, effectively trying to put it back in a position had there been no Order to Self-Isolate, is trying to retrospectively grant relief when no Order to Self-Isolate existed at the time of the suit.[4] *Ulaleo v. Paty*, 902 F.2d 1395, 1399-1400 (9th Cir. 1990). Moreover, Reclaim Idaho's counsel also admitted that the fact that the Order to Self-Isolate did not contain an exception for First Amendment activities, did not make a

---

[4] As discussed below, the fact that Reclaim Idaho alleges it could not collect signatures from March 16, 2020 until March 25, 2020 is due not to State action, but due to Reclaim Idaho's response to the COVID-19 pandemic. That Reclaim Idaho alleges Defendants would not change Idaho's statutory requirements—something which they had no authority to do—again does not point to any action of Defendants that prevented Reclaim Idaho from collecting signatures during that time frame.

difference. [ER 109, Tr. 17:13-25.] Simply put, to the extent that Reclaim Idaho claims the Order impermissibly foreclosed its exercise of federal rights, relief against the Governor and the Secretary is foreclosed by the immunity from federal court suit reaffirmed in the Eleventh Amendment.

Moreover, as discussed below, any alleged condition upon Reclaim Idaho's First Amendment rights in the Order to Self-Isolate was constitutionally sound. Thus removing a constitutionally sound Order to Self-Isolate and the COVID-19 pandemic from the equation, as must be done as it is not of State-creation; the only challenge remaining is to whether a deadline of April 30 of an election year is a constitutionally sound requirement for collecting signatures. And the law is clear that it is. A state has a clear interest in the orderly and efficient administration of elections. *Clements v. Fashing*, 457 U.S. 957, 965 (1982). Idaho's April 30 signature collection deadline, and a May 1 submission deadline, further the State's interest in ensuring sufficient time to verify the signatures submitted, for which the county clerks have 60 days or until the end of June to complete. There is also time for the Secretary of State to verify that the ultimate submission to him qualifies once it is submitted in the first week of July. The signature deadline also furthers the State's interest by allowing arguments for and against an initiative petition that has been found to qualify for the ballot, as well as rebuttals, to be collected in late July through August 1, and for a voters' pamphlet to be compiled such that it is ready for printing

in September. Finally, an April 30 deadline also ensures sufficient time for the Secretary of State to prepare sample ballots, which are required to be sent to the county clerks no later than September 7. And lest we forget, there is also an August election in the mix.

In short, the April 30 deadline for collecting signatures does not burden initiative proponents in such a way that they are denied access to the ballot. *See Thompson v. Dewine*, 959 F.3d 804, 811 (6th Cir. 2020). And taking into account the entire statutory scheme that permits initiative proponents to choose how much time they wish to have to collect signatures, up to 18 months, shows that any burden of having an April 30 deadline to collect signatures is not severe, and that the deadlines further the State's important and compelling interests in an orderly and efficient election, as well as insuring election integrity.

2. <u>The district court erred as a matter of law in finding a severe burden</u>.

In analyzing the two types of restrictions under *Angle*, the district court concluded, regarding restricting one-on-one communication between petitioner circulators and voters, that the "first type of restriction [was] largely not at issue in this case." [ER 025.] The State agrees with that. But the district court found that the second type of restriction was at play (ER 025-26), which arises when "*regulations … make it less likely that proponents will be able to garner the signatures necessary*

to place an initiative on the ballot…." *Angle*, 673 F.3d at 1132 (emphasis added) (citation omitted).

Reclaim Idaho's Complaint was based upon two timelines. In the first timeline, from approximately March 16, 2020 until March 25, 2020, Reclaim Idaho alleged it asked about gathering signatures electronically on March 16, 2020, and was informed by the Secretary of State's Office that "there [was] no statute allowing electronic signatures for petitions in Idaho Statutes 34, Title 18" and after it was "informed … that the Governor would not be taking an executive action to allow for electronic signatures." [ER 209 ¶ 36.] Reclaim Idaho then suspended its campaign. [ER 210 ¶ 37.]

According to the Complaint, the second timeline existed from March 25, 2020 through April 30, 2020. [ER 210 ¶¶ 38-40.] And this, according to the Complaint, is when the Order to Self-Isolate was in effect, which Reclaim Idaho averred had "no exceptions for initiative gathering or other First Amendment activities." [*Id.* ¶ 39; *but see* ER 109 Tr. 17:13-25 (confirming it would have made no difference).]

