**Case No. 20-35584**

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

RECLAIM IDAHO, et al.,
Plaintiffs-Appellees,

vs.

BRADLEY LITTLE, et al.,
Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Idaho
D.C. No. 1:20-cv-00268-BLW
(Winmill, B.L., Presiding)

---

## EXCERPTS OF RECORD, VOLUME 2 OF 2

---

LAWRENCE G. WASDEN
ATTORNEY GENERAL

BRIAN KANE
Assistant Chief Deputy

STEVEN L. OLSEN
Chief of Civil Litigation Division

ROBERT A. BERRY, ISB NO. 7442
MEGAN A. LARRONDO, ISB NO. 10597
Deputy Attorneys General
Statehouse, Room 210, Boise, ID 83720
Telephone: (208) 334-2400
Fax: (208) 854-8073
Counsel for Appellants Bradley Little and Lawerence Denney

July 17, 2020

**INDEX**

| Volume 1 Documents | Date | District Court Docket No. | Excerpt Pages |
|---|---|---|---|
| Order Granting in Part and Denying in Part Plaintiffs' Motion to Enforce the Court's Order | June 30, 2020 | 19 | ER-001 – ER-004 |
| Order Denying Motion to Stay | June 29, 2020 | 17 | ER-005 – ER-008 |
| Memorandum Decision and Order | June 26, 2020 | 14 | ER-009 – ER-035 |

| Volume 2 Documents | Date | District Court Docket No. | Excerpt Pages |
|---|---|---|---|
| Notice of Appeal | June 30, 2020 | 20 | ER-036 – ER-037 |
| Exhibit A to Status Report on Compliance with Court's June 30th Order | July 10, 2020 | 25-1 | ER-038 – ER-042 |
| Notice re: Dkt. 19 | July 9, 2020 | 23 | ER-043 – ER-047 |
| Expedited Motion to Enforce Court's Order | June 29, 2020 | 18 | ER-048 – ER-050 |
| Notice and Motion to Stay Pursuant to F.R.C.P. 62(d) and F.R.A.P. 8 | June 26, 2020 | 16 | ER-051 – ER-064 |
| Exhibit A to: Notice and Motion to Stay Pursuant to F.R.C.P. 62(d) and F.R.A.P. 8 (Order to Self-Isolate (as amended April 15, 2020); Order to Self-Isolate (March 25, 2020)) | June 26, 2020 | 16-1 | ER-065 – ER-082 |

| | | | |
|---|---|---|---|
| Exhibit B to: Notice and Motion to Stay Pursuant to F.R.C.P. 62(d) and F.R.A.P. 8 (CISA guidance) | June 26, 2020 | 16-2 | ER-083 – ER-106 |
| Transcript, June 23, 2020 Hearing Pages: 1, 12, 17, 48 | June 23, 2020 | 15 | ER-107 – ER-111 |
| Corrected Supplemental Declaration of Phil McGrane in Support of Defendants | June 23, 2020 | 12-1 | ER-112 – ER-118 |
| Supplemental Declaration of Jason Hancock in Support of Defendants | June 23, 2020 | 11-2 | ER-119 – ER-122 |
| Governor Little and Idaho Secretary of State's Opposition to Plaintiffs' Motion for Preliminary Injunction (Dkt. 2) | June 18, 2020 | 8 | ER-123 – ER-141 |
| Declaration of Phil McGrane in Support of Defendants | June 18, 2020 | 8-1 | ER-142 – ER-147 |
| Declaration of Jason Hancock in Support of Defendants | June 18, 2020 | 8-2 | ER-148 – ER-153 |
| Exhibit A to Declaration of Jason Hancock in Support of Defendants (Secretary of State Dir. 2015-1) | June 18, 2020 | 8-3 | ER-154 |
| Declaration of Sheryl Millard in Support of Defendants | June 18, 2020 | 8-4 | ER-155 – ER-157 |
| Exhibit A to Declaration of Sheryl Millard in Support of Defendants | June 18, 2020 | 8-5 | ER-158 – ER-159 |
| Declaration of Andrew Mitzel in Support of Defendants | June 18, 2020 | 8-6 | ER-160 – ER-162 |
| Exhibit A to Declaration of Andrew Mitzel in Support of Defendants | June 18, 2020 | 8-7 | ER-163 – ER-166 |
| Declaration of Counsel in Support of Defendants | June 18, 2020 | 8-8 | ER-164 – ER-169 |

| Exhibit A to Declaration of Counsel in Support of Defendants | June 18, 2020 | 8-9 | ER-170 – ER-176 |
|---|---|---|---|
| Expedited Motion for Preliminary Injunction | June 6, 2020 | 2 | ER-177 – ER-179 |
| Declaration of Luke Mayville in Support of Expedited Motion for Preliminary Injunction | June 6, 2020 | 2-2 | ER-180 – ER-196 |
| Declaration of Linda Larson in Support of Expedited Motion for Preliminary Injunction | June 6, 2020 | 2-6 | ER-197 – ER-201 |
| Complaint | June 6, 2020 | 1 | ER-202 – ER-213 |
| District Court Docket Entries / Record of Actions | (as of July 17, 2020) | N/A | ER-214 – ER-218 |

DATED:  July 17, 2020.

Respectfully submitted,

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By:  */s/ Robert A. Berry*
ROBERT A BERRY
Deputy Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 17, 2020.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Robert A. Berry*
ROBERT A BERRY
Deputy Attorney General

LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation Division

ROBERT A. BERRY, ISB #7442
MEGAN A. LARRONDO, ISB #10597
Deputy Attorneys General
Civil Litigation Division
Office of the Attorney General
P. O. Box 83720
Boise, ID  83720-0010
Telephone:     (208) 334-2400
Facsimile:     (208) 854-8073
robert.berry@ag.idaho.gov
megan.larrondo@ag.idaho.gov

    Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| RECLAIM IDAHO, an Idaho political action committee, and LUKE MAYVILLE, | Case No. 1:20-cv-00268-BLW |
| Plaintiffs, | **NOTICE OF  PRELIMINARY INJUNCTION APPEAL** |
| vs. | |
| BRADLEY LITTLE, in his official capacity as Governor of Idaho, and LAWERENCE DENNEY his official capacity as Idaho Secretary of State, | |
| Defendants. | |

    Defendants Bradley Little and Lawerence Denney hereby appeal from the Memorandum

Decision and Order granting Plaintiff's a Preliminary Injunction entered on June 26, 2020 (Dkt.

14) and the Order Granting in Part and Denying in Part Plaintiffs' Motion to Enforce the Court's

Order entered on June 30, 2020 (Dkt. 19) to the Ninth Circuit Court of Appeals.

/ / /

NOTICE OF PRELIMINARY INJUNCTION APPEAL – 1

A Representation Statement is attached hereto pursuant to Ninth Circuit Rule 3-2.

DATED: June 30, 2020.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By:   */s/ Robert A. Berry*
     ROBERT A BERRY
     Deputy Attorney General

---

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 30, 2020, I electronically filed the foregoing with the Clerk of the Court using the CMF/ECF system which sent a Notice of Electronic Filing to the following persons:

| Deborah A. Ferguson | Craig H. Durham |
|---|---|
| daf@fergusondurham.com | chd@fergusondurham.com |

     */s/ Robert A. Berry*
     ROBERT A BERRY
     Deputy Attorney General

Exhibit A to Status Report

1

# FERGUSON DURHAM, PLLC

Deborah A. Ferguson          223 North 6th Street, Suite 325          Telephone
Craig H. Durham                    Boise, Idaho 83702                          (208) 484-2253
                                                                                        Facsimile
Email: daf@fergusondurham.com                                              (208) 906-8663
      chd@fergusondurham.com

July 8, 2020

**Via email**

Robert Berry
Deputy Attorney General
Civil Litigation Division

Re: *Reclaim Idaho v. Gov. Bradley Little and Secretary of State Lawerence Denney*,
Case No. 20-cv-00268- BLW

Dear Robert:

Today will be our fourth meet and confer meeting to address the State's concerns over Reclaim Idaho's plan for collection and submission of authentic e-signatures as set forth in the Court's orders dated June 30th (Dkt. 19), and June 26th, (Dkt. 14). We have already addressed these points with you at our numerous meet and confer meetings, but wanted to provide the written summary as well as we have discussed a lot of detailed information.

- Collection of signatures

    - Reclaim Idaho will establish a dedicated website for on-line signature collection. **Note: As you requested, we have confirmed the website will be secure, with encryption built into it. It will be connected through https:// as opposed to http://.**

    - The landing page will ask for support to place the issue on the ballot to increase funding for K-12 education. The page will provide a link for the person to read the full text at this initial juncture. The potential signers will see the full screen and the long and short titles. They will have the option of clicking a "start" button that will take them to the bottom of the page , or they can scroll to the bottom manually. **Note: As you requested, at any point they can scroll up and down to see the full text of the entire initiative. In sum, the first page, with the short and long titles ballot titles will be easily viewable to all signers. Moreover,**

**Reclaim can commit to sharing a link on the landing page where potential signers can review the full petition before entering their information, in response to your request for this feature.**

o Before a person can proceed, they will be required to check a box verifying that they are a registered voter and that they have not previously signed this petition. **Note: In response to your concerns about informing potential signers that they are leaving Reclaim Idaho's landing page, we modified the language above the form to specifically indicate Docusign's involvement in the process as follows, with the following message: "Please fill out the form below. After you fill out the form, you will be redirected to a DocuSign form where you will sign the official petition."**

o If the person elects to proceed, they will enter their name, voter registration address, city and zip code, last 4 digits of their social security number, and their email address. **Note: The person will not be asked to enter their driver's license number. Docusign has informed Reclaim that a driver's license is not essential for meeting industry standards. In light of that, and the fact that such a requirement would overly restrict the pool of registered voters who are eligible to sign, there appears no need for this requirement.**

o They will hit 'next' and be directed to a PDF of the petition that looks exactly like the paper version except that: 1. It will have only one signature line, 2. It will have fields for the last 4 digits of their SSN and the county where the elector resides, and 3. The circulator statement will have additional wording due to the on-line nature. **Note: This PDF document will contain the Short and Long Ballot titles, which the person can read in full before signing the initiative as you have requested.**

o All of the fields in the PDF document will populate from the information provided by the person on the landing page and they will be asked to confirm the information and authorize the placing of their signature on the petition. If they elect to proceed, a cursive version of their signature will be affixed to the signature field. **Note: You have also expressed concerns about the ability to cancel the transaction, should someone chose to do so. There is also a separate button to cancel the transaction in the event a person declines to sign.**

o If a transaction is cancelled no information is retained. **Note: In response to your concern over the data entered by individuals who chose not to sign, no signer data will be retained, or even accessed by Docusign.**

o A few notes on authentication:

3

- The DocuSign form will capture the person's IP address and GPS location. The form will also capture the person's *intent to sign* by requiring that they check a box confirming their intention to provide an electronic signature. These three factors (IP address, GPS location, and intent to sign) all provide additional authentication. **Note: Taken together with the requirement to provide the last 4 digits of a social security number, these measures will place Reclaim Idaho's petition well above industry standards for authentication.**

- For every signature Reclaim Idaho collects, it will have on file a certificate of completion. This certificate is a legally binding document that provides an audit trail in case the authenticity of a signature needs to be reviewed. The audit trail includes a time stamp for when the person signed along with their GPS location and IP address. **Note: As set forth above, Reclaim Idaho will provide the Secretary of State with a certificate for each e-signature collected if requested, once a protective order is in place. Should the Secretary of State decide to review the authenticity of any signature, he can do so by reviewing the audit trail.**

- <u>Submission and verification of signatures</u>

  - Each signer's name, address, and city or zip code will be collected in CSV file format. This is the same information the county clerks currently are provided in connection with initiative petitions (absent a wet signature). It will be formatted as a spread sheet and be organized as follows:
    First name/Last name/ street address/ city/ zip code

    **Note: You requested that the county clerks also be provided with the last four digits of the social security number of each signer. Reclaim declines this request for several reasons. First, the clerks have never been provided this information on petitions and have no practical use for it. Second, you have indicated that the State may have a duty to release this information in response to a Public Records Act request. According to our research the petition becomes an official public record pursuant to IC § 34-1806, as we have previously discussed with you. As such, we do not want to include these public identifiers beyond the information required by statute and inadvertently expose it to disclosure.**
    **However, to address your concerns and make the process as transparent as possible, we will provide this information to the State once a protective order is in place, if requested. This simple measure should protect the State from an obligation to disclose the last four digits of the social security numbers as a public record, as currently it is our understanding that the current exemptions upon which the Secretary of State relies -IC § 106 (25) and (34) - would not protect this information from disclosure.**

4

- o Reclaim Idaho will submit CSV files to each county via email, containing only the signatures collected in that county. County clerks will then verify whether each signer is a registered voter at the provided address. Clerks will also match a Legislative District to each signer, as they have always done. If this information cannot be confirmed the clerk will strike the signature, just as they have done in the past. **Note: Because the information will be provided in a typewritten spread sheet, this should facilitate an easier and faster review than the handwritten entries usually provided.**

- o In order to further lighten the burden on county clerks, Reclaim Idaho will submit signatures periodically throughout the 48-day drive. At the close of each week during the signature drive, Reclaim Idaho intends to email to each county a CSV file containing all signatures collected from signers in that county during the previous seven days.

- o Reclaim Idaho will take the following measures to meet the highest industry standards for verifying the identity and authenticity of each signature.

    - ▪ Reclaim Idaho's DocuSign form will confirm each signer's intent to sign and their consent to do business electronically (these are the essential measures that must be taken to ensure that signatures are authentic and legally binding under the ESIGN Act).
    - ▪ For every signature Reclaim Idaho collects, it will store a certificate of completion. This certificate is a legally binding document that provides an audit trail. The audit trail includes a time stamp for when the person signed along with their GPS location and IP address.

Thank you for working with us on compliance with the Court's orders.

Very truly yours,

/s/

Deborah A. Ferguson

5

LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation Division

ROBERT A. BERRY, ISB #7442
MEGAN A. LARRONDO, ISB #10597
Deputy Attorneys General
Civil Litigation Division
Office of the Attorney General
P.O. Box 83720
Boise, ID  83720-0010
Telephone:     (208) 334-2400
Facsimile:      (208) 854-8073
robert.berry@ag.idaho.gov
megan.larrondo@ag.idaho.gov

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| RECLAIM IDAHO, an Idaho political action committee, and LUKE MAYVILLE, | ) ) ) ) | Case No. 1:20-cv-00268-BLW |
| Plaintiff, | ) ) | **NOTICE RE: DKT. 19** |
| vs. | ) ) ) | |
| BRADLEY LITTLE, in his official capacity as Governor of Idaho, and LAWERENCE DENNEY his official capacity as Idaho Secretary of State, | ) ) ) ) | |
| Defendants. | ) ) ) | |

On June 30, 2020, this Court entered an Order granting in Part and Denying in Part Plaintiffs' Motion to Enforce the Court's Order. (Dkt. 19.)  The Court ordered counsel to meet and confer by Thursday, July 2, 2020, to implement the process and protocol for accepting signatures gathered through the DocuSign technology.  "Absent an agreement of counsel to the contrary, that

NOTICE RE: DKT. 19 – 1

process and protocol shall be completed by Thursday, July 9." (*Id.* at p. 4.) "Should counsel be unable to reach an agreement as to the process and protocol, Reclaim Idaho may implement an industry standard process and protocol. Such process and protocol must ensure the highest available standards are used to verify a signer's identity, legislative district, and the authenticity of the signature." (*Id.*)

Counsel met and conferred on Wednesday, July 1, 2020; Friday (a holiday), July 3, 2020; and Tuesday, July 7, 2020. Counsel for the Defendants also reviewed written proposals provided by Reclaim Idaho. An agreement is unable to be reached.

While Defendants understand the Court ordered that Reclaim Idaho be allowed to collect electronic signatures on its initiative petition, the Court's order must be interpreted in the narrowest fashion possible. Reclaim Idaho's proposal would sweep aside a myriad of Idaho statutes, would disrespect the Idaho Legislature's policy judgments, and would undermine public confidence in the election process.

Based on the most recent communication from Reclaim Idaho outlining its proposal, Defendants see the following fundamental problems:

(1)      Regarding authentication of signatures, Reclaim Idaho's proposal provides no indication that DocuSign or Reclaim Idaho will, or even can, use the data that Reclaim Idaho proposes to collect during the electronic signature process to verify the authenticity of the "signatures" collected. Yet, Reclaim Idaho states in its proposal that it will withhold this information from the county clerks whose statutory role it is to verify the authenticity of signatures on initiative petitions, as well as from the Secretary of State. That is neither workable nor acceptable.

/ / /

NOTICE RE: DKT. 19 – 2

(2)      Reclaim Idaho's proposal places non-party county clerks in a Catch-22 situation whereby they are prevented from exercising their statutory duties yet at the same time are still bound by Idaho statute, not by the Court's order.  Under Reclaim Idaho's proposal, the clerks would still be required by statute to verify signatures but would no longer have the information necessary to do so.  Again, this is neither workable nor acceptable.

(3)      The process Reclaim Idaho proposes invites opportunities for fraud and abuse.  For example, the system proposed by Reclaim Idaho would allow a single person using one or different computers to sign the petition for themselves and on behalf of others.  In addition, an individual could mask their IP address, GPS location, and time of signing to evade the detection of fraudulent "signatures."  This is deeply troubling, particularly where the website facilitating the process was developed in a matter of days without any testing as far as Defendants are aware.

(4)      Reclaim Idaho's proposal would collect Idaho citizens' highly personal information, e.g. their IP address and GPS location, and the last four digits of their social security number, which are not required to be disclosed when physical signatures are gathered.  There are multiple privacy, data-use, and data-security concerns surrounding private parties collecting personal data for a political purpose.  There is nothing in Reclaim Idaho's proposal that would prevent DocuSign or Reclaim Idaho from using any of the data collected for purposes other than verification of "signatures" on this particular initiative campaign, including from selling this data.  Even more concerning, as stated above, the website collecting this information would have been developed in just a few days and would not undergo any security testing to Defendants' knowledge.

(5)      Defendants have grave concerns about the protection of Idahoan's personal information.  There is a possibility the information collected by Reclaim Idaho and DocuSign could be subject to a public records request.  A protective order would not remedy this concern,

NOTICE RE: DKT. 19 – 3

nor would it be appropriate. The State cannot enter into a protective order against itself. Moreover, a protective order could not protect against loss of the data collected via a data breach.

(6) Defendants are also concerned that the online form of the initiative petition and the language that Reclaim Idaho proposes to use to describe the initiative petition would not comply with Idaho law.

(7) The compressed schedule for creating an entirely new electronic "signature" collection system in a matter of days for initiative petitions has prevented the State from evaluating a number of other issues. These unresolved issues illustrate the fundamental inability of the State to be forced to partner with a private company that it did not select to provide these type of services on a compressed timeframe. For example, Defendants do not know how DocuSign is being compensated for its software and services; whether DocuSign has ever accepted signatures for a ballot initiative; or whether DocuSign has ever accepted signatures from persons it has no prior information about.

Ultimately, while Defendants engaged in good faith communications with Reclaim Idaho regarding a protocol that could be used for the collection of electronic signatures, Defendants' grave concerns regarding electronic signature collection on initiative petitions were confirmed. Defendants cannot agree to Reclaim Idaho's proposal for collecting electronic signatures on their initiative petition. To do so would undermine public faith in elections and disregard the will of Idaho's elected representatives.

DATED this 9th day of July, 2020.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By: ___/s/ Megan A. Larrondo___
MEGAN A. LARRONDO
Deputy Attorney General

NOTICE RE: DKT. 19 – 4

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 9, 2020, I electronically filed the foregoing with the Clerk of the Court using the CMF/ECF system which sent a Notice of Electronic Filing to the following persons:

Deborah A. Ferguson                          Craig H. Durham
daf@fergusondurham.com                       chd@fergusondurham.com


_____/s/ Megan A. Larrondo_____
MEGAN A. LARRONDO
Deputy Attorney General


NOTICE RE: DKT. 19 – 5

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **RECLAIM IDAHO**, an Idaho Political Action Committee, and **LUKE MAYVILLE**, <br><br> Plaintiff, <br><br> v. <br><br> **LAWERENCE DENNEY**, in his official capacity as Idaho Secretary of State; **BRADLEY LITTLE**, in his official capacity as Governor of Idaho <br><br> Defendants. | Case No. 1:20-cv-00268-BLW <br><br><br> **EXPEDITED MOTION TO ENFORCE COURT'S ORDER** |

On June 23, 2020, to remedy the violation of Plaintiffs' constitutional rights, this Court ordered Defendants to choose either to certify the signatures that have been collected and place Reclaim Idaho's initiative on the November 2020 ballot for voter consideration, or to allow Reclaim Idaho an additional 48-days to gather signatures through online solicitation and submission. The Court gave Defendants until 5:00 p.m. on June 26 to make their election.

1

On June 26, the Court issued a written decision memorializing its ruling from the bench. (Dkt. 14.)

In Defendants' "Notice and Motion to Stay Pursuant to F.R.C.P. 62(d) AND F.R.A.P. 8," filed on June 26, they provided notice that they did not intend to comply with the Court's order to choose either option. (Dkt. 16.) Today, the Court issued an order denying Defendants' Motion to Stay. (Dkt. 17.)

Defendants have made it clear that they do not intend to comply with either option that the Court ordered them to choose. In light of their extraordinary response, Reclaim Idaho requests that the Court order Defendants to certify the initiative for the November ballot. The other option would require a "process and protocol" to complete the requested 48-days of online gathering of signatures. (Dkt. 17, pp. 3-4) Defendants' clear response shows that they have no intention of cooperating with Reclaim Idaho or complying with the Court's order. For that reason, Reclaim Idaho respectfully requests that the Court order Defendants to certify the initiative for the November 2020 ballot. Defendants have already indicated that they will seek Ninth Circuit review and such an order would put a definitive remedy before the appellate court. Further, certification for the ballot is not as time-sensitive as the online gathering of signatures would be.

Respectfully submitted on this 29th day of June 2020.


*/s/Deborah A. Ferguson*

Craig H. Durham

Attorneys for Plaintiffs

2

**CERTIFICATE OF SERVICE**

I hereby certify on this 29th day of June, 2020, I filed the foregoing electronically

through the CM/ECF system, which caused the following parties or counsel to be served by

electronic means, as more fully reflected on the Notice of Electronic Filing

> Robert A. Berry
> Megan Ann Larrondo
> robert.berry@ag.idaho.gov
> megan.larrondo@ag.idaho.gov
> Attorneys for Defendants

> */s/ Craig H. Durham*

LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation Division

ROBERT A. BERRY, ISB #7442
MEGAN A. LARRONDO, ISB #10597
Deputy Attorneys General
Civil Litigation Division
Office of the Attorney General
P.O. Box 83720
Boise, ID  83720-0010
Telephone:     (208) 334-2400
Facsimile:     (208) 854-8073
robert.berry@ag.idaho.gov
megan.larrondo@ag.idaho.gov

        Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RECLAIM IDAHO, an Idaho political action committee, and LUKE MAYVILLE, | Case No. 1:20-cv-00268-BLW |
| Plaintiffs, | **NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.A.P. 8** |
| vs. | |
| BRADLEY LITTLE, in his official capacity as Governor of Idaho, and LAWERENCE DENNEY his official capacity as Idaho Secretary of State, | |
| Defendants. | |

## NOTICE REGARDING COURT DECISION MADE JUNE 23, 2020

At the close of the hearing on June 23, 2020, the Court instructed the State to accept, on

the eve of the upcoming elections, one of two options as a remedy to plaintiffs' ("Reclaim Idaho")

motion for preliminary injunction: (a) place Reclaim Idaho's education funding initiative on the

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.AP. 8 - 1

November 3, 2020 ballot without meeting any of the statutory prerequisites for qualifying for the ballot or (b) allow Reclaim Idaho an extension of 48 days to obtain signatures, and allow signatures to be collected electronically through DocuSign, requiring creation of an entirely new signature collection and verification process without any statutory procedure or guidance.

As previously argued, neither option is acceptable to the Governor nor Secretary of State pursuant to United States Supreme Court precedent and Idaho law. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). Reclaim Idaho did not suffer a First Amendment violation here–its injury was caused by its own delay and, as Reclaim Idaho and the Court acknowledge, the COVID-19 pandemic. Moreover, when faced with a society-threatening epidemic, a state may implement emergency measures that temporary curtail constitutional rights so long as the measures have some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *In re Abbott*, 954 F.3d 772, 785 (5th Cir. 2020); *see also Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11, 25 S.Ct. 358, 358 (1905) (rejecting a claim that Massachusetts's compulsory vaccination law, enacted in response to a smallpox epidemic, violated the defendant's Fourteenth Amendment right "to care for his own body and health in such way as to him seems best.") The court in *Abbott* also noted that: "*Jacobson* instructs that all constitutional rights may be reasonably restricted to combat a public health emergency." *Id.* at. 786. That is what occurred here. Now, seven weeks after they missed their deadline to submit signatures, and long after temporary restrictions protecting public health were relaxed, plaintiffs object that the temporary restrictions violated their right to gather signatures.

Even if a First Amendment violation occurred, which it did not, the Court's options are beyond what may permissibly be ordered or what is reasonable under these circumstances.

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.AP. 8 - 2

The Governor and Secretary of State cannot accept option (a) because the signature percentage and geographic distribution requirement for ballot initiatives are not met. Idaho Code § 34-1805; *see also Isbelle v. Denney*, Case No. 1:19-cv-000093-DCN, 2020 WL 2841886 (D. Idaho June 1, 2020). Plaintiffs' evidence demonstrates neither element has been met. Moreover, certifying the initiative would violate other provisions in Idaho law, such as those requiring verification of signatures and those allowing argument or rebuttal as required under Idaho law. *See* Idaho Code §§ 34-1812A, 1812B.

The Governor and Secretary of State cannot accept option (b) because electronic signature gathering is not allowed under Idaho law and will be extremely disruptive to the State's preparation for the August and November elections. Idaho Code § 34-1807. Wholesale changes to the initiative process cannot be made pursuant to *Purcell* and *Republican Nat'l Comm.*, S. Ct. at 1207. Defendants identified the issues and disruption that will be caused by having to adopt a whole new method of signature verification in their opposing brief and as further explained in the Declarations and Supplemental Declarations of Phil McGrane and Jason Hancock. (See Dkts. 8-1, 8-2, 11-2, 11-3.) More specifically, the Supplemental Declaration of Mr. Hancock shows that prospective voters who register to vote online do not "attest" to their identity by electronically signing their voter registration. (Dkt. 11-2.) They provide several points of personal information, many of which are nonpublic, including their driver's license number, social security number and date of birth. When the registered voter then requests an absentee ballot (whether electronically or by filling out an absentee ballot request form), and they receive their absentee ballot, they must physically sign the affidavit on the back of the absentee ballot return envelope. (*Id.*) Upon receiving the completed absentee ballot, the county clerk then compares the physical signature on the back of the envelope with the physical signature on record.  The process is similar for an in-person election, in that the

voter signs the poll book when they come to the polls to vote (in addition to showing their photo ID), and this physical signature can be compared to the physical signature on file. Accordingly, the framework under option (b) remains untenable.

In light of the foregoing, defendants cannot choose either option, because to do so would be to knowingly violate their oaths to uphold the law. The Court should consider whether an injunction is warranted in light of this response. To the extent the Court orders the Governor and the Secretary of State to take steps to implement one of the options above, or a substantially similar option, the Governor and Secretary of State ask that the Court stay that order pending an appeal to the Ninth Circuit. *See* Fed. R. Civ. P. 62(d); Fed. R. App. P. 8.

The Court should grant such stay, which is within the Court's discretion, because the Governor and Secretary of State can show an entitlement to a stay upon the circumstances of this case. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The Governor and Secretary of State have a strong likelihood of succeeding; the Governor and Secretary of State, in their official capacities as elected, constitutional officers of the State of Idaho, will be irreparably injured; the balance of hardships favors a stay; and the public interest lies in upholding a voting system enacted by the people's representatives in the Idaho Legislature. *See Nken*, 556 U.S. at 434.

## A.    The Governor and Secretary of State's strong likelihood of success.

There is a strong likelihood of success for the Governor and Secretary of State if the Court orders them to accept Reclaim Idaho's initiative or permit them another 48 days to collect electronic, DocuSign signatures.  Idaho "has a compelling interest in preserving the integrity of its election process. Confidence in the integrity of our electoral processes is essential to the function of our participatory democracy."  *Purcell*, 549 U.S. at 4.  Both of the proposed remedies would seriously undermine this compelling interest.

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.AP. 8 - 4

The State has the authority to establish its procedures with respect to ballot initiatives. *E.g.*, *Thompson v. DeWine*, 959 F.3d 804, 808 (6th Cir. 2020) (per curiam). Content-neutral initiative requirements that are reasonable and nondiscriminatory should be subjected to rational basis review. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). Severe restrictions "such as exclusion or virtual exclusion from the ballot" should be judged under strict scrutiny. *Thompson*, 959 F.3d at 809 (citing *Burdick*, 504 U.S. at 434). Cases in between weigh the burden imposed by the state against the state's interests, and take into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* (quoting *Burdick*, 504 U.S. at 434) (internal quotation marks and citation omitted).

Here, Reclaim Idaho cannot show a severe burden by any state action. Prior to the issuance of the Orders to Self-Isolate on March 25, 2020, Reclaim Idaho had already suspended its campaign. Even taking into account the Orders to Self-Isolate, which Reclaim Idaho note were in effect from March 25 through April 30, this approximately five-week time frame has not been shown to be a severe burden upon the total 18 months Reclaim Idaho had to collect signatures or even the shorter, six-month period Reclaim Idaho voluntarily chose.

Nor did Reclaim Idaho ever inquire whether they could gather signatures under the Order to Self-Isolate, which incorporated federal standards that allowed "Elections personnel to include both public and private sector elections support" to continue to operate during the term of that Order. *See* attached as Exhibit A (March 25 Stay-Home Order), ¶¶ 8.f and 8.k (incorporating the Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response issued by the Cybersecurity Infrastructure Security Agency of the United States Homeland Security ("CISA Guidance") dated March 19, 2020); *see also* attached as Exhibit B 8.f

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.AP. 8 - 5

and 8.k (incorporating the CISA Guidance dated March 28, 2020). The existence of this exemption further demonstrates the absence of any intrusion on Reclaim Idaho's rights by any action of the State.

The Orders to Self-Isolate at issue here were validly promulgated orders. The U.S. Supreme Court has explained that the exercise of "all rights" are subject to "reasonable conditions" that the government deems "essential to the safety, health, peace, good order, and morals of the community." *Jacobson*, 197 U.S. at 26. This limitation provides the government the power to protect the public health so long as the regulation has a real or substantial relation to public health, and is not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 31. Here, the Orders to Self-Isolate were neutral laws of general applicability. There was a real and substantial relation to public health with these orders, given the concern over the spread of COVID-19.

Requiring the State to implement the Court's selected remedy, whichever one it is, impinges on the State's power to control its elections. *Cf. Esshaki v. Whitmer*, , No. 20-1336, 2020 WL 2185553 at *2 (6th Cir. May 5, 2020) (citing *Clingman v. Beaver*, 544 U.S. 581, 586 (2005)). If the Court orders the Governor and Secretary of State to implement the first option, it will require the State to set aside its legislatively enacted procedures for ensuring voter integrity and those that balance the voters' voice throughout the State. If the Court orders the Governor and Secretary of State to implement the second option, it would completely re-write Idaho election procedures by: requiring the State to accept electronic signatures that lack the same ability to verify qualified elector status as compared to physical signatures, (*see* Dkt. 11-2); imposing an exceptional, if not impossible, burden on clerks' offices around the state to attempt to verify the signatures that are then presented to them in mid-August, (*see e.g.,* Dkt. 11-3); and eliminating the statutory process

to allow public argument and rebuttal, which by law is required to be complete by August 1, 2020, *see* Idaho Code §§ 34-1812A, 1812B.

Even if this Court applies the framework from *Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012) and *Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006), the recent Arizona case, *Arizonans for Fair Elections v. Hobbs*, No. CV-20-00658-PHX-DWL, 2020 WL 1905747 (D. Ariz. Apr. 17, 2020), is instructive. In that case, the district court concluded that the plaintiffs had not shown that a reasonably diligent proponent could not gain a place on the ballot. *Id.*, 2020 WL at *11. Here, the Governor and Secretary of State have already outlined how Reclaim Idaho was not diligent, and how unlike the plaintiffs in the *Fair Maps Nevada v. Cegavske* case, Reclaim Idaho failed to take action before the expiration of the deadline to get their initiative on the ballot this year. *Fair Maps Nevada v. Cegavske*, No. 3:20-cv-00271-MMD-WGC, 2020 WL 2798018 (D Nev. May 2, 2020).

There are some other issues that are worth noting with respect to the Governor and Secretary of State's strong likelihood of success. First, Reclaim Idaho did not seek prohibitory injunctive relief, but instead sought mandatory injunctive relief. Mandatory injunctions order a "party to 'take action.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). "[A] mandatory injunction 'goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored.'" *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). (quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)) (footnote omitted). Courts should deny requests for mandatory injunctions "'unless the facts and law clearly favor the moving party.'" *Id.* (quoting *Stanley*, 13 F.3d at 1320). To put it differently, the "burden here is doubly demanding: Because [Plaintiffs] seek [] a mandatory injunction, [they] must establish that the law and facts *clearly favor* [their] position, not simply that [they are] likely

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.AP. 8 - 7

to succeed." *Id.* The Governor and Secretary of State note that they believe Reclaim Idaho has not met its burden for a mandatory injunction.

Second, Reclaim Idaho has asked this Court to provide relief based upon the Orders to Self-Isolate, which were rescinded as of April 30, more than a month before plaintiffs filed their lawsuit. (Dkt. 1, ¶¶ 38-40; 46.) Rather than timely seeking relief from the Orders, Reclaim Idaho took no action while the Orders were in force. The relief they are thus requesting is retroactive in nature. But the *Ex parte Young* exception to the Eleventh Amendment allows federal courts to grant prospective injunctive relief "to prevent a continuing violation of federal law." *Green v. Mansour*, 474 U.S. 64, 68 (1985) (citation omitted). The U.S. Supreme Court has "refused to extend the reasoning of *Young*, however, to claims for retrospective relief." *Id.* (citations omitted). *Nor* are declaratory judgments generally available in circumstances such as this case. *Id.* at 73-74. And for this reason, plaintiffs' complaint is non-justiciable.

Third, the initiative process gave Reclaim Idaho up to 18 months to obtain the required number of signatures. There has been no showing or claim that the 18-month entitlement has been impermissibly burdened; rather Reclaim Idaho's own suggestion to the Court that they could have obtained the necessary signatures in a month-and-a-half shows that they could have met the statutory deadline had they acted diligently and begun the process earlier. Although Reclaim Idaho is unhappy that it was unable to meet the deadline for the process to get on this year's ballot, they have not argued for or cited any authority for the proposition that they have a First Amendment right to be on *this year's* ballot, especially where they chose not to use the process readily available to afford them more time

For these reasons, there is a strong likelihood of the Governor and Secretary of State's success in this matter.

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.AP. 8 - 8

**B.     Irreparable injury.**

Both of the options presented by the Court enjoin Idaho law, will create confusion amongst Idaho voters, and put at significant risk the State's ability to prepare for, and thus the integrity of, the upcoming August and November elections. If the Court orders the Governor and Secretary of State to implement one of the options that the Court has proposed, then there will be an irreparable injury to the voting system established by the Legislature, as that system would be disregarded in favor of the system or processes established by the Court. Unless the statute is unconstitutional, enjoining a "State from conducting [its] elections pursuant to a statute enacted by the Legislature . . . would seriously and irreparably harm [the State]." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).

By requiring that Reclaim Idaho's initiative be placed on the ballot with no further signature gathering or verification, the Court would be eviscerating Idaho's requirement of district and voter representation found in Idaho Code § 34-1805. The Court would also enjoin the processes chosen by the Idaho Legislature to ensure voter integrity, as applied to the circulators, the county clerks (who are not parties to the action), and the Secretary of State. Idaho Code § 34-1807; *see also* Idaho Code § 34-1802.

By requiring that Reclaim Idaho be permitted another 48 days to gather signatures, and to gather signatures through DocuSign, the Court will enjoin certain provisions of Idaho law, created an extremely burdensome, if not impossible, timeline for the county clerks, and will overlook and effectively enjoin other provisions of Idaho law providing for public input.