The district court's analysis followed this two-timeline approach: It concluded that there was a burden when "the State refused to take executive action to ensure Reclaim Idaho could continue to safely gather signatures from March 16, 2020, when the request was made to both the Governor and the Secretary of State," [ER 026.] It also concluded, consistent with the second timeline, that there was a burden

also "through the end of the amended state-at-home order." [*Id.*] The conclusion as to each timeline was legally incorrect.

> a. *The district court erred as a matter of law in faulting the State for not taking action, and should have analyzed the State's regulations in play during the timeframes.*

The district court faulted the State for "refus[ing] to take executive action to ensure Reclaim Idaho could continue to safely gather signatures…." [ER 026.] In other words, the court decided that the First Amendment requires the government to change its otherwise valid election procedures in response to environmental factors it does not control. This was error, for the legal standard under *Angle* is whether a state's restriction *through state regulation* restricts the direct, one-on-one communication (or speech) between the voters and the petition circulators, or whether the "regulations make it less likely that proponents will be able to garner the signatures necessary to place an initiative on the ballot." 673 F.3d at 1132. The district court should have examined the State's regulations, and not some alleged failure to act. *Cf. Thompson*, 959 F.3d at 810 (citations omitted) ("[J]ust because procuring signatures is now harder (largely because of a disease beyond the control of the State) doesn't mean that Plaintiffs are *excluded* from the ballot. And we must remember, First Amendment violations require state action."). As discussed above, the deadline established by statute to submit signatures is a constitutionally sound way of ensuring both an orderly election and electoral integrity through sufficient

— 40 —

time for the verification of the signatures. As discussed below, the in-person signature requirement is a valid way for the State to prevent fraud regarding initiatives, and it passes strict scrutiny.

>   b.  *The district court erred in finding a burden attributable to the State between March 16, 2020 and at least March 25, 2020.*

The district court faulted the State for not taking executive action between March 16, 2020 and March 25, 2020. But this conclusion is legally problematic—it misinterprets the *Angle* framework. The focus of the *Angle* framework is the State's regulation. 673 F.3d at 1132. Between March 16, and at least March 25, 2020, it was not the State's signature requirement that made it "less likely that proponents will be able to garner the signatures necessary," but the COVID-19 pandemic and attendant concerns related to that pandemic. *Id.*; [*see also* ER 108 Tr. 12:1-8.]

The Sixth Circuit made a similar point in *Thompson*. It had concluded that the law requiring signatures to be collected, whether in a pandemic or not, was not a severe burden created by state action. *Thompson*, 959 F.3d at 810. Further, as with Idaho, Ohio also advanced compelling interests in its anti-fraud measures and its timelines to orderly process the ballots. *Id.* "[J]ust because procuring signatures [was] harder (largely because of a disease beyond the control of the State) doesn't mean that Plaintiffs [were] excluded from the ballot." *Id.* The same is true here. As the Sixth Circuit also cautioned, "we must remember, First Amendment violations

— 41 —

require state action." *Id.* Here there was no State action from March 16, 2020 until at least March 25, 2020, that made it harder for Reclaim Idaho to collect signatures and get a spot on the ballot.

> c. *The district court erred as a matter of law when it failed to analyze the Order to Self-Isolate as a constitutionally sound public health order, even if it had the effect of limiting certain activities, such as signature gathering.*

In describing the second timeline, the district court noted the existence of the Order to Self-Isolate (called the stay-at-home order by the district court) and concluded that it did not include an exception for First Amendment activities. [ER 15-16.] The claim by Reclaim Idaho was that during the second timeline, the State, through the Order to Self-Isolate, had made it impossible for Reclaim Idaho to collect signatures. [ER 211 ¶ 46; *but see* ER 109 Tr. 17:13-25.] Following the district court's first order, the State brought to the district court's attention the fact that the Order to Self-Isolate was a valid public health order [ER 056], but the district court did not reference *Jacobson* in its order addressing the stay or requiring the State to grant Reclaim Idaho 48 additional days to collect electronic signatures [*See* ER 001-04; ER 005-08].

The U.S. Constitution leaves primarily to the states "[t]he safety and the health of the people," known as the police power. *Jacobson*, 197 U.S. at 38. Although the *Jacobson* Court had before it consideration of a mandatory vaccine regulation for

smallpox, it recognized on the larger scale that in times like these, with a pandemic ongoing, that the exercise of "all rights" is subject to "reasonable conditions" that are "essential to the safety, health, peace, good order, and morals of the community." *Id*. at 26; *see also S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (U.S. May 29, 2020) (citing *Jacobson*, 197 U.S. at 38) ("The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'"). Such a condition must have a substantial relation to public health, and not be "beyond all question, a plain, palpable invasion of rights secured by the fundamental law[.]" *Jacobson*, 197 U.S. at 31 (citations omitted). The at-issue orders were neutral laws of general applicability that had a clear and substantial relation to public health, slowing the spread of a pandemic.