Granting another 48 days for Reclaim Idaho to gather signatures *and* requiring Idaho to accept electronic signatures would enjoin enforcement of Idaho's April 30 deadline, Idaho Code § 34-1802(1); and enjoin enforcement of Idaho's requirement for the circulator to collect

signatures on a sheet and certify that such was done in his or her presence, Idaho Code § 34-1807(1). It would place an exceptional burden on the county clerks to verify, to the extent they can, any signatures submitted in a matter of few weeks, during a pandemic and during preparations for the August and November elections, when they normally have 60 days to do such verification. *See* Idaho Code § 34-1802; Dkt. 11-3. It would remove certification and verification factors that the State was able to use with the recent mail-in primary election. (Dkt. 11-2.) And it will effectively eliminate the argument for and against the initiative that Idaho law would otherwise require by July 20, since it would be unknown until late August or September whether the initiative had qualified.

Other courts have recognized the merits of the in-person requirement in an initiative process, and expressed great concern about changing a procedure so close to the election. The Sixth Circuit in *Thompson* recognized that it is the States that "have the ability to choose among the many permissible options when designing elections." *Thompson*, 959 F.3d at 812. It noted the concerns in that case were magnified because the procedure offered by the plaintiffs threatened "to take the state into uncharted waters". *Id.* Because electronic signatures, even if they proved workable, could "also post serious security concerns and other, as yet unrealized, problems", the court noted that the choice to adopt electronic signatures was with the state officials, not the courts. *Id.* The court also recognized the U.S. Supreme Court's warning to not change state election rules as the election approached. *Id.* at 813 (citing *Republican Natl. Comm.*, 140 S. Ct. at 1207; *Purcell*, 549 U.S. at 4-5). The Nevada U.S. District Court likewise took into consideration the *Purcell* principle in the *Fair Maps Nevada* case. *Id.*, 2020 WL 2798018 at *16. It also held that Nevada's in-person requirement survived strict scrutiny by being narrowly tailored to achieve the state's compelling interest of fraud prevention. *Id.* at *16-17. Consistent with these courts' reasoning,

requiring Idaho to adopt and use electronic signatures will irreparably harm Idaho's electoral system.

In short, either option enjoins the Governor and Secretary of State from effectuating the voting system provided by Idaho law, enacted by the Idaho Legislature. Such action is irreparable injury. *Maryland v. King*, 133 S. Ct. 1 (2012) (Roberts, C.J., in chambers); *New Motor Vehicle Bd. of Cal. V. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("it is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."). Without a stay, Idaho's electoral system would be disrupted and displaced. *Cf. Lair v. Bullock*, 697 F.3d 1200, 1214-15 (9th Cir. 2012) ("[B]ecause of the likely disruption to the election and the untold, irreversible consequences that might result, the State of Montana has satisfied its burden of showing a probability that irreparable harm will occur.").

## C.    The substantial injury to Idaho's electoral system from the Court's proposed remedies outweigh any injury to Reclaim Idaho, the party that caused any emergency.

There will be actual, significant irreparable injury to Idaho by either of the Court's options because Idaho's duly enacted laws regarding the initiative process will be enjoined by order of the Court and replaced with a judicially-created procedure. In balancing the harms, the Court should consider equitable principles. *See Lair*, 697 F.3d at 1215.

Any harm Reclaim Idaho might incur by a stay of the Court's order, to the extent it can be blamed on an entity, is largely attributable to Reclaim Idaho. It filed this lawsuit more than a month after the deadline for submitting signatures, more than two months after the Order to Self-Isolate was issued, more than a month after the Order to Self-Isolate (as amended) was rescinded, and more than two-and-a-half months after Reclaim Idaho had itself decided to stop gathering signatures. Its lawsuit came mere weeks before the county clerks would otherwise be required to

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.AP. 8 - 11

complete their signature verifications, mere weeks before Idaho's voters would be allowed to have their voice heard through arguments in favor and against the initiative, and just months before the ballots are to be printed and the initiative and arguments for and against it would be communicated to all households across the great State of Idaho.

In sum, any perceived harm to Reclaim Idaho from it not being able to get on this year's ballot is due to its own lack of diligence in failing to bring this matter to the Court's attention before the deadline for filing signatures. That deadline is meant to ensure a process occurs to instill integrity in the electoral system's initiative process, and a process that allows Idaho voters input on the initiative. Moreover, Reclaim Idaho's substantial delay has rendered it impossible to grant it an extension without thoroughly interfering with Idaho's election process. As a result, the Court's proposed order will cause serious harm to the State's election system, on the eve of the election, and set aside the process that the Idaho Legislature created.

**D.      The peoples' interest in an electoral system that maintains integrity and that is established by their representatives (both in the House and Senate) of the Idaho Legislature.**

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell*, 549 U.S. at 7.

There can be no doubt that the Governor, the Secretary of State, and the State of Idaho have a strong interest in ensuring that Idaho's citizens have an electoral system they can be confident in. Idaho's constitutional right to put forward an initiative is bounded by the fact that the people granted power to the Idaho Legislature to arrive at the conditions and process for proposing such an initiative. Idaho Const. art. III, § 1. The Idaho Legislature, concerned by its finding of "incidents of fraudulent and misleading practices in soliciting and obtaining signatures on initiative …

petitions" as well as finding that false signatures had been made on such petitions, sought to ensure that an integral election system existed. Idaho Code § 34-1801.

To be sure, the Idaho Legislature enacted penalties for those who do commit wrongful acts. *E.g.,* Idaho Code §§ 34-1814 – 34-1822. But the Idaho Legislature also wanted to ensure integrity in the system in the first place. Idaho's electoral system balances the ability of the initiative proponent to circulate the petition and gather signatures, with the ability of the county clerks to verify signatures, and certify the numbers to the Secretary of State, so that the Secretary of State can also collect arguments in favor and against the initiative, with rebuttals, and so that the Secretary of State can inform Idaho's households of the initiative and the argument advanced by competing sides. Idaho's Legislature also wanted to ensure balance in the voice of Idahoans in the process of getting the initiative on the ballot, requiring that at least six percent of qualifying electors in 18 of Idaho's 35 legislative districts signed the petition, and at least six percent of all qualifying electors signed the petition, each based upon the numbers of qualified voters of the last general election for that district and for the State respectively.

This is a sound system that Idaho has established. A system that its citizens can rely upon. A system that its citizens can have confidence in. And a system that was developed through representational process. The public's interest weighs heavily in having a system that can ensure integrity. The Court, if it were to order the Governor and the Secretary of State to adopt one of the two options it presented, would be replacing the process that the peoples' representatives created to ensure that integrity, and would set aside the balance the Idaho Legislature struck. The public interest favors a stay.

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.AP. 8 - 13

**CONCLUSION**

The Governor and Secretary of State cannot choose either option the Court proposed as remedies without violating their duties to uphold the law.  If the Court chooses to award one of the proposed remedies, the Governor and Secretary of State request that the Court stay its order pending an appeal.

DATED:  June 26, 2020.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL


By: _/s/ Robert A. Berry_____
    ROBERT A BERRY
    Deputy Attorney General

----

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 26, 2020, I electronically filed the foregoing with the Clerk of the Court using the CMF/ECF system which sent a Notice of Electronic Filing to the following persons:

| | |
|---|---|
| Deborah A. Ferguson | Craig H. Durham |
| daf@fergusondurham.com | chd@fergusondurham.com |

_/s/ Robert A. Berry_____
ROBERT A BERRY
Deputy Attorney General

⌂ Home (https://coronavirus.idaho.gov) / Statewide Stay-Home Order

# Statewide Stay-Home Order

- View a PDF of the order 🗎 **here** (https://coronavirus.idaho.gov/wp-content/uploads/sites/127/2020/04/amended-statewide-stay-home-order_041520.pdf).
- View Frequently Asked Questions on the order **here** (https://coronavirus.idaho.gov/frequently-asked-questions-on-statewide-stay-home-order/).
- View list of Essential Services and Businesses **here** (https://coronavirus.idaho.gov/essential-services/).
- View Additional Guidance on the order **here** (https://coronavirus.idaho.gov/additional-guidance-statewide-stay-home-order/).

# IDAHO DEPARTMENT OF HEALTH AND WELFARE ORDER OF THE DIRECTOR

**ORDER TO SELF-ISOLATE**

**DATE OF ORDER: March 25, 2020**

**DATE OF AMENDMENT: April 15, 2020\*\*\***

THIS ORDER DIRECTS ALL INDIVIDUALS LIVING IN THE STATE OF IDAHO TO SELF-ISOLATE AT THEIR PLACE OF RESIDENCE.

- EXCEPT THAT THEY MAY LEAVE TO PROVIDE OR RECEIVE CERTAIN ESSENTIAL SERVICES OR ENGAGE IN CERTAIN ESSENTIAL ACTIVITIES AND WORK FOR ESSENTIAL BUSINESS AND GOVERNMENT SERVICES
- EXEMPTING INDIVIDUALS EXPERIENCING HOMELESSNESS FROM THE SELF-ISOLATION ORDER BUT URGING THEM TO FIND SHELTER AND GOVERNMENT AGENCIES TO PROVIDE IT;
- DIRECTING ALL BUSINESSES AND GOVERNMENTAL AGENCIES TO CEASE NONESSENTIALOPERATIONSATPHYSICALLOCATIONSINTHESTATEOF IDAHO;
- PROHIBITING ALL NON-ESSENTIAL GATHERINGS OF ANY NUMBER OF INDIVIDUALS; AND
- ORDERING CESSATION OF ALL NON-ESSENTIAL TRAVEL.

**On March 25, 2020, pursuant to the Constitution of the state of Idaho and Sections 46-601 and 46-1008, Idaho Code, the Governor ordered the Director of the Idaho Department of Health and Welfare ("the Director") to issue this Order to Self-Isolate.**

**The Director of the Idaho Department of Health and Welfare ("the Director") is authorized by Idaho Code § 56-1003(7) "to impose and enforce orders of isolation and quarantine to protect the public from the spread of infectious or communicable diseases."**

**This Order originally became effective at 1:30 p.m. on March 25, 2020 and will continue to be in effect until 11:59 p.m. on April 30, 2020 or until it is extended, rescinded, superseded, or amended in writing by the Director ().**

**\*\*\*The amendments to this Order contained herein are made to Section 1, Section 7 regarding travel into Idaho, Section 8.f.xxv regarding certain businesses, and Section 8.g.iii regarding Minimum Basic Operations. This amendment is effective as of April 15, 2020 and will continue to be in effect until 11:59 p.m. on April 30, 2020 or until it is extended rescinded, superseded, or amended in writing by the Director.**

**Please read this Order carefully. Violation of or failure to comply with this Order could constitute a misdemeanor punishable by fine, imprisonment, or both. Idaho Code § 56- 1003(7)(C).**

**SUMMARY**

The virus that causes Coronavirus 2019 Disease ("COVID-19") is easily transmitted, especially in group settings, and it is essential that the spread of the virus be slowed to protect the ability of public and private health care providers to handle the influx of new patients and safeguard public health and safety.

Because of the risk of the rapid spread of the virus, and the need to protect all citizens of the State of Idaho especially individuals most vulnerable to the virus and health care providers, this Order requires all individu anywhere in the State of Idaho to self-isolate – that is, stay at home – except for certain essential activities an

Privacy - Terms

work to provide essential business and government services or perform essential public infrastructure construction, including housing.

This order begins at 1:30 p.m. on March 25, 2020 and will continue to be in effect until 11:59 p.m. on April 30, 2020 or until it is extended, rescinded, superseded, or amended in writing by the Director, subject to the limited exceptions and under the terms and conditions more particularly set forth below.

Gatherings of individuals outside the home are prohibited, with certain exceptions for essential activities or essential travel or to perform work for essential businesses and government agencies or perform essential infrastructure work.

This Order requires during the effective period of the Order that all bars and nightclubs are ordered closed. Restaurants and cafes, regardless of their seating capacity, that serve food are ordered closed except solely for takeout and delivery service.

Additionally, all indoor gyms and recreation facilities are ordered closed. Homeless individuals are not subject to this Order to Self-Isolate but are strongly urged to find shelter and government agencies are urged to take steps needed to provide shelter for those individuals.

Under any of the limited circumstances in which individuals are allowed to interact in person outside their residence, the Director orders individuals to abide by the following requirements:

(i) Maintain at least six feet from other individuals, wash hands with soap and water for at least 20 seconds as frequently as possible or using hand sanitizer, cover coughs or sneezes, and not shake hands;

(ii) For people with medical conditions, regardless of age, that put them at higher risk of serious complications should they contract COVID-19, and other than health care workers and other essential providers, avoid leaving their homes to the extent possible; and

(iii) For employers in the State of Idaho that do not provide essential businesses or government services, take all steps necessary for employees to work remotely from home to the extent possible.

These requirements build on the United States Centers for Disease Control and Prevention guidelines issued March 11, 2020, extended as necessary to address the health emergency affecting the State of Idaho.

No individual who is sick may go to the workplace or be outside the home except as necessary to seek or receive medical care in accordance with guidance from public health officials.

**The Director may revise this Order as the situation evolves. Check the Governor's coronavirus website (coronavirus.idaho.gov) regularly.**

**UNDER THE AUTHORITY OF IDAHO CODE§ 56-1003(7) THE IDAHO DEPARTMENT OF HEALTH AND WELFARE DIRECTOR ORDERS:**

1. This Order is issued based on evidence of increasing occurrence of COVID-19 within the State of Idaho, scientific evidence and best practices regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, and evidence that the age, condition, and health of a significant portion of the population of the state places its citizens at risk for serious health complications, including death, from COVID-19.

Due to the outbreak of the COVID-19 virus, which the Centers for Disease Control and Prevention ("CDC") considers a serious public health threat, there is a public health emergency throughout the State of Idaho. Making the problem worse, some individuals who contract the COVID-19 virus have no symptoms or have mild symptoms, which means they may not be aware they carry the virus. Because even people without symptoms can transmit the disease, and because evidence shows the disease is easily spread, gatherings can result in transmission of the virus. At present, travel is a common known source of COVID-19 infections in Idaho. All fifty states and the District of Columbia have reported cases and declared states of emergency. Now, COVID-19 clusters with substantial community spread have developed across the United States, including in Idaho and neighboring states. Blaine County has the highest per-capita number of cases in the state and COVID-19 is believed to have been introduced into the county by a traveler or travelers visiting Idaho from out of state.

The scientific evidence shows that at this stage of the emergency, it is essential to slow virus transmission as much as possible to protect the most vulnerable and to prevent the health care system from being overwhelmed. One proven way to slow transmission is to limit interactions among people to the greatest extent practicable. By reducing the spread of the COVID-19 virus, this Order helps preserve critical and limited healthcare capacity in the State of Idaho.

2. This Order is necessary to slow the rate of spread and will be re-evaluated as further data becomes available.

3. The intent of this Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the maximum extent possible. When people need to leave their places of residence, whether to obtain or perform vital services, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times reasonably possible comply with Social Distancing Requirements as defined in Section 8.j. below. All provisions of this Order should be interpreted to effectuate this intent.

4. All individuals currently living within the State of Idaho are ordered to self-isolate at their place of residence. To the extent individuals are using shared or outdoor spaces, they must at all times as reasonably possible maintain social distancing of at least six feet from any other person when they are outside their residence. All persons may leave their residences only for Essential Activities, Essential Governmental Functions, or to operate Essential Businesses, all as defined in Section 8. Individuals experiencing homelessness are exempt from this Section, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable and to use COVID-19 risk mitigation practices in their operation.

5. All businesses with a facility in the State of Idaho, except Essential Businesses as defined below in Section 8, are required to cease all activities at facilities located within the state except Minimum Basic Operations, as defined in Section 8.g. For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home). All Essential Businesses are strongly encouraged to remain open. To the greatest extent feasible, Essential Businesses shall comply with Social Distancing Requirements as defined in Section 8.j. below, including by maintaining six-foot social distancing for both employees and members of the public, including, but not limited to, when any customers are standing in line.

6. All people in Idaho shall immediately cease hosting or participating in all public and private gatherings and multi-person activities for social, spiritual and recreational purposes, regardless of the number of people involved, except as specifically identified in Section 8. Such activity includes, but is not limited to, community, civic, public, leisure, faith-based, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities. This prohibition also applies to planned wedding and funeral events, with the exception that funerals are permitted so long as they occur outside and comply with the Social Distancing Requirements as defined in Section 8.j.

7. Travel Restrictions

a. Intrastate travel is prohibited, including but not limited to, travel on scooter, motorcycle, automobile, or public transit, except for those purposes defined in Section 8. People must use public transit only for purposes of performing Essential Activities or to travel to and from work to operate Essential Businesses or maintain Essential Governmental Functions. All travel must comply with Social Distancing Requirements as defined in Section 8.j. below, to the greatest extent feasible.

b. Statewide directive for individuals arriving in Idaho from another state or country to self-quarantine.

(i). Persons entering the state of Idaho are required to self-quarantine for 14 days. If an individual will be present in Idaho for fewer than 14 days, that individual must self-quarantine for the duration of their visit. For purposes of clarity, this directive does not apply to persons performing an Essential Purpose or persons who as part of their normal life live in one state and work or gain Essential Services in another state.

(ii). **"Essential Purpose"** is interpreted broadly and includes travel required for personal safety; food, beverage or medicine; medical care; pursuant to a lawful permit, license, court order, or rule; care of others; and to perform work, services or functions deemed critical to public health and safety, as well as economic and national security. Travel into the state of Idaho for recreation is not an Essential Purpose.

(iii). Any individual required by this directive to self-quarantine shall be responsible for any and all costs associated with the requirement to self-quarantine, including transportation, lodging, food, and medical care.

(iv.) Persons who have tested positive for COVID-19, are presumptively diagnosed with COVID-19, or are exhibiting symptoms identified in the CDC's screening guidance shall not enter the state of Idaho unless doing so under medical orders for the purposes of medical care, are being transported by emergency personnel, are being driven directly to a medical provider for purposes of medical care, or are a resident of the state of Idaho.

8. Definitions and Exemptions

a. For purposes of this Order, individuals may leave their residence only to perform any of the following **"Essential Activities."** But people at high risk of severe illness from COVID-19 and people who are sick are urged to stay in their residence to the extent possible except as necessary to seek medical care.

(i). To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets) or livestock, such as, by way of example only and without limitation, obtaining medical supplies or medication, visiting a health care professional, or obtaining supplies they need to work from home.

(ii). To obtain necessary services or supplies for themselves and their family or household members, or to deliver, including by truck or rail, those services or supplies to others, such as, by way of example only and without limitation, canned food, dry goods, fresh fruits and vegetables, pet supplies, livestock feed and supplies, fresh meats, fish, and poultry, and any other household consumer products, and products necessary to maintain the safety, sanitation, and essential operation of residences.

(iii). To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements as defined in Section 8.j., such as, by way of example and without limitation, walking, hiking, bicycling, or running.

(iv). To perform work providing essential products and services at an Essential Business or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations.

(v). To care for a family member or pet in another household.

b. For purposes of this Order, individuals may leave their residence to work for or obtain services at any **"Healthcare Operations"** including hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other healthcare facilities, healthcare suppliers, home healthcare services providers, mental health providers, or any related and/or ancillary healthcare services. "Healthcare Operations" also includes veterinary care and all healthcare services provided to animals. This exemption shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. "Healthcare Operations" does not include fitness and exercise gyms and similar facilities.

c. For purposes of this Order, individuals may leave their residence to provide any services or perform any work necessary to the operations and maintenance of **"Essential Infrastructure,"** including, but not limited to, public works construction, commercial construction and the transfer and selling thereof, construction of housing (in particular affordable housing or housing for individuals experiencing homelessness) and the transfer and selling thereof, airport operations, water, sewer, gas, electrical, oil refining, mining, roads and highways, public transportation, solid waste collection and removal, internet, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, telecommunications relay service, and web-based services), provided that they carry out those services or that work in compliance with Social Distancing Requirements as defined this Section, to the extent possible. As explained in Section 8.k. below, this Order incorporates by reference the guidance in the Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response issued by the Cybersecurity and Infrastructure Security Agency of the United States Homeland Security on March 19, 2020 ("CISA Guidance").

d. For purposes of this Order, all first responders, emergency management personnel, emergency dispatchers, court personnel, and law enforcement personnel, and others working for or to support Essential Businesses are categorically exempt from this Order. Further, nothing in this Order shall prohibit any individual from performing or accessing "Essential Governmental Functions." **Essential Government Functions** means all services needed to ensure the continuing operation of local, state, federal, or tribal government agencies and provide for the health, safety and welfare of the public. All Essential Governmental Functions shall be performed in compliance with Social Distancing Requirements as defined by Section 8.j., to the extent possible. As explained in Section 8.k. below, if any provisions in this Order conflict with any of the guidance in the CISA Guidance then the provisions of this Order shall control.

e. For the purposes of this Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function they perform, or its corporate or entity structure.

f. For the purposes of this Order, **"Essential Businesses"** means:

(i). Healthcare Operations and Essential Infrastructure;

(ii). Grocery stores, farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, liquor, beer, and wine and any other household consumer products (such

as cleaning and personal care products). This includes stores that sell groceries and also sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences;

(iii). Food cultivation and production, including farming, livestock, fishing, and food processing;

(iv). Businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals;

(v). Newspapers, television, radio, and other media services;

(vi). Gas stations and auto-supply, auto-repair, and related facilities;

(vii). Banks, credit unions, and financial institutions, including processing and maintaining systems for processing financial transactions and services (e.g., payment clearing, and settlement; wholesale funding; insurance services; and capital markets activities);

(viii). Hardware stores and firearms businesses as provided for in Idaho Code section 46-601(3);

(ix). Plumbers, electricians, exterminators, landscapers, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses;

(x). Businesses providing mailing and shipping services, including post office boxes;

(xi). Educational institutions-including public and private K-12 schools, colleges, and universities-for purposes of facilitating distance learning or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible;

(xii). Laundromats, dry cleaners, and laundry service providers;

(xiii). Restaurants and other facilities that prepare and serve food, but only for delivery or carry out. Schools and other entities that typically provide free food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;

(xiv). Hotels, motels, shared rental units, and similar facilities for purposes of housing, or to quarantine, those individuals exempted under Section 8.

(xv). Businesses that supply products needed for people to work from home;

(xvi). Businesses that supply other Essential Businesses or Essential Government Functions with the support or supplies necessary to operate;

(xvii). Businesses that ship or deliver groceries, food, goods or services directly to residences;

(xviii). Airlines, taxis, and other private transportation providers providing transportation services necessary for Essential Activities and other purposes expressly authorized in this Order;

(xix). Home-based care for seniors, adults, or children;

(xx). Residential facilities and shelters for seniors, adults, and children;

(xxi). Essential tribal operations;

(xxii). All operations at or related to the Idaho National Laboratory or needed to support or provide supplies to the Idaho National Laboratory;

(xxiii). Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities;

(xxiv). Childcare facilities providing services that enable employees exempted in this Order to work as permitted. To the extent possible, childcare facilities must operate under the following condition: childcare must be carried out in as small and stable groups as possible.

(xxv.) Businesses that are able to operate via curbside services, drive in, drive through pick up, mailed services or delivery services. Businesses must continue to maintain Social Distancing Requirements as defined in 8.j for both customers and employees, including prohibiting any congregation of customers or employees in or around the place of business.

As explained in Section 8.k. below, this Order incorporates by reference CISA Guidance issued by the Cybersecurity and Infrastructure Security Agency of the United States Homeland Security on March 19, 2020.

g. For the purposes of this Order, **"Minimum Basic Operations"** include the following, provided that employees comply with Social Distancing Requirements as defined this Section, to the extent possible, while carrying out such operations:

(i). The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, or for related functions.

(ii). The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

(iii). The minimum necessary activities to prepare the business to reopen at such time as deemed appropriate, including but not limited to, sanitization, obtaining personal protective equipment, and setting up procedures to ensure compliance with Social Distancing Requirements.

h. For the purposes of this Order, **"Essential Travel"** includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements as defined in Section 8.j.

(i). Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses, or Minimum Basic Operations.

(ii). Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

(iii). Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

(iv). Travel to return to a place of residence from outside the jurisdiction.

(v). Travel required by law enforcement or court order.

(vi). Travel required  for non-residents to return to their place of residence outside the State of Idaho. Individuals are strongly encouraged to verify that their transportation out of the State of Idaho remains available and functional prior to commencing such travel.

i. For purposes of this order, residences include hotels, motels, shared rental units, and similar facilities.

j. For purposes of this order **"Social Distancing Requirements"** includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

k. This Order incorporates by reference the Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response issued by the Cybersecurity and Infrastructure Security Agency of the United States Homeland Security on  March 28, 2020.  That  guidance  is  located  at **https://www.cis a.gov/publication/guidance-essen tial-cri tical-infrastruct ure-wor kforce** (https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce). This order also incorporates federal guidance from the Department of the Treasury and the Department of defense that are located at https://home.treasury.gov/news /press releases/sm956 and https://media.de fense.gov/2020/Mar/22/2002268024/- 1/- 1/1/DEFENSE-INDUSTRIAL-BASE-ESSENTIAL-CRITICAL INFRASTRUCT URE-WORKFORCE-MEMO.PDF

9. The Director requests that the Sheriff and the Chiefs of Police in the State of Idaho, and the Idaho State Police ensure compliance with and enforce this Order. The violation of any provision of this Order constitutes an imminent threat to public health.

10. This Order shall become effective as of April 15, 2020 and will continue to be in effect until 11:59 p.m. on April 30, 2020 or until it is extended, rescinded, superseded, or amended in writing by the Director.

11. To decrease the spread of COVID-19, the cities, counties, and public health districts of the State of Idaho may enact more stringent public health orders than those set out in this Order.

12. This Self-Isolation Order supersedes and replaces the prior Self-Isolation Order I issued for Blaine County, Idaho on March 20, 2020.

13. Each county and each city must promptly provide copies of the Order as follows: (1) by posting the Order on its website, (2) by posting the Order at each county courthouse and each city hall, and (3) by providing a copy to any member of the public requesting it. The Order will also be posted on the website of the Department of Health and Welfare.

14. If any provision of this Order or its application to any person or circumstance is held to be invalid, then the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

IT IS SO ORDERED.

Signed by Dave Jeppesen, Director, Idaho Department of Health and Welfare

Dated: March 25, 2020

Amended: April 15, 2020

## IDAHO DEPARTMENT OF HEALTH AND WELFARE
## ORDER OF THE DIRECTOR

### ORDER TO SELF-ISOLATE
### DATE OF ORDER: March 25, 2020
### DATE OF AMENDMENT: April 15, 2020

THIS ORDER DIRECTS ALL INDIVIDUALS LIVING IN THE STATE OF IDAHO TO SELF-ISOLATE AT THEIR PLACE OF RESIDENCE.

1. EXCEPT THAT THEY MAY LEAVE TO PROVIDE OR RECEIVE CERTAIN ESSENTIAL SERVICES OR ENGAGE IN CERTAIN ESSENTIAL ACTIVITIES AND WORK FOR ESSENTIAL BUSINESS AND GOVERNMENT SERVICES;

2. EXEMPTING INDIVIDUALS EXPERIENCING HOMELESSNESS FROM THE SELF-ISOLATION ORDER BUT URGING THEM TO FIND SHELTER AND GOVERNMENT AGENCIES TO PROVIDE IT;

3. DIRECTING ALL BUSINESSES AND GOVERNMENTAL AGENCIES TO CEASE NONESSENTIAL OPERATIONS AT PHYSICAL LOCATIONS IN THE STATE OF IDAHO;

4. PROHIBITING ALL NON-ESSENTIAL GATHERINGS OF ANY NUMBER OF INDIVIDUALS; AND

5. ORDERING CESSATION OF ALL NON-ESSENTIAL TRAVEL.

On March 25, 2020, pursuant to the Constitution of the state of Idaho and Sections 46-601 and 46-1008, Idaho Code, the Governor ordered the Director of the Idaho Department of Health and Welfare ("the Director") to issue this Order to Self-Isolate.

The Director of the Idaho Department of Health and Welfare is authorized by Idaho Code § 56-1003(7) "to impose and enforce orders of isolation and quarantine to protect the public from the spread of infectious or communicable diseases."

This Order originally became effective at 1:30 p.m. on March 25, 2020 and will continue to be in effect until 11:59 p.m. on April 30, 2020 or until it is extended, rescinded, superseded, or amended in writing by the Director.

***The amendments to this Order contained herein are made to Section 1, Section 7 regarding travel into Idaho, Section 8.f.xxv regarding certain businesses, and Section 8.g.iii regarding Minimum Basic Operations. This amendment is effective as of April 15, 2020 and will continue to be in effect until 11:59 p.m. on April 30, 2020 or until it is extended rescinded, superseded, or amended in writing by the Director.

## IDAHO DEPARTMENT OF HEALTH AND WELFARE
## ORDER OF THE DIRECTOR – 1

**Please read this Order carefully. Violation of or failure to comply with this Order could constitute a misdemeanor punishable by fine, imprisonment, or both. Idaho Code § 56-1003(7)(c).**

## SUMMARY

The virus that causes Coronavirus 2019 Disease ("COVID-19") is easily transmitted, especially in group settings, and it is essential that the spread of the virus be slowed to protect the ability of public and private health care providers to handle the influx of new patients and safeguard public health and safety.

Because of the risk of the rapid spread of the virus, and the need to protect all citizens of the State of Idaho, especially individuals most vulnerable to the virus and health care providers, this Order requires all individuals anywhere in the State of Idaho to self-isolate – that is, stay at home – except for certain essential activities and work to provide essential business and government services or perform essential public infrastructure construction, including housing.

This order begins at 1:30 p.m. on March 25, 2020 and will continue to be in effect until 11:59 p.m. on April 30, 2020 or until it is extended, rescinded, superseded, or amended in writing by the Director, subject to the limited exceptions and under the terms and conditions more particularly set forth below.

Gatherings of individuals outside the home are prohibited, with certain exceptions for essential activities or essential travel or to perform work for essential businesses and government agencies or perform essential infrastructure work.

This Order requires during the effective period of the Order that all bars and nightclubs are ordered closed. Restaurants and cafes, regardless of their seating capacity, that serve food are ordered closed except solely for takeout and delivery service.

Additionally, all indoor gyms and recreation facilities are ordered closed. Homeless individuals are not subject to this Order to Self-Isolate but are strongly urged to find shelter and government agencies are urged to take steps needed to provide shelter for those individuals.

Under any of the limited circumstances in which individuals are allowed to interact in person outside their residence, the Director orders individuals to abide by the following requirements:

(i)     Maintain at least six feet from other individuals, wash hands with soap and water for at least 20 seconds as frequently as possible or using hand sanitizer, cover coughs or sneezes, and not shake hands;

(ii)    For people with medical conditions, regardless of age, that put them at higher risk of serious complications should they contract COVID-19, and other than health care workers and other essential providers, avoid leaving their homes to the extent possible; and

**IDAHO DEPARTMENT OF HEALTH AND WELFARE**
**ORDER OF THE DIRECTOR – 2**

(iii)   For employers in the State of Idaho that do not provide essential businesses or government services, take all steps necessary for employees to work remotely from home to the extent possible.

These requirements build on the United States Centers for Disease Control and Prevention guidelines issued March 11, 2020, extended as necessary to address the health emergency affecting the State of Idaho.

No individual who is sick may go to the workplace or be outside the home except as necessary to seek or receive medical care in accordance with guidance from public health officials. **The Director may revise this Order as the situation evolves. Check the Governor's coronavirus website (coronavirus.idaho.gov) regularly.**

**UNDER THE AUTHORITY OF IDAHO CODE § 56-1003(7) THE IDAHO DEPARTMENT OF HEALTH AND WELFARE DIRECTOR ORDERS:**

1.  This Order is issued based on evidence of increasing occurrence of COVID-19 within the State of Idaho, scientific evidence and best practices regarding the most effective approaches to slow the transmission of communicable diseases generally and COVID-19 specifically, and evidence that the age, condition, and health of a significant portion of the population of the state places its citizens at risk for serious health complications, including death, from COVID-19.

    Due to the outbreak of the COVID-19 virus, which the Centers for Disease Control and Prevention ("CDC") considers a serious public health threat, there is a public health emergency throughout the State of Idaho. Making the problem worse, some individuals who contract the COVID-19 virus have no symptoms or have mild symptoms, which means they may not be aware they carry the virus. Because even people without symptoms can transmit the disease, and because evidence shows the disease is easily spread, gatherings can result in transmission of the virus. At present, travel is a common known source of COVID-19 infections in Idaho. All fifty states and the District of Columbia have reported cases and declared states of emergency. Now, COVID-19 clusters with substantial community spread have developed across the United States, including in Idaho and neighboring states. Blaine County has the highest per-capita number of cases in the state and COVID-19 is believed to have been introduced into the county by a traveler or travelers visiting Idaho from out of state.

    The scientific evidence shows that at this stage of the emergency, it is essential to slow virus transmission as much as possible to protect the most vulnerable and to prevent the health care system from being overwhelmed. One proven way to slow transmission is to limit interactions among people to the greatest extent practicable. By reducing the spread of the COVID-19 virus, this Order helps preserve critical and limited healthcare capacity in the State of Idaho.

**IDAHO DEPARTMENT OF HEALTH AND WELFARE**
**ORDER OF THE DIRECTOR – 3**

2. This Order is necessary to slow the rate of spread and will be re-evaluated as further data becomes available.

3. The intent of this Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the maximum extent possible. When people need to leave their places of residence, whether to obtain or perform vital services, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times reasonably possible comply with Social Distancing Requirements as defined in Section 8.j. below. All provisions of this Order should be interpreted to effectuate this intent.

4. All individuals currently living within the State of Idaho are ordered to self-isolate at their place of residence. To the extent individuals are using shared or outdoor spaces, they must at all times as reasonably possible maintain social distancing of at least six feet from any other person when they are outside their residence. All persons may leave their residences only for Essential Activities, Essential Governmental Functions, or to operate Essential Businesses, all as defined in Section 8. Individuals experiencing homelessness are exempt from this Section, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable and to use COVID-19 risk mitigation practices in their operation.

5. All businesses with a facility in the State of Idaho, except Essential Businesses as defined below in Section 8, are required to cease all activities at facilities located within the state except Minimum Basic Operations, as defined in Section 8.g. For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home). All Essential Businesses are strongly encouraged to remain open. To the greatest extent feasible, Essential Businesses shall comply with Social Distancing Requirements as defined in Section 8.j. below, including by maintaining six-foot social distancing for both employees and members of the public, including, but not limited to, when any customers are standing in line.

6. All people in Idaho shall immediately cease hosting or participating in all public and private gatherings and multi-person activities for social, spiritual and recreational purposes, regardless of the number of people involved, except as specifically identified in Section 8. Such activity includes, but is not limited to, community, civic, public, leisure, faith-based, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities. This prohibition also applies to planned wedding and funeral events, with the exception that funerals are permitted so long as they occur outside and comply with the Social Distancing Requirements as defined in Section 8.j.

7. Travel Restrictions

**IDAHO DEPARTMENT OF HEALTH AND WELFARE
ORDER OF THE DIRECTOR – 4**

a. Intrastate travel is prohibited, including but not limited to, travel on scooter, motorcycle, automobile, or public transit, except for those purposes defined in Section 8. People must use public transit only for purposes of performing Essential Activities or to travel to and from work to operate Essential Businesses or maintain Essential Governmental Functions. All travel must comply with Social Distancing Requirements as defined in Section 8.j. below, to the greatest extent feasible.

b. Statewide directive for individuals arriving in Idaho from another state or country to self-quarantine.

    i. Persons entering the state of Idaho are required to self-quarantine for 14 days. If an individual will be present in Idaho for fewer than 14 days, that individual must self-quarantine for the duration of their visit. For purposes of clarity, this directive does not apply to persons performing an Essential Purpose or persons who as part of their normal life live in one state and work or gain Essential Services in another state.

    ii. **"Essential Purpose"** is interpreted broadly and includes travel required for personal safety; food, beverage or medicine; medical care; pursuant to a lawful permit, license, court order, or rule; care of others; and to perform work, services or functions deemed critical to public health and safety, as well as economic and national security. Travel into the state of Idaho for recreation is not an Essential Purpose.

    iii. Any individual required by this directive to self-quarantine shall be responsible for any and all costs associated with the requirement to self-quarantine, including transportation, lodging, food, and medical care.

    iv. Persons who have tested positive for COVID-19, are presumptively diagnosed with COVID-19, or are exhibiting symptoms identified in the CDC's screening guidance shall not enter the state of Idaho unless doing so under medical orders for the purposes of medical care, are being transported by emergency personnel, are being driven directly to a medical provider for purposes of medical care, or are a resident of the state of Idaho.