Here, there can be no question that Idaho put in place its Order to Self-Isolate for the protection of its citizenry. To the extent the Order limited Reclaim Idaho's ability to collect signatures, such restriction was appropriate in an effort to control the spread of COVID-19. Moreover, as discussed below, the Order to Self-Isolate also incorporated guidance from the Cybersecurity and Infrastructure Security Agency ("CISA") of the United States Homeland Security Department that allowed

election activity. Most telling, counsel for Reclaim Idaho admitted at oral argument that even if there had been an express exemption for "First Amendment activity" it would not have made a difference because Reclaim Idaho still would not have collected signatures during the pandemic. [ER 109 Tr. 17:13-25.]

> d. *The district court failed to account for the fact that Idaho had incorporated CISA guidance as part of its Orders to Self-Isolate.*

The district court concluded that the Order to Self-Isolate did not provide an exception for First Amendment activities. [ER 016.] However, as the State informed the court in its June 26, 2020 notice, the Order to Self-Isolate did provide that entities could operate essential businesses [ER 055-056; ER 067 ¶¶ 4-5; ER 074 ¶¶ 4-5], and as part of its definition of "essential business," incorporated by reference CISA guidance [ER 070; ER 080-81.] That guidance in turn included elections personnel as part of its definition of "Other community-based government operations and essential functions," which the CISA guidance clarified on March 28: "Elections personnel to include both public and private sector elections support." [ER 092; ER 103.] Thus, Reclaim Idaho could have continued to collect signatures during the Order to Self-Isolate under this guidance, although it never sought clarification or confirmation of this.

3.    <u>The district court erred as a matter of law in implicitly concluding that Idaho's anti-fraud measures requiring in-person signatures, circulator certification of the signatures, and county clerk verifications, do not survive strict scrutiny.</u>

According to *Angle*, if the district court concludes that an election regulation imposes a severe burden, the district court is then to apply strict scrutiny to the regulations that are at issue. 673 F.3d at 1133. After discussing the constitutional framework, [ER 024-27], reasonable diligence, [ER 028-29], and the ability of a party to place an initiative on the ballot, [ER 029-31], the district court immediately concluded its analysis and moved on to irreparable harm, [ER 031]. The court did not consider whether Idaho's regulations survived strict scrutiny, specifically whether Idaho's in-person signature requirements survived strict scrutiny. This misinterpretation of the legal principle regarding Reclaim Idaho's likelihood of success justifies vacating the district court's preliminary injunction.

Idaho's in-person signature requirements and attendant verification requirements, Idaho Code § 34-1807, survive strict scrutiny.[5] Under the First

---

[5] To say that a law that promotes an anti-fraud measure by requiring in-person signatures actually burdens or restricts speech in such a way that it deserves strict scrutiny shows the fallacy of the framework used by *Angle*. Rather, such a law is a reasonable type of a non-discriminatory, content-neutral regulation that should be subject to rational basis review. "When States impose 'reasonable nondiscriminatory restrictions[,]' courts apply rational basis review and 'the State's important regulatory interests are generally sufficient to justify' the restrictions.'" *Thompson*, 959 F.3d at 808 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)) (some internal quotation marks omitted).

Amendment, a law survives strict scrutiny if "it advances a compelling state interest, and is narrowly tailored[.]" *Eu*, 489 U.S. at 222 (citations omitted). A State, of course, has a compelling interest in ensuring the integrity of its election and in preventing fraud. *See Purcell*, 549 U.S. at 4. The consequences of voter fraud include "driv[ing] honest citizens out of the democratic process," and "breed[ing] distrust" in government, a sense of disenfranchisement, and, ultimately, denial of the "'right of suffrage.'" *Id.* (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).

Idaho's requirements are narrowly tailored to further this interest. By requiring a signature, and other information from the voter, Idaho ensures that its county clerks can verify that the signature is legitimate—as the clerk of Idaho's largest county explained, his office is verifying the signature on the petition against the signature maintained on the voter registration card. [ER 151 ¶ 17.] This furthers Idaho's interest in preventing fraudulent signatures, a concern the Idaho Legislature expressly declared. Idaho Code § 34-1801.