8. Definitions and Exemptions

a. For purposes of this Order, individuals may leave their residence only to perform any of the following "**Essential Activities**." But people at high risk of severe illness from COVID-19 and people who are sick are urged to stay in their residence to the extent possible except as necessary to seek medical care.

    i. To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets) or livestock, such as, by way of example only and without

**IDAHO DEPARTMENT OF HEALTH AND WELFARE**
**ORDER OF THE DIRECTOR – 5**

limitation, obtaining medical supplies or medication, visiting a health care professional, or obtaining supplies they need to work from home.

ii.     To obtain necessary services or supplies for themselves and their family or household members, or to deliver, including by truck or rail, those services or supplies to others, such as, by way of example only and without limitation, canned food, dry goods, fresh fruits and vegetables, pet supplies, livestock feed and supplies, fresh meats, fish, and poultry, and any other household consumer products, and products necessary to maintain the safety, sanitation, and essential operation of residences.

iii.     To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements as defined in Section 8.j., such as, by way of example and without limitation, walking, hiking, bicycling, or running.

iv.     To perform work providing essential products and services at an Essential Business or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations.

v.     To care for a family member or pet in another household.

b.     For purposes of this Order, individuals may leave their residence to work for or obtain services at any "**Healthcare Operations**" including hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other healthcare facilities, healthcare suppliers, home healthcare services providers, mental health providers, or any related and/or ancillary healthcare services. "Healthcare Operations" also includes veterinary care and all healthcare services provided to animals. This exemption shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. "Healthcare Operations" does not include fitness and exercise gyms and similar facilities.

c.     For purposes of this Order, individuals may leave their residence to provide any services or perform any work necessary to the operations and maintenance of "**Essential Infrastructure**," including, but not limited to, public works construction, commercial construction and the transfer and selling thereof, construction of housing (in particular affordable housing or housing for individuals experiencing homelessness) and the transfer and selling thereof, airport operations, water, sewer, gas, electrical, oil refining, mining, roads and highways, public transportation, solid waste collection and removal, internet, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, telecommunications relay service, and web-based services), provided that they carry out those services or that work in compliance with Social Distancing Requirements as defined this Section, to the extent possible.

**IDAHO DEPARTMENT OF HEALTH AND WELFARE**
**ORDER OF THE DIRECTOR – 6**

As explained in Section 8.k. below, this Order incorporates by reference the guidance in the Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response issued by the Cybersecurity and Infrastructure Security Agency of the United States Homeland Security on March , 2020 ("CISA Guidance").

d. For purposes of this Order, all first responders, emergency management personnel, emergency dispatchers, court personnel, and law enforcement personnel, and others working for or to support Essential Businesses are categorically exempt from this Order. Further, nothing in this Order shall prohibit any individual from performing or accessing "Essential Governmental Functions." **Essential Government Functions** means all services needed to ensure the continuing operation of local, state, federal, or tribal government agencies and provide for the health, safety and welfare of the public. All Essential Governmental Functions shall be performed in compliance with Social Distancing Requirements as defined by Section 8.j., to the extent possible.

As explained in Section 8.k. below, if any provisions in this Order conflict with any of the guidance in the CISA Guidance then the provisions of this Order shall control.

e. For the purposes of this Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function they perform, or its corporate or entity structure.

f. For the purposes of this Order, "**Essential Businesses**" means:

   i.     Healthcare Operations and Essential Infrastructure;

   ii.    Grocery stores, farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish, and poultry, liquor, beer, and wine and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries and also sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences;

   iii.   Food cultivation and production, including farming, livestock, fishing, and food processing;

   iv.    Businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals;

   v.     Newspapers, television, radio, and other media services;

   vi.    Gas stations and auto-supply, auto-repair, and related facilities;

**IDAHO DEPARTMENT OF HEALTH AND WELFARE**
**ORDER OF THE DIRECTOR – 7**

vii.    Banks, credit unions, and financial institutions, including processing and maintaining systems for processing financial transactions and services (e.g., payment clearing, and settlement; wholesale funding; insurance services; and capital markets activities);

viii.    Hardware stores and firearms businesses as provided for in Idaho Code section 46-601(3);

ix.    Plumbers, electricians, exterminators, landscapers, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses;

x.    Businesses providing mailing and shipping services, including post office boxes;

xi.    Educational institutions—including public and private K-12 schools, colleges, and universities—for purposes of facilitating distance learning or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible;

xii.    Laundromats, dry cleaners, and laundry service providers;

xiii.    Restaurants and other facilities that prepare and serve food, but only for delivery or carry out. Schools and other entities that typically provide free food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;

xiv.    Hotels, motels, shared rental units, and similar facilities for purposes of housing, or to quarantine, those individuals exempted under Section 8.

xv.    Businesses that supply products needed for people to work from home;

xvi.    Businesses that supply other Essential Businesses or Essential Government Functions with the support or supplies necessary to operate;

xvii.    Businesses that ship or deliver groceries, food, goods or services directly to residences;

xviii.    Airlines, taxis, and other private transportation providers providing transportation services necessary for Essential Activities and other purposes expressly authorized in this Order;

**IDAHO DEPARTMENT OF HEALTH AND WELFARE**
**ORDER OF THE DIRECTOR – 8**

xix.    Home-based care for seniors, adults, or children;

xx.    Residential facilities and shelters for seniors, adults, and children;

xxi.    Essential tribal operations;

xxii.    All operations at or related to the Idaho National Laboratory or needed to support or provide supplies to the Idaho National Laboratory;

xxiii.    Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities;

xxiv.    Childcare facilities providing services that enable employees exempted in this Order to work as permitted. To the extent possible, childcare facilities must operate under the following condition: childcare must be carried out in as small and stable groups as possible.

xxv.    Businesses that are able to operate via curbside services, drive in, drive through pick up, mailed services or delivery services. Businesses must continue to maintain Social Distancing Requirements as defined in 8.j for both customers and employees, including prohibiting any congregation of customers or employees in or around the place of business.

As explained in Section 8.k. below, this Order incorporates by reference CISA Guidance issued by the Cybersecurity and Infrastructure Security Agency of the United States Homeland Security on March 28, 2020.

g.    For the purposes of this Order, "**Minimum Basic Operations**" include the following, provided that employees comply with Social Distancing Requirements as defined this Section, to the extent possible, while carrying out such operations:

i.    The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, or for related functions.

ii.    The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

iii.    The minimum necessary activities to prepare the business to reopen at such time as deemed appropriate, including but not limited to, sanitization, obtaining personal protective equipment, and setting up procedures to ensure compliance with Social Distancing Requirements.

**IDAHO DEPARTMENT OF HEALTH AND WELFARE**
**ORDER OF THE DIRECTOR – 9**

h. For the purposes of this Order, "**Essential Travel**" includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements as defined in Section 8.j.

   i. Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses, or Minimum Basic Operations.

   ii. Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

   iii. Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

   iv. Travel to return to a place of residence from outside the jurisdiction.

   v. Travel required by law enforcement or court order.

   vi. Travel required for non-residents to return to their place of residence outside the State of Idaho. Individuals are strongly encouraged to verify that their transportation out of the State of Idaho remains available and functional prior to commencing such travel.

i. For purposes of this order, residences include hotels, motels, shared rental units, and similar facilities.

j. For purposes of this order "**Social Distancing Requirements**" includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

k. This Order incorporates by reference the Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response issued by the Cybersecurity and Infrastructure Security Agency of the United States Department of Homeland Security on March 28, 2020. That guidance is located at https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce. This order also incorporates federal guidance from the Department of the Treasury and the Department of defense that are located at https://home.treasury.gov/news/press-releases/sm956 and https://media.defense.gov/2020/Mar/22/2002268024/-1/-1/1/DEFENSE-INDUSTRIAL-BASE-ESSENTIAL-CRITICAL-INFRASTRUCTURE-WORKFORCE-MEMO.PDF

9. The Director requests that the Sheriff and the Chiefs of Police in the State of Idaho, and the Idaho State Police ensure compliance with and enforce this Order. The violation of any provision of this Order constitutes an imminent threat to public health.

**IDAHO DEPARTMENT OF HEALTH AND WELFARE**
**ORDER OF THE DIRECTOR – 10**

10. This Order shall become effective as of April 15, 2020 and will continue to be in effect until 11:59 p.m. on April 30, 2020 or until it is extended, rescinded, superseded, or amended in writing by the Director.

11. To decrease the spread of COVID-19, the cities, counties, and public health districts of the State of Idaho may enact more stringent public health orders than those set out in this Order.

12. This Self-Isolation Order supersedes and replaces the prior Self-Isolation Order I issued for Blaine County, Idaho on March 20, 2020, and for the entire State of Idaho on March 25, 2020.

13. Each county and each city must promptly provide copies of the Order as follows: (1) by posting the Order on its website, (2) by posting the Order at each county courthouse and each city hall, and (3) by providing a copy to any member of the public requesting it. The Order will also be posted on the website of the Department of Health and Welfare.

14. If any provision of this Order or its application to any person or circumstance is held to be invalid, then the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

**IT IS SO ORDERED:**

Dated: April 15, 2020

DAVE JEPPESEN, DIRECTOR
IDAHO DEPARTMENT OF HEALTH
AND WELFARE

**IDAHO DEPARTMENT OF HEALTH AND WELFARE**
**ORDER OF THE DIRECTOR – 11**

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.A.P. 8
EXHIBIT A
Page 18 of 18

ER - 082



**U.S. Department of Homeland Security**
Cybersecurity & Infrastructure Security Agency
*Office of the Director*
Washington, DC 20528

March 19, 2020

## MEMORANDUM ON IDENTIFICATION OF ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS DURING COVID-19 RESPONSE

FROM:    Christopher C. Krebs
               Director
               Cybersecurity and Infrastructure Security Agency (CISA)

---

As the Nation comes together to slow the spread of COVID-19, on March 16th, the President issued updated Coronavirus Guidance for America. This guidance states that:

> *"If you work in a critical infrastructure industry, as defined by the Department of Homeland Security, such as healthcare services and pharmaceutical and food supply, you have a special responsibility to maintain your normal work schedule."*

The Cybersecurity and Infrastructure Security Agency (CISA) executes the Secretary of Homeland Security's responsibilities as assigned under the Homeland Security Act of 2002 to provide strategic guidance, promote a national unity of effort, and coordinate the overall federal effort to ensure the security and resilience of the Nation's critical infrastructure. CISA uses trusted partnerships with both the public and private sectors to deliver infrastructure resilience assistance and guidance to a broad range of partners.

In accordance with this mandate, and in collaboration with other federal agencies and the private sector, CISA developed an initial list of "Essential Critical Infrastructure Workers" to help State and local officials as they work to protect their communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security. The list can also inform critical infrastructure community decision-making to determine the sectors, sub-sectors, segments, or critical functions that should continue normal operations, appropriately modified to account for Centers for Disease Control (CDC) workforce and customer protection guidance.

The attached list identifies workers who conduct a range of operations and services that are essential to continued critical infrastructure viability, including staffing operations centers, maintaining and repairing critical infrastructure, operating call centers, working construction, and performing management functions, among others. The industries they support represent, but are not necessarily limited to, medical and healthcare, telecommunications, information technology systems, defense, food and agriculture, transportation and logistics, energy, water and wastewater, law enforcement, and public works.

We recognize that State, local, tribal, and territorial governments are ultimately in charge of implementing and executing response activities in communities under their jurisdiction, while the Federal Government is in a supporting role. As State and local communities consider COVID-19-related restrictions, CISA is offering this list to assist prioritizing activities related to continuity of operations and incident response, including the appropriate movement of critical infrastructure workers within and between jurisdictions.

**Accordingly, this list is advisory in nature. It is not, nor should it be considered to be, a federal directive or standard in and of itself.**

In addition, these identified sectors and workers are not intended to be the authoritative or exhaustive list of critical infrastructure sectors and functions that should continue during the COVID-19 response. Instead, State and local officials should use their own judgment in using their authorities and issuing implementation directives and guidance. Similarly, critical infrastructure industry partners will use their own judgment, informed by this list, to ensure continued operations of critical infrastructure services and functions. All decisions should appropriately balance public safety while ensuring the continued delivery of critical infrastructure services and functions.

CISA will continue to work with you and our partners in the critical infrastructure community to update this list as the Nation's response to COVID-19 evolves. We also encourage you to submit how you might use this list so that we can develop a repository of use cases for broad sharing across the country.

Should you have questions about this list, please contact CISA at CISA.CAT@cisa.dhs.gov.

**Attachment:** "Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response"

# Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response

Version 1.0 (March 19, 2020)

## THE IMPORTANCE OF ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS

Functioning critical infrastructure is imperative during the response to the COVID-19 emergency for both public health and safety as well as community well-being. Certain critical infrastructure industries have a special responsibility in these times to continue operations.

This guidance and accompanying list are intended to support State, Local, and industry partners in identifying the critical infrastructure sectors and the essential workers needed to maintain the services and functions Americans depend on daily and that need to be able to operate resiliently during the COVID-19 pandemic response.

This document gives guidance to State, local, tribal, and territorial jurisdictions and the private sector on defining essential critical infrastructure workers. Promoting the ability of such workers to continue to work during periods of community restriction, access management, social distancing, or closure orders/directives is crucial to community resilience and continuity of essential functions.

## CONSIDERATIONS FOR GOVERNMENT AND BUSINESS

This list was developed in consultation with federal agency partners, industry experts, and State and local officials, and is based on several key principles:

1. Response efforts to the COVID-19 pandemic are locally executed, State managed, and federally supported

2. Everyone should follow guidance from the CDC, as well as State and local government officials, regarding strategies to limit disease spread.

3. Workers should be encouraged to work remotely when possible and focus on core business activities. In-person, non-mandatory activities should be delayed until the resumption of normal operations.

4. When continuous remote work is not possible, businesses should enlist strategies to reduce the likelihood of spreading the disease. This includes, but is not necessarily limited to, separating staff by off-setting shift hours or days and/or social distancing. These steps can preserve the workforce and allow operations to continue.

**CONNECT WITH US**
www.cisa.gov

For more information,
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

5. All organizations should implement their business continuity and pandemic plans, or put plans in place if they do not exist. Delaying implementation is not advised and puts at risk the viability of the business and the health and safety of the employees.

6. In the modern economy, reliance on technology and just-in-time supply chains means that certain workers must be able to access certain sites, facilities, and assets to ensure continuity of functions.

7. Government employees, such as emergency managers, and the business community need to establish and maintain lines of communication.

8. When government and businesses engage in discussions about critical infrastructure workers, they need to consider the implications of business operations beyond the jurisdiction where the asset or facility is located. Businesses can have sizeable economic and societal impacts as well as supply chain dependencies that are geographically distributed.

9. Whenever possible, jurisdictions should align access and movement control policies related to critical infrastructure workers to lower the burden of workers crossing jurisdictional boundaries.

## IDENTIFYING ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS

The following list of sectors and identified essential critical infrastructure workers are an initial recommended set and are intended to be overly inclusive reflecting the diversity of industries across the United States. CISA will continually solicit and accept feedback on the list (both sectors/sub sectors and identified essential workers) and will evolve the list in response to stakeholder feedback. We will also use our various stakeholder engagement mechanisms to work with partners on how they are using this list and share those lessons learned and best practices broadly. We ask that you share your feedback, both positive and negative on this list so we can provide the most useful guidance to our critical infrastructure partners.  Feedback can be sent to CISA.CAT@CISA.DHS.GOV.



**CONNECT WITH US**
www.cisa.gov

For more information,
email CISA.CAT@cisa.dhs.gov

Linkedin.com/company/cybersecurity-
and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

Facebook.com/CISA

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.A.P. 8
EXHIBIT B
Page 4 of 24
ER - 086

**Essential Critical Infrastructure Workforce**

## HEALTHCARE / PUBLIC HEALTH

- Workers providing COVID-19 testing; Workers that perform critical clinical research needed for COVID-19 response
- Caregivers (e.g., physicians, dentists, psychologists, mid-level practitioners, nurses and assistants, infection control and quality assurance personnel, pharmacists, physical and occupational therapists and assistants, social workers, speech pathologists and diagnostic and therapeutic technicians and technologists)
- Hospital and laboratory personnel (including accounting, administrative, admitting and discharge, engineering, epidemiological, source plasma and blood donation, food service, housekeeping, medical records, information technology and operational technology, nutritionists, sanitarians, respiratory therapists, etc.)
- Workers in other medical facilities (including Ambulatory Health and Surgical, Blood Banks, Clinics, Community Mental Health, Comprehensive Outpatient rehabilitation, End Stage Renal Disease, Health Departments, Home Health care, Hospices, Hospitals, Long Term Care, Organ Pharmacies, Procurement Organizations, Psychiatric Residential, Rural Health Clinics and Federally Qualified Health Centers)
- Manufacturers, technicians, logistics and warehouse operators, and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products
- Public health / community health workers, including those who compile, model, analyze and communicate public health information
- Blood and plasma donors and the employees of the organizations that operate and manage related activities
- Workers that manage health plans, billing, and health information, who cannot practically work remotely
- Workers who conduct community-based public health functions, conducting epidemiologic surveillance, compiling, analyzing and communicating public health information, who cannot practically work remotely
- Workers performing cybersecurity functions at healthcare and public health facilities, who cannot practically work remotely
- Workers conducting research critical to COVID-19 response
- Workers performing security, incident management, and emergency operations functions at or on behalf of healthcare entities including healthcare coalitions, who cannot practically work remotely
- Workers who support food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, such as those residing in shelters
- Pharmacy employees necessary for filling prescriptions
- Workers performing mortuary services, including funeral homes, crematoriums, and cemetery workers
- Workers who coordinate with other organizations to ensure the proper recovery, handling, identification, transportation, tracking, storage, and disposal of human remains and personal effects; certify cause of death; and facilitate access to mental/behavioral health services to the family members, responders, and survivors of an incident

**CONNECT WITH US**
www.cisa.gov

For more information,
email CISA.CAT@cisa.dhs.gov

Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.A.P. 8
EXHIBIT B
Page 5 of 24

**Essential Critical Infrastructure Workforce**

## LAW ENFORCEMENT, PUBLIC SAFETY, FIRST RESPONDERS

- Personnel in emergency management, law enforcement, Emergency Management Systems, fire, and corrections, including front line and management
- Emergency Medical Technicians
- 911 call center employees
- Fusion Center employees
- Hazardous material responders from government and the private sector.
- Workers – including contracted vendors – who maintain digital systems infrastructure supporting law enforcement and emergency service operations.

## FOOD AND AGRICULTURE

- Workers supporting groceries, pharmacies and other retail that sells food and beverage products
- Restaurant carry-out and quick serve food operations - Carry-out and delivery food employees
- Food manufacturer employees and their supplier employees—to include those employed in food processing (packers, meat processing, cheese plants, milk plants, produce, etc.) facilities; livestock, poultry, seafood slaughter facilities; pet and animal feed processing facilities; human food facilities producing by-products for animal food; beverage production facilities; and the production of food packaging
- Farm workers to include those employed in animal food, feed, and ingredient production, packaging, and distribution; manufacturing, packaging, and distribution of veterinary drugs; truck delivery and transport; farm and fishery labor needed to produce our food supply domestically
- Farm workers and support service workers to include those who field crops; commodity inspection; fuel ethanol facilities; storage facilities; and other agricultural inputs
- Employees and firms supporting food, feed, and beverage distribution, including warehouse workers, vendor-managed inventory controllers and blockchain managers
- Workers supporting the sanitation of all food manufacturing processes and operations from wholesale to retail
- Company cafeterias - in-plant cafeterias used to feed employees
- Workers in food testing labs in private industries and in institutions of higher education
- Workers essential for assistance programs and government payments
- Employees of companies engaged in the production of chemicals, medicines, vaccines, and other substances used by the food and agriculture industry, including pesticides, herbicides, fertilizers, minerals, enrichments, and other agricultural production aids
- Animal agriculture workers to include those employed in veterinary health; manufacturing and distribution of animal medical materials, animal vaccines, animal drugs, feed ingredients, feed, and bedding, etc.; transportation of live animals, animal medical materials; transportation of deceased animals for disposal; raising of animals for food; animal production operations; slaughter and packing plants and associated regulatory and government workforce
- Workers who support the manufacture and distribution of forest products, including, but not limited to timber, paper, and other wood products
- Employees engaged in the manufacture and maintenance of equipment and other infrastructure necessary to agricultural production and distribution

**CONNECT WITH US**
www.cisa.gov

For more information,
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

Facebook.com/CISA

**Essential Critical Infrastructure Workforce**

## ENERGY

**Electricity industry:**
- Workers who maintain, ensure, or restore the generation, transmission, and distribution of electric power, including call centers, utility workers, reliability engineers and fleet maintenance technicians
- Workers needed for safe and secure operations at nuclear generation
- Workers at generation, transmission, and electric blackstart facilities
- Workers at Reliability Coordinator (RC), Balancing Authorities (BA), and primary and backup Control Centers (CC), including but not limited to independent system operators, regional transmission organizations, and balancing authorities
- Mutual assistance personnel
- IT and OT technology staff – for EMS (Energy Management Systems) and Supervisory Control and Data Acquisition (SCADA) systems, and utility data centers; Cybersecurity engineers; cybersecurity risk management
- Vegetation management crews and traffic workers who support
- Environmental remediation/monitoring technicians
- Instrumentation, protection, and control technicians

**Petroleum workers:**
- Petroleum product storage, pipeline, marine transport, terminals, rail transport, road transport
- Crude oil storage facilities, pipeline, and marine transport
- Petroleum refinery facilities
- Petroleum security operations center employees and workers who support emergency response services
- Petroleum operations control rooms/centers
- Petroleum drilling, extraction, production, processing, refining, terminal operations, transporting, and retail for use as end-use fuels or feedstocks for chemical manufacturing
- Onshore and offshore operations for maintenance and emergency response
- Retail fuel centers such as gas stations and truck stops, and the distribution systems that support them

**Natural and propane gas workers:**
- Natural gas transmission and distribution pipelines, including compressor stations
- Underground storage of natural gas
- Natural gas processing plants, and those that deal with natural gas liquids
- Liquefied Natural Gas (LNG) facilities
- Natural gas security operations center, natural gas operations dispatch and control rooms/centers natural gas emergency response and customer emergencies, including natural gas leak calls
- Drilling, production, processing, refining, and transporting natural gas for use as end-use fuels, feedstocks for chemical manufacturing, or use in electricity generation
- Propane gas dispatch and control rooms and emergency response and customer emergencies, including propane leak calls
- Propane gas service maintenance and restoration, including call centers

**CONNECT WITH US**
**www.cisa.gov**

For more information,
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

Facebook.com/CISA



**Essential Critical Infrastructure Workforce**

- Processing, refining, and transporting natural liquids, including propane gas, for use as end-use fuels or feedstocks for chemical manufacturing
- Propane gas storage, transmission, and distribution centers

## WATER AND WASTEWATER

Employees needed to operate and maintain drinking water and wastewater/drainage infrastructure, including:

- Operational staff at water authorities
- Operational staff at community water systems
- Operational staff at wastewater treatment facilities
- Workers repairing water and wastewater conveyances and performing required sampling or monitoring
- Operational staff for water distribution and testing
- Operational staff at wastewater collection facilities
- Operational staff and technical support for SCADA Control systems
- Chemical disinfectant suppliers for wastewater and personnel protection
- Workers that maintain digital systems infrastructure supporting water and wastewater operations

## TRANSPORTATION AND LOGISTICS

- Employees supporting or enabling transportation functions, including dispatchers, maintenance and repair technicians, warehouse workers, truck stop and rest area workers, and workers that maintain and inspect infrastructure (including those that require cross-border travel)
- Employees of firms providing services that enable logistics operations, including cooling, storing, packaging, and distributing products for wholesale or retail sale or use.
- Mass transit workers
- Workers responsible for operating dispatching passenger, commuter and freight trains and maintaining rail infrastructure and equipment
- Maritime transportation workers - port workers, mariners, equipment operators
- Truck drivers who haul hazardous and waste materials to support critical infrastructure, capabilities, functions, and services
- Automotive repair and maintenance facilities
- Manufacturers and distributors (to include service centers and related operations) of packaging materials, pallets, crates, containers, and other supplies needed to support manufacturing, packaging staging and distribution operations
- Postal and shipping workers, to include private companies
- Employees who repair and maintain vehicles, aircraft, rail equipment, marine vessels, and the equipment and infrastructure that enables operations that encompass movement of cargo and passengers
- Air transportation employees, including air traffic controllers, ramp personnel, aviation security, and aviation management
- Workers who support the maintenance and operation of cargo by air transportation, including flight crews, maintenance, airport operations, and other on- and off- airport facilities workers

**CONNECT WITH US**
**www.cisa.gov**

**For more information,**
**email CISA.CAT@cisa.dhs.gov**

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

Facebook.com/CISA

# PUBLIC WORKS

- Workers who support the operation, inspection, and maintenance of essential dams, locks and levees
- Workers who support the operation, inspection, and maintenance of essential public works facilities and operations, including bridges, water and sewer main breaks, fleet maintenance personnel, construction of critical or strategic infrastructure, traffic signal maintenance, emergency location services for buried utilities, maintenance of digital systems infrastructure supporting public works operations, and other emergent issues
- Workers such as plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences
- Support, such as road and line clearing, to ensure the availability of needed facilities, transportation, energy and communications
- Support to ensure the effective removal, storage, and disposal of residential and commercial solid waste and hazardous waste

# COMMUNICATIONS AND INFORMATION TECHNOLOGY

**Communications:**
- Maintenance of communications infrastructure- including privately owned and maintained communication systems- supported by technicians, operators, call-centers, wireline and wireless providers, cable service providers, satellite operations, undersea cable landing stations, Internet Exchange Points, and manufacturers and distributors of communications equipment
- Workers who support radio, television, and media service, including, but not limited to front line news reporters, studio, and technicians for newsgathering and reporting
- Workers at Independent System Operators and Regional Transmission Organizations, and Network Operations staff, engineers and/or technicians to manage the network or operate facilities
- Engineers, technicians and associated personnel responsible for infrastructure construction and restoration, including contractors for construction and engineering of fiber optic cables
- Installation, maintenance and repair technicians that establish, support or repair service as needed
- Central office personnel to maintain and operate central office, data centers, and other network office facilities
- Customer service and support staff, including managed and professional services as well as remote providers of support to transitioning employees to set up and maintain home offices, who interface with customers to manage or support service environments and security issues, including payroll, billing, fraud, and troubleshooting
- Dispatchers involved with service repair and restoration

**Information Technology:**
- Workers who support command centers, including, but not limited to Network Operations Command Center, Broadcast Operations Control Center and Security Operations Command Center
- Data center operators, including system administrators, HVAC & electrical engineers, security personnel, IT managers, data transfer solutions engineers, software and hardware engineers, and database administrators
- Client service centers, field engineers, and other technicians supporting critical infrastructure, as well as

**CONNECT WITH US**
**www.cisa.gov**

For more information,
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

Facebook.com/CISA

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.A.P. 8
EXHIBIT B
Page 9 of 24

ER - 091

**Essential Critical Infrastructure Workforce**

manufacturers and supply chain vendors that provide hardware and software, and information technology equipment (to include microelectronics and semiconductors) for critical infrastructure

- Workers responding to cyber incidents involving critical infrastructure, including medical facilities, SLTT governments and federal facilities, energy and utilities, and banks and financial institutions, and other critical infrastructure categories and personnel
- Workers supporting the provision of essential global, national and local infrastructure for computing services (incl. cloud computing services), business infrastructure, web-based services, and critical manufacturing
- Workers supporting communications systems and information technology used by law enforcement, public safety, medical, energy and other critical industries
- Support required for continuity of services, including janitorial/cleaning personnel

## OTHER COMMUNITY-BASED GOVERNMENT OPERATIONS AND ESSENTIAL FUNCTIONS

- Workers to ensure continuity of building functions
- Security staff to maintain building access control and physical security measures
- Elections personnel
- Federal, State, and Local, Tribal, and Territorial employees who support Mission Essential Functions and communications networks
- Trade Officials (FTA negotiators; international data flow administrators)
- Weather forecasters
- Workers that maintain digital systems infrastructure supporting other critical government operations
- Workers at operations centers necessary to maintain other essential functions
- Workers who support necessary credentialing, vetting and licensing operations for transportation workers
- Customs workers who are critical to facilitating trade in support of the national emergency response supply chain
- Educators supporting public and private K-12 schools, colleges, and universities for purposes of facilitating distance learning or performing other essential functions, if operating under rules for social distancing
- Hotel Workers where hotels are used for COVID-19 mitigation and containment measures

## CRITICAL MANUFACTURING

- Workers necessary for the manufacturing of materials and products needed for medical supply chains, transportation, energy, communications, food and agriculture, chemical manufacturing, nuclear facilities, the operation of dams, water and wastewater treatment, emergency services, and the defense industrial base.

## HAZARDOUS MATERIALS

- Workers at nuclear facilities, workers managing medical waste, workers managing waste from pharmaceuticals and medical material production, and workers at laboratories processing test kits
- Workers who support hazardous materials response and cleanup
- Workers who maintain digital systems infrastructure supporting hazardous materials management operations

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.A.P. 8
EXHIBIT B
Page 10 of 24

ER - 092

**Essential Critical Infrastructure Workforce**

## FINANCIAL SERVICES

- Workers who are needed to process and maintain systems for processing financial transactions and services (e.g., payment, clearing, and settlement; wholesale funding; insurance services; and capital markets activities)
- Workers who are needed to provide consumer access to banking and lending services, including ATMs, and to move currency and payments (e.g., armored cash carriers)
- Workers who support financial operations, such as those staffing data and security operations centers

## CHEMICAL

- Workers supporting the chemical and industrial gas supply chains, including workers at chemical manufacturing plants, workers in laboratories, workers at distribution facilities, workers who transport basic raw chemical materials to the producers of industrial and consumer goods, including hand sanitizers, food and food additives, pharmaceuticals, textiles, and paper products.
- Workers supporting the safe transportation of chemicals, including those supporting tank truck cleaning facilities and workers who manufacture packaging items
- Workers supporting the production of protective cleaning and medical solutions, personal protective equipment, and packaging that prevents the contamination of food, water, medicine, among others essential products
- Workers supporting the operation and maintenance of facilities (particularly those with high risk chemicals and/or sites that cannot be shut down) whose work cannot be done remotely and requires the presence of highly trained personnel to ensure safe operations, including plant contract workers who provide inspections
- Workers who support the production and transportation of chlorine and alkali manufacturing, single-use plastics, and packaging that prevents the contamination or supports the continued manufacture of food, water, medicine, and other essential products, including glass container manufacturing

## DEFENSE INDUSTRIAL BASE

- Workers who support the essential services required to meet national security commitments to the federal government and U.S. Military. These individuals, include but are not limited to, aerospace; mechanical and software engineers, manufacturing/production workers; IT support; security staff; security personnel; intelligence support, aircraft and weapon system mechanics and maintainers
- Personnel working for companies, and their subcontractors, who perform under contract to the Department of Defense providing materials and services to the Department of Defense, and government-owned/contractor-operated and government-owned/government-operated facilities

**CONNECT WITH US**
www.cisa.gov

For more information,
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.A.P. 8
EXHIBIT B
Page 11 of 24

ER - 093

**DEFEND TODAY,** SECURE TOMORROW

# Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response

Version 2.0 (March 28, 2020)

## THE IMPORTANCE OF ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS

Functioning critical infrastructure is imperative during the response to the COVID-19 emergency for both public health and safety as well as community well-being. Certain critical infrastructure industries have a special responsibility in these times to continue operations.

This advisory guidance and accompanying list are intended to support state, local, tribal, territorial and industry partners in identifying the critical infrastructure sectors and the essential workers needed to maintain the services and functions Americans depend on daily and that need to be able to operate resiliently during the COVID-19 pandemic response.

This document gives advisory guidance on defining essential critical infrastructure workers. Promoting the ability of such workers to continue to work during periods of community restriction, access management, social distancing, or closure orders/directives is crucial to community resilience and continuity of essential functions.

CISA will continually solicit and accept feedback on the list and will evolve the list in response to stakeholder feedback. We will also use our various stakeholder engagement mechanisms to work with partners on how they are using this list and share those lessons learned and best practices broadly. Feedback can be sent to CISA.CAT@CISA.DHS.GOV.

## CONSIDERATIONS FOR GOVERNMENT AND BUSINESS

This list was developed in consultation with federal agency partners, industry experts, and State and local officials, and is based on several key principles:

1. Response efforts to the COVID-19 pandemic are locally executed, state managed, and federally supported.

2. Everyone should follow guidance from the CDC, as well as State and local government officials, regarding strategies to limit disease spread.

3. Workers should be encouraged to work remotely when possible and focus on core business activities. In-person, non-mandatory activities should be delayed until the resumption of normal operations.

4. When continuous remote work is not possible, businesses should enlist strategies to reduce the likelihood of spreading the disease. This includes, but is not necessarily limited to, separating staff by off-setting shift hours or days and/or social distancing. These steps can preserve the workforce and allow operations to continue.

5. All organizations should implement their business continuity and pandemic plans or put plans in place if they do not exist. Delaying implementation is not advised and puts at risk the viability of the business and the

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

Facebook.com/CISA

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.A.P. 8
EXHIBIT B
Page 12 of 24

ER - 094

health and safety of the employees.

6. Reliance on technology and just-in-time supply chains means that certain workers must be able to access certain sites, facilities, and assets to ensure continuity of functions.

7. Government employees, such as emergency managers, and the business community need to establish and maintain lines of communication.

8. When government and businesses engage in discussions about essential critical infrastructure workers, they need to consider the implications of business operations beyond the jurisdiction where the asset or facility is located. Businesses can have sizeable economic and societal impacts as well as supply chain dependencies that are geographically distributed.

9. Whenever possible, jurisdictions should align access and movement control policies related to critical infrastructure workers to lower the burden of workers crossing jurisdictional boundaries.

## IDENTIFYING ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS

The following list of identified essential critical infrastructure workers is intended to be overly inclusive reflecting the diversity of industries across the United States.



CONNECT WITH US
www.cisa.gov

For more information,
email CISA.CAT@cisa.dhs.gov

Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

Facebook.com/CISA

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.A.P. 8
EXHIBIT B
Page 13 of 24
ER - 095

# HEALTHCARE / PUBLIC HEALTH

- Workers who perform critical clinical research, development, and testing needed for COVID-19 response.
- Healthcare providers and Caregivers including physicians, dentists, psychologists, mid-level practitioners, nurses and assistants, infection control and quality assurance personnel, pharmacists, physical and occupational therapists and assistants, social workers, optometrists, speech pathologists, chiropractors, and diagnostic and therapeutic technicians and technologists.
- Hospital and laboratory personnel (including accounting, administrative, admitting and discharge, engineering, epidemiological, source plasma and blood donation, food service, housekeeping, medical records, information technology and operational technology, nutritionists, sanitarians, respiratory therapists, etc.).
- Workers in other medical and biomedical facilities (including Ambulatory Health and Surgical, Blood Banks, Clinics, Community Mental Health, Comprehensive Outpatient rehabilitation, End Stage Renal Disease, Health Departments, Home Health care, Hospices, Hospitals, Long Term Care, Nursing Care Facilities, Organ Pharmacies, Procurement Organizations, Psychiatric Residential, Rural Health Clinics and Federally Qualified Health Centers, and retail facilities specializing in medical good and supplies).
- Manufacturer workers for health manufacturing (including biotechnology companies), materials and parts suppliers, logistics and warehouse operators, distributors of medical equipment (including those who test and repair), personal protective equipment (PPE), isolation barriers, medical gases, pharmaceuticals (including materials used in radioactive drugs), dietary supplements, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.
- Public health / community health workers, including those who compile, model, analyze and communicate public health information.
- Blood and plasma donors and the employees of the organizations that operate and manage related activities.
- Workers who manage health plans, billing, and health information, who cannot practically work remotely.
- Workers who conduct community-based public health functions, conducting epidemiologic surveillance, compiling, analyzing and communicating public health information, who cannot practically work remotely.
- Workers performing information technology and cybersecurity functions at healthcare and public health facilities, who cannot practically work remotely.
- Workers performing security, incident management, and emergency operations functions at or on behalf of healthcare entities including healthcare coalitions, who cannot practically work remotely.
- Pharmacy employees necessary to maintain uninterrupted prescription filling.
- Workers performing mortuary funeral, cremation, burial, cemetery, and related services, including funeral homes, crematoriums, cemetery workers, and coffin makers.
- Workers who coordinate with other organizations to ensure the proper recovery, handling, identification, transportation, tracking, storage, and disposal of human remains and personal effects; certify cause of death; and facilitate access to mental/behavioral health services to the family members, responders, and survivors of an incident.

**CONNECT WITH US**
www.cisa.gov

Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

**For more information,**
email CISA.CAT@cisa.dhs.gov

@CISAgov | @cyber | @uscert_gov

Facebook.com/CISA

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.A.P. 8
EXHIBIT B
Page 14 of 24

## LAW ENFORCEMENT, PUBLIC SAFETY, AND OTHER FIRST RESPONDERS

- Public, private, and voluntary personnel (front line and management) in emergency management, law enforcement, fire and rescue services, emergency medical services, and private security, to include public and private hazardous material responders, air medical service providers (pilots and supporting technicians), corrections, and search and rescue personnel.
- 911 call center employees and Public Safety Answering Points who can't perform their duties remotely.
- Fusion Center employees.
- Workers – including contracted vendors -- who maintain, manufacture, or supply equipment and services supporting law enforcement emergency service and response operations (to include electronic security and life safety security personnel).
- Workers supporting the manufacturing of safety equipment and uniforms for law enforcement, public safety personnel, and first responder.
- Workers supporting the operation of firearm or ammunition product manufacturers, retailers, importers, distributors, and shooting ranges.
- Public agency workers responding to abuse and neglect of children, elders, and dependent adults.
- Workers who support weather disaster / natural hazard mitigation and prevention activities.
- Security staff to maintain building access control and physical security measures.