One of the cases cited with approval by the district court also found that the state's in-person signature requirement survived strict scrutiny under the *Angle* framework. *Fair Maps Nev.*, 2020 WL 2798018. Like here, the plaintiffs there "ask[ed] the Court to order the Secretary to set up a system for collecting and verifying signatures offered to support an initiative petition electronically, for the first time, immediately." *Id.* at *16. As noted above, the court first rejected the

request under the *Purcell* principle. *Id.* Alternatively, the Nevada court noted that the in-person signature requirements made "clear their approach to preventing fraud is to ensure people sign initiative petitions in-person, and do not appear to allow for electronic signatures." *Id.* at *17; *see also* Idaho Code § 34-1801. It found that they were narrowly tailored to serve that interest.

Here, had the district court below heeded the *Purcell* principle, like the Nevada district court had, it should have steered clear of Reclaim Idaho's request for gathering electronic signatures. But even upon finding a severe burden, the district court should have applied a strict scrutiny analysis—which it did not do— and found that Idaho's in-person signature requirements survive strict scrutiny, just like Nevada's in-person signature requirements. *Cf. Thompson*, 959 F.3d at 810 ("[J]ust because procuring signatures is now harder (largely because of a disease beyond the control of the State) doesn't mean that Plaintiffs are excluded from the ballot.").

**III.  The district court abused its discretion in consideration of the other preliminary injunction factors**.

**A.    The district court's irreparable harm analysis was based on the flawed premise that Reclaim Idaho had a right to be on this year's ballot.**

For its irreparable harm analysis, the district court concluded that without a preliminary injunction, "the initiative will not appear on the 2020 general election

ballot." [ER 031.] The court also rejected the State's argument that Reclaim Idaho could restart its petition for the 2022 election. [ER 029-30.] The district court's analysis, however, failed to explain or address why the First Amendment guaranteed Reclaim Idaho a spot on this year's ballot. The First Amendment contains no right to place an initiative on the ballot. *Angle*, 673 F.3d at 1133 (citation omitted); *see also Jones v. Markiewicz-Qualkinbush*, 892 F.3d 935, 937 (7th Cir. 2018) (collecting cases). Nor does the statutory scheme itself guarantee placement on a particular year's ballot, except for those initiative petitions that meet the deadlines and requirements, which Reclaim Idaho did not do. That Reclaim Idaho may try again with the 2022 election demonstrates that it has not been irreparably harmed. *Cf. Morgan*, 2020 WL 3818059, at *2 ("If we understand the Governor's orders, coupled with the signature requirements, as equivalent to a decision to skip all referenda for the 2020 election cycle, there is no federal problem. Illinois may decide for itself whether a pandemic is a good time to be soliciting signatures on the streets in order to add referenda to a ballot.").

**B.    The district court's consideration of the balance of equities and public interests failed to account for the harm to the State in enjoining its carefully crafted initiative process, and the public interest in enforcement of the Legislature's laws.**

The district court found that both the balance of equities and public interest weighed in favor of Reclaim Idaho. [ER 031-33.] However, the district court's

— 48 —

decision to enjoin a large portion of Idaho's carefully crafted initiative process is harm to the State. *E.g.*, *Maryland v. King*, 133 S. Ct. 1, 2 (2012) (Roberts, C.J., in chambers); *New Motor Vehicle Bd. of Cal. V. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("it is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."). Moreover, the public's interest lies in ensuring an integral initiative process, with vetted checks to ensure against fraud. The district court's hastily implemented remedy undermines this important public interest.

### C. The balance of equities did not favor Reclaim Idaho, as it sat on its rights, and the district court erred in not applying laches.

The balance of equities also did not favor Reclaim Idaho. And although the State argued Reclaim Idaho's case should be dismissed under laches, the district court disagreed. [*See* ER 029.] Reclaim Idaho's pattern of dilatoriness continued beyond when it started the initiative process. It continued to this lawsuit. Reclaim Idaho did *not* file its lawsuit when the first cases of COVID-19 were reported in Idaho. Reclaim Idaho did *not* file its lawsuit when staff of the Governor's office and of the Secretary of State's office responded to inquiries. Reclaim Idaho did *not* file its lawsuit when it voluntarily suspended its campaign. Reclaim Idaho did *not* file its lawsuit when Idaho's Order to Self-Isolate was entered, or when it was amended.

Reclaim Idaho did *not* file its lawsuit on the last day of signature gathering, or on the last day to submit its signatures to the counties. And Reclaim Idaho did *not* file its lawsuit on or before the last day the Order to Self-Isolate was in effect.