## FOOD AND AGRICULTURE

- Workers supporting groceries, pharmacies, convenience stores, and other retail (including unattended and vending) that sells human food, animal/pet food and pet supply, and beverage products, including retail customer support service and information technology support staff necessary for online orders, pickup and delivery.
- Restaurant carry-out and quick serve food operations, including dark kitchen and food prep centers, and carry-out and delivery food employees.
- Food manufacturer employees and their supplier employees—to include those employed in food ingredient production and processing facilities; livestock, poultry, seafood slaughter facilities; pet and animal feed processing facilities; human food facilities producing by-products for animal food; beverage production facilities; and the production of food packaging.
- Farmers, farm workers, and agribusiness support services to include those employed in auction and sales: grain and oilseed handling, processing and distribution; animal food, feed, and ingredient production, packaging, and distribution; manufacturing, packaging, and distribution of veterinary drugs; truck delivery and transport; farm and fishery labor needed to produce our food supply domestically and for export.
- Farmers, farm workers, support service workers, and their supplier employees to include those engaged in producing and harvesting field crops; commodity inspection; fuel ethanol facilities; biodiesel and renewable diesel facilities; storage facilities; and other agricultural inputs.
- Employees and firms supporting the distribution of food, feed, and beverage and ingredients used in these products, including warehouse workers, vendor- managed inventory controllers and blockchain managers.
- Workers supporting the sanitation and pest control of all food manufacturing processes and operations from wholesale to retail.
- Employees in cafeterias used to feed employees, particularly employee populations sheltered against COVID-19.
- Workers in animal diagnostic and food testing laboratories in private industries and in institutions of higher education.

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.gov

Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.A.P. 8
EXHIBIT B
Page 15 of 24

- Government, private, and non-governmental organizations' workers essential for food assistance programs (including school lunch programs) and government payments.
- Employees of companies engaged in the production, storage, transport, and distribution of chemicals, medicines, vaccines, and other substances used by the food and agriculture industry, including seeds, pesticides, herbicides, fertilizers, minerals, enrichments, and other agricultural production aids.
- Animal agriculture workers to include those employed in veterinary health (including those involved in supporting emergency veterinary or livestock services); raising of animals for food; animal production operations; livestock markets; slaughter and packing plants, manufacturers, renderers, and associated regulatory and government workforce.
- Transportation supporting animal agricultural industries, including movement of animal medical and reproductive supplies and materials, animal vaccines, animal drugs, feed ingredients, feed, and bedding, live animals, animal by-products, and deceased animals for disposal.
- Workers who support sawmills and the manufacture and distribution of fiber and forest products, including, but not limited to timber, paper, and other wood and fiber products.
- Employees engaged in the manufacture and maintenance of equipment and other infrastructure necessary for agricultural production and distribution.

## ENERGY

- Workers supporting the energy sector, regardless of the energy source (including but not limited to nuclear, fossil, hydroelectric, or renewable), segment of the system, or infrastructure the worker is involved in, or who are needed to monitor, operate, engineer, and maintain the reliability, safety, environmental health, and physical and cyber security of the energy system.
- Energy/commodity trading/scheduling/marketing functions, who can't perform their duties remotely.
- IT and OT technology for essential energy sector operations including support workers, customer service operations; energy management systems, control systems, and Supervisory Control and Data Acquisition SCADA systems, and energy sector entity data centers; cybersecurity engineers; and cybersecurity risk management.
- Workers supporting the energy sector through renewable energy infrastructure (including, but not limited to wind, solar, biomass, hydrogen, ocean, geothermal, and/or hydroelectric), including those supporting construction, manufacturing, transportation, permitting, operation/maintenance, monitoring, and logistics.
- Workers and security staff involved in nuclear re-fueling operations.
- Providing services related to energy sector fuels (including, but not limited, petroleum (crude oil), natural gas, propane, natural gas liquids, other liquid fuels, nuclear, and coal), supporting the mining, processing, manufacturing, construction, logistics, transportation, permitting, operation/maintenance, security, waste disposal and storage, and monitoring of support for resources.
- Environmental remediation/monitoring, limited to immediate critical needs technicians.
- Manufacturing and distribution of equipment, supplies, and parts necessary to maintain production, maintenance, restoration, and service at energy sector facilities (across all energy sector segments).

**Electricity industry:**
- Workers who maintain, ensure, or restore, or are involved in the development, transportation, fuel procurement, expansion, or operation of the generation, transmission, and distribution of electric power, including call centers, utility workers, engineers, retail electricity, constraint maintenance, and fleet maintenance technicians who cannot perform their duties remotely.
- Workers at coal mines, production facilities, and those involved in manufacturing, transportation, permitting, operation/maintenance and monitoring at coal sites which is critical to ensuring the reliability of the electrical system.

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

- Workers who produce, process, ship and handle coal used for power generation and manufacturing.
- Workers needed for safe and secure operations at nuclear generation to include but not limited to, the broader nuclear supply chain, parts to maintain nuclear equipment, fuel manufacturers and fuel components used in the manufacturing of fuel.
- Workers at renewable energy infrastructure (including, but not limited to wind, solar, biomass, hydrogen, geothermal, and/or hydroelectric), including those supporting construction, manufacturing, transportation, permitting, operation/maintenance, monitoring, and logistics.
- Workers at generation, transmission, and electric black start facilities.
- Workers at Reliability Coordinator, Balancing Authorities, and primary and backup Control Centers, including but not limited to independent system operators, regional transmission organizations, and local distribution control centers.
- Mutual assistance personnel which may include workers from outside of the state or local jurisdiction.
- Vegetation management and traffic control for supporting those crews.
- Environmental remediation/monitoring workers limited to immediate critical needs technicians.
- Instrumentation, protection, and control technicians.
- Essential support personnel for electricity operations.
- Generator set support workers such as diesel engineers used in power generation including those providing fuel.

**Petroleum industry:**

- Workers for onshore and offshore petroleum drilling operations; platform and drilling construction and maintenance; transportation (including helicopter operations), maritime transportation, supply, and dredging operations; maritime navigation; well stimulation, intervention, monitoring, automation and control, extraction, production; processing; waste disposal, and maintenance, construction, and operations.
- Workers for crude oil, petroleum and petroleum product storage and transportation, including pipeline, marine transport, terminals, rail transport, storage facilities and racks and road transport for use as end-use fuels such as gasoline, diesel fuel, jet fuel, and heating fuels or feedstocks for chemical manufacturing.
- Petroleum and petroleum product security operations center employees and workers who support maintenance and emergency response services.
- Petroleum and petroleum product operations control rooms/centers and refinery facilities.
- Retail fuel centers such as gas stations and truck stops, and the distribution systems that support them.
- Supporting new and existing construction projects, including, but not limited to, pipeline construction.

**Natural Gas, Natural Gas Liquids (NGL), Propane, and other liquid fuels**

- Workers who support onshore and offshore drilling operations, platform and drilling construction and maintenance; transportation (including helicopter operations); maritime transportation, supply, and dredging operations; maritime navigation; natural gas and natural gas liquid production, processing, extraction, storage and transportation; well intervention, monitoring, automation and control; waste disposal, and maintenance, construction, and operations.
- Transmission and distribution pipeline workers, including compressor stations and any other required, operations maintenance, construction, and support for natural gas, natural gas liquid, propane, and other liquid fuels.
- Natural gas, propane, natural gas liquids, and other liquid fuel processing plants, including construction, maintenance, and support operations.
- Natural gas processing plants workers, and those that deal with natural gas liquids.
- Workers who staff natural gas, propane, natural gas liquids, and other liquid fuel security operations centers, operations dispatch and control rooms/centers, and emergency response and customer emergencies (including leak calls) operations.
- Drilling, production, processing, refining, and transporting natural gas for use as end-use fuels, feedstocks for

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

Facebook.com/CISA

chemical manufacturing, or use in electricity generation.

- Dispatch and control rooms and emergency response and customer emergencies, including propane leak calls.
- Propane gas service maintenance and restoration, including call centers.
- Propane, natural gas liquids, and other liquid fuel distribution centers.
- Propane gas storage, transmission, and distribution centers.
- Supporting new and existing construction projects, including, but not limited to, pipeline construction.
- Ethanol and biofuel production, refining, and distribution.
- Workers in fuel sectors (including, but not limited to nuclear, coal, and gas types and liquid fuels) supporting the mining, manufacturing, logistics, transportation, permitting, operation/maintenance, and monitoring of support for resources.

## WATER AND WASTEWATER

Employees needed to operate and maintain drinking water and wastewater/drainage infrastructure, including:

- Operational staff at water authorities.
- Operational staff at community water systems.
- Operational staff at wastewater treatment facilities.
- Workers repairing water and wastewater conveyances and performing required sampling or monitoring, including field staff.
- Operational staff for water distribution and testing.
- Operational staff at wastewater collection facilities.
- Operational staff and technical support for SCADA Control systems.
- Chemical and equipment suppliers to water and wastewater systems and personnel protection.
- Workers who maintain digital systems infrastructure supporting water and wastewater operations.

## TRANSPORTATION AND LOGISTICS

- Employees supporting or enabling transportation functions, including truck drivers, bus drivers, dispatchers, maintenance and repair technicians, warehouse workers, truck stop and rest area workers, Department of Motor Vehicle (DMV) employees, towing/recovery services, roadside assistance workers, intermodal transportation personnel, and workers who maintain and inspect infrastructure (including those that require cross-jurisdiction travel).
- Workers supporting the distribution of food, pharmaceuticals (including materials used in radioactive drugs) and other medical materials, fuels, chemicals needed for water or water treatment and energy Maintenance and operation of essential highway infrastructure, including roads, bridges, and tunnels (e.g., traffic operations centers and moveable bridge operators).
- Employees of firms providing services, supplies, and equipment that enable warehouse and operations, including cooling, storing, packaging, and distributing products for wholesale or retail sale or use. Includes cold- and frozen-chain logistics for food and critical biologic products.
- Mass transit workers and providing critical transit services and/or performing critical or routine maintenance to mass transit infrastructure or equipment.
- Employees supporting personal and commercial transportation services – including taxis, delivery services, vehicle rental services, bicycle maintenance and car-sharing services, and transportation network providers.
- Workers responsible for operating and dispatching passenger, commuter and freight trains and maintaining rail infrastructure and equipment.
- Maritime transportation workers, including dredgers, port workers, mariners, ship crewmembers, ship pilots and tug boat operators, equipment operators (to include maintenance and repair, and maritime-specific medical

CONNECT WITH US
www.cisa.gov

For more information,
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

Facebook.com/CISA

providers), ship supply, chandler, and repair companies.

- Workers including truck drivers, railroad employees and contractors, maintenance crew, and cleaners supporting transportation of chemicals, hazardous, medical, and waste materials to support critical infrastructure, capabilities, functions, and services, including specialized carriers, crane and rigging industry workers.
- Bus drivers and workers who provide or support intercity, commuter and charter bus service in support of other essential services or functions.
- Automotive repair, maintenance, and transportation equipment manufacturing and distribution facilities (including those who repair and maintain electric vehicle charging stations).
- Transportation safety inspectors, including hazardous material inspectors and accident investigator inspectors.
- Manufacturers and distributors (to include service centers and related operations) of packaging materials, pallets, crates, containers, and other supplies needed to support manufacturing, packaging staging and distribution operations.
- Postal, parcel, courier, last-mile delivery, and shipping and related workers, to include private companies.
- Employees who repair and maintain vehicles, aircraft, rail equipment, marine vessels, bicycles, and the equipment and infrastructure that enables operations that encompass movement of cargo and passengers.
- Air transportation employees, including air traffic controllers and maintenance personnel, ramp workers, aviation and aerospace safety, security, and operations personnel and accident investigations.
- Workers who support the operation, distribution, maintenance, and sanitation, of air transportation for cargo and passengers, including flight crews, maintenance, airport operations, those responsible for cleaning and disinfection, and other on- and off- airport facilities workers.
- Workers supporting transportation via inland waterways such as barge crew, dredging, river port workers for essential goods.
- Workers critical to rental and leasing of vehicles and equipment that facilitate continuity of operations for essential workforces and other essential travel.
- Warehouse operators, including vendors and support personnel critical for business continuity (including HVAC & electrical engineers; security personnel; and janitorial staff) and customer service for essential functions.

## PUBLIC WORKS AND INFRASTRUCTURE SUPPORT SERVICES

- Workers who support the operation, inspection, and maintenance of essential public works facilities and operations, including bridges, water and sewer main breaks, fleet maintenance personnel, construction of critical or strategic infrastructure, traffic signal maintenance, emergency location services for buried utilities, maintenance of digital systems infrastructure supporting public works operations, and other emergent issues.
- Workers such as plumbers, electricians, exterminators, builders, contractors, HVAC Technicians, landscapers, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, businesses and buildings such as hospitals, senior living facilities, any temporary construction required to support COVID-19 response.
- Workers who support, such as road and line clearing, to ensure the availability of and access to needed facilities, transportation, energy and communications.
- Support to ensure the effective removal, storage, and disposal of residential and commercial solid waste and hazardous waste, including landfill operations.
- Workers who support the operation, inspection, and maintenance of essential dams, locks and levees.
- Workers who support the inspection and maintenance of aids to navigation, and other government provided services that ensure continued maritime commerce.

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

# COMMUNICATIONS AND INFORMATION TECHNOLOGY

**Communications:**

- Maintenance of communications infrastructure- including privately owned and maintained communication systems- supported by technicians, operators, call -centers, wireline and wireless providers, cable service providers, satellite operations, Internet Exchange Points, Points of Presence, Network Access Points, back haul and front haul facilities, and manufacturers and distributors of communications equipment.
- Government and private sector employees (including government contractors) with work related to undersea cable infrastructure and support facilities, including cable landing sites, beach manhole vaults and covers, submarine cable depots and submarine cable ship facilities.
- Government and private sector employees (including government contractors) supporting Department of Defense internet and communications facilities.
- Workers who support radio, television, and media service, including, but not limited to front-line news reporters, studio, and technicians for newsgathering, and reporting, and publishing news.
- Network Operations staff, engineers and/or technicians to include IT managers and staff, HVAC & electrical engineers, security personnel, software and hardware engineers, and database administrators that manage the network or operate facilities.
- Engineers, technicians and associated personnel responsible for infrastructure construction and restoration, including contractors for construction and engineering of fiber optic cables, buried conduit, small cells, other wireless facilities, and other communications sector-related infrastructure. This includes construction of new facilities and deployment of new technology as these are required to address congestion or customer usage due to unprecedented use of remote services.
- Installation, maintenance and repair technicians that establish, support or repair service as needed.
- Central office personnel to maintain and operate central office, data centers, and other network office facilities, critical support personnel assisting front line employees.
- Customer service and support staff, including managed and professional services as well as remote providers of support to transitioning employees to set up and maintain home offices, who interface with customers to manage or support service environments and security issues, including payroll, billing, fraud, logistics, and troubleshooting.
- Workers providing electronic security, fire, monitoring and life safety services, and to ensure physical security, cleanliness and safety of facilities and personnel, including temporary licensing waivers for security personnel to work in other States of Municipalities.
- Dispatchers involved with service repair and restoration.
- Retail customer service personnel at critical service center locations for onboarding customers, distributing and repairing equipment and addressing customer issues in order to support individuals' remote emergency communications needs, supply chain and logistics personnel to ensure goods and products are on-boarded to provision these front-line employees.
- External Affairs personnel to assist in coordinating with local, state and federal officials to address communications needs supporting COVID-19 response, public safety, and national security.

**Information Technology:**

- Workers who support command centers, including, but not limited to Network Operations Command Centers, Broadcast Operations Control Centers and Security Operations Command Centers.
- Data center operators, including system administrators, HVAC & electrical engineers, security personnel, IT managers and purchasers, data transfer solutions engineers, software and hardware engineers, and database administrators, for all industries (including financial services).

**CONNECT WITH US**
www.cisa.gov

For more information,
email CISA.CAT@cisa.dhs.gov

Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

ER - 102

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.A.P. 8

EXHIBIT B
Page 20 of 24

- Workers who support client service centers, field engineers, and other technicians and workers supporting critical infrastructure, as well as manufacturers and supply chain vendors that provide hardware and software, support services, research and development, and information technology equipment (to include microelectronics and semiconductors), and HVAC and electrical equipment for critical infrastructure, and test labs and certification agencies that qualify such equipment (to include microelectronics, optoelectronics, and semiconductors) for critical infrastructure, including data centers.

- Workers needed to preempt and respond to cyber incidents involving critical infrastructure, including medical facilities, SLTT governments and federal facilities, energy and utilities, and banks and financial institutions, securities/other exchanges, other entities that support the functioning of capital markets, public works, critical manufacturing, food & agricultural production, transportation, and other critical infrastructure categories and personnel, in addition to all cyber defense workers (who can't perform their duties remotely).

- Suppliers, designers, transporters and other workers supporting the manufacture, distribution and provision and construction of essential global, national and local infrastructure for computing services (including cloud computing services and telework capabilities), business infrastructure, financial transactions/services, web-based services, and critical manufacturing.

- Workers supporting communications systems and information technology- and work from home solutions- used by law enforcement, public safety, medical, energy, public works, critical manufacturing, food & agricultural production, financial services, education, and other critical industries and businesses.

- Employees required in person to support Software as a Service businesses that enable remote working, performance of business operations, distance learning, media services, and digital health offerings, or required for technical support crucial for business continuity and connectivity.

## OTHER COMMUNITY- OR GOVERNMENT-BASED OPERATIONS AND ESSENTIAL FUNCTIONS

- Workers to ensure continuity of building functions, including but not limited to security and environmental controls (e.g., HVAC), the manufacturing and distribution of the products required for these functions, and the permits and inspections for construction supporting essential infrastructure.

- Elections personnel to include both public and private sector elections support.

- Workers supporting the operations of the judicial system.

- Federal, State, and Local, Tribal, and Territorial employees who support Mission Essential Functions and communications networks.

- Trade Officials (FTA negotiators; international data flow administrators).

- Employees necessary to maintain news and media operations across various media.

- Employees supporting Census 2020.

- Weather forecasters.

- Clergy for essential support.

- Workers who maintain digital systems infrastructure supporting other critical government operations.

- Workers who support necessary credentialing, vetting and licensing operations for critical infrastructure workers.

- Customs and immigration workers who are critical to facilitating trade in support of the national emergency response supply chain.

- Educators supporting public and private K-12 schools, colleges, and universities for purposes of facilitating distance learning or performing other essential functions.

- Staff at government offices who perform title search, notary, and recording services in support of mortgage and real estate services and transactions.

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

Facebook.com/CISA

- Residential and commercial real estate services, including settlement services.
- Workers supporting essential maintenance, manufacturing, design, operation, inspection, security, and construction for essential products, services, and supply chain and COVID 19 relief efforts.

## CRITICAL MANUFACTURING

- Workers necessary for the manufacturing of metals (including steel and aluminum), industrial minerals, semiconductors, materials and products needed for medical supply chains, and for supply chains associated with transportation, energy, communications, information technology, food and agriculture, chemical manufacturing, nuclear facilities, wood products, commodities used as fuel for power generation facilities, the operation of dams, water and wastewater treatment, processing and reprocessing of solid waste, emergency services, and the defense industrial base. Additionally, workers needed to maintain the continuity of these manufacturing functions and associated supply chains, and workers necessary to maintain a manufacturing operation in warm standby.
- Workers necessary for the manufacturing of materials and products needed to manufacture medical equipment and personal protective equipment (PPE).
- Workers necessary for mining and production of critical minerals, materials and associated essential supply chains, and workers engaged in the manufacture and maintenance of equipment and other infrastructure necessary for mining production and distribution.
- Workers who produce or manufacture parts or equipment that supports continued operations for any essential services and increase in remote workforce (including computing and communication devices, semiconductors, and equipment such as security tools for Security Operations Centers (SOCs) or datacenters).

## HAZARDOUS MATERIALS

- Workers who manage hazardous materials associated with any other essential activity, including but not limited to healthcare waste (medical, pharmaceuticals, medical material production), testing operations (laboratories processing test kits), and energy (nuclear facilities) Workers at nuclear facilities, workers managing medical waste, workers managing waste from pharmaceuticals and medical material production, and workers at laboratories processing tests Workers who support hazardous materials response and cleanup.
- Workers who maintain digital systems infrastructure supporting hazardous materials management operations.

## FINANCIAL SERVICES

- Workers who are needed to provide, process and maintain systems for processing, verification, and recording of financial transactions and services, including payment, clearing, and settlement; wholesale funding; insurance services; consumer and commercial lending; and capital markets activities).
- Workers who are needed to maintain orderly market operations to ensure the continuity of financial transactions and services.
- Workers who are needed to provide business, commercial, and consumer access to bank and non-bank financial services and lending services, including ATMs, lending and money transmission, and to move currency, checks, securities, and payments (e.g., armored cash carriers).
- Workers who support financial operations and those staffing call centers, such as those staffing data and security operations centers, managing physical security, or providing accounting services.
- Workers supporting production and distribution of debit and credit cards.
- Workers providing electronic point of sale support personnel for essential businesses and workers.

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.A.P. 8

EXHIBIT B
Page 22 of 24

ER - 104

## CHEMICAL

- Workers supporting the chemical and industrial gas supply chains, including workers at chemical manufacturing plants, workers in laboratories, workers at distribution facilities, workers who transport basic raw chemical materials to the producers of industrial and consumer goods, including hand sanitizers, food and food additives, pharmaceuticals, paintings and coatings, textiles, building materials, plumbing, electrical, and paper products.
- Workers supporting the safe transportation of chemicals, including those supporting tank truck cleaning facilities and workers who manufacture packaging items.
- Workers supporting the production of protective cleaning and medical solutions, personal protective equipment, disinfectants, fragrances, and packaging that prevents the contamination of food, water, medicine, among others essential.
- Workers supporting the operation and maintenance of facilities (particularly those with high risk chemicals and/or sites that cannot be shut down) whose work cannot be done remotely and requires the presence of highly trained personnel to ensure safe operations, including plant contract workers who provide inspections.
- Workers who support the production and transportation of chlorine and alkali manufacturing, single-use plastics, and packaging that prevents the contamination or supports the continued manufacture of food, water, medicine, and other essential products, including glass container manufacturing.

## DEFENSE INDUSTRIAL BASE

- Workers who support the essential services required to meet national security commitments to the federal government and U.S. Military. These individuals include, but are not limited to, space and aerospace; mechanical and software engineers (various disciplines), manufacturing/production workers; IT support; security staff; security personnel; intelligence support, aircraft and weapon system mechanics and maintainers; and sanitary workers who maintain the hygienic viability of necessary facilities.
- Personnel working for companies, and their subcontractors, who perform under contract or sub-contract to the Department of Defense, as well as personnel at government-owned/contractor- operated and government-owned/government-operated facilities, and who provide materials and services to the Department of Defense, including support for weapon systems, software systems and cybersecurity, defense and intelligence communications and surveillance, space systems and other activities in support of our military, intelligence and space forces.

## COMMERCIAL FACILITIES

- Workers who support the supply chain of building materials from production through application/installation, including cabinetry, fixtures, doors, cement, hardware, plumbing, electrical, heating/cooling, refrigeration, appliances, paint/coatings, and employees who provide services that enable repair materials and equipment for essential functions.
- Workers supporting ecommerce through distribution, warehouse, call center facilities, and other essential operational support functions.
- Workers in hardware and building materials stores, consumer electronics, technology and appliances retail, and related merchant wholesalers and distributors - with reduced staff to ensure continued operations.
- Workers distributing, servicing, repairing, installing residential and commercial HVAC systems, boilers, furnaces and other heating, cooling, refrigeration, and ventilation equipment.

## RESIDENTIAL/SHELTER FACILITIES AND SERVICES

- Workers in dependent care services, in support of workers in other essential products and services.

**CONNECT WITH US**
**www.cisa.gov**

Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

**For more information,**
**email CISA.CAT@cisa.dhs.gov**

@CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.A.P. 8
EXHIBIT B
Page 23 of 24

ER - 105

- Workers who support food, shelter, and social services, and other necessities of life for needy groups and individuals, including in-need populations and COVID-19 responders (including travelling medical staff).
- Workers in animal shelters.
- Workers responsible for the leasing of residential properties to provide individuals and families with ready access to available housing.
- Workers responsible for handling property management, maintenance, and related service calls who can coordinate the response to emergency "at-home" situations requiring immediate attention, as well as facilitate the reception of deliveries, mail, and other necessary services.
- Workers performing housing construction related activities to ensure additional units can be made available to combat the nation's existing housing supply shortage.
- Workers performing services in support of the elderly and disabled populations who coordinate a variety of services, including health care appointments and activities of daily living.
- Workers supporting the construction of housing, including those supporting government functions related to the building and development process, such as inspections, permitting and plan review services that can be modified to protect the public health, but fundamentally should continue and serve the construction of housing (e.g., allow qualified private third-party inspections in case of government shutdown).

## HYGIENE PRODUCTS AND SERVICES

- Workers who produce hygiene products.
- Workers in laundromats, laundry services, and dry cleaners.
- Workers providing personal and household goods repair and maintenance.
- Workers providing disinfection services, for all essential facilities and modes of transportation, and supporting the sanitation of all food manufacturing processes and operations from wholesale to retail.
- Workers necessary for the installation, maintenance, distribution, and manufacturing of water and space heating equipment and its components.
- Support required for continuity of services, including commercial disinfectant services, janitorial/cleaning personnel, and support personnel functions that need freedom of movement to access facilities in support of front-line employees.

**CONNECT WITH US**
www.cisa.gov

For more information,
email CISA.CAT@cisa.dhs.gov

Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

Facebook.com/CISA

NOTICE AND MOTION TO STAY PURSUANT TO F.R.C.P. 62(d) AND F.R.A.P. 8
EXHIBIT B
Page 24 of 24

ER - 106

1          **UNITED STATES DISTRICT COURT**

2            **DISTRICT OF IDAHO**

3   RECLAIM IDAHO, an Idaho        ) Case No. 1:20-cv-00268-BLW
    political action committee,    )
4   and LUKE MAYVILLE,             ) **MOTION HEARING**
                                   )
5            Plaintiffs,           )
                                   )
6         vs.                      )
                                   )
7   BRADLEY LITTLE, in his official )
    capacity as Governor of Idaho, )
8   and LAWERENCE DENNEY his       )
    official capacity as Idaho     )
9   Secretary of State,            )
                                   )
10           Defendants.           )
    _____ )

11

12        **TRANSCRIPT OF VIDEO CONFERENCE PROCEEDINGS**
          **BEFORE THE HONORABLE B. LYNN WINMILL**
13          **TUESDAY, JUNE 23, 2020; 2:00 P.M.**
                  **BOISE, IDAHO**

14

15  **FOR PLAINTIFFS**
          Deborah Ferguson
16        Craig H. Durham
          FERGUSON DURHAM, PLLC
17        223 N. 6th Street, Suite 325
          Boise, ID 83712
18

19  **FOR DEFENDANTS**
          Robert A. Berry, Deputy Attorney General
          Civil Litigation Division
20        OFFICE OF THE ATTORNEY GENERAL
          P.O. Box 83720
21        Boise, ID 83720-0010

22  Proceedings recorded by mechanical stenography, transcript
    produced by computer.
23  _____

24          **TAMARA I. HOHENLEITNER, CSR 619, CRR**
            FEDERAL OFFICIAL COURT REPORTER
25        550 WEST FORT STREET, BOISE, IDAHO  83724

1          They realized, at some point then, the danger to the

2     public to continue to circulate among it and collect signatures

3     was just far too great.  It was also too great for the

4     volunteers, that army of volunteers, primarily senior citizens,

5     who are -- you know, have extra exposure and risk of death from

6     COVID.

7          So once that became clear, it really forced a

8     suspension.  This occurred after the governor had

9     initiated -- declared a state of emergency and then extreme

10    emergency.  And then there was the shelter in place, and that

11    became a misdemeanor to try to -- to attempt to collect

12    signatures or to leave our homes during those many weeks.

13         And so that brings us to:  What's Reclaim doing now?

14    And there was a real tone of criticism from the state in its

15    brief that Reclaim should have brought this lawsuit sooner.

16         And I would -- I would say this can't be viewed in

17    some bubble or isolation.  This is being brought during the

18    middle of the pandemic and the shutdown.

19         Like the courts, our law office here was closed, and

20    Mr. Durham and I worked from our respective homes at makeshift

21    offices.

22         I was contacted by Mr. Mayville on a weekend as he

23    described the situation of the initiative, and there was a big

24    ask:  In the middle of this pandemic, while you're working from

25    home, already trying to just patch through our clients and

1      reading these -- these cases, reading *Angle* and other cases

2      about initiatives when they arise in the context of the

3      government, state legislatures making it more difficult and then

4      the courts grasping -- you know, looking at, you know, how

5      severe is this burden.

6            Well, we have got a totally different paradigm here.

7      I mean, the burden with the stay-at-home order subject to

8      criminal misdemeanor penalties is -- is absolute.

9      It's -- it's -- it's severe.  So I don't think there is

10     any -- any doubt that this has inflicted just an incredible

11     burden and really made it impossible for Reclaim Idaho to

12     continue to get this important initiative on the ballot.

13           THE COURT:  All right.  One of the comments that were

14     made in the briefing was that the governor did not make an

15     exception for First Amendment activities.

16           I guess I was a little skeptical whether that would

17     have made any difference because just people -- well, I mean,

18     maybe it's belied by the fact that people were willing to go out

19     and protest, obviously, after the Black Lives Matter issue

20     arose.  But it's a little bit different to collect signatures

21     than to take to the streets to protest something as dramatic as

22     what occurred in Minneapolis.

23           (Inaudible) had exempted First Amendment activity from

24     his stay-at-home order?

25           MS. FERGUSON:  In all candor, no.  I don't think so.

1      something on the ballot and do nothing more than that.

2           The other alternative is to permit online solicitation

3      for another -- I think it was 48 days -- whatever the number of

4      days were between the cutoff and the date in which they stopped

5      soliciting and allow online solicitation, collection, and

6      certification of signatures similar to the manner suggested by

7      the plaintiffs.

8           But frankly, I find that more problematic because I

9      think it does force the court to run the elections, run the

10     initiative process for the state, which I'm reluctant to do.

11          But I also understand that the state may have

12     reasons -- perhaps the relationship between the governor and

13     secretary of state and the legislature may be such a compelling

14     reason -- that they would -- that they would prefer to undertake

15     that substantial effort as opposed to simply allow

16     certification.

17          So what I'm going to order is that the state will be

18     given the choice, which they must exercise by week's end, to

19     either simply certify the initiative or inclusion on the general

20     election ballot or extend by the same number of days that we

21     discussed earlier -- I want to say 48 days -- and then allow

22     online solicitation, collection, and certification of signatures

23     similar to the manner suggested by the plaintiffs.

24          I wish it were possible to just extend the date and

25     still require in-person certification.  But as I noted, I don't

REPORTER'S CERTIFICATE


I, TAMARA I. HOHENLEITNER, CSR, RPR, CRR, certify that the foregoing is a correct transcript of proceedings in the above-entitled matter.


/s/  Tamara I. Hohenleitner                    06/26/2020
_____      _____
TAMARA I. HOHENLEITNER, CSR, RPR, CRR          Date

LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation Division

ROBERT A. BERRY, ISB #7442
MEGAN A. LARRONDO, ISB #10597
Deputy Attorneys General
Civil Litigation Division
Office of the Attorney General
P.O. Box 83720
Boise, ID  83720-0010
Telephone:     (208) 334-2400
Facsimile:     (208) 854-8073
robert.berry@ag.idaho.gov
megan.larrondo@ag.idaho.gov

      Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| RECLAIM IDAHO, an Idaho political action committee, and LUKE MAYVILLE, <br><br> Plaintiff, <br><br> vs. <br><br> BRADLEY LITTLE, in his official capacity as Governor of Idaho, and LAWERENCE DENNEY his official capacity as Idaho Secretary of State, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 1:20-cv-00268-BLW

**CORRECTED SUPPLEMENTAL DECLARATION OF PHIL MCGRANE IN SUPPORT OF DEFENDANTS**

I, PHIL MCGRANE, declare as follows:

1.     I am over the age of 18 years and competent to testify on the matters herein. I make this declaration based upon my own personal knowledge.

2.     I am the Ada County Clerk and am responsible for the supervision and

CORRECTED SUPPLEMENTAL DECLARATION OF PHIL MCGRANE IN SUPPORT OF
DEFENDANTS – 1

administration of elections in Ada County. This includes the verification of petition signatures.

3.      The Elections division of my office strives to maintain open and cooperative communication with all parties involved the circulation of petitions. This includes the Plaintiff, Reclaim Idaho.

4.      During all petition cycles, we work with circulators to balance the demands and deadlines related to verifying petitions with the demands and deadlines of conducting elections.

5.      Ada County Elections has received approximately 940 petitions from Reclaim Idaho for the petition in question. Each of these petitions contain anywhere from one to twelve signatures needing review.

6.      On April 6th, having seen media reports that Reclaim Idaho was ceasing its efforts to collect signatures, our Elections Director, Saul Seyler, contacted Reclaim Idaho to determine if signature verification was still being requested. Attached to this declaration are e-mails confirming this conversation from April 8th and 9th between Mr. Seyler and Ashley Prince, Field Director for Reclaim Idaho. As the e-mails indicate, Reclaim Idaho was aware of the extraordinary challenges our office is facing and confirmed that they were not asking us to validate the signatures we had received from their campaign.

7.      Ada County relied in good faith on the phone conversation and e-mail exchange with Ms. Prince and has not validated the signatures on the petitions from Reclaim Idaho in advance of the June 30th deadline.

8.      Conducting a fair, free, safe and accessible election is challenging anytime. Doing so during the current COVID-19 pandemic, has proven, and will continue to be extremely difficult. These challenges and risks have recently been highlighted by other states, specifically Georgia and Wisconsin, as they have recently struggled to conduct their primary elections.

CORRECTED SUPPLEMENTAL DECLARATION OF PHIL MCGRANE IN SUPPORT OF DEFENDANTS – 2

9.      In Idaho, the demand for mail ballots and the corresponding work has significantly increased because of the pandemic. Leading up to the State's recent May Primary election, I increased the elections staff from ten to forty in order to keep up with the demand. Recruiting poll workers and securing polling locations has also proven to be significantly more difficult because of the associated health risks related to the pandemic. Every indication is that all of these challenges will continue to exist through the August and November elections. I anticipate that our overall workload will nearly double for each of these elections due to the necessary changes caused by the pandemic. This is due to the requirement to maintain traditional polling places, while simultaneously conducting significant mail out voting and the addition of safety measures needed to protect public health in each.

10.     The Plaintiffs' recent proposal to shorten the time for my office to verify petition signatures from sixty (60) days to twenty-one (21) days would be extremely difficult to achieve, particularly in the populous areas like Ada County. This burden is significantly increased by our reliance on the communication from Reclaim Idaho that we did not need to increase resources and personnel in order to verify the signatures they had previously provided us.

11.     As mentioned in my initial declaration, we often struggle to meet the sixty day timeframe due to the sheer volume of signatures requiring review. Individually reviewing and comparing tens of thousands of anything takes considerable time and resources. This is true of reviewing signatures and looking up individuals to confirm they are actively registered to vote. The proposed alternatives for signature gathering will not significantly alter the time needed for review.

12.     As stated previously, both the upcoming August and November elections are going to be extremely difficult to conduct without adding in the task of verifying initiative signatures

CORRECTED SUPPLEMENTAL DECLARATION OF PHIL MCGRANE IN SUPPORT OF
DEFENDANTS – 3

during either of these elections. The proposed timeline creates a conflict between the administration of a fair, free, safe and accessible election and the need to verify the authenticity of signatures filed for a petition, both of which are important. This conflict is largely and intentionally avoided under existing law.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 23rd day of June, 2020.