Instead, Reclaim Idaho filed its lawsuit on June 6, 2020. The more than two and one-half months that Reclaim Idaho elected to wait to bring its lawsuit, should have under equitable circumstances, barred this suit by laches. The fact that it was brought more than a month after any Order to Self-Isolate was in effect and more than a month after signatures were due should also have caused the district court to find that Reclaim Idaho's lawsuit was barred by laches.

Here, there are both unreasonable delay by Reclaim Idaho and prejudice to the State. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001) (per curiam). With respect to the delay, Reclaim Idaho knew or should have known of any potential claim—at least based on the district court's holding—no later than March 16, 2020 or March 25, 2020. Yet it waited more than two months, and more than a month after the signature deadline had lapsed and after the Order to Self-Isolate (as amended) had been rescinded, to even bring this suit.

Such a delay is unreasonable, especially in the elections context where in June, Reclaim Idaho sought more than 45 days of additional time, and yet by federal law, absentee ballots have to be printed by September 14, 2020. [*See* ER 149-50 ¶ 7; ER 154]. As described above, the fact that *now* in light of the court's order, the counties

*and* the State will have only from August 27 until September 14 to complete their duties that they would have otherwise had from May 1 to complete (a difference of about four months) shows the unreasonableness of Reclaim Idaho's delay. It is proof of why federal courts should not interrupt state elections—including their initiative process—so close to the election cycle.

Reclaim Idaho's delay was unreasonable as a matter of law. Reclaim Idaho's period of delay cannot be attributed to any administrative exhaustion process—there was none; there was no period of evaluation and preparation of a complicated claim; and there was no evidence of laborious hours spent trying to determine whether to sue the State. *See Danjaq*, 263 F.3d at 954 (citations omitted). Rather, Reclaim Idaho decided to "invest[] time in developing a model for an online signature-collection plan." [ER 189 ¶ 41.] That's action reserved to the Legislature.

Reclaim Idaho's delay in filing suit has severely prejudiced the State. *See Danjaq*, 263 F.3d at 955 ("A defendant may also demonstrate prejudice by showing that it took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly.").

In rejecting the State's asserted equities, the court did not examine Reclaim Idaho's delay, nor did it seek to understand what prejudice would befall the State. This misinterpretation of this Circuit's underlying legal principle for laches, alone, justifies reversal of the district court's mandatory injunctive relief. If this Court

— 51 —

reaches the issue of laches, it should fault Reclaim Idaho for its delay. *Cf. Lyons v. City of Columbus*, No. 2:20-cv-3070, 2020 WL 3396319, at *5-6 (S.D. Ohio, Jun. 19, 2020) (applying laches to plaintiffs who "waited until the day before their filing deadline to seek injunctive or declaratory relief" and finding that the defendants were prejudiced by it).

## CONCLUSION

The district court erred repeatedly as a matter of law by fundamentally altering Idaho's initiative process, as that process was ongoing and with deadlines already passed. The district court also abused its discretion and committed legal error in its interpretation of the legal principles that guided the issuance of mandatory injunctive relief. All told, the district court abused its discretion in granting Reclaim Idaho, a political action committee, who was not reasonably diligent in this matter, a preliminary injunction. The district court's preliminary injunction should be vacated.

Respectfully submitted,

LAWRENCE G. WASDEN
Attorney General

BRIAN KANE
Assistant Chief Deputy
STEVEN L. OLSEN
Chief of Civil Litigation

_/s/Robert A. Berry_

ROBERT A. BERRY, ISB NO. 7442
MEGAN A. LARRONDO, ISB NO. 10597
Deputy Attorneys General
Statehouse, Room 210
Boise, ID 83720
Attorneys for Appellants

— 53 —

## STATEMENT OF RELATED CASES

Under Ninth Cir. Rule 28-2.6, the State is not aware of any related case.

## **CERTIFICATE OF COMPLIANCE**
## **PURSUANT TO CIRCUIT RULE 32-1**

I certify that:

The brief is

 XX  Proportionately spaced, has a typeface of 14 points or more and contains 12,380 words

or is

_____ Monospaced, has 10.5 or fewer characters per inch and contains _____ words or _____ lines of text

or is

_____ In conformance with the type specifications set forth at Fed. R. App. P. 32(a)(5) and does not exceed _____ pages

By: */s/ Robert A. Berry*
ROBERT A. BERRY, ISB NO. 7442
MEGAN A. LARRONDO, ISB NO. 10597
Deputy Attorneys General
Statehouse, Room 210
Boise, ID 83720
Attorneys for Appellants