_____/s/ Phil McGrane_____
PHIL MCGRANE

CORRECTED SUPPLEMENTAL DECLARATION OF PHIL MCGRANE IN SUPPORT OF DEFENDANTS – 4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 23, 2020, I electronically filed the foregoing with the Clerk of the Court using the CMF/ECF system which sent a Notice of Electronic Filing to the following persons:

Deborah A. Ferguson                                     Craig H. Durham
daf@fergusondurham.com                         chd@fergusondurham.com


/s/ Robert A. Berry

ROBERT A. BERRY
Deputy Attorney General

CORRECTED SUPPLEMENTAL DECLARATION OF PHIL MCGRANE IN SUPPORT OF DEFENDANTS – 5

# Phil McGrane

| | |
|---|---|
| **From:** | Saul Seyler |
| **Sent:** | Monday, June 22, 2020 4:30 PM |
| **To:** | Phil McGrane |
| **Subject:** | FW: [EXTERNAL] Re: Hello There! |

FYI



**Saul H. Seyler, JD**
*Director*
Ada County Elections
400 N. Benjamin Lane, #100
Boise, ID 83704
(208) 287-6851

**From:** Ashley Prince [mailto:ashlex.prince@gmail.com]
**Sent:** Thursday, April 9, 2020 9:16 AM
**To:** Saul Seyler
**Subject:** [EXTERNAL] Re: Hello There!

> **CAUTION:** This email originated from outside Ada County email servers. Do not click on links or open attachments unless you recognize the sender and know the content is safe. Verify the sender by mouse-hovering over their display name in order to see the sender's full email address and confirm it is not suspicious. If you are unsure an email is safe, please report the email by using the 'Phish Alert' button in Outlook.

Hi Saul,

Thank you so much for following up! It looks like I had a typo in your email address when I sent my message. As we discussed, Reclaim Idaho has suspended its signature drive due to COVID-19. Due to the remaining time available to us per Idaho Election Code we will not be able to meet the deadline to qualify this petition for the 2020 ballot. Under the circumstances we are not asking the Ada County elections office to validate signatures you have received from our campaign.

Please let me know if you have any questions or need anything further

Ashley Prince
Reclaim Idaho Field Director
(208) 971-3000
reclaimidaho.org [reclaimidaho.org]


On Apr 8, 2020, at 5:21 PM, Saul Seyler <sseyler@adacounty.id.gov> wrote:

Hi Ashley,

1

Just circling back on our previous conversation about a letter saying that we here at Ada County do not need to complete finalization of verifying your petition signatures. Based on the conversation we had and your groups intent to no longer pursue this effort during this year, I would greatly appreciate this. As we discussed, we are up against some very unique circumstances that require a lot of internal resources and it would be great to take this off of our plate given the current environment. We obviously would continue to hold your paper copies of the petitions for pickup in the future either by you or another member of Reclaim.

Thanks so much and please let me know if I can provide you with anything to help this process along.

<image001.png>  **Saul H. Seyler, JD**
*Director*
Ada County Elections
400 N. Benjamin Lane, #100
Boise, ID 83704
(208) 287-6851
Fax: (208) 287-6939

LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation Division

ROBERT A. BERRY, ISB #7442
MEGAN A. LARRONDO, ISB #10597
Deputy Attorneys General
Civil Litigation Division
Office of the Attorney General
P.O. Box 83720
Boise, ID  83720-0010
Telephone:     (208) 334-2400
Facsimile:     (208) 854-8073
robert.berry@ag.idaho.gov
megan.larrondo@ag.idaho.gov

Attorneys for Defendants

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| RECLAIM IDAHO, an Idaho political action committee, and LUKE MAYVILLE, | ) ) ) | Case No. 1:20-cv-00268-BLW |
| Plaintiff, | ) ) ) | **SUPPLEMENTAL DECLARATION OF JASON HANCOCK IN SUPPORT OF DEFENDANTS** |
| vs. | ) ) | |
| BRADLEY LITTLE, in his official capacity as Governor of Idaho, and LAWERENCE DENNEY his official capacity as Idaho Secretary of State, | ) ) ) ) | |
| Defendants. | ) ) | |

I, JASON HANCOCK, declare as follows:

1.      I am over the age of 18 years and competent to testify on the matters herein. I make

this declaration based upon my own personal knowledge.

SUPPLEMENTAL DECLARATION OF JASON HANCOCK IN SUPPORT OF
DEFENDANTS – 1

2.      Plaintiffs' reference the ability over the last primary to request an absentee ballot electronically, but the reference does not identify the factors used to authenticate the identity of the requesting party.

3.      The Secretary of State's Office used three non-public factors to authenticate the identity of the requesting party: date of birth; Idaho driver's license or identification number; and the last four digits of a person's social security number.

4.      When individuals register to vote today, they are required to list their Idaho driver's license or identification number, or the last four digits of their social security number, but that has not always been the case.

5.      In the past, individuals could register to vote simply by signing the voter registration form.

6.      Voters with an older, signature-only voter registration form on file were unable to request their absentee ballot for the May 2020 primary election electronically, and had to use a signed, paper request form instead.

7.      Notably, the electronic request for an absentee ballot did not alter the requirement that the outer envelope of the absentee ballot be signed by the voter and returned to the applicable county clerk.

8.      Upon receipt of the absentee ballot, the county clerk would compare the signature with the signature on file, to ensure that they matched, and would also check to ensure that the voter was a registered voter.

9.      The signature, therefore, was a required authenticating factor, regardless of how the absentee ballot was requested.

10.     Using DocuSign in the way the Plaintiffs suggest would also raise issues for

SUPPLEMENTAL DECLARATION OF JASON HANCOCK IN SUPPORT OF
DEFENDANTS – 2

counting signatures for a petition.

11.    If individuals with an older voter registration provide DocuSign with their Idaho driver's license or identification number, and social security number, as proposed by the Plaintiffs, the county clerk would not have a record with which to match the information submitted, because this information does not exist for most older voter registrations.

12.    Unlike the driver's license or identification number, or last four digits of the social security number, the voter signature is the universal identifier available for all voters and petition signers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 23rd day of June, 2020.

_____/s/ Jason Hancock_____
JASON HANCOCK

SUPPLEMENTAL DECLARATION OF JASON HANCOCK IN SUPPORT OF
DEFENDANTS – 3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 23, 2020, I electronically filed the foregoing with the Clerk of the Court using the CMF/ECF system which sent a Notice of Electronic Filing to the following persons:

Deborah A. Ferguson                         Craig H. Durham
daf@fergusondurham.com                      chd@fergusondurham.com


_____
        */s/ Robert A. Berry*
        ROBERT A. BERRY
        Deputy Attorney General

SUPPLEMENTAL DECLARATION OF JASON HANCOCK IN SUPPORT OF
DEFENDANTS – 4

LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation Division

ROBERT A. BERRY, ISB #7442
MEGAN A. LARRONDO, ISB #10597
Deputy Attorneys General
Civil Litigation Division
Office of the Attorney General
P.O. Box 83720
Boise, ID  83720-0010
Telephone:     (208) 334-2400
Facsimile:      (208) 854-8073
robert.berry@ag.idaho.gov
megan.larrondo@ag.idaho.gov

       Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RECLAIM IDAHO, an Idaho political action committee, and LUKE MAYVILLE, <br><br>            Plaintiffs, <br><br> vs. <br><br> BRADLEY LITTLE, in his official capacity as Governor of Idaho, and LAWERENCE DENNEY his official capacity as Idaho Secretary of State, <br><br>            Defendants. | Case No. 1:20-cv-00268-BLW <br><br> **GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2)** |

## I.      INTRODUCTION

     Plaintiffs' own voluntary choices and dilatory conduct caused Reclaim Idaho to miss the

deadline to gather the required signatures for its initiative petition.  Now, over two months after

Plaintiffs knew Reclaim Idaho would miss the deadline and over a month after it actually missed

the deadline, Plaintiffs ask this Court for special dispensation from the deadline and from the in-

person signature gathering requirements that have been in place for almost 100 years. This case turns on a series of choices that the Plaintiffs made: to gather signatures within a six month timeframe rather than the generous 18 months permitted by statute (Idaho Code § 34-1802(1); to voluntarily quit gathering signatures on March 18, 2020, a week before the Governor issued the state-wide stay-at-home order; and to not take any steps regarding the legal effect of their choices until they filed this suit on June 6, more than a month after the May 1, 2020 deadline to submit their signatures passed. And perhaps most troubling, Plaintiffs ask this Court to aggressively invade the Idaho Legislature's constitutionally-created authority and create a signature-gathering alternative that is nowhere contemplated by the Idaho Constitution or Code and that has never even been introduced for legislative consideration. This suit should be dismissed in its entirety, particularly since Plaintiffs have a remedy: they can now restart their petition and have a full 18 months in which to gather signatures.

Plaintiffs' dilatory posture is opposite the plaintiffs' diligence in *Fair Maps Nevada et al v. Cegavske*, the case on which Reclaim Idaho heavily relies. In that case, the plaintiffs filed their action on May 6, almost two months <u>prior</u> to the running of the June 2, 2020 deadline. In contrast, the Plaintiffs here gave up on circulating their petition, let the deadline run, and, a month later, now request court intervention and seek an extension of 48 days <u>plus</u> the time they wasted after the deadline ran before filing this lawsuit. Plaintiffs' requested relief cannot issue. Particularly within the election context, deadlines have meaning. Ballots must be prepared, absentee ballots must be mailed and the state must have election materials prepared in order to fully comply with the requirements of the federal Uniform Military and Overseas Voters Act. Even more extraordinarily, Plaintiffs ask this Court to legislate an entirely new manner of gathering signatures on initiative petitions.[1]

---

[1] Reviewing the Legislature's website, there is no indication that Plaintiffs attempted to introduce the signature gathering alternative they now ask this court to author. In sum, Plaintiffs propose an alternative that the Idaho Legislature has never had the opportunity to consider or debate. Plaintiffs approach runs counter to every fundamental premise of separation of powers, state sovereignty, and this republic.

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 2

This Court should refuse to grant the requested preliminary injunction because Plaintiffs lack standing and they cannot show the necessary elements to obtain a preliminary injunction. Among other considerations, their claim is barred by the doctrine of laches. This Court must deny Plaintiffs' request that this Court sweep aside the legislatively-set deadlines and the legislatively-created manner in which signatures are gathered and authenticated in favor of a new judicially-created system. The Idaho Legislature—not the unelected federal judiciary—is charged by Idaho's Constitution with determining the manner under which initiatives proceed.

For these reasons, which are discussed in more detail below, Plaintiffs' motion should be denied and the case should be dismissed.

## II.     BACKGROUND

### A.     Reclaim Idaho Voluntarily Shortened the Time Available to Collect Signatures and then Voluntarily Suspended its Campaign before Any Relevant State Action Occurred.

The right to an initiative is found in the Idaho Constitution and it provides that legal voters may initiate legislation or cause the same to be submitted to vote at a general election "**under such conditions and in such manner as may be provided by acts of the legislature.**" Idaho Const. art. III, § 1 (emphasis added). In order to begin the initiative process, a proponent crafts an initiative and collects twenty signatures. Idaho Code § 34-1804. The proposed initiative is delivered to the Secretary of State.

Reclaim Idaho filed the initiative at issue here, referred to herein as "Invest in Idaho," with the Secretary of State by petition on August 30, 2019. (Declaration of Jason Hancock ("Hancock Decl.") ¶ 5.) After review by the Secretary of State and Attorney General's office, Reclaim Idaho received the ballot titles and sample petition on October 25, 2019. *Id.*; *see* Idaho Code § 34-1809.

Petitioners may circulate an initiative petition for up to 18 months following the issuance of the ballot titles. Idaho Code § 34-1802(1)-(2). Rather than giving itself the full 18 months allowed by statute, Reclaim Idaho chose to seek to place the "Invest in Idaho" initiative on the ballot in November 2020, leaving itself approximately six months between October 25, 2019 and

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 3

May 1, 2020 to collect the necessary signatures. (Hancock Decl. ¶ 6.) By its own admission, Reclaim Idaho left the vast majority (almost three-quarters) of its signature gathering efforts for the months of March and April. (Dkt. 2-2 ¶ 15.)

In circulating the petition for signatures, Reclaim Idaho was bound by a statutory subsection that has been in effect since 1933. (See Declaration of Counsel ("Counsel Decl."), Exhibit A, 1933 Idaho Sess. Laws 435.) It requires that "[a]ny person who circulates any petition for an initiative…shall be a resident of the state of Idaho and at least eighteen (18) years of age." Idaho Code § 34-1807. Each sheet of a petition containing signatures "shall be verified on the face thereof" by the person circulating the petition in a statutory prescribed form as follows.

> That I am a resident of the State of Idaho and at least eighteen (18) years of age: that every person who signed this sheet of the foregoing petition **signed his or her name thereto in my presence**: I believe that each has stated his or her name, address and residence correctly, that each signer is a qualified elector of the State of Idaho, and a resident of the county of…..

*Id.* (emphasis added). This requirement applies equally to all petitioners.

By April 30, 2020, Reclaim Idaho was required to gather the signatures of legal voters equal to at least six percent (6%) of the qualified electors at the time of the last general election in each of at least eighteen (18) legislative districts; the total number of signatures must be equal to or greater than six percent (6%) of the qualified electors of the state at the time of the last general election. Idaho Code § 34-1805.

Reclaim Idaho's signatures had to be submitted to the appropriate county clerk for verification by May 1, 2020. Idaho Code § 34-1802(2). County clerks verify the signatures within 60 days of the deadline for submission of the signatures, "but in no event shall the time extend beyond" June 30, 2020. Idaho Code § 34-1802(3). The county clerks have until July 6, 2020 to submit the signatures to the Secretary of State. Idaho Code §§ 34-1802(4), 34-116.

Reclaim Idaho missed its May 1 deadline because it voluntarily suspended its campaign on March 18, 2020, after trying briefly to figure out a way that it felt comfortable collecting signatures

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 4

due to concerns about the exposure and spread of COVID-19 and federal public health guidance. *See* Dkt. 2-2 ¶¶ 23, 28.

Reclaim Idaho has stated that it has collected approximately 30,000 signatures. Plaintiffs' briefing asserts that Reclaim Idaho has collected 10,593 signatures which have already been verified by the county clerks and that it stands ready to provide an additional 20,000 signatures to the county clerks.[2] (Dkt. 2-1 at 10). Ashley Prince, Field Director of Reclaim Idaho, declares that Reclaim Idaho "collected an estimated 33,000 signatures by March 18th" and that Reclaim Idaho estimates only 86% of those signatures are valid.[3] (Dkt. 2-5 at ¶ 12.) Ms. Prince guesses that Reclaim Idaho had collected sufficient signatures to qualify only five of the necessary 18 legislative districts. (Dkt. 2-5 at ¶ 11.)

Rebecca Schroeder had email exchanges with a member of Governor's Little's staff for a few hours on the morning of March 16 requesting a meeting between Mr. Mayville and the Governor to discuss "the safest way to move forward with the ballot initiative." (Declaration of Andrew Mitzel ("Mitzel Decl."), Exhibit A.) There were no other communications with the Governor's office before this day or after. (*Id.*) Ms. Schroeder emailed the Secretary of State's office once on March 16 to ask about electronic signature gathering and was correctly informed that the Secretary of State's office did not have jurisdiction to make the change. (Declaration of Sheryl Millard, Exhibit A.) Reclaim Idaho made one last minor effort on March 18 to contact Representative Gannon about legislative change. (Dkt. 2-3 ¶ 41.)

The Governor is not involved in the initiative process. (Mitzel Decl., Ex. A.) His office's only involvement in this matter was the March 16th email correspondence with a member of his staff described above. (Dkt 2-3 ¶¶ 32-38.) While Governor Little did issue emergency

---

[2] At no point does Reclaim Idaho or any declarant explain why it did not provide the 20,000 unverified signatures to the county clerks for verification on March 18th or at any point thereafter.
[3] While Reclaim Idaho asserts that it has used an internal verification process on the signatures it has collected, it cannot be sure that the county clerks will agree with their conclusions. According to Ada County Clerk Phil McGrane, approximately 30 to 40 percent of signatures on initiative petitions are rejected. (Declaration of McGrane ("McGrane Decl.") at ¶ 10).

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 5

proclamations on March 25, 2020 and April 30, 2020, Reclaim Idaho had already suspended its campaign a week before the first proclamation issued.  (*See* Dkt. 2-1 at 8-9.)

**B.      The May 1, 2020 Deadline for Signature Submission is Only One Deadline in a Series of Deadlines Leading Up to the November 3, 2020 Election.**

Once the signatures submitted by the County Clerks are filed with the Secretary of State, arguments concerning initiative measures are due July 20, 2020; rebuttal arguments are due August 1, 2020; and voter pamphlets about the initiative must be printed and distributed to all households in the State no later than September 25, 2020.  Idaho Code §§ 34-1812A, 1812B, 1812C.

Sample ballots from the Secretary of State are due September 7, 2020 to the county clerks, along with certified copies of the names of State office candidates, and a certified copy of the ballot titles and number of measures to be voted upon at the next general election.  Idaho Code § 34-909.

All absentee ballots must be printed no later than September 14, 2020.  This deadline comes from the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), in particular 52 U.S. Code § 20302, and Directive 2015-1 issued by Secretary of State Lawerence Denney.  (Hancock Decl. ¶ 7; McGrane Decl. ¶¶ 14-15.)  Further, pursuant to the UOCAVA and Directive 2015-1, absentee ballots, if requested, must be mailed by September 21, 2020 to those who request it.

### III.      ARGUMENT

**A.      This Court Should Deny Plaintiffs' Motion Because Plaintiffs Lack Standing to Bring this Challenge; Their Alleged Injuries Cannot be Attributed to Action by the Governor or the Secretary of State.**

"Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies.'"  *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007). Among other elements, to establish Article III standing, "a plaintiff must show . . . (2) the injury is fairly traceable to the challenged action of the defendant; . . . ."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  The party invoking federal jurisdiction bears the burden of establishing these elements.  *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (citations omitted).

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 6

Plaintiffs cannot establish that their alleged injury is fairly traceable to the challenged actions of either Defendant. Plaintiffs' alleged injury is their failure to meet the May 1, 2020 deadline to submit their signatures. Plaintiffs argue that their injury resulted from the Governor's emergency orders, the Governor's office's ostensible refusal to grant exceptions for Reclaim Idaho signature gathering (in reality, a refusal by a staff member to arrange a meeting between Mr. Mayville and the Governor at a time of great crisis when the demands on the Governor's time were extreme), and the Secretary of State's refusal to grant exceptions for signature gathering (in reality, a recognition by the Secretary of State's staffer about the limits of the Secretary's statutory authority). *See* Dkt. 2-1 at 10-12. The allegations in the Complaint establish that Plaintiffs' failure to meet the statutory deadline was unrelated to Governor Little or Secretary Denney.

The alleged facts demonstrate that Plaintiffs' failure to meet the deadline was the result of their own choices to significantly shorten their timeline for collecting signatures, to employ an approach that left most of the signature-gathering to the end of the statutory period, and to voluntarily cease all signature-gathering activities in response to federal public health guidance.

Plaintiffs admit they could have had a total of 18 months to gather the necessary signatures by the May 1, 2020 deadline. (*See* Dkt. 1 ¶ 13.) However, their "attention" was "diverted" in the spring and summer of 2019. (Dkt. 2-1 at 5; Dkt. 2-3 ¶ 3.) They chose to file the initiative petition with the Secretary of State on a date that meant they could begin collecting signatures on October 25, 2019, leaving them with a little over six months, instead of 18 months, to collect the necessary signatures. (*See* Dkt. 1 ¶ 22; Hancock Decl. ¶ 5.) Plaintiffs <u>voluntarily</u> ceased their signature-gathering efforts on March 18, 2020, before any State action that might have limited their ability to collect signatures.

Mr. Mayville attests that Reclaim Idaho's petition efforts ceased on its own volition on March 18, 2020:

> After carefully reviewing the latest recommendations of public health authorities, we have concluded that it is no longer safe for volunteers to engage in face-to-face interactions that are necessary for effective signature gathering. In order to protect

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 7

the health of our volunteers and the wider public, we are calling on all Reclaim Idaho volunteers to suspend signature collection until further notice.

(Dkt. 2-2 ¶ 37.)  Further, "Our decision to suspend operations was based on our assessment of the risks of signature gathering in the midst of a pandemic." (*Id.* ¶ 39.) Mr. Mayville's declaration shows his organization stopped collecting signatures due to the pandemic, not due to state action.

Statements submitted by Reclaim Idaho team members corroborate this. "It was necessary to suspend because of Covid-19."  (Dkt. 2-4 ¶ 24.)  "By Monday March 16th, it became abundantly clear that there was NO SAFE METHOD to continue to encourage tens of thousands of face-to-face conversations with voters."  (Dkt. 2-3 ¶ 29.)  In a March 13th email, Judge Lansing, who was one of their "most active and committed volunteers" wrote the following:

> *I feel that my commitment and desire to gather signatures for this critical initiative directly conflicts with my obligation as a citizen to practice social distancing to protect my fellow Idahoans . . . . As important as the initiative is, I reluctantly conclude that it is outweighed by my responsibility to avoid possibly putting others at risk.*
>
> Judge Lansing's email was the first of many similar messages sent to us from volunteers from all around the state.

(Dkt. 2-2 ¶ 24.)  Further, Linda Larson, the Bonner County Volunteer leader, and her team, stopped collecting signatures on March 13th because of safety concerns.  (Dkt. 2-6 ¶¶ 16-17.)

A recent decision from another court recently concluded that a substantially similar pattern of dilatory conduct established that the plaintiffs there had "not demonstrated that their injury [was] traceable to the challenged actions of any of the Defendants."  *Morgan v. White*, No. 20 C 2189, 2020 WL 2526484, at *3-4 (N. Dist. Ill. May 18, 2020) (expressing grave doubts about plaintiffs' standing in an initiative matter).

Given that Plaintiffs' failure to meet the deadline to collect the necessary signatures was the product of the pandemic and their own voluntary choices, Plaintiffs' failure to meet the deadline cannot be attributed to State action.  *See Thompson v. DeWine*, 959 F.3d 804, 810 (citations omitted) (6th Cir. May 26, 2020) (citations omitted) ("[J]ust because procuring signatures is now harder (largely because of a disease beyond the control of the State) doesn't

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 8

mean that Plaintiffs are *excluded* from the ballot. And we must remember, First Amendment violations require state action."). Because no state action is at issue, Plaintiffs lack standing.

**B.    Plaintiffs Cannot Carry the Heavy Evidentiary Burden Necessary to Obtain a Preliminary Injunction.**

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). The elements for it are already set forth above. "The Ninth Circuit has held that the trial court can utilize a 'sliding scale' in weighing the [*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20-23 (2008)] factors, such that 'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met.'" *Big Sky Scientific LLC v. Idaho State Police*, Case No. 1:19-cv-00040-REB, 2019 WL 438336, at *4 (D. Idaho Feb. 2, 2019). The "purpose of a preliminary injunction is to preserve the status quo." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009) (internal quotation omitted). Plaintiffs seek to change the status quo, not preserve it.

**1.    Plaintiffs Cannot Establish the Requisite Likelihood of Success on the Merits.**

Under the two governing Ninth Circuit decisions that have interpreted the analysis that applies to First Amendment challenges for regulations governing the signature-gathering process for initiative petitions—*Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012) and *Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006)—"Plaintiffs bear the initial burden of showing that the challenged provisions  . . .  impose a severe burden on their First Amendment rights." *Arizonans for Fair Elections v. Hobbs*, No. CV-20-00658-PHX-DWL, 2020 WL 1905747, at *8 (D. Ariz. Apr. 17, 2020); *see also Fair Maps Nevada v. Cegavske*, Case No.  3:20-cv-00271-MMD-WG, 2020 WL 2798018, *11 (D. Nev. May 29, 2020). In other words, "under the First Amendment, election "[r]egulations imposing *severe burdens* on plaintiffs' rights must be narrowly tailored and advance a compelling state interest." *Arizonans*, at * 8 (emphasis in original). By contrast "[*l*]esser *burdens* ... trigger less exacting review, and a State's important regulatory interests will usually be enough

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 9

to justify reasonable, nondiscriminatory restrictions." *Angle*, 673 F.3d at 1132 (emphasis in original). "In applying this standard, we bear in mind that 'States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally.'" *Id.*

### a.    Plaintiffs Cannot Demonstrate the Burden is Severe.

"[T]he burden on plaintiffs' rights should be measured by whether, in light of the entire statutory scheme regulating ballot access, 'reasonably diligent' initiative proponents can normally gain a place for their proposed initiative on the ballot[.]" *Angle*, 673 F.3d at 1133 (citations omitted). The party challenging the regulation bears the burden of establishing severity. *Ariz. Green Party v. Reagan*, 838 F.3d 983, 989 (9th Cir. 2016).

Plaintiffs cannot meet their burden of showing a burden—severe or otherwise—on their First Amendment rights. The only "burdens" that Plaintiffs allege that occurred before Reclaim Idaho suspended its campaign on March 18, 2020, and thus could possibly have any causal relationship to their signature gathering efforts, were (1) a staffer at the Governor's office declining to arrange a meeting between Mr. Mayville and the Governor in an email exchange on the morning of March 16; and (2) a staffer at the Secretary of State's office correctly informing Plaintiffs that the Secretary of State lacks statutory authority to change an almost 100 year-old signature gathering requirement in favor of an electronic system. These cannot possibly be construed as burdens on Plaintiffs' First Amendment rights, let alone severe burdens.

Further, taking plaintiffs' claims regarding the signature gathering deadline and in-person signature gathering at face value, Plaintiffs cannot show a severe burden. The signature gathering deadline applies uniformly to all initiatives. The State gives a generous 18 months to collect signatures. Further, the burden of in-person signature gathering can hardly be construed as severe. It applies to all initiative campaigns and, by Plaintiff's own admission, had they given themselves more time, they would have easily gathered the necessary signatures in-person.

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 10

ER - 132

Plaintiffs cannot show a reasonably diligent initiative proponent could not have gotten its initiative on the ballot. As described above, Plaintiffs were far from reasonably diligent. Plaintiffs' actions here cost them 44 weeks (11 months). Yet they ask this Court to legislate from the bench because, they allege, they lost six weeks of signature gathering to the pandemic. In addition to the dilatory conduct described above, there is no evidence that they continued to work or take action towards getting their initiative on the ballot between March 18 and May 1 to extend their deadline. Plaintiffs did not even submit the 20,000 unverified signatures they allege to have to the county clerks for verification. And they waited from March 18, 2020 until June 6, 2020—five weeks after the deadline to submit signatures had passed to seek any accommodation for signature gathering.

Plaintiffs failed to act—unlike the plaintiffs in the Nevada case who sought prospective relief before the time to collect signatures expired. *See Fair Maps Nevada v. Cegavske*, Case No. 3:20-cv-00271-MMD-WGC, 2020 WL 2798018 at \*2, 5 (D. Nev. May 29, 2020); *Id.* Dkt. 2 (filing a preliminary injunction on May 6, 2020 requesting a prospective extension of the June 24, 2020 deadline). It is clear from the decision in that matter that plaintiffs filed for relief before their June deadline as the court was able to issue a decision in May. *See generally id.* In another matter, the court found that plaintiffs were not diligent in pursuing their initiative efforts through the full time provided to them after waiting close to a year before beginning their efforts. *Arizonans for Fair Elections*, 2020 WL 1905747, at \*10-11 ("This analysis, to be clear, should not be interpreted as a criticism of Plaintiffs. They are hardly the only members of our community who failed to anticipate and plan for a once-in-a-century pandemic. But the relief they are seeking in this case is profound—the displacement of a bedrock component of Arizona law. Such laws should not be wantonly overturned, and that is why courts (including the Ninth Circuit) require parties raising constitutional challenges to state ballot access laws to show not only that *they* have been thwarted by the law, but that a reasonably diligent party would have been thwarted, too.") The Nevada and Arizona cases provide the appropriate guidance. Plaintiffs cannot meet their burden of showing a reasonably diligent initiative proponent could not have gotten an initiative on the ballot.

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 11

ER - 133

### b.    The challenged laws further an important regulatory interest.

As described in the following subsection, the deadline for the submission of signatures is fundamental and furthers important interests.

Further, Idaho's in-person signature requirement is a part of Idaho's statutory scheme to allow citizens to exercise their legislative powers in an effective, valid, and informed manner. (Hancock Decl. ¶ 16.)  Notably, the Idaho legislature has maintained Idaho's in-person signature gathering requirement throughout the various crises that have faced the State since 1933, despite the availability of mail, and later, telephonic substitutes.  The circulator is an integral part of the scheme and the attesting affidavit helps verify that the person signing the petition indeed is the person signing and in this way helps to prevent fraud. (*Id.* ¶ 17.) Yet Plaintiffs would have this Court step in and replace the in-person signature gathering requirement with an internet-based system, despite the fact that recent years have shown that the internet is highly subject to fraud and abuse in the election context, even with the best intentions.

Suggesting to use DocuSign also overlooks the necessary component of in-person verification and changes the geographic scope of the initiative process from physical to virtual. (*Id.* ¶ 13.) Volunteers would no longer be necessary in legislative districts and instead virtual contact from one central location could be used. (*Id.* ¶ 14.) There no longer would be a "grass roots" component to any such campaign and there would be no opportunity for face-to-face interactions in legislative districts throughout the state, replacing it with an impersonal electronic process with minimal, if any, opportunity for questions, education, or explanation, thus making a less informed electorate. (*Id.* ¶ 15.)  An initiative campaign could be run entirely by out-of-state actors circulating a petition on the internet.

*Angle* found an important regulatory interest is "in making sure that an initiative has sufficient grass roots support to be placed on the ballot."  673 F.3d at 1135 (citation omitted) and it appears that *Idaho Coal. United for Bears v. Cenarussa*, 342 F.3d 1073, 1079 (9th Cir. 2003) would have found these interests important too.  And perhaps most importantly, this Court has already found that "the residency requirement of I.C. § 34-1807 passes muster under the

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 12

ER - 134

reasonableness test." *Idaho Coal. United for Bears v. Cenarussa*, 234 F. Supp.2d 1159, 1164 (D. Idaho 2001). DocuSign's participation in the circulation process violates Idaho Code § 34-1807 as it is a non-resident of Idaho. And per the plain language of Idaho Code § 34-1807, a circulator is required to be a "person," "resident of state of Idaho," "at least (18) years of age" and the person who circulated the petition must sign "by his or her affidavit." DocuSign is none of these things. The change would negate the geographic, in-person requirement, which the Legislature deemed necessary to ensure the integrity of the ballot process. (*Id.* ¶ 19.)

In short, the state's interests in the challenged deadline and the in-person signature requirement far outweigh any alleged burden and support important interests.

### c. Plaintiffs' claim is barred by the doctrine of laches.

Separate from the importance of Plaintiffs' diligence to determining of the severity of the burden imposed, Plaintiff's lack of diligence results in their claim being barred by the doctrine of laches. "When an emergency appears likely to arise prior to an election, but a litigant waits until afterwards to press its claims, it has failed to act with the diligence the circumstances require." Michael T. Morley, *Election Emergencies: Voting in the Wake of Natural Disasters and Terrorist Attacks*, 67 Emory L.J. 545, 596 (2018). "To establish laches, a 'defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself.'" *Arizona State Leg. v. Ariz. Indep. Redistricting Comm'n*, 997 F. Supp. 2d 1047, 1050 (D. Ariz. Feb. 21, 2014) (citation omitted).

Plaintiffs' delay is unreasonable. In addition to the conduct described above, while they now fault the Governor's stay at home orders, they did not evaluate whether the orders allowed for signature gathering, even if the Governor's orders caused them to suspend their signature gathering efforts (they did not). Effectively, Plaintiffs are claiming that their activities to collect signatures are essential, but essential services were excepted. Further, as noted in Mr. Mitzel's declaration, the time leading up to the end of the 2020 legislative session was extraordinarily busy in the Governor's Office. (Mitzel Decl. ¶ 6.) Had a representative of Reclaim Idaho contacted the Governor's office again after the Legislature finished its session, Mr. Mitzel believed her concerns would have been considered and she would have received a response. (*Id.* ¶ 8.) Reclaim Idaho did

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 13

not do this.  Moreover, they did not file this lawsuit back in March when they knew of the alleged injury.  Only now, seven weeks after the deadline has passed, Plaintiffs expect this Court to rescue them from the consequences of their own decisions.  Plaintiffs' unreasonable delay is fatal.

This matter has been brought far too late and it seeks to usurp Constitutional authority in an unprecedented manner, which is inherently prejudicial to the State of Idaho.  The burden that would be placed on the entire State and all of its clerks would be extraordinary, and in light of Idaho and federal law, impossible. (McGrane Decl. ¶¶ 5, 7, 12, 18.)  As set forth above, the deadlines to get this State ready to vote by November 3, 2020 have long been set.  While Reclaim Idaho claims its proposed remedy would result in minimal harm to the State, nothing could be further from the truth.  Assuming the Court grants the requested relief on June 23, 2020, August 10, 2020 would be the deadline for Reclaim Idaho to submit its signatures.  The clerks then would have 60 days to verify the signatures (until October 9, 2020) and four days to submit the signatures to the Secretary of State.[4] (*Id.* ¶ 11.)  Any argument regarding the initiative would then need to be submitted October 23, 2020 and rebuttal would be November 4, 2020, the day after the election.  The clerks and the Secretary of State still must keep preparing the ballots for the election, coordinating volunteers, and informing the public that every candidate for office has a fair and proper election, including getting ballots ready by the September 21, 2020 so that they could go out in the mail. (*Id.* ¶ 4, 12, 13, 14.)  Again, per federal law, the ballots must be ready to go out by September 21, 2020 for absentee ballots, and it takes ten to 14 days to prepare these ballots to meet the deadline. (*Id.* ¶ 12.)  This request will throw a wrench into the entire State's election. (*Id.* ¶ 18.)  If this were an appeal, it would be dismissed outright as untimely.

---

[4] Plaintiffs cannot be heard to argue that DocuSign would relieve this burden.  Even if this Court were to allow DocuSign to play a role—and it should not—the county clerks would have figure out how best to fit this electronic system within their statutory responsibilities, learn how to use the software, and deal with the inevitable delays and problems that crop up when working with a new system.  But more importantly, as detailed herein, the myriad issues with the use of DocuSign compel this Court to deny that portion of Plaintiffs' requested relief.

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 14

In short, Plaintiffs cannot establish a likelihood of success on the merits. Under the more relaxed scrutiny that must apply here, the State's interest justifies the burdens that are imposed on the initiative process. Even if the challenged State action failed the applicable level of scrutiny, Plaintiffs' claims are barred by the doctrine of laches.

> ### 2.    Plaintiffs Submitted No Competent Evidence to Support Their Assertion That They Will Suffer Irreparable Harm.

Plaintiffs have the burden of demonstrating that "irreparable injury is *likely* in the absence of an injunction," not just a mere "possibility." *Winter*, 555 U.S. at 22 (citations omitted). Further, "[a]bstract injury is not enough. The plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be 'both real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (citations omitted). Plaintiff cannot establish an injury. Plaintiffs failed to obtain the required number of signatures and it remains speculative whether, if allowed, they even could meet a new deadline. But even if they did, their injury is not irreparable. They could try again in the future or they could advocate for legislative changes to the statutes they seek to alter.

> ### 3.    The Balancing of Equities and Public Interest Favors the State and the State Will Suffer Irreparable Harm As A Matter of Law From The Relief That Plaintiffs Have Requested.

> > #### a.    The public interest favors the State, because it has a vested interest in conducting elections pursuant to its own statutes.

The facts set forth in the latches argument show that the harm to the State will affect the entire State election. The States' irreparable injury is further established by *Purcell*. Courts should not change election rules in the middle of an ongoing election, as such changes "can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam). "As an election draws closer, that risk will increase." *Id.* Moreover, any time a state is enjoined from effectuating statutes enacted by the representatives of its people it suffers a form of irreparable injury. *Abbott v. Perez*, 138 S. Ct.

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 15

ER - 137

2305, 2324 & n.17 (2018) (citations omitted).  Further, given that the "State indisputably has a compelling interest in preserving the integrity of its election process," *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989) (citation omitted), and in the "orderly administration" of its elections, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 196 (2008) (controlling plurality of Stevens, J.), the irreparable harm to the State is particularly grave here.

In authorizing the initiative process in the Constitution, Idaho specified that the Legislature would determine the manner of how the initiative process would be conducted. Granting the requested relief will irreparably harm by the State by creating disorder, undue hardship and a lack of integrity in future initiative proceedings where a petitioner sleeps or gives up on their rights and then blames the State.

> **b.**    **The equities favor the State, because Plaintiffs' own decisions on when to start their campaign and when to end it should not be rewarded.**

The equities favor the State.  Disrupting an entire State's election scheme so that Plaintiffs might be able to get enough signatures on an initiative when they chose to shorten their timeframe and then stop their campaign places the balance of the equities squarely in favor of the State's clerks and election workers.  These workers should not have an increased burden and pressure to conduct an election on a truncated basis when every other candidate for office campaigned for their primary.  Compounding that is Plaintiffs' request to utilize a private vendor without State ties and where clerks would have no experience in using its service.  Plaintiffs' own inaction caused any injury.  Plaintiffs cannot be allowed to sow confusion on this election and deeply disrespect Idaho's sovereign judgments.  The harm is evident to State of Idaho, its Legislature, and its citizens.

> **c.**    **Plaintiffs' requested electronic signature relief would result in grave harm to the State.**

The request to collect signatures electronically by a private entity is a fundamental departure from Idaho law and its Constitution.  (Hancock Decl. ¶ 11.)  In Idaho, the running of and integrity of elections is done by the state and its counties—not a private out-of-state company. (*Id.*)

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 16

ER - 138

"[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974); *see also Navarro v. Neal*, 716 F.3d 425, 430-31 (7th Cir. 2013). As noted above, the Legislature is vested with the authority to provide the manner in which initiatives occur. Idaho Const., art. III, § 1. Since 1933, Idaho Code § 34-1807 has required in-person circulation. (Counsel Decl. Ex. A.) The requested relief also usurps Idaho Code § 34-1802(3), which requires signatures—not a private entity such as DocuSign—be verified by County Clerks. Again, this abrogates the government's responsibility all the while requiring the State to use and trust a particular vendor selected by Plaintiffs.

The move to this electronic medium usurps the Secretary of State's statutory authority. See Idaho Code § 34-1804. Serious transparency concerns are raised with taking the signature verification responsibility from the county clerks (as per I.C. 1802(3)) and handing it to an out-of-state private vendor selected by Plaintiffs. Private entities do not conduct elections; states conduct the elections. *Libertarian Party of Ill. v. Rednour*, 108 F.3d 768, 774 (7th Cir. 1997) ("States have not only an interest, but also a duty to ensure that the electoral process produces order rather than chaos.")

From a practical standpoint, there is no need for such a drastic change. The State of Idaho is already in Stage 4 of the recovery from the pandemic and in-person interactions are allowed and occurring. Moreover, most of Ada County's staff do not have experience using DocuSign and it takes time and training to understand; given preparations for the upcoming two elections in Ada County that would be an undue burden. (McGrane Decl. ¶ 16.) It also appears that the process may take additional time to review each signature. (*Id.*) When reviewing petition signatures, in addition to confirming registration, the Ada County clerk compares the signature on the petition to the signature on the voter's original registration card. (McGrane Decl. ¶ 17.) The DocuSign example provided by the petitioner shows a signature being submitted that is not a signature that would match for a voter, but a signature that is computer generated and would not possibly match

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 17

ER - 139

the signer's original signature on their registration card. (*Id.*) Under Ada County's existing procedures, these signatures would then be rejected. (*Id.*)

While Plaintiffs suggest a one-time exception to use DocuSign, as discussed above, this suggestion overlooks the necessary component of in-person verification, it changes the geographic scope of the initiative process from physical to virtual, and it eliminates the need for people to travel to legislative districts. Instead, an initiative could be conducted by actors working entirely out of state. The change would negate the geographic, in-person requirement, which the Legislature deemed necessary in the initiative process.

Ultimately, this motion "raises significant federalism and separation-of-powers concerns." *Arizonans for Fair Elections*, 2020 WL 1905747, at \*16. "[L]ower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citations omitted). It is the place of the people of the State of Idaho, or their elected representatives, to make the policy choices at issue here.

## IV.     CONCLUSION

This Court should dismiss this case and/or deny Plaintiffs' motion rather than reward Plaintiffs' dilatory conduct.


DATED:  June 18, 2020.

STATE OF IDAHO                            STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL           OFFICE OF THE ATTORNEY GENERAL


By:   */s/ Robert A. Berry*              By:   */s/ Megan A. Larrondo*
      ROBERT A BERRY                            MEGAN A. LARRONDO
      Deputy Attorney General                   Deputy Attorney General


GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 18

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 18, 2020, I electronically filed the foregoing with the Clerk of the Court using the CMF/ECF system which sent a Notice of Electronic Filing to the following persons:

Deborah A. Ferguson                          Craig H. Durham
daf@fergusondurham.com                       chd@fergusondurham.com


                                   */s/ Robert A. Berry*
                                   ───────────────────────
                                   ROBERT A BERRY
                                   Deputy Attorney General

GOVERNOR LITTLE AND IDAHO SECRETARY OF STATE'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 2) – 19

LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation Division

MEGAN A. LARRONDO, ISB #10597
ROBERT A. BERRY, ISB #7442
Deputy Attorneys General
Civil Litigation Division
Office of the Attorney General
P.O. Box 83720
Boise, ID  83720-0010
Telephone:     (208) 334-2400
Facsimile:     (208) 854-8073
megan.larrondo@ag.idaho.gov
robert.berry@ag.idaho.gov

        Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RECLAIM IDAHO, an Idaho political action committee, and LUKE MAYVILLE, <br><br> Plaintiff, <br><br> vs. <br><br> BRADLEY LITTLE, in his official capacity as Governor of Idaho, and LAWERENCE DENNEY his official capacity as Idaho Secretary of State, <br><br> Defendants. | Case No. 1:20-cv-00268-BLW <br><br> **DECLARATION OF PHIL MCGRANE IN SUPPORT OF DEFENDANTS** |

        I, PHIL MCGRANE, declare as follows:

        1.      I am over the age of 18 years and competent to testify on the matters herein. I make

this declaration based upon my own personal knowledge.

DECLARATION OF PHIL MCGRANE IN SUPPORT OF DEFENDANTS  – 1

2.      I am the Ada County Clerk and assumed office in 2019. Before becoming Ada County Clerk I served as the Chief Deputy Clerk from 2010 to 2019 and an Elections Deputy from 2005 - 2007. I hold a B.A. in philosophy from the University of Washington; a juris doctorate degree from the University of Denver; and a master of public administration degree from Boise State University.

3.      I am charged with the supervision and administration of elections pursuant to I.C. §34-206.

4.      Ada County elections is currently preparing for two upcoming elections. The first election is in August and the second election is the November General Election, which also is a presidential election.

5.      Presidential general elections consistently see the largest turnout and as a result are difficult elections to prepare for. It takes an enormous amount of preparation and work to ensure the each election goes smoothly, and even more so due to Covid-19.

6.      I understand that a request has been made to extend the deadline for a voter initiative sponsored by Reclaim Idaho.

7.      The requested relief would be near impossible to achieve due to the limited time available between now and when ballots must be prepared and mailed for the November election.

8.      As I understand the request, Reclaim Idaho is requesting an additional forty-eight days of relief in which it could continue to obtain signatures. If so, and assuming the Court rules on June 23, 2020, that would make the deadline to submit signatures August 10, 2020.

9.      By statute, clerks have sixty days to verify the signatures following the submission of petitions. This time is essential to allow clerks adequate time to review and verify each signature. Under normal circumstances, I have to hire additional staff to complete the signature review

DECLARATION OF PHIL MCGRANE IN SUPPORT OF DEFENDANTS  – 2

ER - 143

process within the sixty day timeframe. By statute the second half of the sixty day timeframe occurs during a period when our office is not conducting and election, which allows for the capacity to complete this task. Based on the requested relief, this would not occur during one of the most intensive preparation periods for our largest election in November.

10.      It is a laborious process to verify the signatures submitted in support of an initiative. As part of the process, my staff looks to ensure that each signature is valid; that the signer is a registered voter; and that if a registered voter, the correct address was used. Based upon these three bases, approximately 30 to 40 percent of the signatures are typically rejected. This is a known fact to ballot initiative proponents and because of this, the volume of signatures submitted to meet the signature threshold will be much higher. This is also why all the time is needed to review the signatures submitted.

11.      If the requested relief was granted on June 23rd and the deadline became August 10th, the statutory sixty days needed for clerks to review signatures would end on October 9, 2020, well after the deadlines to finalize, print and mail ballots for the November Election.

12.      Under state and federal law, namely, the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), and in particular 52 U.S. Code § 20302, absentee ballots, if requested, must be mailed to those who requested them forty-five days in advance of the November Election in order to allow adequate time for ballots to travel to and from voters. The deadline for this November is September 21, 2020.

13.      Due to current health concerns by voters, Ada County will see a record number of absentee ballot requests for this year's November 3, 2020 general election. Ada County has already received approximately 100,000 requests for the November Election to date. These ballots will

DECLARATION OF PHIL MCGRANE IN SUPPORT OF DEFENDANTS  – 3

need to be prepared, printed, and assembled for mailing prior to the September 21st deadline, which will take ten to fourteen days.

14.    I would also note that the last day for any county clerk to print ballots is September 18, 2020 per Idaho Code § 34-1003.

15.    I understand that as part of the relief requested is to use electronic signature gathering by DocuSign.

16.    I have concerns regarding the use of DocuSign in this context as most my staff do not have experience using DocuSign. I imagine it would take time and training to learn and understand how DocuSign operates, but given preparations for the upcoming two elections that would be an undue burden. It also appears that the process may take additional time to review each signature.

17.    When reviewing petition signatures, in addition to confirming registration, we also compare the signature on the petition to the signature on the voter's original registration card. The DocuSign example provided by the petitioner shows a signature being submitted that is not a signature that would match for a voter, but a signature that is computer generated and would not possibly match the signer's original signature on their registration card. Under our existing procedures, these signatures would then be rejected.

18.    There are numerous practical and procedural challenges to the relief requested, most notably the time needed to complete all related requirements. The combination of the required tasks along with the requirements of conducting the August and November Elections makes this relief near impossible to complete.

/ / /

/ / /

DECLARATION OF PHIL MCGRANE IN SUPPORT OF DEFENDANTS  – 4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 18th day of June, 2020.

_____*/s/ Phil McGrane*_____

PHIL MCGRANE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 18, 2020, I electronically filed the foregoing with the Clerk of the Court using the CMF/ECF system which sent a Notice of Electronic Filing to the following persons:

Deborah A. Ferguson                    Craig H. Durham
daf@fergusondurham.com                 chd@fergusondurham.com


                            _____/s/ Robert A. Berry_____
                            ROBERT A. BERRY
                            Deputy Attorney General

DECLARATION OF PHIL MCGRANE IN SUPPORT OF DEFENDANTS  – 6

LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation Division

ROBERT A. BERRY, ISB #7442
MEGAN A. LARRONDO, ISB #10597
Deputy Attorneys General
Civil Litigation Division
Office of the Attorney General
P.O. Box 83720
Boise, ID  83720-0010
Telephone:      (208) 334-2400
Facsimile:      (208) 854-8073
robert.berry@ag.idaho.gov
megan.larrondo@ag.idaho.gov

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RECLAIM IDAHO, an Idaho political action committee, and LUKE MAYVILLE, <br><br> Plaintiff, <br><br> vs. <br><br> BRADLEY LITTLE, in his official capacity as Governor of Idaho, and LAWERENCE DENNEY his official capacity as Idaho Secretary of State, <br><br> Defendants. | Case No. 1:20-cv-00268-BLW <br><br> **DECLARATION OF JASON HANCOCK IN SUPPORT OF DEFENDANTS** |

I, JASON HANCOCK, declare as follows:

1.      I am over the age of 18 years and competent to testify on the matters herein. I make

this declaration based upon my own personal knowledge.

DECLARATION OF JASON HANCOCK IN SUPPORT OF DEFENDANTS – 1

2.      I am currently employed with the Idaho Secretary of State as a Deputy Secretary of State.

3.      As part of my work in the Idaho Secretary of State's office, I oversee and assist in the oversight of the elections division. I began this role on April 7, 2020.

4.      Given my role in the Idaho Secretary of State's office, I have access to all of the documents that are filed with the Secretary of State, including initiative related documents.

5.      Reclaim Idaho filed the initiative at issue here, "An initiative augmenting funding for K-12 education by increasing the individual and corporate income tax rates", referred to herein as "Invest in Idaho," with the Secretary of State by petition on August 30, 2019.  After verification of the signatures on the petition, the Secretary of State transmitted the proposal to the Attorney General's office for review on September 4, 2019. The advisory review was completed and transmitted to the Secretary of State's office on September 24, 2019. The Secretary of State's office transmitted the same by email to Reclaim Idaho on the same day. On October 15, 2019, two copies of the Initiative were sent to the Attorney General's office for preparation of short and long ballot titles. The Attorney General's office transmitted short and long ballot titles to the Secretary on October 25, 2019, which were then transmitted along with a sample petition to Reclaim Idaho on the same date. At that time, reclaim Idaho was legally able to start circulating the petition.

6.      Rather than giving itself the full 18 months allowed by statute, Reclaim Idaho chose to seek to place the "Invest in Idaho" initiative on the ballot in November 2020, leaving itself only six and a half months between October 15, 2019 and April 30, 2020 to collect the necessary signatures.

7.      All absentee ballots must be printed no later than September 14, 2020 and this deadline is driven by the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"),

DECLARATION OF JASON HANCOCK IN SUPPORT OF DEFENDANTS – 2

and in particular 52 U.S. Code § 20302 and Directive 2015-1 issued by Secretary of State Lawerence Denney, a true and correct copy of which is attached hereto as Exhibit A. The reason for this requirement is so that ballots can be sent to those Idahoans living or serving overseas, to ensure their ability to vote. Further, pursuant to the UOCAVA and Directive 2015-1, absentee ballots, if requested, must be mailed by September 21, 2020 to those who request it.

8.  In reviewing the requested extension by Reclaim Idaho, it would have severe repercussions to all of the deadlines leading up to the general election, upending the statutory scheme that governs initiative petitions. There would not be enough time for the county clerks to verify signatures by their deadline to print ballots, which is September 14, 2020 under Directive 2015-1. The Secretary of State also must provide sample ballots by September 7, 2020. These ballots contain, among other things, office titles, order of office, candidate names, ballot questions, and ballot layout.  In order to provide these sample ballots to the county clerks, the Secretary of State usually begins preparing these in July and then would create pdf files for delivery by September 7, 2020.

9.  In a normal election year, there is a period of approximately four and a half months from the time that signatures are turned in until ballots are printed. If the relief asked for by Reclaim Idaho is granted it would compress all of the steps necessary to ready the State for election into five weeks until ballots are printed. It would be unreasonable, unduly burdensome, and unachievable with the resources the state and county clerks have in place.

10.  I also note that Reclaim Idaho wants to replace Idaho Code § 34-1807's in-person signature requirement and instead use a private out-of-state vendor with little to no ties to the electoral process in Idaho. There are a multitude of reasons why this is problematic.

11.  The main issue is that the request to collect signatures electronically by a private

DECLARATION OF JASON HANCOCK IN SUPPORT OF DEFENDANTS – 3

entity is a fundamental departure from Idaho law and its Constitution. The running of and integrity of government elections is the responsibility of the state and its counties.

12.     There are serious transparency concerns in removing the signature verification role from the county clerks (as per I.C. 1802(3)) and giving it to an out-of-state, private vendor selected by plaintiffs, which would abrogate the statutory duties of the clerks in the verification process.

13.     The suggestion to use DocuSign also overlooks the necessary component of in-person verification and changes the geographic scope of the initiative process from physical to virtual.

14.     Volunteers would no longer be necessary in legislative districts and instead virtual contact from one central location could be used.

15.     There no longer would be a "grass roots" component to any such campaign and there would be no opportunity for face-to-face interactions in legislative districts throughout the state.  Instead it would be replaced with an impersonal, electronic process with minimal opportunity for questions, education, or explanation, resulting in a less informed petition-signer and electorate.

16.     Idaho's in person signature requirement is a part of Idaho's statutory scheme to allow citizens to exercise their legislative powers in an effective, valid, and informed manner.

17.     The circulator is an integral part of the scheme and the attesting affidavit helps verify that the person signing the petition indeed is the person signing, and in this way, helps to prevent fraud.

18.     An important aspect of fraud prevention is that a circulator in Idaho, who is an Idaho resident aged 18 or over, would be subject to Idaho's subpoena power, whereas DocuSign appears to be based in San Francisco, California, not Idaho.

DECLARATION OF JASON HANCOCK IN SUPPORT OF DEFENDANTS – 4

19.     The change requested would negate the geographic, in-person requirement, which the Legislature deemed necessary to ensure the integrity of the ballot process.

20.     In addition, in review of Idaho Code § 34-1807, a circulator is required to be a "person", "resident of state of Idaho", "at least (18) years of age" and the person who circulated the petition must sign "by his or her affidavit". DocuSign is none of these things.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 18th day of June, 2020.


_____/s/ Jason Hancock_____
JASON HANCOCK

DECLARATION OF JASON HANCOCK IN SUPPORT OF DEFENDANTS – 5

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 18, 2020, I electronically filed the foregoing with the Clerk of the Court using the CMF/ECF system which sent a Notice of Electronic Filing to the following persons:

Deborah A. Ferguson
daf@fergusondurham.com

Craig H. Durham
chd@fergusondurham.com


                                    _/s/ Robert A. Berry_____
                                    ROBERT A. BERRY
                                    Deputy Attorney General



## STATE OF IDAHO
### OFFICE OF THE SECRETARY OF STATE
### LAWERENCE DENNEY

### SECRETARY OF STATE DIRECTIVE
(Directive 2015-1)

In order to maintain uniformity in the application, operation and interpretation of the election laws of the State of Idaho, and to facilitate the absentee ballot process, pursuant to Section 34-202, Idaho Code, the Secretary of State, does hereby issue the following directive:

For a Primary and General Election held in an even numbered year, all absentee ballots shall be printed no later than fifty (50) days prior to the election.  This directive is necessary to comply with the mailing requirement of section 34-1003(3), Idaho Code, which provides for a forty-five (45) day ballot transit time for absentee ballots where the absentee request was received at least forty-five (45) days before an election.

For all other elections, including special district elections held in odd numbered years, all absentee ballots shall be printed no later than forty (40) days prior to the election. This is necessary to allow for at least 30 days transit time of the absentee ballot to the voter and transit back from the voter.  However, it is recommended that the County Clerk continue to strive to have absentee ballots mailed by the 45th day before any election to allow for transit to all voters requesting absentee ballots at least forty-five (45) days before an election.

LAWERENCE DENNEY
Secretary of State

Directive: 2015-1
Issued: October 2, 2015

P.O. Box 83720, Boise, Idaho 83720-0080
Elections Telephone: (208) 334-2852, FAX: (208) 334-2282
Located at 700 W Jefferson, Ste. E-205

**DECLARATION OF HANCOCK**
**EXHIBIT A** 7/17
**Page 1 of 1**

LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation Division

ROBERT A. BERRY, ISB #7442
MEGAN A. LARRONDO, ISB #10597
Deputy Attorneys General
Civil Litigation Division
Office of the Attorney General
P.O. Box 83720
Boise, ID  83720-0010
Telephone:    (208) 334-2400
Facsimile:    (208) 854-8073
robert.berry@ag.idaho.gov
megan.larrondo@ag.idaho.gov

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| RECLAIM IDAHO, an Idaho political action committee, and LUKE MAYVILLE, <br><br> Plaintiff, <br><br> vs. <br><br> BRADLEY LITTLE, in his official capacity as Governor of Idaho, and LAWERENCE DENNEY his official capacity as Idaho Secretary of State, <br><br> Defendants. | Case No. 1:20-cv-00268-BLW <br><br> **DECLARATION OF SHERYL MILLARD IN SUPPORT OF DEFENDANTS** |

I, SHERYL MILLARD, declare as follows:

1.     I am over the age of 18 years and competent to testify on the matters herein. I make

this declaration based upon my own personal knowledge.

DECLARATION OF SHERYL MILLARD IN SUPPORT OF DEFENDANTS – 1

2.      I am an Elections Compliance Specialist in the Office of the Idaho Secretary State of Idaho. I have been with the Office since November 2019.

3.      On March 16, 2020, the Secretary of State's Office received an email at the general elections address, elections@sos.idaho.gov. The email was sent at 11:17 a.m. I responded to the email that same day at 2:12 p.m. A true and correct copy of email correspondence is attached as Exhibit A.

4.      I had no further communications with Ms. Schroeder.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


DATED this 17th day of June, 2020.


_____/s/ Sheryl Millard_____
SHERYL MILLARD


DECLARATION OF SHERYL MILLARD IN SUPPORT OF DEFENDANTS – 2

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 18, 2020, I electronically filed the foregoing with the Clerk of the Court using the CMF/ECF system which sent a Notice of Electronic Filing to the following persons:

Deborah A. Ferguson                                    Craig H. Durham
daf@fergusondurham.com                       chd@fergusondurham.com


                                                    _/s/ Robert A. Berry_____
                                                    ROBERT A. BERRY
                                                    Deputy Attorney General

DECLARATION OF SHERYL MILLARD IN SUPPORT OF DEFENDANTS – 3

| | |
|---|---|
| **From:** | Elections |
| **To:** | Rebecca Schroeder |
| **Subject:** | RE: ***CoVid-19 and Idaho ballot initiative rights |
| **Date:** | Monday, March 16, 2020 2:11:50 PM |
| **Attachments:** | image001.png |

Dear Rebecca,

Thank you and your fellow supporters for sharing your concern with us via email. While we understand the current situation we are in is unprecedented and can appreciate how the further efforts in attaining the remaining signatures for your petition will be complicated logistically, we are sorry to say that there is no statute allowing electronic signatures for petitions in Idaho Statutes 34 Chapter 18.

Sincerely,
Sheryl



**Sheryl Millard**
**Elections Compliance Specialist**
*Office of the Secretary of State*
Office: (208) 334-2852
Direct: (208) 332-2832
https://sos.idaho.gov/

**From:** Rebecca Schroeder <rebeccaschroeder4idaho@gmail.com>
**Sent:** Monday, March 16, 2020 11:17 AM
**To:** Elections <elections@sos.idaho.gov>
**Subject:** ***CoVid-19 and Idaho ballot initiative rights

Dear Mr. Denney,
We are faced with a global pandemic. Idahoans are responding by cancelling public events and dramatically reducing face-to-face interactions. This reality creates extraordinary obstacles for Idaho's ballot initiative process and the constitutional right of every Idahoan to participate in that process. Idaho's initiative qualification laws, which are among the strictest in the country, require tens of thousands of face-to-face interactions. In the interest of safeguarding the health of the public and protecting the constitutional rights of Idahoans, we are asking to authorize temporary online petitioning for Idaho ballot initiatives. The state of Idaho conducts much of our public business online, from voter registration to campaign finance documentation to the registration of new corporations. It is well within our capacity as a state to process petition signatures online. During these extraordinary times, online petitioning is the most effective way to protect public safety while maintaining the constitutional right of Idahoans to participate in the ballot initiative process. Please advise if this is within the realm of the SOS, or whether it would require Legislative or Executive action.

As the executive director of Reclaim Idaho, I have hundreds of volunteers (many retirees and "at risk" individuals) reaching out to me for guidance. At this point, electronic signature gathering is truly

**DECLARATION OF MILLARD**
**EXHIBIT A**
**Page 1 of 2**

the only safe path forward. Over 30K signatures have already been collected, and several districts have qualified with their 6% of voters. I understand that this is an extraordinary request--but we are obviously facing extraordinary times.

Sincerely,
Rebecca Schroeder
Reclaim Idaho executive director
208-660-9038

LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation Division

ROBERT A. BERRY, ISB #7442
MEGAN A. LARRONDO, ISB #10597
Deputy Attorneys General
Civil Litigation Division
Office of the Attorney General
P.O. Box 83720
Boise, ID  83720-0010
Telephone:     (208) 334-2400
Facsimile:      (208) 854-8073
robert.berry@ag.idaho.gov
megan.larrondo@ag.idaho.gov

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RECLAIM IDAHO, an Idaho political action committee, and LUKE MAYVILLE, <br><br> Plaintiff, <br><br> vs. <br><br> BRADLEY LITTLE, in his official capacity as Governor of Idaho, and LAWERENCE DENNEY his official capacity as Idaho Secretary of State, <br><br> Defendants. | Case No. 1:20-cv-00268-BLW <br><br> **DECLARATION OF ANDREW MITZEL IN SUPPORT OF DEFENDANTS** |

I, ANDREW MITZEL, declare as follows:

1.     I am over the age of 18 years and competent to testify on the matters herein. I make this declaration based upon my own personal knowledge.

DECLARATION OF ANDREW MITZEL IN SUPPORT OF DEFENDANTS – 1

ER - 160

2.      I am a Senior Advisor, Intergovernmental Affairs for the Office of the Governor. I have held this position since January 2019. I hold Bachelor of Arts and a Masters of Community and Regional Planning degrees from Boise State University.

3.      I was contacted on March 16, 2020 by Rebecca Schroeder at 9:08 in the morning by email. I have attached a true and correct copy of this email, along with the rest of the emails I exchanged that morning with Ms. Schroeder as Exhibit A.

4.      I had never spoken with Ms. Schroeder regarding Reclaim Idaho's "Invest in Idaho" initiative before this email correspondence. I have not been contacted by or communicated with Ms. Schroeder since March 16, 2020 regarding that initiative.

5.      On March 16, 2020, the legislature was still in session. The 2020 legislative adjourned sine die on March 20, 2020.

6.      The time leading up to the end of the 2020 legislative session was extraordinarily busy in the Governor's Office due to the demands of finishing the session and the need to ensure a thorough and effective response to the COVID-19 pandemic that was arising in Idaho at the time.

7.      So far as I am aware, Ms. Schroeder did not contact anyone else within the Governor's staff.

8.      Had she contacted the Governor's Office after the legislature finished its session, I believe her concerns would have been considered and she would have received a response.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

DECLARATION OF ANDREW MITZEL IN SUPPORT OF DEFENDANTS – 2

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 18th day of June, 2020.


_____/s/ Andrew Mitzel_____
ANDREW MITZEL

DECLARATION OF ANDREW MITZEL IN SUPPORT OF DEFENDANTS – 3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 18, 2020, I electronically filed the foregoing with the Clerk of the Court using the CMF/ECF system which sent a Notice of Electronic Filing to the following persons:

| | |
|---|---|
| Deborah A. Ferguson | Craig H. Durham |
| daf@fergusondurham.com | chd@fergusondurham.com |

 

 

_/s/ Robert A. Berry_

ROBERT A. BERRY
Deputy Attorney General

DECLARATION OF ANDREW MITZEL IN SUPPORT OF DEFENDANTS – 4

| From: | Andrew Mitzel |
|-------|---------------|
| To:   | Brian Wonderlich |

Rebecca,

Given our intense focus on spending as much time and resources on protecting the health and safety of the broader population, the Governor's Office has no intention of taking executive action on this matter.

Andrew

Get Outlook for iOS

**From:** Rebecca Schroeder <rebeccaschroeder4idaho@gmail.com>
**Sent:** Monday, March 16, 2020 12:08:34 PM
**To:** Andrew Mitzel <Andrew.Mitzel@gov.idaho.gov>
**Subject:** Re: Ballot initiatives with CoVid-19

Dear Andrew,

The SOS has just informed us that a change to electronic signature gathering would require Executive or Legislative action. I understand that the Governor's office is very busy dealing with this crisis--but the SOS does not have jurisdiction to resolve this--and it absolutely falls under the realm of protecting wider public safety. We request a meeting or phone call about this urgent matter please.

Rebecca

On Mon, Mar 16, 2020 at 10:58 AM Andrew Mitzel <Andrew.Mitzel@gov.idaho.gov> wrote:

Rebecca,

We understand your concerns about the limitations that the current situation presents. The Secretary of State's office is actively working on ways to make the election process move forward in light of the concerns about spreading coronavirus, and your organization may benefit from using some of their ideas. The Governor's Office is intently focused on the health and safety of the broader population right now, and we are referring you to the Secretary of State's office to resolve these concerns.

Andrew

Get Outlook for iOS

**From:** Rebecca Schroeder <rebeccaschroeder4idaho@gmail.com>
**Sent:** Monday, March 16, 2020 11:24:00 AM
**To:** Andrew Mitzel <Andrew.Mitzel@gov.idaho.gov>
**Subject:** Re: Ballot initiatives with CoVid-19

Hey Andrew,

**DECLARATION OF MITZEL
EXHIBIT A
Page 1 of 3**

We have been simultaneously consulting with the SOS office. They advised us that it would take a Legislative or Executive action to extend the signature deadline. We have communicated with them about **electronic signature gathering (the only safe method at this point)** also, and await their response. I hope that if Executive action is required--that Governor Little would consider a meeting with one of us. I know you all are bombarded with trying to deal with this crisis...we are doing the same. Hundreds of volunteers have put their hearts into this effort. We understand that this is an extraordinary request--but we are certainly in extraordinary times.

Thanks Andrew,

Rebecca

On Mon, Mar 16, 2020 at 9:04 AM Andrew Mitzel <Andrew.Mitzel@gov.idaho.gov> wrote:

Rebecca,

Thanks for reaching out. I would encourage you to reach out to the Secretary of States office with your concerns regarding ballot initiatives as they oversee that process.

Andrew

Get Outlook for iOS

---

**From:** Rebecca Schroeder <rebeccaschroeder4idaho@gmail.com>
**Sent:** Monday, March 16, 2020 9:02:08 AM
**To:** Andrew Mitzel <Andrew.Mitzel@gov.idaho.gov>
**Subject:** Ballot initiatives with CoVid-19

Dear Andrew,

As you know, we are facing the unprecedented circumstances of a public health crisis. Volunteers around the state have been working for months collecting signatures for the citizen ballot initiative to increase funds to Idaho K-12 schools. Collecting signatures face-to-face puts both volunteers and the general public at risk, and goes against the guidelines that we are hearing from public health officials.

The result is that **Idahoans are no longer able to exercise their constitutional right to bring forward a ballot initiative.** Please give Reclaim Idaho co-founder Luke Mayville the opportunity to meet with the Governor about the safest way to move forward with our ballot initiative. We have already collected over 30K signatures, and were well on our way to qualifying the initiative. Hundreds of volunteers have already put in hundreds of hours. Along with the Governor, our priority is the health and safety of our Idaho communities. This extraordinary situation requires action by the Governor to ensure the public safety is maintained while we exercise our Constitutional rights.

Sincerest thanks,

Rebecca Schroeder

208-660-9038

Andrew Mitzel

Senior Advisor, Intergovernmental Affairs | Office of the Governor
phone: 208-854-3025

mobile: 208-695-5440
email: Andrew.mitzel@gov.idaho.gov

**DECLARATION OF MITZEL**
**EXHIBIT A**
**Page 3 of 3**

LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation Division

ROBERT A. BERRY, ISB #7442
MEGAN A. LARRONDO, ISB #10597
Deputy Attorneys General
Civil Litigation Division
Office of the Attorney General
P.O. Box 83720
Boise, ID  83720-0010
Telephone:     (208) 334-2400
Facsimile:     (208) 854-8073
robert.berry@ag.idaho.gov
megan.larrondo@ag.idaho.gov

  Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RECLAIM IDAHO, an Idaho political action committee, and LUKE MAYVILLE,<br><br>   Plaintiff,<br><br>vs.<br><br>BRADLEY LITTLE, in his official capacity as Governor of Idaho, and LAWERENCE DENNEY his official capacity as Idaho Secretary of State,<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 1:20-cv-00268-BLW

**DECLARATION OF COUNSEL IN SUPPORT OF DEFENDANTS**

  I, ROBERT A. BERRY, declare as follows:

  1. I am over the age of 18 years and competent to testify on the matters herein. I make this declaration based upon my own personal knowledge.

DECLARATION OF COUNSEL IN SUPPORT OF DEFENDANTS – 1

2.      I am currently one of the counsel of record for the defendants in this matter and am employed as a Deputy Attorney General for the State of Idaho.

3.      Attached hereto as Exhibit A is a copy of the 1933 Idaho Sess. Laws, Chapter 210 (H.B. No. 186).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 18th day of June, 2020.

_____
            /s/ Robert A. Berry
ROBERT A. BERRY

DECLARATION OF COUNSEL IN SUPPORT OF DEFENDANTS – 2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 18, 2020, I electronically filed the foregoing with the Clerk of the Court using the CMF/ECF system which sent a Notice of Electronic Filing to the following persons:

| | |
|---|---|
| Deborah A. Ferguson | Craig H. Durham |
| daf@fergusondurham.com | chd@fergusondurham.com |

_____/s/ Robert A. Berry_____
ROBERT A. BERRY
Deputy Attorney General

DECLARATION OF COUNSEL IN SUPPORT OF DEFENDANTS – 3

public officer he is entitled to vote upon.   Any person signing any name other than his own to any petition, or knowingly signing his name more than once thereon, or who is not at the time of signing the same a legal voter of this state, or any officer or person wilfully violating any provision of this statute, shall, upon conviction thereof be punished by a fine not exceeding $5000.00, or by imprisonment in the penitentiary not exceeding two years, or by both such fine and imprisonment, in the discretion of the court before which such conviction shall be had.

SEC. 20.  It shall be unlawful for any person to wilfully or knowingly circulate, publish or exhibit any false statement or representation concerning the contents, purport or effect of any petition mentioned in this Act for the purpose of obtaining any signature to any such petition, or for the purpose of persuading any person to sign any such petition.

SEC. 21.  It shall be unlawful for any person to file in the office of any officer provided by law to receive such filing any petition mentioned in this Act to which is attached, appended or subscribed any signature which the person so filing such petition knows to be false or fraudulent or not the genuine signature of the person purporting to sign such petition, or whose name is attached, appended or subscribed thereto.

SEC. 22.  It shall be unlawful for any person to circulate or cause to be circulated any petition mentioned in this Act, knowing the same to contain false, forged or fictitious names.

SEC. 23.  It shall be unlawful for any person to make any false affidavit concerning any petition mentioned in this Act or the signatures appended thereto.

SEC. 24.  It shall be unlawful for any public official or employee knowingly to make any false return, certification or affidavit concerning any petition mentioned in this Act, or the signatures appended thereto.

SEC. 25.  It shall be unlawful for any person to knowingly sign his own name more than once to any petition mentioned in this Act, or to sign his name to any such petition knowing himself at the time of such signing not to be qualified to sign the same.

SEC. 26.  It shall be a felony for any person to offer, propose or threaten to do any act mentioned in this section

concerning any petition mentioned in this Act for any pecuniary reward or consideration:  (a) To offer, propose, threaten or attempt to sell, hinder or delay any petition or any part thereof or of any signatures thereon mentioned in this Act;  (b) To offer, propose, or threaten to desist, for a valuable consideration, from beginning, promoting or circulating any petition mentioned in this Act, or soliciting signatures to any such petition;  (c) To offer, propose, attempt or threaten in any manner or form to use any petition or any power of promotion or opposition in any manner or form for extortion, blackmail or secret or private intimidation of any person or business interest.

SEC. 27.  Any person, either as principal or agent, violating any of the provisions of this Act shall be punished upon conviction by imprisonment in the penitentiary or in the county jail not exceeding two years, or by a fine not exceeding $5000.00, or by both, excepting that imprisonment in the penitentiary and punishment by a fine shall be the only penalty for violation of any provision of Section 26 of this Act.

SEC. 28.  All acts and parts of acts in conflict with the provisions of this Act are hereby repealed.

Approved March 13, 1933.

———

## CHAPTER 210
### (H. B. No. 186)

### AN ACT

PROVIDING FOR HOLDING INITIATIVE AND REFERENDUM ELECTIONS; PROVIDING TIME OF FILING OF PETITIONS FOR INITIATIVE AND REFERENDUM; PROVIDING FORM OF PETITIONS, THEIR FILING, PRINTING AND PROCEDURE IN CONNECTION THEREWITH; PROVIDING FOR THE TAKING EFFECT OF ANY LAW PRESCRIBING THE NUMBER OF SIGNATURES REQUIRED ON SUCH PETITIONS; PROVIDING FORM OF VERIFICATION AND PRESCRIBING DUTIES OF CLERK OF THE DISTRICT COURT IN COMPARISON AND CERTIFICATION OF SIGNATURES; PRESCRIBING CERTIFICATION OF SIGNATURES BY NOTARY PUBLIC; PROVIDING FOR MANDAMUS TO COMPEL FILING OF PETITION AND FIXING JURISDICTION AND PROCEDURE; PROVIDING FOR BALLOT TITLE,

S.L. '33, c. 210
Ref. 10
S.L. '33, c. 111
sec. 1, p. 210

DECLARATION OF COUNSEL
EXHIBIT A
Page 1 of 7

Case: 20-35584, 07/17/2020, ID: 11757816, DktEntry: 18-2, Page 140 of 188

Case: 20-35584, 07/17/2020, ID: 11757816, DktEntry: 18-2, Page 141 of 188

432     IDAHO SESSION LAWS

C. 210 '33

PREPARATION OF SAME BY ATTORNEY GENERAL AND PROVIDING FOR APPEAL THEREFROM; PROVIDING THAT SECRETARY OF STATE SHALL FURNISH CERTIFIED COPIES OF BALLOT TITLES TO COUNTY AUDITORS AND PRESCRIBING "THEIR NUMBERING AND DESIGNATIONS; PROVIDING THE MANNER OF VOTING AND DETERMINING RESULTS THEREOF; PROVIDING FOR DETERMINING RESULTS IN CASE OF CONFLICTING LAWS PASSED AT SAME ELECTION; PROVIDING, FOR PRINTING AND DISTRIBUTION OF COPIES OF MEASURE AND ARGUMENTS; PROVIDING RULES IN CONNECTION THEREWITH AND ALSO TIME LIMITS AND COSTS OF SAME; PROVIDING FOR COUNTING AND CANVASS OF VOTES AND PROCLAMATION OF RESULTS; FIXING QUALIFICATIONS OF SIGNERS TO PETITIONS AND PROVIDING FOR PENALTIES FOR VIOLATION OF THIS STATUTE; FIXING CRIME FOR FALSE STATEMENTS CONCERNING CONTENTS OF PETITION; FIXING CRIME FOR FILING PETITIONS WITH SIGNATURES FRAUDULENTLY OBTAINED; FIXING CRIME FOR CIRCULATION OF PETITION CONTAINING FORGED OR FICTITIOUS NAMES; FIXING CRIME FOR FALSE AFFIDAVITS IN CONNECTION WITH PETITIONS; FIXING CRIME FOR RETURN OR CERTIFICATION OF FALSE PETITION; FIXING CRIME FOR DUPLICATE SIGNING OR SIGNING BY DISQUALIFIED PERSON; DEFINING FELONIOUS ACTS CONCERNING PETITION AND FIXING PENALTIES FOR VIOLATION OF ANY PROVISIONS OF THIS ACT; REPEALING ALL ACTS AND PARTS OF ACTS IN CONFLICT HEREWITH.

*Be It Enacted by the Legislature of the State of Idaho:*

SECTION 1. That the following shall be substantially the form of petition for any law proposed by the initiative:

### WARNING

It is a felony for any one to sign any initiative or referendum petition with any name other than his own, or to knowingly sign his name more than once for the measure, or to sign such petition when he is not a legal voter.

### INITIATIVE PETITION

"To the Honorable _____, Secretary of State of the State of Idaho: "We, the undersigned citizens and legal voters of the State of Idaho, respectfully demand that the

IDAHO SESSION LAWS     433

C. 210 '33

following proposed law, to-wit: (setting out full text of measure proposed) shall be submitted to the legal voters of the State of Idaho, for their approval or rejection at the regular, general election, to be held on the _____ day of _____, A. D., 19_____, and each for himself says: I have personally signed this petition; I am a legal voter of the State of Idaho; my residence and post-office are correctly written after my name."

Name.      Residence.      Post-office.

(If in a city, street and number.)

(Here follow twenty numbered lines for signatures.)

The petition for referendum on any act passed by the State Legislature of the State of Idaho shall be in substantially the same form with appropriate title and changes, setting out in full the text of the act of the Legislature to be referred to the people for their approval or rejection.

SEC. 2. Initiative petitions with the requisite number of signatures attached shall be filed with the Secretary of State not less than four months before the election at which they are to be voted upon.

SEC. 3. Referendum petitions with the requisite number of signatures attached shall be filed with the Secretary of State not more than sixty days after the final adjournment of the session of the State Legislature which passed on the bill on which the referendum is demanded. All elections on measures referred to the people of the state shall be had at the biennial regular election. Any measure so referred to the people shall take effect and become a law when it is approved by a majority of the votes cast thereon, and not otherwise.

SEC. 4. Before or at the time of beginning to circulate any petition for the referendum to the people on any act passed by the State Legislature of the State of Idaho, or for any law proposed by the initiative, the person or persons or organization or organizations under whose authority the measure is to be referred or initiated shall send or deliver to the Secretary of State a copy of such petition duly signed by at least twenty electors of the state which shall be filed by said officer in his office, and who shall immediately examine and specify the form and kind and size of paper on which such petition shall be printed for circulation for signatures. All petitions for the initiative and for the referendum and sheets for signatures shall

**DECLARATION OF COUNSEL**
**EXHIBIT A**
**Page 2 of 7**

C. 210 '33

be printed on a good quality of bond or ledger paper on pages eight and one-half inches in width by thirteen inches in length, with a margin of one and three-fourths inches at the top for binding. To every sheet of petitioners' signatures shall be attached a full and correct copy of the measure so proposed by initiative petition; but such petition may be filed by the Secretary of State in numbered sections for convenience in handling. Every sheet of petitioners' signatures upon referendum petitions shall be attached to a full and correct copy of the measure on which the referendum is demanded, and may be filed in numbered sections in like manner as initiative petitions. Not more than twenty (20) signatures on one sheet shall be counted.

SEC. 5. After the form of the initiative or referendum petition has been approved by the Secretary of State as in this Act provided same shall be printed by the person or persons or organization or organizations under whose authority the measure is to be referred or initiated and circulated in the several counties of the state for the signatures of legal voters. Before such petitions shall be entitled to final filing and consideration by the Secretary of State there shall be affixed thereto the signatures of legal voters equal in number to not less than ten per cent (10%) of the electors of the state based upon the aggregate vote cast for Governor at the general election next preceding the filing of such initiative or referendum petition.

SEC. 6. When any such initiative or referendum petition shall be offered for filing the Secretary of State shall detach the sheets containing the signatures and affidavits and cause them all to be attached to one or more printed copies of the measure so proposed by initiative or referendum petitions. If the aforesaid sheets shall be too bulky for convenient binding in one volume, they may be bound in two or more volumes, those in each volume to be attached to a single printed copy of such measure. If any such measure shall, at the ensuing election, be approved by the people, then the copies thereof so preserved, with the sheets and signatures and affidavits, and a certified copy of the Governor's proclamation declaring the same to have been approved by the people, shall be bound together in such form that they may be conveniently identified and preserved. The Secretary of State shall cause every such measure so approved by the people to be printed with the general laws enacted by the next ensuing session of the State Legislature with the date of the Governor's proclamation declaring the same to have been approved by the people.

C. 210 '33

SEC. 7. Each and every sheet of every such petition containing signatures shall be verified on the fact thereof in substantially the following form, by the person who circulated said sheet of said petition, by his or her affidavit thereon, and as a part thereof:

"State of Idaho, } ss.
County of _____

I, _____, being first duly sworn, say: that every person who signed this sheet of the foregoing petition signed his or her name thereto in my presence; I believe that each has stated his or her name, post-office address and residence correctly, that each signer is a legal voter of the State of Idaho, and county of _____

(Signed) _____

Post-office address _____

Subscribed and sworn to before me this _____ day of _____ 19____.

(Notary Seal)                    Notary Public.

Residing at _____

In addition to said affidavit the Clerk of the District Court of each county in which any such petition shall be signed shall compare the signatures of the electors signing the same with the signatures on the registration oaths and records in his office, and shall carefully examine said petitions and shall attach to the sheets of said petition containing such signatures his certificate to the Secretary of State substantially as follows:

"State of Idaho, } ss.
County of _____

To the honorable _____, Secretary of State for the State of Idaho: I, _____, Clerk of the District Court of the _____ Judicial District of the State of Idaho in and for _____ sheets (specifying number of sheets) of the referendum (initiative) petition attached hereto, with the signatures of said electors as they appear upon the registration oaths, books and records of my office, and from such information as I have been able to obtain I believe the signatures of (names of signers) numbering (number of genuine signatures) are genuine

DECLARATION OF COUNSEL
EXHIBIT A
Page 3 of 7

Case: 20-35584, 07/17/2020, ID: 11757816, DktEntry: 18-2, Page 143 of 188

ine.  As to the remainder of the signatures thereon, I
believe they are not genuine, except that the following
names (..............................................) do not appear on the regis-
tration oaths, books and records in my office.

                            (Signed).............................................
                                        Clerk of District Court.
(Seal of office)
                            By.............................................
                                        Deputy.                    ”

Every such certificate shall be prima facie evidence of the
facts stated therein and of the qualifications of the electors
whose signatures are thus certified to be genuine, and the
Secretary of State shall consider and count only such sig-
natures on such petitions as shall be so certified by said
Clerk of the District Court to be genuine; provided, that
the Secretary of State shall consider and count such of
the remaining signatures as shall be proved to be the genu-
ine signatures of legal voters.  To establish such facts the
official certificate of a notary public of the county in which
the signer resides shall be required as to the facts for each
of such last named signatures, in form substantially as fol-
lows:

“State of Idaho          ⎱
County of ..........................⎰ss.

I, .............................................., a duly qualified and acting
Notary Public in and for the State of Idaho, residing at
.........................., county of .........................., do hereby
certify:  That I am personally acquainted with each of the
following named electors whose signatures are affixed to
the annexed petition, and I know of my own knowledge
that they are legal voters of the State of Idaho, and of the
county written after their several names in the annexed
petition, and that their residence and post-office addresses
are correctly stated therein, to-wit:
(names of such electors.)
In Testimony Whereof, I have hereunto set my hand and
official seal this .................. day of .................. 19.........

(Notary Seal)          Notary Public

                    Residing at .......................... Idaho.”

The Clerk of the District Court shall not retain in his pos-
session any such petition or any part thereof for a longer

period than two days for the first 200 signatures thereon,
and one additional day for each 200 additional signatures
or fractions thereof, on the sheets presented to him, and
at the expiration of such time he shall deliver the same to
the person from whom he received it with his certificate
attached thereto as above provided.  The forms herein
given are not mandatory and if substantially followed in
any petition, it shall be sufficient, disregarding clerical and
merely technical error.

SEC. 8.  If the Secretary of State shall refuse to accept
and file any petition for the initiative or for the referendum
with the requisite number of signatures of bona fide elec-
tors thereto attached, any citizen may apply, within ten
days after such refusal to the District Court for a writ
of mandamus to compel him to do so.  If it shall be decided
by the court that such petition is legally sufficient, the Sec-
retary of State shall then file it, with a certified copy of
the judgment attached thereto, as of the date on which it
was originally offered for filing in his office. On a show-
ing that any petition filed is not legally sufficient, the court
may enjoin the Secretary of State and all other officers
from certifying or printing on the official ballot for the
ensuing election the ballot title and numbers of such meas-
ure.  All such suits shall be advanced on the court docket
and heard and decided by the court as quickly as possible.
Either party may appeal to the Supreme Court within ten
days after a decision is rendered.  The District Court of
the Third Judicial District of the State of Idaho in and for
Ada County shall have jurisdiction in all cases of meas-
ures to be submitted to the electors of the state at large.

SEC. 9.  When a copy of the petition for any measure to
be referred to the people of the state, either by the initia-
tive or the referendum, shall be filed with the Secretary of
State, as herein provided, the Secretary of State shall forth-
with transmit two copies thereof to the Attorney General
of the state.  Within ten days after receiving said copies
the Attorney General shall provide a ballot title therefor
and return one of said copies to the Secretary of State,
together with the ballot title so prepared by him.  A copy
of the ballot title as prepared by the Attorney General shall
be furnished by the Secretary of State with his approved
form of any initiative or referendum petition, as provided
herein, to the person or persons or organization or organi-
zations under whose authority the measure is initiated or
referred.  Said ballot title shall be used and printed on
the covers of the petition when in circulation; the short title

DECLARATION OF COUNSEL
EXHIBIT A
Page 4 of 7

C. 210 '33

shall be printed in type not less than twenty points on the covers of all such petitions circulated for signatures. The ballot title shall contain: (1) Distinctive short title in not exceeding ten words by which the measure is commonly referred to or spoken of and which shall be printed in the foot margin of each signature sheet of the petition. (2) A general title which may not be distinct from the legislative title of the measure expressing in not more than one hundred words the purpose of the measure. The ballot title shall be printed with the numbers of the measure on the official ballot. In making such ballot title the Attorney General shall to the best of his ability give a true and impartial statement of the purpose of the measure and in such language that the ballot title shall not be intentionally an argument or likely to create prejudice either for or against the measure. Any person who is dissatisfied with the ballot title or the short title provided by the Attorney General for any measure, may appeal from his decision to the Supreme Court by petition, praying for a different title and setting forth the reason why the title prepared by the Attorney General is insufficient or unfair. No appeal shall be allowed from the decision of the Attorney General on a ballot title unless the same is taken within twenty days after said ballot title is filed in the office of the Secretary of State. A copy of every such ballot title shall be served by the Secretary of State upon the person offering or filing such initiative or referendum petition, or appeal. The service of such decision may be by mail or telegraph and shall be made forthwith when it is received from the Attorney General by the Secretary of State. Said Supreme Court shall thereupon examine said measure, hear argument, and in its decision thereon certify to the Secretary of State a ballot title and a short title for the measure in accord with the intent of this section. The Secretary of State shall print on the official ballot the title thus certified to him.

SEC. 10. The Secretary of State, at the time he furnishes to the county auditors of the several counties certified copies of the names of candidates for state and district offices shall furnish to each of said county auditors a certified copy of the ballot titles and numbers of the several measures to be voted upon at the ensuing general election, and he shall use for each measure the ballot title designated in the manner herein provided. Such ballot title shall not resemble, so far as to probably create confusion, any such title previously filed for any measure to be submitted at that election; he shall number such measures and such ballot titles shall be printed in the order in which Acts referred

C. 210 '33

by petitions to the people shall be filed in his office. The affirmative of the first measure shall be numbered 100, and the negative 101 in numerals, and the succeeding measures shall be numbered consecutively 102, 103, 104, 105 and so on at each election. It shall be the duty of the several county auditors to print said ballot titles and numbers upon the official ballot in the order presented to them by the Secretary of State and the relative position required by law. Measures referred by petition shall be designated "Referendum Ordered by Petition of the People," measures proposed by initiative petition shall be designated and distinguished on the ballot by the heading "Proposed by Initiative Petition."

SEC. 11. The manner of voting upon measures submitted to the people shall be the same as is now or may be required and provided by law; no measure shall be adopted unless it shall receive an affirmative majority of the aggregate number of votes cast on such measure. If two or more conflicting laws shall be approved by the people at the same election, the law receiving the greatest number of affirmative votes shall be paramount in all particulars as to which there is a conflict, even though such law may not have received the greatest majority of affirmative votes. If two or more conflicting amendments to the constitution shall be approved by the people at the same election, the amendment which receives the greatest number of affirmative votes shall be paramount in all particulars as to which there is a conflict, even though such amendment may not have received the greatest majority of affirmative votes.

SEC. 12. Not later than the nineteenth day before any regular general election at which any proposed law, part of any Act or amendment to the constitution is to be submitted to the people, the Secretary of State shall cause to be printed in pamphlet form a true copy of the title and text of each measure to be submitted with the number and form in which the ballot title thereof will be printed on the official ballot. The person, committee or duly authorized officers of any organization filing any petition for the initiative, but no other person or organization, shall have the right to file with the Secretary of State for printing and distribution any argument advocating such measure; said argument shall be filed not later than the one hundred and fiftieth day before the regular election at which the measure is to be voted upon. Any person, committee or organization may file with the Secretary of State, for printing and distribution, any arguments they may desire, opposing

DECLARATION OF COUNSEL
EXHIBIT A
Page 5 of 7

C. 210 '33

any measure, not later than the one hundred and fifth day immediately preceding such election. Arguments advocating or opposing any measure referred to the people by referendum petition at a regular general election shall be governed by the same rules as to time but may be filed with the Secretary of State by any person, committee or organization. In every case the person or persons offering such arguments for printing and distribution shall pay to the Secretary of State sufficient money to pay all the expenses for paper and printing to supply one copy with every copy of the measure to be printed by the state; and he shall forthwith notify the persons offering the same the amount of money necessary. The Secretary of State shall cause one copy of each of said arguments to be bound in the pamphlet copy of the measures to be submitted as herein provided, and all such measures and arguments to be submitted at one election shall be bound together in a single pamphlet. All the printing shall be done by the state as by law provided, and the pages of said pamphlet shall be numbered consecutively from one to the end. The pages of said pamphlet shall be six by nine inches in size and the printed matter therein shall be set in six-point Roman-faced solid type on not to exceed seven-point body, in two columns of thirteen ems in width each to the page with six-point dividing rule and with appropriate headings, and printed on a good quality of book paper twenty-five by thirty-eight inches weighing not more than fifty pounds to the ream. The title page of every measure bound in said pamphlet shall show the measure or measures it favors or opposes and by what persons or organizations it is issued. When such arguments are printed the Secretary of State out of said deposits shall pay for the printing of such pamphlets and return the surplus, if any, to the parties who paid it to him. The cost of printing, binding and distributing the measures proposed, and of binding and distributing the arguments shall be paid by the state, it being intended that only the cost of paper and printing the arguments shall be paid by the parties presenting the same, and they shall not be charged any higher rate for such work than is paid by the state for similar work and paper. Not later than the seventy-fifth day before the regular general election at which such measures are to be voted upon the Secretary of State shall transmit to the auditors of the several counties of the state sufficient copies of such pamphlet for every legal voter upon the registration rolls of the respective counties, and such auditors shall immediately thereafter transmit by mail, with postage fully prepaid, to every voter

C. 210 '33

in his county whose address he may have, one copy of such pamphlet, provided, that if the Secretary of State shall, at or about the same time be transmitting to said auditors any other pamphlet for the voters, he may if practicable, bind the matter herein provided for in the first part of said pamphlet, numbering the pages of the entire pamphlet consecutively from one to the end, or he may enclose the pamphlets under one cover.

SEC. 13. The votes on measures and questions shall be counted, canvassed and returned by the regular boards of judges, clerks and officers, as votes for candidates are counted, canvassed and returned, and the abstract made by the several county auditors of votes on measures shall be returned to the Secretary of State on separate abstract sheets in the manner provided for abstracts of votes for state and county officers. It shall be the duty of the Secretary of State, in the presence of the Governor, to proceed within thirty days after the election, and sooner if the returns be all received, to canvass the votes given for each measure, and the Governor shall forthwith issue his proclamation, giving the whole number of votes cast in the state for and against such measure and question, and declaring such measures as are approved by a majority of those voted thereon to be in full force and effect as the law of the State of Idaho from the date of said proclamation; provided, that if two or more measures shall be approved at said election which are known to conflict with each other or to contain conflicting provisions he shall also proclaim which is paramount in accordance with the provisions of this Act.

SEC. 14. Every person who is a qualified elector of the State of Idaho may sign a petition for the referendum or for the initiative for any measure which he is legally entitled to vote upon. Any person signing any name other than his own to any petition, or knowingly signing his name more than once for the same measure at one election, or who is not at the time of signing the same a legal voter of this state, or any officer or person wilfully violating any provision of this statute, shall, upon conviction thereof be punished by a fine not exceeding $5000.00 or by imprisonment in the penitentiary not exceeding two years, or by both such fine and imprisonment, in the discretion of the court before which such conviction shall be had.

SEC. 15. It shall be unlawful for any person to wilfully or knowingly circulate, publish or exhibit any false statement or representation concerning the contents, purport

DECLARATION OF COUNSEL
EXHIBIT A
Page 6 of 7

or effect of any petition mentioned in this Act for the purpose of obtaining any signature to any such petition, or for the purpose of persuading any person to sign any such petition.

SEC. 16. It shall be unlawful for any person to file in the office of any officer provided by law to receive such filing any petition mentioned in this Act to which is attached, appended or subscribed any signature which the person so filing such petition knows to be false or fraudulent or not the genuine signature of the person purporting to sign such petition, or whose name is attached, appended or subscribed thereto.

SEC. 17. It shall be unlawful for any person to circulate or cause to be circulated any petition mentioned in this Act, knowing the same to contain false, forged or fictitious names.

SEC. 18. It shall be unlawful for any person to make any false affidavit concerning any petition mentioned in this Act or the signatures appended thereto.

SEC. 19. It shall be unlawful for any public official or employee knowingly to make any false return, certification or affidavit concerning any petition mentioned in this Act, or the signatures appended thereto.

SEC. 20. It shall be unlawful for any person to knowingly sign his own name more than once to any petition mentioned in this Act, or to sign his name to any such petition knowing himself at the time of such signing not to be qualified to sign the same.

SEC. 21. It shall be a felony for any person to offer, propose or threaten to do any act mentioned in this section of or concerning any petition mentioned in this Act for any pecuniary reward or consideration: (a) To offer, propose, threaten or attempt to sell, hinder or delay any petition or any part thereof or of any signatures thereon mentioned in this Act; (b) To offer, propose, or threaten to desist, for a valuable consideration, from beginning, promoting or circulating any petition mentioned in this Act, or soliciting signatures to any such petition; (c) To offer, propose, attempt or threaten in any manner or form to use any petition or power of promotion or opposition in any manner or form for extortion, blackmail or secret or private intimidation of any person or business interest.

SEC. 22. Any person, either as principal or agent, violat-

ing any of the provisions of this Act shall be punished upon conviction by imprisonment in the penitentiary or in the county jail not exceeding two years, or by a fine not exceeding $5000.00, or by both, excepting that imprisonment in the penitentiary and punishment by a fine shall be the only penalty for violation of any provision of Section 21 of this Act.

SEC. 23. All acts and parts of acts in conflict with the provisions of this Act are hereby repealed.

Approved March 13, 1933.

---

## CHAPTER 211
### (H. B. No. 213)

### AN ACT

AMENDING SECTION 13-701, IDAHO CODE ANNOTATED, RELATING TO THE USES FOR WHICH THE RIGHT OF EMINENT DOMAIN IS AUTHORIZED, BY INCLUDING BENEFITS FOR THE STATE AND STATE PROPERTY IN CERTAIN PROVISIONS THEREOF AND ADDING TO SECTION 13-701, IDAHO CODE ANNOTATED, A SUBDIVISION NO. 10, EXTENDING THE RIGHT OF EMINENT DOMAIN TO INCLUDE SNOW FENCES FOR HIGHWAY PROTECTION.

*Be It Enacted by the Legislature of the State of Idaho:*

SECTION 1. That Section 13-701, Idaho Code Annotated, be, and the same is hereby, amended to read as follows:

"Section 13-701. USES FOR WHICH AUTHORIZED.— Subject to the provisions of this chapter, the right of eminent domain may be exercised in behalf of the following public uses:

"1. Public buildings and grounds for the use of the state, and all other public uses authorized by the Legislature.

"2. Public buildings and grounds for the use of any county, incorporated city, village, town or school district; canals, aqueducts, flumes, ditches or pipes for conducting water *for use on state property or* for the use of the inhabitants of any county, incorporated city, village or town or for draining *state property or* any county, incorporated

DECLARATION OF COUNSEL
EXHIBIT A
Page 7 of 7

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| **RECLAIM IDAHO**, a political action committee, and **LUKE MAYVILLE**, | Case No.  1:20-cv-00268-BLW |
| Plaintiffs, |  |
| v. | **EXPEDITED MOTION FOR PRELIMINARY INJUNCTION** |
| **BRADLEY LITTLE**, in his official capacity as the Governor of Idaho, and **LAWERENCE DENNEY**, in his official capacity as Idaho's Secretary of State, |  |
| Defendants. |  |

Plaintiff Reclaim Idaho and Plaintiff Luke Mayville seek to qualify a citizens' initiative, "Invest in Idaho," and place it on the general election ballot for this November. Yet orders and decisions by the Governor and the Secretary of State during the COVID-19 pandemic have prevented Plaintiffs from doing so and have severely burdened their First Amendment rights.

Plaintiffs move this Court to enter a preliminary injunction enjoining Defendants from strictly enforcing, as against Plaintiffs, the in-person signature gathering requirements set out in

1

Idaho Code § 34-1807 and the deadline for gathering signatures in Idaho Code § 34-1802. Specifically, Plaintiffs seek an order permitting an additional 48 days to circulate Reclaim Idaho's Invest in Idaho petition and an order permitting them to gather signatures by safe, secure, and reliable electronic means.

This motion is brought under Rule 65 of the Federal Rules of Civil Procedure and the First and Fourteenth Amendments to the United States Constitution. It is supported by the attached memorandum of law and by the declarations of Luke Mayville, Rebecca Schroeder, Deborah Silver, Karen Lansing, Ashley Prince and Linda Larson.

Plaintiffs request that the motion be set on an expedited schedule for briefing and ruling, as delay further infringes on the Plaintiffs' constitutional rights, and irreparably hinders Reclaim Idaho's ability to qualify for the general election ballot this November.

Respectfully submitted this 6th day of June 2020.

/s/Craig H. Durham
Deborah A. Ferguson

Attorneys for Plaintiffs

2

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of June 2020, I filed the foregoing electronically

through the Court's CM/ECF system, which caused the following parties or counsel to be served

by electronic means, as more fully reflected on the Notice of Electronic Filing :

No appearance in this case yet by Defendants

I further hereby certify that on the 6th day of June, 2020, I served a copy of the foregoing

to counsel for the defendants, the Idaho Attorney General, by emailing a copy to the following:

Steven Olsen
Chief, Civil Litigation Unit
Office of the Attorney General
PO Box 83720
Boise, ID 83720-0010
steven.olsen@ag.idaho.gov
Attorney for Defendants

/s/ Deborah A. Ferguson

3

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **RECLAIM IDAHO**, an Idaho Political Action Committee; **LUKE MAYVILLE**<br><br>Plaintiffs,<br><br>v.<br><br>**BRADLEY LITTLE**, in his official capacity as Governor of Idaho; **LAWERENCE DENNEY**, in his official capacity as Idaho Secretary of State; Defendants. | Case No. 1:20-cv-00268-BLW<br><br>**DECLARATION OF LUKE MAYVILLE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

I, Luke Mayville, having first been duly sworn upon oath, declare as follows:

1.     My name is Luke Mayville, and I am a Co-founder of Reclaim Idaho, the other plaintiff in this case.

2.     I have served as a volunteer leader and organizer for Reclaim Idaho since spring 2017, when I co-founded the organization in my hometown of Sandpoint. My role with Reclaim Idaho

Declaration of Luke Mayville-                    p.1

includes setting strategic priorities for the organization, fundraising, communicating with media, writing opinion columns, drafting initiative proposals, and traveling the state to recruit volunteers and leaders. I am an academic by training and was most recently employed by Columbia University as a postdoctoral fellow and lecturer in the fields of History and American Studies. I have also held teaching and research positions at Yale University and American University. In 2016, I published a book on the political thought of President John Adams.

3.    Reclaim Idaho is a grassroots movement designed to protect and improve the quality of life of working Idahoans. Reclaim organizes to pass citizens' initiatives and to elect candidates who believe in strengthening public schools, protecting public lands, and extending healthcare to working families.

4.    Reclaim filed an "Invest in Idaho" K-12 educational funding initiative with the Secretary of State in the fall of 2019.  If put on the ballot and passed, this initiative would invest $170 million in education in Idaho.

5.    Reclaim was operating on the model of organizing that it had successfully used during the Medicaid expansion drive, a model of organizing we had begun to develop in 2017.

6.    That year, we filed a Medicaid Expansion initiative—a proposal that eventually qualified for the ballot with well over the 56,000 signatures required. Several additional advocacy groups contributed to signature collection in the final months of petitioning, but the vast majority of required signatures were collected by Reclaim Idaho volunteers.

7.    Moreover, Reclaim Idaho volunteers easily surpassed Idaho's requirements for geographic distribution by collecting signatures from more than 6% of registered voters in well over 18 of Idaho's 35 legislative districts.

8.      We attribute the success of our Medicaid signature drive to a highly effective and labor intensive model of organizing.

9.      In the early stages of the effort, members of our statewide team visited over 20 counties and worked to recruit volunteers and organize those volunteers into county-based teams. This method of organizing didn't yield large numbers of signatures during the early months of the drive, but it did build strong, well-trained teams capable of scaling up the operation exponentially during the final few months before the deadline.

10.      By mid-March, with just six weeks left before the deadline, we had collected fewer than half of the required signatures. But we were able to accelerate the rate of signature collection rapidly in the final weeks.

11.      One factor in particular contributed to our ability to ramp up signature collection in the final stretch: the sense of urgency brought about by the impending deadline. With the deadline looming, our most active volunteers grew more committed and more efficient in their work, and hundreds of new volunteers joined the effort for the first time. (The motivating effects of the looming deadline was compounded by changing weather. In the final stretch, just as volunteers were growing more motivated, the weather warmed up and enabled them to collect signatures much more effectively.)

12.      In my own observations and studies of different signature-drive models, I have found that the motivating effect of a looming deadline is especially important for grassroots drives that rely mainly on volunteers. When signature drives rely mainly on paid-signature gatherers, the final stretch of a signature drive is not much different than the early months. Throughout the drive, petitioners are motivated by the wages they earn. In contrast, grassroots campaigns stand to

Declaration of Luke Mayville-                    p.3

benefit enormously from the highly motivating sense of urgency that kicks in during the final stretch of time before a deadline.

13.     The model of organizing we developed during our Medicaid drive prepared us well to capitalize on the sense of urgency during the final weeks of the effort. By investing time and resources during the early months in volunteer-recruitment and team-building, we were well-poised in the final stretch to absorb hundreds of new volunteers and scale up our work dramatically.

14.     When we began the signature drive for our "Invest in Idaho" K-12 funding initiative, we made every effort to replicate the success of our Medicaid drive. Beginning in September 2019—over one month before our petition was approved for circulation by the Idaho Secretary of State, organizers visited counties in every region. They recruited volunteers, organized them into county-based teams, and trained them with effective signature-gathering tactics.

15.     Our rate of signature collection was low during the first several months, comparable to what it had been during our Medicaid signature drive. By February 15th, we had collected an estimated 15,000 signatures—roughly one quarter of the signatures needed to qualify the initiative.

16.     But in the weeks that followed, as the deadline began to loom on the horizon, our rate of signature collection accelerated dramatically. Our most active volunteers grew even more committed and efficient in their work. Hundreds of new volunteers were motivated by the impending deadline to join the effort.

17.     During the four weeks between mid-February and March 12th, we more than doubled our total number of signatures from 15,000 to over 30,000. We progressed from zero legislative

Declaration of Luke Mayville-          p.4

districts qualified to 5 districts qualified and 7 additional districts within a few hundred signatures of qualification.

18.    On March 12th, the day before the first case of COVID-19 was confirmed in Idaho, we were significantly ahead of where we had been by that same date during our Medicaid drive two years earlier.

19.    On March 13th, the first case of COVID-19 was confirmed in Idaho and Governor Little declared a state of emergency in order to prevent the spread of the coronavirus. It was on that date that it became apparent to our team that we would need to take significant steps to adapt to changing circumstances.

20.    On that same day, we sent an email newsletter to all supporters with the following guidelines:

- *Stay home if you are exhibiting any symptoms of illness.*

- *Avoid approaching anyone that is symptomatic of illness for a signature.*

- *Practice excellent hand hygiene before and after collecting signatures. Carry a small bottle of hand sanitizer if possible.*

- *Wipe down clipboards before and after a signature gathering shift.*

- *Avoid shaking hands or direct physical contact when collecting signatures.*

- *We recommend adopting a "KEEP THE PEN" policy. In an effort to reduce transmission of germs, volunteers should carry packages of "disposable" pens. If the signer doesn't have a pen of their own, simply allow them to keep the pen. Our campaign is committed to providing pens and/or reimbursing volunteers for the cost of pens.*

21.    We also notified volunteers that we would be transitioning toward more outdoor signature-collection activities, considering that staying outdoors would reduce the risk of the airborne spread of germs.

Declaration of Luke Mayville-          p.5

22.    That week, the CDC issued guidelines for individual and community organizations operating under conditions of "minimal to moderate" spread of COVID-19. Those guidelines included:

- Reduction of in-person activities, especially for organizations with individuals at increased risk of severe illness

- Cancellation of large gatherings of 250 or more people

- Implementation of personal protection measures such as staying home when sick, handwashing respiratory etiquette, and cleaning frequently touched surfaces daily

23.    Over the next five days, between March 13th and March 18th, we observed a dramatic escalation of the public health risk. Relevant developments during those days included:

24.    On the evening of Friday, March 13th, we received an email from retired Idaho appellate Judge Karen Lansing—one of our most active and committed volunteers—notifying us that she was suspending her efforts to gather signatures. She wrote:

> *I feel that my commitment and desire to gather signatures for this critical initiative directly conflicts with my obligation as a citizen to practice social distancing to protect my fellow Idahoans. I appreciate the suggestion that use of disposable pens and frequent cleaning of clipboards would reduce the risk of disease transmission. Those measures undoubtedly would help, but it is not possible for anyone to sign the petition without touching the page as they write, so it seems to me that the risk substantially remains. As important as the initiative is, I reluctantly conclude that it is outweighed by my responsibility to avoid possibly putting others at risk.*

Judge Lansing's email was the first of many similar messages sent to us from volunteers from all around the state.

25.    Guidelines from the CDC and other public health authorities made clear that the health risk posed by the coronavirus was especially severe for older adults. This fact weighed heavily on our decision-making, considering that the majority of Reclaim Idaho's most active volunteers are retirees over the age of 60.

Declaration of Luke Mayville-                        p.6

26.     On Saturday, March 14th, Meridian Library District announced that all libraries were closing operations due to the coronavirus. Likewise, the City of Boise closed all libraries on Monday, March 16th, and in subsequent weeks libraries would close across the state. On Tuesday, March 17th, DMV offices closed in Ada and Canyon counties. This was highly significant because libraries and DMVs had proven to be the most promising public locations for volunteers to collect signatures.

27.     On Sunday, March 15th, the CDC recommended cancellation or postponement of all gatherings of 50 or more. Most dramatically, the CDC also began recommending a six-foot "social distancing" rule which quickly became a widespread norm of behavior.

28.     As I would later explain in an April 9th interview with *CityLab* [1], our organization struggled over those five days to adapt to rapidly changing circumstances. As a last resort, we considered setting up "drive-through" signature collection stations. (We had recently learned that the Save Our Schools Arizona initiative—an initiative that would eventually suspend operations due to the pandemic—was experimenting with drive-through signature-gathering). But it quickly became clear that in-person signature gathering of any kind was simply too hazardous in the midst of a deadly pandemic. The announcement of the six-foot rule made this especially clear.

29.     As I would later explain in my interview with *CityLab* :

> *We were trying to adapt with the guidelines as they grew more and more stringent…But once the six-foot rule settled in, it just became impractical. It also became clear at that*

---

[1] CityLab describes itself on its web site as "a partnership between Bloomberg Philanthropies, the Aspen Institute and The Atlantic, CityLab is the preeminent meeting of city leaders and the top minds in urbanism and city planning, economics, education, art, architecture, public sector innovation, community development, and business — convened with the goal of creating scalable solutions to major challenges faced by cities everywhere."

*point that any continuation of a signature drive would put volunteers and the wider public at risk.*

30.     On Monday, March 16th, having concluded that in-person signature gathering would be too great a public health risk, we decided to appeal to Governor Brad Little with a request for the authorization of electronic signature gathering. We sent an email newsletter inviting supporters to sign our online petition to the Governor.

31.     The text of the newsletter included the following:

> *This pandemic is obstructing the ability of every Idahoan to participate in the ballot initiative process...In the interest of safeguarding the health of the public and protecting the constitutional rights of Idahoans, we're calling on Governor Brad Little to exercise his executive powers to authorize temporary online petitioning for Idaho ballot initiatives.*

32.     As soon as supporters signed the petition online, they were then prompted with an opportunity to email the Governor's office and ask the Governor to authorize electronic signature collection.

33.     That same day, Reclaim Idaho Executive Director Rebecca Schroeder corresponded via email with Andrew Mitzel, a member of the Governor's staff. When Mitzel directed Schroeder and Reclaim Idaho to bring our request for electronic signature capabilities to the Idaho Secretary of State, Schroeder immediately made contact via email with the Secretary of State's office. The Secretary of State's office then claimed, in reply, that "there is no statute allowing electronic signatures for petitions in Idaho Statutes 34 Chapter 18," and that they were therefore unable to take action. When Schroeder then brought this information to Mitzel and the Governor's office, Mitzel replied as follow:

> *Given our intense focus on spending as much time and resources on protecting the health and safety of the broader population, the Governor's Office has no intention of taking executive action on this matter.*

Declaration of Luke Mayville-          p.8

34.     Later that day, in a public statement given to BSU Public Radio, the Governor's Press Secretary Marissa Morrison Hyer said "Idaho statute does not allow for the suspension of rules regarding the physical collection of signatures, even in times of emergency."

35.     Upon learning that the Governor did not intend to take action, we made one last attempt to save the signature drive. I contacted Representative John Gannon and asked him to propose legislation in the Idaho House of Representatives that would temporarily adjust Idaho's ballot initiative rules. The following day, Rep. Gannon reported to me that he shared a legislative proposal with at least one member of majority leadership, but that he was unable to find support for the bill. In his judgment, there was no legislative path forward for the proposal.

36.     By Wednesday, March 18th, we determined that we had exhausted all avenues of action. Neither the Governor, the Secretary of State, nor the Legislature were willing to take action, and there were no available tactics for collecting in-person signatures while also preserving the safety of our volunteers and the wider public.

37.     That morning, we sent the following message to our supporters via email newsletter and social media:

> *After carefully reviewing the latest recommendations of public health authorities, we have concluded that it is no longer safe for volunteers to engage in the face-to-face interactions that are necessary for effective signature gathering. In order to protect the health of our volunteers and the wider public, we are calling on all Reclaim Idaho volunteers to suspend signature collection until further notice.*
>
> *We do not make this decision lightly. Tragically, the coronavirus pandemic brought our signature drive to a standstill at the exact moment when we'd built our strongest momentum. Thanks to the hard work of volunteers across the state during the past month, our campaign cleared 30,000 signatures—more than we'd collected at this stage of the Medicaid Expansion campaign.*
>
> *But health and safety must come first. There is simply too much at risk to take chances.*

Declaration of Luke Mayville-                    p.9

38.     Governor Little's proclamation of a stay-at-home order was issued on March 25th. That order remains in partial effect today and remained in full effect through April 30th, which coincidentally was the final day before the official signature-gathering deadline on May 1st.

39.     Our decision to suspend operations was based on our assessment of the risks of signature gathering in the midst of a pandemic.

40.     The stay-at-home order exacerbated the risk and made signature-gathering impossible.

41.     Reclaim Idaho has invested time in developing a model for an online signature-collection plan that will allow the initiative campaign to obtain sufficient and verifiable signatures of Idaho electors. Our plan will enable the county clerk offices to verify electronic signatures in a process that closely resembles the normal verification process. In order to reduce the burden on county clerks, we plan to submit all signatures currently in our possession that have not yet been verified in order to give county clerks time to process these signatures prior to the time period when electronic signatures will need to be processed. We estimate this total amount to be approximately 20,000 signatures.

42.     Moreover, our plan will not impose significant additional burdens on the Idaho Secretary of State. The following email, sent to me by Deputy Secretary of State Jason Hancock on Wednesday, June 3rd, clarifies that the Secretary of State is not involved in verifying the validity of signatures, but only in counting them in order to determine whether the petition includes the requisite number of signatures statewide and the requisite number of signatures in 18 districts:

> *Since the county clerks, individually, are not in a position to know whether or not the petition includes the requisite number of valid signatures statewide, or the requisite number of valid signatures in at least 18 legislative districts, these tasks are performed by the Secretary of State after the various county clerks submit their reports showing the signatures that were submitted to them that they were able to verify.*

Declaration of Luke Mayville-                    p10

43.     Furthermore, we are prepared to reduce the additional burden on the Secretary of State by immediately providing them with 10,593 signatures that have been verified already by county clerks.

44.     Attached to this affidavit are slides that show how the electronic signature process would work. It will be under a contract with DocuSign, the country's leading company for execution of electronic signatures on legal documents.

45.     Regarding the reliability of DocuSign as a system for collecting authentic signatures, the following information has been published by DocuSign, Inc.:

- In 2017, DocuSign was officially certified by the Federal Risk and Authorization Management Program (FedRAMP), a government-wide service that vets technology providers for security and risk. DocuSign is now used by 800 federal, state, and local government agencies, including the Federal Communications Commission (FCC), the state of North Carolina, the Nevada Department of Transportation, and 400 California cities.

- DocuSign is used by Fortune 500 companies and global financial institutions including T-Mobile, Apple, Aetna, VISA, and Prudential Financial.

- More than 775,000 documents are signed using DocuSign each day, yet only in 2-3 instances have DocuSign documents been challenged in court. DocuSign maintains a court admissible certificate of completion that provides proof of the signing process – including who signed what, when and where – for all parties in the transaction. A DocuSign electronic signature is more enforceable than a wet signature because of the court-admissible evidence it contains.

- Unlike wet signatures, e-signatures also come with an electronic record that serves as an audit trail and proof of the transaction. The audit trail includes the history of actions taken with the document, including the details of when it was opened, viewed and signed. Depending on the provider, and if the signer agreed to allow access to their location, the record will also show the geolocation where it was signed. If one of the signers disputes their signature, or if there's any question about the transaction, this audit trail is available to all participants in the transaction and can resolve such objections.

- As an additional layer of authentication, DocuSign signatures include certificates of completion, which can include specific details about each signer on the document, including the consumer disclosure indicating the signer agreed to use e-signature, the signature image, key event timestamps and the signer's IP address and other identifying information.

Declaration of Luke Mayville-                              p11

- Once the signing process is complete, all documents are digitally sealed using Public Key Infrastructure (PKI), an industry-standard technology. This seal indicates the electronic signature is valid and that the document hasn't been tampered with or altered since the date of signing.

46.    Working with DocuSign, Reclaim Idaho has developed a plan to comply with Idaho's

requirements for state initiative petitions, with additional safeguards to ensure that signatures are

those of the persons whom they purport to be. The model will work as follows:

- Reclaim Idaho will establish a dedicated website for on-line signature collection.

- The landing page will ask for support to place the issue on the ballot to increase funding for K-12 education. The page will provide a link for the person to read the full text. It will notify persons that only Idaho registered voters are permitted to sign.

- If the person elects to proceed, they will enter their name, voter registration address, city or zip code, the last 4 digits of their social security number, and their email address.

- They will hit 'next' and be directed to a PDF of the petition that looks exactly like the paper version except that: 1. It will have only one signature line, 2. It will have fields for the last 4 digits of their SSN and the county where the elector resides, and 3. The circulator statement will have additional wording due to the on-line nature. All of the fields will populate from the information provided by the person on the prior page and they will be asked to confirm the information and authorize the placing of their signature on the petition. If they do, a cursive version of their signature will be affixed to the signature field or they can choose to draw their own signature electronically. Either way, the signature is legally binding, complying with the ESIGN Act. The document will be a self-contained single signature complete part-petition.

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

    EXECUTED ON this 5th day of June 2020.


    /s/Luke Mayville


Declaration of Luke Mayville-                      p12

# SIGN OUR OFFICIAL PETITION TO INCREASE FUNDING FOR K-12 EDUCATION. IT ONLY TAKES A COUPLE OF MINUTES.

**DUE TO COVID-19, WE ARE COLLECTING SIGNATURES ELECTRONICALLY TO QUALIFY OUR K-12 INITIATIVE FOR THE BALLOT, AND WE NEED YOUR HELP!**

**PLEASE FILL OUT THE FORM BELOW. AFTER YOU FILL OUT THE FORM, YOU WILL BE REDIRECTED TO A SITE WHERE YOU WILL SIGN THE OFFICIAL PETITION.**

Name *

First Name                                      Last Name

Street Address *
Where you're registered to vote

City or Zip Code *

Date *

County *

Last 4 Digits of SSN
This helps the county confirm your identity to verify your signature.

Email *

I AM A REGISTERED IDAHO VOTER AND I WANT TO SIGN THE PETITION TO INCREASE FUNDING FOR K-12 EDUCATION

Declaration of Luke Mayville-          p13









Declaration of Luke Mayville- p15







Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **RECLAIM IDAHO**, an Idaho Political Action Committee, and **LUKE MAYVILLE,** | Case No. 1:20-cv-00268-BLW |
| Plaintiffs, | |
| v. | **DECLARATION OF LINDA LARSON IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| **BRADLEY LITTLE,** in his official capacity as Governor of Idaho, and **LAWERENCE DENNEY**, in his official capacity as Idaho Secretary of State, | |
| Defendants. | |

I, Linda Larson, having first been duly sworn upon oath, declare as follows:

1.      My name is Linda Larson, and I am the Volunteer Leader for Bonner County of Reclaim

Idaho, a Plaintiff in this case.

2.      The Reclaim Idaho "Invest In Idaho" campaign was abruptly halted on March 18, 2020

due to the coronavirus pandemic, after Reclaim's requests to state officials to allow electronic

1

signature gathering were denied. Our volunteer team in Sandpoint--working alongside a team of volunteers in Bonners Ferry--had already qualified District 1 and was ready to help add signatures to the statewide totals.

3.     Had Reclaim Idaho been able to continue, there is no doubt in my mind that we would have successfully met the state requirements needed to see this put on the November ballot. I have provided a summary here of the events as they happened in Sandpoint, Idaho, Bonner County, District 1.

4.     I served as a volunteer for Reclaim Idaho in the capacity of co-Leader for Bonner County during the 2017/2018 Medicaid Expansion campaign where our team collected over 4000 signatures. We easily qualified District 1 and helped collect additional signatures that went to the statewide totals needed to put Medicaid Expansion on the ballot. Our team consisted of over 100 dedicated volunteers.

5.     The Invest in Idaho campaign started in November of 2019 and I accepted the volunteer position of Bonner County Leader.

6.     Our team assembled quickly and collected over 300 signatures during our first one day event.

7.     We began with the goal of collecting 100 signatures per week and easily exceeded that during most weeks.

8.     On February 1, we held an event in Sandpoint to tell people more about the initiative and 65 people attended. We were able to recruit 55 new volunteers who committed to collect signatures at events or from friends and family.

9.     The momentum from that event continued to build and we collected over 800 signatures during the month of February.

2

10.     By early March, my team was beginning to become concerned about how the virus might affect our campaign.

11.     We decided to set a new goal of qualifying no later than March 30 in case the virus disrupted our collection activities.

12.     The majority of our team in Sandpoint is over 60 years old, and many had high risk family members as well, so we were on high alert for potential risks.

13.     Starting in early March, we began purchasing masks, gloves, hand sanitizers and disinfectant wipes.

14.     We started requiring that all volunteers use the extra hygiene precautions and provided pocketed aprons and supplies to everyone collecting at public events.

15.     As the CDC guidelines began to be released, our team decided that the last public event that we would collect signatures at would be March 13 as we no longer believed that we could assure the safety of our volunteers and the public.

16.     Specifically, volunteers Nancy Gerth, Jill Trick, Carol Holmes, Rebecca Holland, and Linda Byars, voiced concerns about safety for themselves and for the public.

17.     We all brainstormed about different possible methods for collecting in a safe manner, but in the end Reclaim Idaho suspended the campaign on March 18 after the leadership of Reclaim Idaho were informed we could not collect signatures electronically or get an extension to the original signature deadline.

18.     In the absence of a solution to collect signatures during the pandemic, we were all very discouraged, frustrated and disappointed.  Reclaim Idaho's volunteers called and emailed the Governor and asked for an extension of the deadline or permission to collect signatures electronically. Governor Little denied our requests which left us feeling demoralized.

3

19.     I believe the state of Idaho has a responsibility to protect our rights during these unprecedented times.

20.     In an interview with National Public Radio that aired on March 31st, I spoke of the importance of the initiative process for addressing the underfunding of Idaho schools: "If our legislators aren't willing to solve it, then, OK, fine, we'll do this, but give us the tools to be able to do this. That's all we're asking."

21.     We immediately stopped all collection activities and turned in our last petitions to the elections office on March 27.

22.     Because we had increased our collection efforts in early March, we were easily able to qualify our district, five weeks before the April 30 deadline.

23.     From my experience with the Medicaid Expansion efforts, the last six weeks were by far the most productive weeks during the collection window.

24.     This campaign was no different except that I feel we had a stronger, more experienced team this time around.

25.     I have no doubt that our team would have continued to work hard right up to the deadline to ensure that the statewide totals were met.  We even had a dedicated team who was ready to travel to other districts that needed assistance.  One volunteer, Rebecca Holland, offered to lead this venture and offered to fund the travel expenses as an in-kind donation to Reclaim Idaho.

26.     My team of volunteers understood that the current level of funding for education in Idaho is a crisis.  They recognized that this effort was critical and were ready to do the work necessary to help this initiative succeed.  They were every bit as dedicated to getting this initiative onto the ballot as were my volunteers for the Medicaid Expansion effort.

4

27.     Based on my personal experience, I believe that had we been able to continue collecting signatures our statewide team would have met the state requirements to put our initiative onto the November 3, 2020 ballot.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.   EXECUTED ON this 6th day of June 2020.

/s/ Linda Larson

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| **RECLAIM IDAHO**, an Idaho political action committee, and **LUKE MAYVILLE**,<br><br>        Plaintiffs,<br>v.<br>**BRADLEY LITTLE**, in his official capacity as Governor of Idaho, and **LAWERENCE DENNEY**, in his official capacity as Idaho Secretary of State,<br><br>        Defendants. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY INJUNCTION** |

### INTRODUCTION

1.      Reclaim Idaho requests a declaratory judgement and preliminary injunction regarding its "Invest in Idaho" initiative, which it seeks to be included on Idaho's November 3, 2020 general election ballot. Plaintiffs ask that the Court modify Idaho's in person signature collection requirement and the deadlines required for the gathering and presentation of collected

1

signatures for this initiative in light of the current public health emergency caused by COVID-19 and Defendant Little's ensuing emergency orders effectively shutting down the state.

## JURISDICTION AND VENUE

2.      Plaintiffs bring this action for violations of their federal constitutional rights under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 and 2202 to redress the deprivation under color of state law rights secured by the First Amendment of the United States Constitution.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

4.      The Defendants reside in the District of Idaho, and Plaintiffs' claims for relief arose in this District. Accordingly, venue in the District of Idaho is proper under 28 U.S.C. § 1391 (b)(1) and (2).

5.      This Court has authority to enter a declaratory judgment and to provide preliminary injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 42 U.S.C. § 1983, and 28 U.S.C. § 2201 and 2202.

## PARTIES

6.      Plaintiff Reclaim Idaho is an Idaho based political action committee, registered with the Idaho Secretary of State. Reclaim Idaho advocates for candidates and initiatives that strengthen public schools, protect public lands, and extend healthcare to working families. Reclaim Idaho is responsible for circulating the "Invest in Idaho" educational funding initiative for signature and otherwise qualifying it for the ballot.

7.      Plaintiff Luke Mayville is the co-founder of Reclaim Idaho, and lives in Boise. He works to advance the goals of Reclaim Idaho and has a stake in Reclaim Idaho's ability to

2

express its political speech through the "Invest in Idaho" initiative, which is protected under the First Amendment.

8.    Defendant Bradley "Brad" Little is the Governor of Idaho and is sued in his official capacity. Governor Little is responsible for issuing Idaho's emergency orders banning gatherings, closing businesses and other public places, requiring that people shelter at home, and making it impossible for the Plaintiffs to collect the signatures required to place their initiative on the November 3, 2020 ballot.

9.    Defendant Lawerence Denney is the Idaho Secretary of State and is sued in his official capacity. Secretary Denney is the Chief Election Officer for the State of Idaho. Idaho Code § 34-201. It is "his responsibility to obtain and maintain uniformity in the application, operation and interpretation of the election laws." *Id.* Furthermore, it is the Secretary of State's duty to "assist and advise each county clerk with regard to the application, operation and interpretation of the election laws as they apply to elections, registration of electors and voting procedures which by laws are under the direction and control of the county clerk." Idaho Code § 34-203.

## RELEVANT FACTS

## THE INITIATIVE PROCESS

10.    Idaho recognizes the right of its citizens to use popular democratic measures to make law at both the local and state-wide levels. Article III section 1 of the Idaho Constitution provides that "[t]he people reserve to themselves the power to propose laws, and enact the same at the polls independent of the legislature." Subject to "such conditions and in such manner as may be provided by acts of the legislature," legal voters may initiate any legislation and cause it to be submitted to the people for a vote at a general election. Idaho Const. Art. III, sec. 1.

3

11.     In Idaho, the initiative process is governed by Title 34, Chapter 18 of the Idaho Code.

12.     The number of signatures needed to place a measure on the ballot in Idaho is equal to 6 percent of the number of registered voters as of the state's last general election. Moreover, Idaho has a distribution requirement requiring signatures to equal at least 6% of registered voters in 18 of the state's 35 legislative districts. Currently 55,057 signatures are required to meet the statewide 6% threshold for the 2020 general election. 2013 Idaho Senate Bill No. 1108.

13.     Under Idaho law, petitioners have 18 months to collect signatures after the ballot title has been granted. Signatures may not be collected after April 30 of the year in which the measure would appear on the ballot. Signatures must be filed with the county clerk by the close of business on May 1 and cannot be collected after April 30. Idaho Code § 34-1802.

14.     Each signature is verified by the county clerks and transmitted to the secretary of state. Under Idaho law, this must occur within 60 calendar days of the deadline for the submission of the signatures (May 1st). Petitions with the requisite number of signatures must be filed with the secretary of state not less than four months before the general election. *Id.*

15.     Idaho law mandates that signatures be collected in the presence of the circulator and that signers "personally" place their name on the petition. Idaho Code § 34-1807. This requirement persists despite Idaho's adoption of the Uniform Electronic Transactions Act, which provides, in relevant part, that:

(A) A record or signature may not be denied legal effect or enforceability solely because it is in electronic form.

4

(B) A contract may not be denied legal effect or enforceability solely because an

electronic record was used in its formation.

(C) If a law requires a record to be in writing, an electronic record satisfies the law.

(D) If a law requires a signature, an electronic signature satisfies the law.

Idaho Code. § 28-50-107.

16.     The Secretary of State is the Chief Election Officer and "it is his responsibility to

obtain and maintain uniformity in the application, operation and interpretation of the election

laws." Idaho Code § 34-201.

17.     In carrying out his responsibility as Chief Election Officer, the Secretary of State

must prepare and distribute to the county clerks directives and instructions relating to election

laws. Idaho Code § 34-202. Furthermore, it is the Secretary of State's duty to "assist and advise

each county clerk with regard to the application, operation and interpretation of the election laws

as they apply to elections, registration of electors and voting procedures which by laws are under

the direction and control of the county clerk." Idaho Code § 34-203.

18.     Although the county clerks exercise general supervision of the administration of

the election laws, they do so "[s]ubject to and in accordance with the directives and instructions

prepared and distributed or given under the authority of the Secretary of State." Idaho Code § 34-

206.

## RECLAIM IDAHO AND THE "INVEST IN IDAHO" INITIATIVE

19.     Reclaim Idaho is a grassroots organization designed to protect and improve the

quality of life of working Idahoans. Reclaim Idaho organizes to pass citizens' initiatives and to

elect candidates who believe in strengthening public schools, protecting public lands, and

extending healthcare to working families

5

20.    Reclaim Idaho was formed in the summer of 2017 by Luke Mayville and a few

other Idaho citizens with the purpose of putting Medicaid expansion on the Idaho ballot. It grew

into a grassroots movement with over 2,000 volunteers in over 25 counties.

21.    In 2018, Reclaim Idaho succeeded in getting its Medicaid expansion initiative on

the ballot, proving that it has the support and organizational structure necessary to advance a

viable initiative. Reclaim Idaho volunteers easily surpassed the legal requirements for geographic

distribution by collecting signatures from more than 6% of registered voters in well over 18 of

Idaho's 35 legislative districts. They gathered the vast majority of the over 56,000 signatures

needed from registered voters by the April 30, 2018 deadline. The citizens of Idaho voted

overwhelmingly to pass the initiative into law.

22.    In the fall of 2019, Reclaim Idaho started a new initiative drive. It filed an "Invest

in Idaho" K-12 educational funding initiative with the Secretary of State which was approved

and released in October 2019.

23.    If passed, this initiative would invest $170 million annually in education in Idaho.

Reclaim Idaho was operating on the organizational model that it had successfully used during the

Medicaid expansion drive.

24.    In September of 2019, Reclaim Idaho began its first volunteer organizing tour for

the "Invest in Idaho" initiative. Between then and early November, it had held 18 separate

meetings in communities large and small across the state. These events were often covered by

local media, laying the groundwork for the signature drive.

25.    From early November through the end of the year, Reclaim Idaho continued to

gather signatures, and the momentum continued to build. Based on their successful experience

with the previous initiative, Reclaim Idaho's staff believed that they had more than enough time to gather the signatures.

26.     By February 15, 2020 Reclaim Idaho had 15,000 signatures. By March 12, it had doubled that number to approximately 30,000. This was well ahead of the pace set by the successful Medicaid expansion campaign.

27.     Reclaim Idaho has already submitted many of those signatures to the county clerks for verification and stands ready to immediately provide the Secretary of State with the 10,593 verified signatures it has collected thus far.

### THE GLOBAL COVID-19 PANDEMIC AND THE SEVERE BURDEN PLACED ON RECLAIM IDAHO

28.     On January 30, 2020, the World Health Organization declared that the novel coronavirus (COVID-19) constitutes a Public Health Emergency of International Concern.

29.     On March 13, President Trump declared that the country was in a state of emergency because of the rapid spread of COVID-19.

30.     On March 13, officials from the Idaho Department of Health and Welfare announced the first confirmed case of COVID-19 within the state of Idaho. On the same day, Defendant Little issued a "proactive emergency declaration."

31.     On that same day, Reclaim Idaho emailed all supporters with guidelines for continuing to gather signatures. These included, in part, avoiding shaking hands, using sanitizer, wiping down clipboards before and after a signature gathering shift, allowing signers to keep disposable pens.

32.     COVID-19 is especially dangerous to those above the age of 65. Reclaim Idaho's most active volunteers are retirees in that age group.

33.     Leaders of Reclaim Idaho began receiving emails from volunteers expressing concern about continuing. For example, on March 13 retired Court of Appeals Judge Karen Lansing, an especially dedicated and active volunteer, indicated that "[a]s important as the initiative is, I reluctantly conclude that it is outweighed by my responsibility to avoid possibly putting others at risk."

34.     Public spaces for signature gathering quickly closed. The Meridian Public Library shut down on March 14. The Boise Public Library followed suit on March 16. The next day, the DMV closed. Libraries and DMVs had proven to be the most promising public locations for volunteers to collect signatures.

35.     Reclaim Idaho explored all other avenues between March 13 and March 18 that would allow it to continue collecting signatures, but it struggled over those five days to adapt to rapidly changing circumstances. For example, it considered "drive through" signature collection stations, but that conflicted with the six-foot distance recommendation.

36.     On March 16, Reclaim Idaho Executive Director Rebecca Schroeder emailed Andrew Mitzel, a member of Governor Little's staff, to inquire whether Reclaim Idaho could gather signatures electronically. Mitzel referred her to the Secretary of State's Office, which responded that "there is no statute allowing electronic signatures for petitions in Idaho Statutes 34, Title 18." Schroeder then turned back to Mitzel, who informed her that the Governor would not be taking any executive action to allow for electronic signatures. Plaintiff Luke Mayville on behalf of Reclaim Idaho also drafted a bill to temporary modify the signature collection requirements in light of the pandemic, and approached leadership in the Legislature, which expressed no interest in it.

8

ER - 209

37.     After exhausting all possibilities to move forward, Reclaim Idaho was forced to suspend its campaign on March 18.

38.     On March 25, Defendant Little signed an "extreme emergency" declaration and his Department of Health and Welfare issued a statewide stay-at-home order. The order required all non-essential workers throughout the state to remain in their homes, closed all non-essential businesses, and prohibited all non-essential gatherings. A violation of this order was a misdemeanor.

39.      The order included no exceptions for initiative gathering or other First Amendment activities.

40.     Governor Little later extended the order through April 30.  Coincidentally, that was the deadline for Reclaim Idaho to submit the signatures for the "Invest in Idaho" initiative.

41.     Because of the presence of the pandemic in Idaho, the restrictions on businesses, the prohibitions on gatherings, the distancing requirements, and the mandatory stay at home order, it was impossible for Reclaim Idaho to solicit the signatures needed to support the "Invest in Idaho" petition required to place the initiative on Idaho's November 2020 election ballot.

42.     As such, Idaho law, together with the COVID-19 outbreak and Defendants' orders, directly caused an injury-in-fact to the Plaintiffs and their First Amendment rights. The First Amendment is made applicable to the states through the Fourteenth Amendment

43.     The Plaintiffs' injuries are traceable to the Idaho laws requiring submission of petition signatures by May 1 and in person signature collection during the COVID-19 pandemic, and Defendant Little's orders described in this action.

**CAUSE OF ACTION- FIRST AMENDMENT VIOLATION**

44.     All previous paragraphs and allegations are incorporated herein.

9

45. Under present circumstances, Idaho's ballot-access requirements for the "Invest in Idaho" initiative for Idaho's November 3, 2020 election violate rights guaranteed to these Plaintiffs by the First and Fourteenth Amendments to the United States Constitution, as enforced through 42 U.S.C. § 1983.

46. Defendant Little's emergency stay at home orders have not only placed an undue burden on Reclaim Idaho to comply with existing Idaho law, they have made it impossible to collect signatures within the time period prescribed by statute and thereby violated rights guaranteed to these Plaintiffs by the Due Process Clause of the Fourteenth Amendments to the United States Constitution, as enforced through 42 U.S.C. § 1983.

47. Defendant Denney's refusal to exercise his authority as the Chief Election Officer by granting exceptions to the onerous requirements for initiative ballot qualification have not only placed an undue burden on Reclaim Idaho to comply with existing Idaho law, they have made it impossible to collect signatures within the time period prescribed by statute and thereby violated rights guaranteed to these Plaintiffs by the Due Process Clause of the Fourteenth Amendments to the United States Constitution, as enforced through 42 U.S.C. § 1983.

48. A real and actual controversy exists between the parties.

49. Plaintiffs have no adequate remedy at law other than this action for declaratory and equitable relief.

50. Defendants were acting under color of law.

51. Plaintiffs are suffering irreparable harm as a result of the violations complained of herein, and that harm will continue unless declared unlawful and enjoined by this Court.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request that this Court:

A.      Declare that the application of I.C. § 34-1802 on the facts and circumstances presented here violates the U.S. Constitution by unduly burdening the initiative process;

B.       Declare that the application of I.C. § 34-1807 on the facts and circumstances here violates the U.S. Constitution by unduly burdening signature gathering efforts in support of the "Invest in Idaho" initiative;

C.      Issue a preliminary injunction enjoining the enforcement of I.C. § 34-1802 and I.C. § 34-1807 for as long as necessary to remove the undue burden on the Plaintiffs;

D.      Issue a preliminary injunction extending the deadline to submit petition signatures to the county clerks for verification to a date that does not unduly burden the Plaintiffs;

E.      Issue a preliminary injunction extending the deadline to submit petition signatures to the Secretary of State to a date that does not unduly burden the Plaintiffs;

F.      Issue a preliminary injunction to permit the electronic circulation of the initiative and to the State to accept electronic signatures;

G.      Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

H.      Grant such other and further relief as the Court deems just and proper.

I.      The declaratory and injunctive relief requested in this action is sought against each Defendant; against each Defendant's officers, employees, and agents; and against all persons acting in active concert or participation with any Defendant, or under any Defendant's supervision, direction, or control.

11

Dated this 6th day of June 2020.

/s/ Deborah A. Ferguson
/s/ Craig H. Durham
Ferguson Durham, PLLC

Attorneys for Plaintiffs

12

# U.S. District Court
## District of Idaho (LIVE Database)Version 6.3 (Boise - Southern)
## CIVIL DOCKET FOR CASE #: 1:20-cv-00268-BLW

Reclaim Idaho et al v. Little et al
Assigned to: Judge B. Lynn Winmill
Case in other court:  USCA, 20-35584
Cause: 42:1983 Civil Rights Act

Date Filed: 06/06/2020
Jury Demand: None
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: Federal Question

**Plaintiff**

**Reclaim Idaho**
*an Idaho political action committee*

represented by **Craig Durham**
Ferguson Durham, PLLC
223 N. 6th Street, Suite 325
Boise, ID 83702
208-724-2617
Fax: 208-906-8663
Email: chd@fergusondurham.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Deborah A Ferguson**
Ferguson Durham, PLLC
223 N. 6th Street
Suite 325
Boise, ID 83702
208-484-2253
Fax: 208-906-8663
Email: daf@fergusondurham.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Luke Mayville**

represented by **Craig Durham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Deborah A Ferguson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Bradley Little**
*in his official capacity as Governor of Idaho*

represented by   **Megan Ann Larrondo**
Office of the Attorney General
954 W. Jefferson- Second Floor
Boise, ID 83720
208-332-3548
Email: megan.larrondo@ag.idaho.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Arthur Berry**
Office of the Attorney General
Civil Litigation
954 W. Jefferson Street
PO BOX 83720
Boise, ID 83720-0010
(208) 334-2400
Fax: 208-854-8073
Email: robert.berry@ag.idaho.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lawerence Denney**
*in his official capacity as Idaho Secretary of State*

represented by   **Megan Ann Larrondo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Arthur Berry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

District of Idaho-Live CM/ECF

| Date Filed | # | Docket Text |
|---|---|---|
| 06/06/2020 | 1 | COMPLAINT *for Declaratory Judgment and Preliminary Injunction* against All Defendants ( Filing fee $ 400 receipt number 0976-2057610.), filed by All Plaintiffs. (Attachments: # 1 Cover Sheet, # 2 Summons Governor LIttle, # 3 Summons Secretary of State Denney)(Durham, Craig) |
| 06/06/2020 | 2 | Expedited MOTION for Preliminary Injunction Craig Durham appearing for Plaintiffs Luke Mayville, Reclaim Idaho. Responses due by 6/29/2020 (Attachments: # 1 Memorandum in Support, # 2 Exhibit Declaration of Luke Mayville, # 3 Exhibit Declaration of Rebecca Schroeder, # 4 Exhibit Declaration of Deborah Silver, # 5 Exhibit Declaration of Ashley Prince, # 6 Exhibit Declaration Linda Larson, # 7 Exhibit Declaration of Karen Lansing)(Durham, Craig) |
| 06/08/2020 | 3 | Summons Issued as to All Defendants. (Print attached Summons for service.) (Attachments: # 1 Summons)(jp) |
| 06/08/2020 | 4 | DOCKET ENTRY ORDER: The Court hereby sets the following briefing schedule on Plaintiffs' Expedited Motion for Preliminary Injunction 2 : Defendants must file a response **on or before June 18, 2020** and any reply must be filed **on or before June 22, 2020**. A hearing on the motion will be set via forthcoming notice of hearing.<br>Signed by Judge B. Lynn Winmill.<br>(ah) |
| 06/08/2020 | | Set/Reset Deadlines as to 2 Expedited MOTION for Preliminary Injunction . Per Order dkt 4, Responses due by 6/18/2020 Replies due by 6/22/2020. (jp) (Entered: 06/09/2020) |
| 06/10/2020 | 5 | NOTICE of Appearance by Megan Ann Larrondo on behalf of Lawerence Denney, Bradley Little (Larrondo, Megan) |
| 06/10/2020 | 6 | NOTICE of Availability of Magistrate Judge and Requirement for Consent sent to counsel for Lawerence Denney, Bradley Little, Luke Mayville, Reclaim Idaho re 1 Complaint, 5 Notice of Appearance. Consent/Objection to Magistrate due by 8/10/2020. (jp) |
| 06/10/2020 | 7 | DOCKET ENTRY NOTICE OF HEARING regarding 2 Expedited MOTION for Preliminary Injunction: A Video Motion Hearing is set for 6/23/2020 at 2:00 PM (Mountain Time) before Judge B. Lynn Winmill. The Parties will be provided a link to connect to video separately. The public may listen to the hearing by phone using the following information: 1-669-254-5252; Meeting ID: 161 049 1843; Password: 595473. Members of the public are reminded to mute their phones and that recording the proceedings is prohibited.(jlb) |
| 06/18/2020 | 8 | MEMORANDUM in Opposition re 2 Expedited MOTION for Preliminary Injunction filed by Lawerence Denney, Bradley Little. Replies due by 7/2/2020. (Attachments: # 1 Declaration of Phil McGrane, # 2 Declaration of Jason Hancock, # 3 Exhibit A to Hancock Declaration, # 4 Declaration of Sheryl Millard, # 5 Exhibit A to Millard Declaration, # 6 Declaration of Andrew Mitzel, # 7 Exhibit A to Mitzel Declaration, # 8 Declaration of Counsel, # 9 Exhibit A to Counsel Declaration)(Berry, Robert) |
| 06/21/2020 | 9 | REPLY to Response to Motion re 2 Expedited MOTION for Preliminary Injunction filed by Luke Mayville, Reclaim Idaho.Motion Ripe Deadline set for 6/22/2020. (Attachments: # 1 Exhibit A, # 2 Supplemental Declaration of Luke Mayville, # 3 Declaration of Counsel)(Durham, Craig) |

| 06/22/2020 | 10 | AFFIDAVIT in Support by Luke Mayville re 2 Expedited MOTION for Preliminary Injunction *2nd Supplemental Declaration of Luke Mayville* filed by Reclaim Idaho.(Ferguson, Deborah) |
| 06/23/2020 | 11 | SUPPLEMENT by Defendants Lawerence Denney, Bradley Little re 8 Memorandum in Opposition to Motion,, *Supplemental Declaration of Counsel*. (Attachments: # 1 Exhibit A to Declaration of Counsel, # 2 Supplemental Declaration of Jason Hancock, # 3 Supplemental Declaration of Phil McGrane)(Berry, Robert) |
| 06/23/2020 | 12 | ERRATA by Defendants Lawerence Denney, Bradley Little re 11 Supplement, . (Attachments: # 1 Corrected Supplemental Declaration of Phil McGrane)(Berry, Robert) |
| 06/23/2020 | 13 | Minute Entry for proceedings held before Judge B. Lynn Winmill: A Video Motion Hearing was held on 6/23/2020 re 2 Plaintiff's Expedited Motion for Preliminary Injunction. Motion GRANTED. An order is forthcoming. (Court Reporter Tammy Hohenleitner.) (jlb) |
| 06/26/2020 | 14 | MEMORANDUM DECISION AND ORDER- It is ORDERED that: 1. Plaintiffs' Expedited Motion for Preliminary Injunction (Dkt. 2 ) is GRANTED. 2. On or before June 26, 2020 at 5:00 p.m. M.S.T., Defendants must file with the Court a notice detailing the reasonable accommodation they have chosen to make to preserve Plaintiffs' core political speech rights as detailed in this Memorandum Decision and Order. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by jp) |
| 06/26/2020 | 15 | Notice of Filing of Official Transcript of Proceedings held on 6/23/20 before Judge B. Lynn Winmill. Court Reporter/Transcriber Tamara I. Hohenleitner, Email tammy_hohenleitner@id.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed until release of transcript restriction re 13 Motion Hearing,. Redaction Request due 7/17/2020. Redacted Transcript Deadline set for 7/27/2020. Release of Transcript Restriction set for 9/24/2020. (th) |
| 06/26/2020 | 16 | MOTION to Stay re 14 Memorandum Decision,,, Order,,, Terminate Motions,, Robert Arthur Berry appearing for Defendants Lawerence Denney, Bradley Little. Responses due by 7/17/2020 (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Berry, Robert) |
| 06/29/2020 | 17 | ORDER DENYING MOTION TO STAY - Defendants Notice And Motion To Stay Pursuant To F.R.C.P. 62(D) and F.R.A.P. 8 (Dkt. 16 ) is DENIED. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by jd) |
| 06/29/2020 | 18 | Expedited MOTION to Enforce Court's Order , Craig Durham appearing for Plaintiffs Luke Mayville, Reclaim Idaho. Responses due by 7/20/2020 (Durham, Craig) |
| 06/30/2020 | 19 | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO ENFORCE THE COURT'S ORDER - Plaintiffs Expedited Motion to Enforce the Courts Order (Dkt. 18 ) is GRANTED IN PART and DENIED IN PART as explained in this decision. The 48-day period provided for Reclaim Idaho to resume its petition gathering activities begins July 9, 2020. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by jd) |
| 06/30/2020 | 20 | NOTICE OF APPEAL as to 14 Memorandum Decision,,, Order,,, Terminate Motions,, 19 Order on Motion for Miscellaneous |

| | | Relief,, by Lawrence Denney, Bradley Little. Filing fee $ 505, receipt number 0976-2069893. (Notice sent to Court Reporter & 9th Cir) (Attachments: # 1 Representation Statement)(Berry, Robert) |
|---|---|---|
| 07/01/2020 | 21 | USCA Case Number 20-35584 for 20 Notice of Appeal, filed by Bradley Little, Lawerence Denney. (kt) |
| 07/02/2020 | 22 | ORDER of USCA (20-35584) as to 20 Notice of Appeal, filed by Bradley Little, Lawrence Denney (Attachments: # 1 Mediation Questionnaire)(kt) (Main Document 22 replaced on 7/7/2020) (jp). (Attachment 1 replaced on 7/7/2020) (jp). (Entered: 07/06/2020) |
| 07/09/2020 | 23 | NOTICE by Lawerence Denney, Bradley Little re 19 Order on Motion for Miscellaneous Relief,, (Larrondo, Megan) |
| 07/09/2020 | 24 | ORDER of USCA as to 20 Notice of Appeal, filed by Bradley Little, Lawrence Denney. The court sua sponte expedites this appeal. The opening brief is due July 17, 2020. The answering brief is due July 29, 2020. The optional reply brief is due August 3, 2020. (Attachments: # 1 Dissent)(jp) (Entered: 07/10/2020) |
| 07/10/2020 | 25 | STATUS REPORT *on Compliance with Court's June 30th Order* by Reclaim Idaho. (Attachments: # 1 Exhibit A to Status Report, # 2 Affidavit 4th Mayville Declaration, # 3 Exhibit 1 to 4th Mayville Declaration, # 4 Exhibit 2 to 4th Mayville Declaration)(Ferguson, Deborah) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/17/2020 13:56:20 | | | |
| **PACER Login:** | gc0491cl:4413743:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-00268-BLW |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |