No. 20-35584

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

RECLAIM IDAHO, an Idaho Political Action Committee, and
LUKE MAYVILLE,

*Plaintiffs-Appellees*

v.

BRADLEY LITTLE, in his official capacity as Governor of Idaho,
and LAWERENCE DENNEY,
in his official capacity as Idaho Secretary of State,

*Defendants-Appellants.*

_____

Appeal from the United States District Court for the District of Idaho
Honorable B. Lynn Winmill
District Court Case No. 1:20-cv-00268-BLW

_____

**ANSWERING BRIEF OF APPELLEES RECLAIM IDAHO
AND LUKE MAYVILLE**

_____

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho, 83702
T: (208) 484-2253
daf@fergusondurham.com
chd@fergusondurham.com
*Attorneys for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Appellees are an individual and a non-corporate Idaho political action committee of volunteers. No corporate disclosure is required.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................ i

TABLE OF AUTHORITIES ..................................................... iv

INTRODUCTION ................................................................ 1

JURISDICTIONAL STATEMENT ........................................... 3

STATEMENT OF THE CASE................................................... 4

    A.    Reclaim Idaho and its Invest in Idaho citizens' initiative................... 4

    B.    Reclaim Idaho seeks an official accommodation to continue exercising its First Amendment rights ................................. 6

    C.    Reclaim Idaho goes to court, and the court gives Idaho officials options – which they flatly refuse – before opening a window for electronic signature gathering.......................................... 9

ISSUE PRESENTED .............................................................. 16

SUMMARY OF THE ARGUMENT ....................................... 16

STANDARD OF REVIEW ..................................................... 19

LEGAL STANDARDS GOVERNING PRELIMINARY INJUNCTIONS.......... 20

    A.    The Supreme Court's *Winter* standard ............................... 20

    B.    This Court's standard for granting "prohibitory" versus "mandatory" injunctive relief........................................... 21

ARGUMENT ........................................................................ 24

    The district court did not abuse its discretion in granting a preliminary injunction and ordering limited, targeted, and temporary relief to remedy an ongoing violation of Reclaim Idaho's First Amendment rights .................................................................. 24

I.    The district court did not err in finding that Reclaim Idaho is likely to succeed on the merits of its First Amendment claim .................................... 24

    A.    Reclaim Idaho was more than reasonably diligent, and state action caused its injury....................................... 28

    1.  Diligence ............................................................... 29

    2.  State Action ........................................................... 33

    3.  As applied, the law fails strict scrutiny ..................... 36

II.  The district court correctly found that Reclaim Idaho will be irreparably harmed in the absence of injunctive relief ................................. 39

III.  The balance of the equities tipped in Reclaim Idaho's favor, and the district court acted well within its discretion in fashioning temporary relief to remedy the harm ............................................................................. 40

  A.  The *Purcell* principle is inapplicable because nothing was changed on the "eve of the election," and there will be no voter confusion or undermining of voter confidence on November 3 ....... 43

  B.  The process and protocol to collect the remaining signatures is safe, reliable, and verifiable ................................................. 46

  C.  The only temporary change is to permit electronic signature gathering for the remaining signatures needed. State and county officials retain all other statutory duties ............................................. 51

  D.  Voting on election day in November is unchanged ........................... 53

  E.  The district court's relief is remedial and proper .............................. 54

IV.  The public interest supports the injunctive relief ......................................... 55

CONCLUSION ........................................................................................................ 56

STATEMENT OF RELATED CASES ................................................................... 57

CERTIFICATE OF COMPLIANCE ...................................................................... 58

CERTIFICATE OF SERVICE ............................................................................... 59

iii

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ..................................................................... 24, 27

*Angle v. Miller*,
  673 F.3d 1122 (9th Cir. 2012).................................................... *passim*

*Ariz. Dream Act Coalition v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014).................................................... 21, 23

*Ariz. Green Party v. Reagan*,
  838 F.3d 983 (9th Cir. 2016)....................................................... 24, 25

*Ariz. Libertarian Party v. Reagan*,
  798 F.3d 723 (9th Cir. 2015)..............................................................25

*Brown v. Board of Education*,
  349 U.S. 294 (1955) ...........................................................................55

*Buckley v. Am. Constitutional L. Found., Inc.*,
  525 U.S. 182 (1999) ................................................. 10, 25, 26, 27, 28

*Burdick v. Takushi*,
  504 U.S. 428 (1992) .................................................................... 24, 27

*Coca-Cola Co. v. Overland, Inc.*,
  692 F.2d 1250 (9th Cir. 1982)............................................................41

*Cuviello v. City of Vallejo*,
  944 F.3d 816 (9th Cir. 2019)..............................................................39

*Democratic Exec. Comm. of Fla. v. Lee*,
  915 F.3d 1312 (11th Cir. 2019)............................................. 13, 14, 49

*Elrod v. Burns*,
  427 U.S. 347 (1976) ...........................................................................39

*Esshaki v. Whitmer*,
  2020 WL 2185553 (6th Cir. May 5, 2020)..........................................34

*Fla. Democratic Party v. Detzner*,
  4:16CV607-MW/CAS, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016)................50

iv

*Gregorio T. v. Wilson*,
   59 F.3d 1002 (9th Cir.1995) ...................................................................20

*Harris v. Board of Supervisors, L.A. County*,
   366 F.3d 754 (9th Cir. 2004) .................................................................20

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) ..................................................... 20, 22, 23

*In Re Mayfield*,
   2016 WL 3958982 (Bankr. E.D. Cal. Jul 15, 2016) .............................50

*In re Mortg. Elec. Registration Sys., Inc.*,
   754 F.3d 772 (9th Cir. 2014) .................................................................21

*Jacobson v. Massachusetts*,
   197 U.S. 11 (1905) .................................................................................36

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009) .................................................................21

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ..................................................... 39, 55, 56

*Merrill v. Alabama*,
   2020 WL 3604049 (July 2, 2020) ..........................................................44

*Meyer v. Grant*,
   486 U.S. 414 (1988) ..................................................................... *passim*

*Miller v. Thurston*,
   2020 WL 4218245 (8th Cir. July 23, 2020) ..................................... 34, 38

*Milliken v. Bradley*,
   433 U.S. 267 (1977) ...............................................................................55

*Morgan v. White*,
   2020 WL 2526484 (N. Dist. Ill. May 18, 2020) ...................................33

*Morgan v. White*,
   2020 WL 3818059 (7th Cir. 2020) ........................................................33

*Park Vill. Aprt. v. Mortimer Howard Trust*,
   636 F.3d 1150 (9th Cir. 2011) ...............................................................22

*People First of Alabama v. Merrill*,
2020 WL 3207824 (N.D. Ala. June 15, 2020) .................................................. 45

*Pimentel v. Dreyfus*,
670 F.3d 1096 (9th Cir. 2012) ................................................................. 20

*Puente Arizona v. Arpaio*,
821 F.3d 1098 (9th Cir. 2016) ...................................................... 19, 20

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ........................................................ 18, 43, 44

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
140 S. Ct. 1205 (2020) .......................................................... 44

*Rubin v. City of Santa Monica*,
308 F.3d 1008 (9th Cir. 2002) .............................................. 24

*Sampson v. Murray*,
415 U.S. 61 (1974) .......................................................... 43

*Sierra Hikers Ass'n v. Blackwell*,
390 F.3d 630 (9th Cir. 2004) ............................................. 41

*Sinner v. Jaeger*,
2020 WL 3244143 (D.N.D 2020) ......................................... 33

*Smith v. Salt River Proj. Agr. Imp. P. Dist*,
109 F.3d 586 (9th Cir. 1997) .............................................. 29

*Tanner Motor Livery, Ltd. v. Avis, Inc.*,
316 F.2d 804 (9th Cir. 1963) .............................................. 41

*Texas Democratic Party v. Abbott*,
140 S. Ct. 2015 (2020) ....................................................... 45

*Texas Democratic Party v. Abbott,*.
2020 WL 2541971 (W.D. Tex. May 19, 2020) .................................. 45

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .............................................. 22

*University of Hawaii Prof. Asm. v. Cayetano*,
183 F.3d 1096 (9th Cir. 1999) ............................................. 40

vi

*Williams On Behalf of J.E. v. Reeves*,
   954 F.3d 729 (5th Cir. 2020) ................................................................54

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................... 20, 21, 22

## Constitution and Statutes

U.S. Const. amend. I ........................................................... *passim*

15 U.S.C. § 7001 *et seq*.................................................................48

28 U.S.C. § 1292(a)(1).................................................................3

28 U.S.C. § 1331 ........................................................................3

42 U.S.C. § 1983 ........................................................................3

Idaho Code § 28-50-101 *et seq*. ..............................................47

Idaho Code § 28-50-107(A)......................................................47

Idaho Code § 28-50-107(D)......................................................47

## Other Authorities

11A Fed. Prac. & Proc. Civ ...................................................... 22

Business Insider, June 3, 2020, at https://tinyurl.com/yx4dg5j4........................... 38

David Daley, *Unrigged: How Americans are Battling Back to Save
   Democracy*, (2020) ................................................................4

"How Coronavirus Cases Have Risen Since States Reopened," NY Times, at
   https://www.nytimes.com/interactive/2020/07/09/us/coronavirus-cases-
   reopening-trends.html ..........................................................6

"Idaho state primary has highest recorded turnout in decades," A.P., June 22,
   2020, at https://apnews.com/7669cbfffc9e896b686b8326bd35cbca ............ 45, 46

"No. 51, Again: IEA Decries Per-Pupil Spending", Idaho Education News,
   July 7, 2020, at https://tinyurl.com/yxk75lm5 ................................5, 39

**INTRODUCTION**

This Court should affirm the district court's reasonable and temporary injunctive relief that gives Reclaim Idaho a chance – only a chance – to qualify its citizens' initiative for the fall ballot. The State will not be irreparably harmed. The lower court did not abuse its discretion.

Over 100 years ago, the people of Idaho enshrined in their constitution the basic right of Idahoans to place citizens' initiatives on the ballot. The initiative process is direct democracy in action. Initiatives often represent the most consequential political issues of the day. The process of circulating petitions and attempting to get them on the ballot involves core political speech. The Supreme Court has long held that restrictions on this process that severely burden such speech are subject to strict scrutiny under the First Amendment.

Reclaim Idaho is a pure manifestation of these fundamental democratic principles. It is a true grassroots and local organization with hundreds of volunteers who passionately seek change in Idaho. In 2018, it successfully organized a campaign to get Medicaid expansion on the ballot, which Idahoans approved overwhelmingly. This election cycle, it organized a campaign – "Invest in Idaho" – that would put before the voters the question of whether to adequately fund Idaho schools that rank last in the nation in per student funding.

1

Reclaim Idaho was well on its way to qualifying the initiative for the ballot when the pandemic hit. Reclaim Idaho immediately went to the Governor and the Secretary of State, seeking an accommodation to allow it to continue exercising its First Amendment rights. State officials refused any accommodation, and the Governor's subsequent stay-at-home orders made non-essential, in-person contact a misdemeanor. Under these heavy restrictions, it became impossible for Reclaim Idaho to complete its campaign.

The district court recognized all this and applied the correct precedent. The district court reasonably found, on a well-developed factual record, that Reclaim Idaho had been more than diligent in pursuing its goal. The court concluded that the state's application of its in-person signature gathering requirements and its deadline for completion, in these circumstances, severely burdened Reclaim Idaho's First Amendment rights. The State was given an opportunity to help fix the problem. The State again refused. The district court's resulting order that allows for a window of time to collect signatures electronically is necessary, tailored, temporary, and accounts for the State's interests. The court's orders changes nothing about who will vote, when they will vote, or how they will vote in November. Success only means that people of Idaho will get the final say on "Invest in Idaho" at the polls. This Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the complaint filed by Appellees Reclaim Idaho and Luke Mayville ("Reclaim Idaho") under 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

It entered its orders granting preliminary injunctive relief on June 26 and June 30, 2020. ER 1, 35. The district court's relief is prospective as it addresses an ongoing injury to Reclaim Idaho. The Governor and the Secretary of State ("the State") filed a timely notice of appeal on June 30. ER 36.

This Court has jurisdiction over an appeal from a district court's order granting preliminary injunctive relief under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE CASE

The State has omitted material facts and has downplayed others in its dire narrative that even the opportunity for Reclaim Idaho to qualify its initiative for the ballot in November poses an existential threat to Idaho's elections. Reclaim Idaho wishes to provide the Court with a more complete story here.

### A.    Reclaim Idaho and its Invest in Idaho citizens' initiative.

Citizen initiative drives have deep roots in Idaho. Since 1912 the Idaho Constitution has granted voters authority to put initiatives on the ballot. Idaho Const. Art. III, sec. 1. Over the years, the Idaho legislature has enacted conditions on qualifying initiatives, which are described in the Appellant's Opening Brief ("AOB"), but the basic right endures. AOB at 4-6.

Reclaim Idaho is a local grassroots movement driven by passionate and non-partisan volunteers who have broad public support. *See*, *generally*, David Daley, *Unrigged: How Americans are Battling Back to Save Democracy*, pp. 23-34 (2020). It has no paid signature collectors. Its most active volunteers are retired senior citizens. ER 185.

This November, it is seeking to put "Invest in Idaho" before the voters. The initiative is an option to increase funding in kindergarten through 12th grade education in a state that ranks dead last in school funding per pupil nationally. *See*,

"No. 51, Again: IEA Decries Per-Pupil Spending", Idaho Education News, July 7, 2020, at https://tinyurl.com/yxk75lm5.

The district court found that Reclaim Idaho had diligently built and doggedly pursued its campaign over several months. It found that Reclaim Idaho had modeled its petition circulation and signature-gathering strategy on its previously successful initiative in 2018, "Medicaid for Idaho." ER 13-15, ER 181-183. The model included "early stage" volunteer recruitment events, where the group worked to build teams in Idaho's legislative districts. ER 13-14.The model also included a plan to gradually scale up signature collection efforts in the final months before the May 1, 2020 submission deadline. *Id*. Invest in Idaho's size, momentum, and enthusiasm grew exponentially as the April 30 deadline loomed. ER 183-184. The gradual scaling of Reclaim Idaho's efforts reached "critical mass" in early March 2020—the surge in volunteers, favorable springtime weather, and daylight hours was anticipated to boost its organizing efforts in the final stages of its drive. SER 11-13.

By mid-March of 2020, Reclaim Idaho was ahead of the pace of its successful 2018 campaign, with over 30,000 signatures collected of the 55,057 it needed. ER 183-184. Experience showed that it would have reached the statutory threshold had the global public health crisis not occurred. ER 27.

5

When the COVID-19 pandemic hit, momentum slowed considerably. ER 184. Reclaim Idaho's leadership began to communicate with its local volunteer leaders regarding a set of guidelines it developed for safer signature collection. *Id.* Around that time, the Centers for Disease Control (CDC) issued guidance to curb the spread of COVID-19. ER 185. Maintaining a distance between oneself and others of at least six feet was – and is – one of the CDC's main recommendations to prevent the spread of the virus. *See Id.*[1]

## B. Reclaim Idaho seeks an official accommodation to continue exercising its First Amendment rights.

The Court is undoubtedly familiar with the dire situation presented by the pandemic. On March 13, five days before Reclaim Idaho temporarily suspended (not terminated) its signature gathering campaign, Governor Little declared a state of emergency. ER 184. Two days before Reclaim Idaho finally determined that it had no option but to suspend its canvassing, it approached the Governor and the Secretary of State of Idaho seeking an accommodation. What the State continues to

---

[1]     Since the district court's preliminary injunction, COVID-19 cases have continued to soar in Idaho. As of July 9, Idaho ranked third in the United States in percentage increase of COVID-19 cases since reopening - a 1491% increase. *See*, "How Coronavirus Cases Have Risen Since States Reopened," NY Times, at https://www.nytimes.com/interactive/2020/07/09/us/coronavirus-cases-reopening-trends.html.

dismiss as token contacts "between staffers," in which Reclaim Idaho "requested a meeting between Reclaim's founder and the Governor," AOB at 11-12, was quite a bit more than that. Reclaim Idaho immediately sought to work with State officials to come up with a state-sanctioned solution to continue its petition drive. ER 28.

Reclaim Idaho's Executive Director, Rebecca Schroeder emailed Andrew Mitzel, a Senior Advisor to Governor Little, on the morning of March 16, 2020. ER 16-17, 187, SER 5-6. The back and forth that day with state officials showed the group's concern about the potential negative health effects involved with in-person signature gathering on its volunteers, many of whom are in the senior demographic most susceptible to serious consequences from COVID-19, and to the public generally. SER 5-8.

Ms. Schroeder indicated in her emails to Mr. Mitzel that Reclaim Idaho had already collected over 30,000 signatures and was "well on [its]way to qualifying the initiative." SER 6-7. Mr. Schroeder wrote that "Idahoans are no longer able to exercise their constitutional right to bring forward a ballot initiative." *Id*. She informed Mr. Mitzel that "this extraordinary situation requires action by the Governor to ensure the public safety is maintained" while Reclaim Idaho exercised its Constitutional rights. *Id*. In one email, she wrote that electronic signature gathering is "**the only safe method at this point**." *Id*. (emphasis in original).

7

Advisor Mitzel referred her to the Secretary of State. ER 17, SER 6. Ms. Schroeder responded that the Secretary of State's office had already advised that "a change to electronic signature gathering would require Legislative or Executive action." *Id*. Mr. Mitzel then gave her a definitive answer: "the Governor's Office has no intention of taking executive action on this matter." SER 7. Similarly, the Secretary of State's Office wrote that "we are sorry to say that there is no statute allowing electronic signatures for petitions in Idaho Statutes 34 Chapter 18." ER 18.

Responsibly following the CDC guidance amid rising health concerns voiced by its volunteers, and receiving no accommodation from Idaho's executive branch, Reclaim Idaho cancelled all door-to-door canvassing events and signature gathering efforts at larger public events on or around March 18. ER 185-189. A week later, on March 25, Governor Little issued an extreme emergency proclamation requiring all Idahoans who were not essential workers to stay at home. ER 15. A violation was subject to misdemeanor penalties. There were no exceptions for petition circulators or similar First Amendment activities. *Id*. He extended the order to April 30, which would have also been the deadline for Reclaim Idaho to provide all petition signatures to county clerks. ER 16, 27.

Despite the Governor's response to Reclaim Idaho that he would "take no executive action" on the group's reasonable request to protect its First Amendment

8

constitutional rights, he did take other significant executive action altering election statutes during the pandemic. ER 30, 31.

In an emergency proclamation, the Governor extended five election deadlines and decreed that Idaho would have mail-in voting in the 2020 primary elections due to COVID-19 for the first time in Idaho's history. With a stroke of his pen, the Governor suspended nine Idaho election statutes. SER 25-29. He also delegated to the Secretary of State as Idaho's chief elections officer the authority to suspend any additional statutory requirements within Title 34, Idaho Code, that conflicted with any orders or directives under the state of emergency. *Id*. at 28. The Governor stated that these dramatic actions were "necessary to protect the liberty, constitutional right to vote, health and safety of voters, poll workers, and all citizens from COVID-19…" *Id*. at 29.

### C. Reclaim Idaho goes to court, and the court gives Idaho officials options – which they flatly refuse – before opening a window for electronic signature gathering.

On June 6, less than two weeks after it was able to secure pro-bono counsel, Reclaim Idaho filed this lawsuit seeking an injunction that would give it back the time it lost and would permit it to continue gathering signatures electronically.[2]

---

[2]    The State persists in chiding Reclaim Idaho for not filing this lawsuit before June 6, 2020. AOB at 15, 49-52. This argument ignores the reality of people's lived experiences during this pandemic. Until May 1, the Governor's orders required all non-essential persons to stay at home. As co-founder Luke Mayville explained, the grassroots group lacked the legal know-how or funding to hire

The district court expedited the matter and granted Reclaim Idaho's motion for a preliminary injunction from the bench. *See* Dist. Ct. Dkt. 13. It followed with a written Decision and Order four days later. ER 9-35.

In its decision, the district court cited Supreme Court precedents in *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. Am. Constitutional L. Found.*, *Inc.*, 525 U.S. 182 (1999). ER 29-30. It applied Circuit precedent from *Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012), which all parties agreed set out the law. ER 25. It concluded that the circumstances created by COVID-19, the State's refusal to accommodate Reclaim Idaho with any alternative, and the Governor's stay-at-home orders severely burdened Reclaim Idaho's First Amendment right to make its initiative the focus of statewide discussion by getting it on the ballot. ER 25-26. The court further found that "[o]nce the group started its drive, there is no real argument to diligence in effort." *Id* at 28. Strict scrutiny was necessary. ER 26.

The district court determined that Reclaim Idaho had "established it is likely to succeed on the merits, it will suffer irreparable harm in the absence of preliminary relief, the balance of the equities tips in its favor, and an injunction is in the interests of the public." ER 26.

---

attorneys, so it needed extra time to develop a plan for legal action. SER 32. Once Reclaim Idaho found experienced counsel willing to work pro bono, it filed its case and an expedited preliminary injunction 12 days later. *Id.*

The district court initially gave the State Defendants two options. First, based on the evidence that showed Reclaim Idaho was well on its way to meeting the statutory requirements when it was shut down, they could choose simply to certify the initiative. ER 34. Or, they could reopen and extend the deadline for gathering signatures by the period that Reclaim Idaho had lost – 48 days – and permit Reclaim Idaho to circulate its petition electronically and to accept electronic signatures with the assistance of DocuSign, a world leader in electronic signature gathering. *Id.* The district court gave the State four days to decide. ER 35.

The State chose neither option. Two hours before their deadline, they filed a document styled, "Notice and Motion to Stay Pursuant to F.R.C.P. 62(d) and F.R.A.P. 8." ER 51-82. There, they informed the district court that "neither option is acceptable to the Governor nor the Secretary of State…" *Id*. at 52.

On June 30, the district court ordered that the deadline would be extended and the State would accept electronic signatures. ER 1-4. The district court gave the parties nine days to meet and confer "to implement the process and protocol for accepting signatures gathered through the DocuSign technology" after which Reclaim Idaho may "resume the solicitation of signatures for a period of 48 days." *Id*. at 3-4. Should the parties not agree, Reclaim Idaho was directed that it could proceed to implement an industry standard process and protocol" that ensures the

11

"highest available standards are used to verify a signer's identity, legislative district, and the authenticity of the signature." *Id*.

Reclaim Idaho diligently worked with the State in several meetings to refine the process and procedure to collect electronic signatures with DocuSign's technology, and made numerous modifications to the system in response to the State's requests and inquiries. SER 46-48, 51-54, 55-58. At no time during these discussions did the State make any alternative electronic signature gathering proposals for Reclaim Idaho to consider. SER 48. It also did not accept a single part of the process Reclaim Idaho proposed. *Id*.

The State's motions to stay failed in the district court and before this Court. ER 5-8; Cir. Dkt. Entry 14. The State's emergency application for a stay to the Supreme Court is pending as of the filing of this brief.

The State uses considerable briefing space to challenge the district court's remedy. *See* AOB 17-18, 20-27 and *passim*. Respectfully, as set forth in more detail in this brief, they mischaracterize the remedy and grossly exaggerate its consequences. Their "sky-is-falling" rhetoric is divorced from the facts on the ground. It is necessary to note here the following:

- The district court did not "seize control" of Idaho's initiative process. AOB at 3. Its remedy is narrow, limited in scope, and temporary. The order was

also entered four months before the November general election, which it does not affect.

- The only parts of Idaho's initiative rules that have been temporarily enjoined are the in-person signature gathering requirement and the deadline to collect signatures. The other stringent conditions remain and Reclaim Idaho must comply with them to qualify for the ballot. Those include collecting signatures of 6% of the total number of registered voters in the entire state and 6% of the registered voters in at least 18 legislative districts.

- Today, technology offers a safe, secure, and reliable alternative to in-person signature gathering through electronic petition circulation and electronic signatures. Courts (including Idaho courts), businesses, and government agencies rely on the authenticity of electronic signatures every day.

- Over the course of several meetings with the State, Reclaim Idaho received the State's input and made adjustments in response to concerns regarding security, authentication, and transparency of the electronic signature gathering protocol. SER 51-54, 57.

- Federal Courts have found that visual "wet ink" signature matching, the 100-year-old practice that the State so ardently defends, is unreliable at preventing fraud and regularly disenfranchises legitimate voters. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1320 (11th Cir.

2019) (holding that visual signature matching is unreliable and often
disenfranchises voters because of the variable nature of signatures).
Regardless, the district court did not order state officials to abandon that
practice or to use electronic signatures in the future. Electronic signatures
offer a reasonable and brief accommodation for Reclaim Idaho to retain its
First Amendment rights during this extraordinary public health emergency.
It is limited in Idaho to this one initiative, for this one group, in this one
election cycle.

- The State has already "demonstrated it is comfortable relying on digital
signature collection in both the voter registration and online ballot collection
processes." ER 34-35.

- Once the signing process is complete, all documents are digitally sealed
using Public Key infrastructure, an industry-standard technology. SER 84.

- Contrary to the State's claim, AOB 18, Reclaim Idaho is providing the
county clerks with all of the usual authenticating information (besides a wet
signature) and *has* offered to disclose to state officials the certificates of
completion (the "audit trail") from DocuSign of each electronic signature
that it gathers. Reclaim Idaho will also give the State the last four digits of
the social security numbers it collects from signers, once a protective order

14

is in place to shield this personal information from public disclosure. SER 53.

- It is true that the county clerks will not need to visually match physically written signatures with voter registration cards, but they will still be required to verify the signers' authenticating information on the petition, as they have normally done. All other statutory duties for state officials and county clerks remain in place.

- As required under Idaho Code, Reclaim Idaho submitted to the Secretary of State its written argument in support of the initiative by the July 20 deadline, for the voter's pamphlet. There is still time for the Secretary of State to meet all the September statutory ballot deadlines, including the preparation of a voter pamphlet on the normal statutory timeframe.

- There is no evidence that the remedy will cause "voter confusion" or endanger "voter confidence" in Idaho's elections. AOB 4, 22. The State draws no logical connection between electronic signature gathering for an initiative petition drive, ending on August 26, and voter confusion or lack of confidence in the election on November 3. That is because there is none.

## ISSUE PRESENTED

**Whether the district court abused its discretion in granting a preliminary injunction and ordering limited, targeted, and temporary relief to remedy an ongoing violation to Reclaim Idaho's First Amendment rights.**

## SUMMARY OF THE ARGUMENT

The First Amendment's protection is at its zenith when a governmental regulation or law burdens political speech. Citizens' initiative drives involve core political speech. The Supreme Court has held that a state's restrictions on its citizens' initiative process that severely burden such speech must be narrowly tailored to meet a compelling state interest.

When a challenge arises, this Court's precedent requires district courts to assess whether the petitioners were reasonably diligent in pursuing the initiative and whether the state's regulation put a severe burden on their First Amendment rights. If the district court finds both, then strict scrutiny applies.

The district court recognized these standards and the standards governing preliminary injunctions. It applied Supreme Court and Ninth Circuit precedent to the facts as it found them.

Based on abundant and non-disputed evidence, the district court found that Reclaim Idaho had been diligent in preparing and executing its campaign before the pandemic struck. It found that Reclaim Idaho reasonably modeled its current

campaign on its successful Medicaid expansion campaign. As the deadline approached, signature gathering increased exponentially. Reclaim Idaho had over half of the raw and verified signatures it needed seven weeks from the deadline. It had more signatures that it did at the same time in its successful Medicaid expansion initiative. The district court did not abuse its discretion in finding diligence on this record. This Court should defer to that fact-finding.

The district court next determined that the State's strict application of the in-person signature gathering requirements in Idaho Code during the pandemic, coupled with the State's refusal to grant any accommodation when asked and the Governor's subsequent stay-at-home orders, severely burdened Reclaim Idaho's First Amendment rights. Following this Court's law, it applied strict scrutiny. Because the State had provided no tailoring, let alone narrow tailoring, the court determined that Reclaim Idaho was likely to succeed in showing that these provisions were unconstitutional as applied. This is a well-reasoned and supportable conclusion. The district court did not abuse its discretion on this point either.

The district court also concluded that Reclaim Idaho would be irreparably harmed absent injunctive relief. This is self-evident, as it would have no opportunity to get its initiative on the ballot. That means its speech on a core political issue would be severely burdened by the State. It also means that two

17

more classes of students would have to go without the essential educational funding that the initiative seeks.

The district court finally concluded that the balance of the equities favored Reclaim Idaho. This was also a proper exercise of discretion. The State makes much here of the alleged harm to election integrity and its interest in running its own election. But the district court's order does not violate the "*Purcell* principle."[3] The district court did not issue its order on the "eve of an election." There will be no "voter confusion." The remedy does not undermine "voter confidence" in the election. It disenfranchises no one. Either the initiative will be on the ballot, or it won't. If it is on the ballot, then the voters can decide whether they support the initiative, or not.

The State has never offered evidence that the electronic signature gathering process, which meets the highest industry standards, is not safe, reliable, and secure. The State's interest in preventing fraud is no more protected, probably much less so, through use of its antiquated process of visually matching signatures without any criteria guiding staff in the 44 different county clerk offices. Even so, this is a temporary fix for one initiative, and the State is not required to abandon that practice. Contrary to the State's repeated accusations, Reclaim Idaho has offered to provide the State the audit trail of each electronic signature.

---

[3]     *Purcell v. Gonzalez*, 549 U.S. 1 (2006).

Nor has the election been outsourced to a private party. The clerks and the Secretary of State retain all their normal duties except matching "wet ink" signatures. The State's claim that implementing the process would be "near impossible" rings hollow. Many of the clerks have either already verified and returned thousands of signatures or still have those signatures in their possession to verify. Though inconvenienced, the State has time to complete all its pre-election tasks and still certify Reclaim Idaho's petition if it qualifies for the ballot.

The district court's order is prospective, not retrospective, because it targets and attempts to remedy the ongoing harm to Reclaim Idaho's First Amendment rights. Also, the district court did not cite the law governing mandatory versus prohibitory injunctions because the State did not bring it up until after the court had already ruled. But no matter, as the court's ruling satisfies either standard.

The district court's order is a minor and temporary modification to a small aspect of Idaho's initiative process in the middle of a pandemic – allowing for industry-standard electronic signature gathering and extending the deadline for doing so – which is itself one small part of Idaho's electoral laws and regulations. The order has no impact on November's election. It should be affirmed.

## STANDARD OF REVIEW

A district court's decision regarding preliminary injunctive relief is subject to limited and deferential review. *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1103

19

(9th Cir. 2016); *Harris v. Board of Supervisors, L.A. County*, 366 F.3d 754, 760 (9th Cir. 2004). This Court does not review the underlying merits of the case. *Gregorio T. v. Wilson*, 59 F.3d 1002, 1004 (9th Cir.1995).

The Court's inquiry is at an end once it determines that "the district court employed the appropriate legal standards which govern the issuance of a preliminary injunction, and ... correctly apprehended the law with respect to the underlying issues in litigation." *Harris*, 366 F.3d at 760 (internal citation and quotation marks omitted).

## LEGAL STANDARDS GOVERNING PRELIMINARY INJUNCTIONS

### A.    The Supreme Court's *Winter* standard

Plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under this Court's "sliding scale" approach, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.'" *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017) (quoting *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012)).

**B.** **This Court's standard for granting "prohibitory" versus "mandatory" injunctive relief**

On appeal, the State argues that the district court erred by applying the *Winter* standard rather than a heightened standard for the issuance of "mandatory" injunctions. AOB at 28. This is an argument that the State did not raise in the district court before the court granted the motion for a preliminary injunction. ER 131- 140. In fact, the State did not use the words "mandatory injunction" until it filed its motion to stay in the district court. ER 57-58. It should not be permitted to lie in wait below and then claim error on appeal. *E.g.*, *In re Mortg. Elec. Registration Sys., Inc*., 754 F.3d 772, 780 (9th Cir. 2014).

The State is correct that this Court recognizes a distinction between what it has termed "prohibitory" and "mandatory" injunctions. The Court has described the difference this way: "[a] prohibitory injunction prohibits a party from taking action and 'preserve[s] the status quo pending a determination of the action on the merits.' *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 878-79 (9th Cir. 2009) (citations omitted). A mandatory injunction orders a responsible party to "take action" and goes beyond maintaining the status quo during the litigation. *Id*. The status quo in this context "refers to the legally relevant relationship between the parties before the controversy arose." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014).

21

The distinction has been sharply criticized by federal courts and academics alike. *See*, *e.g.*, 11A Fed. Prac. & Proc. Civ. § 2948 (noting that "the doctrine has been subject to academic criticism and frequently is ignored or rejected by the courts.") (citation omitted). It has also been criticized from inside the Court. *See, e.g., Hernandez*, 872 F.3d at 998 (acknowledging "the complexities of the problem, the lack of clear authority as to how the distinction is implemented, and the inherent contradictions underlying the somewhat artificial legal construct ..."). Recently, it was ignored by the Court altogether in an appeal after it been prominently argued and relied on in the district court. *See United States v. California*, 921 F.3d 865 (9th Cir. 2019) (applying *Winter* instead). Reclaim Idaho respectfully contends that there is no need to add a gloss to the *Winter* analysis because the balancing of the equities under *Winter* already accounts for any additional burden on the party to which an injunction applies.

An injunction can also have parts that are prohibitory and parts that are mandatory. *Park Vill. Aprt. v. Mortimer Howard Trust*, 636 F.3d 1150, 1159 (9th Cir. 2011). The injunction in this case is more prohibitory than mandatory. It temporarily prohibits the State from enforcing the in-person signature gathering requirements and extends the deadline. By doing that, the Court puts the parties back in the position they were before the pandemic and its associated restrictions that caused the controversy. While the sections of the Idaho Code that the district

court enjoined in this case are not new, they are new as applied during this

pandemic. And, "injunctions that prohibit enforcement of a new law or policy" are

prohibitory. *Arizona Dream Act Coalition*, 757 F.3d at 1061 (categorizing a

preliminary injunction that enjoined the Arizona Department of Transportation

from enforcing a new policy as prohibitory).

     At bottom, this is a distinction without a difference. Even if the district court

did issue entirely a mandatory injunction, such relief is most appropriate when "the

status quo ... is exactly what will inflict the irreparable injury upon complainant."

*Hernandez*, 872 F.3d at 999 (citation omitted). Here, without the court's remedy,

the status quo would continue to inflict a serious First Amendment injury on

Reclaim Idaho.

## ARGUMENT

**The district court did not abuse its discretion in granting a preliminary injunction and ordering limited, targeted, and temporary relief to remedy an ongoing violation of Reclaim Idaho's First Amendment rights.**

### I. The district court did not err in finding that Reclaim Idaho is likely to succeed on the merits of its First Amendment claim.

While the State's brief focuses on its interests in conducting an election under its own rules, it nearly ignores the First Amendment rights at stake. The district court, in contrast, relied on the relevant precedent and reasonably applied it to the facts from the record before it. There was no abuse of discretion.

There is no doubt that states have an interest in ensuring the integrity of their voting processes, but the Supreme Court has long held that any election system "inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). When disputes arise, courts apply a balancing test to resolve the tension between the state's interests and individual constitutional rights. *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1014 (9th Cir. 2002). The more severe a burden that the state's enforcement of its election laws puts on the individual's rights, the more compelling the state's interest must be to survive. *Ariz. Green Party v. Reagan*,

24

838 F.3d 983, 988 (9th Cir. 2016) (quoting *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 729–30 (9th Cir. 2015)).

The Supreme Court has applied this framework to the more specific issue of citizen initiatives and referenda. It has held that although states are not required to have an initiative or referendum process, when they do, the circulation of a petition is core political speech because it involves "interactive communication concerning political change." *Meyer*, 486 U.S. at 422. That includes both the free speech right of circulators to communicate with the public on political matters and the right of the petition's proponents to turn those matters into a larger statewide discussion by qualifying the initiative for the ballot. *Id.* at 421-23 (1988).

Petition circulation necessarily "involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Id*. at 421. When state restrictions impinge on or chill political speech, "First Amendment protection is at its zenith." *Id*. at 425; *see also Buckley*, 525 U.S. at 186–87 (citing *Meyer*). Restrictions that burden First Amendment rights in the context of an initiative drive are subject to "exacting scrutiny." *Meyer*, 486 U.S. at 421; *Buckley*, 525 U.S. at 204.

This Court, in turn, has applied *Meyer* and *Buckley* to restrictions on an initiative in *Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012). There, the Court noted that *Meyer* had recognized the two ways in which state regulations can impact

speech during the initiative process. *Id*. at 1132. First, the regulations might burden one-on-one communication between voters and circulators. *Id*. Second, the regulations might burden the ability of the initiatives' proponents to qualify the initiative for the ballot. *Id*.

*Angle* said nothing new. It merely held – like *Meyer* and *Buckley* – that lower courts must assess the severity of the burden that an election restriction puts on free speech. If the petitioners can show that the burden is "severe," then strict scrutiny applies. *Id*. at 1133. The state must then offer a compelling interest and show that the regulation was narrowly tailored to further that interest. *Id*. at 1132. The Court wrote: "as applied to the initiative process, we assume that ballot access restrictions place a severe burden on core political speech, and trigger strict scrutiny, when they significantly inhibit the ability of initiative proponents to place initiatives on the ballot." *Id*. at 1133.

The Governor and the Secretary of State conceded below that *Angle* provided the correct standard. ER 131-32 (applying *Angle* in their Opposition to Motion for Preliminary Injunction). The district court applied *Angle* and concluded that the circumstances created by COVID-19, the State's refusal to accommodate Reclaim Idaho, and the Governor's stay-at-home orders severely burdened the petitioners' First Amendment right to make the initiative a focus of statewide discussion by getting it on the fall ballot. ER 26. Strict scrutiny applied, and

through that lens the district court concluded that Reclaim Idaho was likely to prove a First Amendment violation. *Id*.

This Court should turn aside any suggestion from the State now that *Angle* was wrongly decided, or that it failed to hold that regulations burdening a petitioner's ability to get an initiative on the ballot can raise First Amendment concerns in the first place. AOB at 29-30, fn.3. The State posits an alternative framework wherein "non-discriminatory, content neutral" election regulations warrant only rational basis review. *Id*. at fn.3. But that is not the law.

*Angle* is a faithful application of *Anderson/Burdick*, and especially *Meyer* and *Buckley*. Under that precedent, the court focuses its inquiry on the burden that the regulation has on the constitutional right, not on whether the regulation is itself "non-discriminatory" or "content neutral." In *Meyer*, the Supreme Court struck down a regulation that had prohibited paid circulators. 486 U.S. at 417. A regulation that prohibits paid circulators is non-discriminatory and content neutral; it applies to all proponents of initiatives, regardless of their viewpoint or content. The Supreme Court focused on the ways in which that particular regulation burdened free speech. *Id*. at 422-23. Restricting communication and making it less likely that an initiative will appear on the ballot reduces the total quantum of speech on a public issue. *Id*. at 423.

The Supreme Court used no different test in *Buckley*. It again looked to the effect that the Colorado regulations had on speech. 525 U.S. at 196-99. It weighed the burdens against the state's purported interests in those regulations, rather than assessing whether the regulations were non-discriminatory or content neutral. *Id*. Indeed, in response to Justice Thomas's concurrence, Justice Ginsburg wrote for the majority that "[o]ur decision is entirely in keeping with the 'now-settled approach' that state regulations 'impos[ing] 'severe burdens' on speech . . . [must] be narrowly tailored to serve a compelling state interest." *Id*. at fn. 12.

*Angle* walks the same ground. It acknowledges the holdings in the Supreme Court's initiative restriction cases and applies them. This panel is just as bound by it as the district court was. To the extent that the State has a problem with *Angle*, its problem is with the Supreme Court. Lurking beneath the State's discontent may be a camouflaged argument that there should be no federal constitutional concern at all because the initiative process is a creature of state law. The Supreme Court has already rejected that view. *E.g. Meyer*, 486 U.S. at 425 (agreeing with the Court of Appeals that the power to ban initiatives entirely does not include the power to limit discussion of political issues raised in initiative petitions.)

### A. Reclaim Idaho was more than reasonably diligent, and state action caused its injury.

The State continues to argue that Reclaim Idaho is at fault for any injury that it sustained. AOB at 4, 11, 52. Part of its argument is that Reclaim Idaho was not

diligent in pursuing its initiative drive. *Id*. at 31-33. The other part is that the State had no role to play. *Id*. at 16, 20, 36. The district court rejected these contentions. This Court should too.

### 1. *Diligence*

The district court's determination that Reclaim Idaho was reasonably diligent is based on its factual findings regarding the planning, preparation, and execution of the group's campaign, to which this Court must defer absent clear error. *E.g.*, *Smith v. Salt River Proj. Agr. Imp. P. Dist*, 109 F.3d 586, 591 (9th Cir. 1997). There is no error, let alone clear error, on this point.

The State continues to flog the notion that Idaho law gives circulators 18 months to collect signatures and Reclaim Idaho started this drive "a little over six months" before the deadline. AOB at 7, 11, 31-34. According to the State, this somehow means that Reclaim Idaho was not reasonably diligent.

The district court was rightly unpersuaded. It found that Reclaim Idaho based its current drive on its previous successful initiative campaign in 2018. ER 22-23. It was ahead of that campaign when it was required to shut down. As an all-volunteer force the momentum of a looming deadline was crucial to keep the volunteers motivated. By mid-March, it had collected over 30,000 signatures and experience showed it would collect the remainder before the deadline. ER 27. Its planning, preparation, and execution based on its proven model from its earlier

successful campaign was hardly a random "guess," as the State characterizes it. AOB at 32-33. It was instead a deliberate and diligent strategy to move forward. ER 22-23.

By pinning diligence to an earlier start date, the State appears to assume that the full 18 months was available to Reclaim Idaho. That is not correct. The pandemic made in-person signature gathering over approximately the last seven weeks excessively burdensome, unsafe, and then illegal once the Governor issued a stay-at-home order. The logical conclusion to the State's argument is that Reclaim Idaho should have completed its signature gathering effort before those last seven weeks so that it did not need the final weeks. That is not reasonable diligence. That would be extreme diligence or even flawlessness.

The State's framing is simply wrong. The question is not whether Reclaim Idaho should have started earlier. The question is whether Reclaim Idaho was reasonably diligent in planning and executing its campaign based on *the deadline given to it under state law*. It had no reason to know that an unprecedented global health emergency would stand in its way months later.

Consider the analogous situation of a litigant who has an 18-month statute of limitations to file a lawsuit. That litigant reasonably relies on the time given to her under the state's law to investigate her case and to plan on when she will file. Her counsel intends to file near the deadline, based on strategy and past experience. Yet

seven weeks before the deadline, state officials unexpectedly cut the time short. Surely no court would find that the litigant was unreasonable in relying on the established deadline under state law, regardless of when she started her investigation.

Or consider a football team that is well known for its fourth quarter comebacks. Its hallmark is to plod forward in the early quarters and build momentum until the fourth quarter when it puts everything on the line. In the championship, though, the referees arbitrarily stop the game at the end of the third quarter. It would neither be reasonable nor fair to claim that the team should have just "scored more points" earlier in the game. It was entitled to a full four quarters.

That is equally true here. The district court did not make any earth-shaking observation when it wrote that "reason dictates that there is no way Reclaim Idaho could have predicted the global COVID-19 pandemic when it began to plan its initiative drive—planning which necessarily must have occurred in advance of August 2019 when its petition was first submitted to the Secretary of State's office." ER 23. And it noted a truism that Reclaim Idaho's "rights exist throughout the circulation process, whether the first day or in the last months." *Id.*

When the focus is properly on what Reclaim Idaho did during its campaign, the district court's finding of diligence is well-supported by the evidence. The campaign was driven by older volunteers who are passionate about their work.

31

Field Director Ashley Prince notes "that there were always a portion of our volunteers who collected signatures at a relatively high and frequent rate." SER 16. By March 10, they had "grown to 546 volunteers statewide with 150 being highly active, each with an average of 50 signatures per week." *Id.* In one county, for example, volunteer leader Linda Larson set a goal of 100 signatures a week and easily exceeded it most weeks. ER 198. She and her team helped qualify District 1 and were helping to get more signatures. *Id.*

Volunteer Deborah Silver was "door-knocking five-seven days a week." SER 11-12. She would go "until total darkness ... [and] adjusted the start time as the sun set later and later." SER 12. She and her companion volunteers had a high success rate over the winter months, when they "went in snow, wind, and cold." SER 13. Their persistence was fruitful: the number of signatures doubled from February to March 2020. By the time the drive was shut down, it had over 30,000 combined verified and raw signatures. Based on their experience in the earlier initiative process, Reclaim's leaders knew that most signatures come in the last month or so. SER 3. That experience showed that they were going to reach their goal had the campaign not been shut down. SER 8.

None of the cases on which the State relies support its argument that Reclaim Idaho lacked diligence. In those cases, the petitioners were far behind Reclaim Idaho. In some, they hadn't even started.

For instance, the plaintiffs in *Morgan v. White*, 2020 WL 2526484 (N. Dist.
Ill. May 18, 2020), had barely begun gathering signatures when they sought an
injunction. Of the seven plaintiffs, "just one" claimed to have begun an initiative
petition drive before filing the lawsuit, and even he "offered no evidence when he
began those efforts or how many signatures he has collected." *Id*. at *3. The other
plaintiffs alleged that they "wished to circulate petitions." *Id*. The Seventh Circuit
affirmed the district court. *Morgan v. White*, 2020 WL 3818059 (7th Cir. 2020).
That contrasts with Reclaim Idaho, which had collected over half of the
approximately 55,000 signatures that it needed before the pandemic struck. The
Seventh Circuit was right to find that the *Morgan* petitioners were unworthy of
relief. *See also Sinner v. Jaeger*, 2020 WL 3244143 at *6 (D.N.D 2020)
(attributing plaintiff's predicament to his own delay).

The district court did not commit clear error in its finding of the facts and it
did not abuse its discretion in concluding that Reclaim Idaho was diligent.

### 2. State Action

The State also argues that it cannot be faulted for the constitutional injury.
AOB at 31-34. Reclaim Idaho has addressed the diligence piece of this argument,
above. Here it focuses on the claim that there was no state action.

The State repeatedly misses the point that this is an *as-applied* challenge to
the in-person signature gathering requirements during the unique circumstances of

33

a once in a century public health crisis. It is not a facial challenge to the statutory provisions during ordinary times. The district court was required to assess the burdensome nature of the law's operation under the facts as they now exist, not in some theoretical universe of alternative facts.

The distinction is important because it is the State's strict enforcement of the in-person signature gathering requirement during an historic pandemic *with no official compromise or accommodation* that severely burdened Reclaim Idaho's First Amendment rights. Other courts have had little trouble in seeing state action in these circumstances. *See, e.g., Esshaki v. Whitmer*, 2020 WL 2185553, at *1 (6th Cir. May 5, 2020) (holding that "the combination of [Michigan's] strict enforcement of [its] ballot-access provisions and [its] Stay-at-Home Orders imposed a severe burden on the plaintiff's ballot access[,]"); *see also Miller v. Thurston*, 2020 WL 4218245, at * 4 (8th Cir. July 23, 2020) ("the plaintiffs have adequately shown their asserted injuries are fairly traceable to Arkansas's action, i.e., enforcement of its initiative petition rules requiring in-person signatures and in-person notarization.")

The State gives short shrift to the communications between Reclaim Idaho and state officials. AOB at 11. Reclaim Idaho sought a reasonable accommodation to what had become an impossible statutory requirement. The State continues to

mischaracterize these contacts as merely a low-level attempt to set up a meeting with the Governor. *Id.*

Executive Director Rebecca Schroeder wrote to the Governor's Senior Advisor Mitzel and to the Secretary of State's office. SER 5-7. She explicitly stated that "Idahoans are no longer able to exercise their constitutional right to bring forward a ballot initiative"; "this extraordinary situation requires action by the Governor to ensure the public safety is maintained"; and that electronic signature gathering was "**the only safe method at this point**." *Id.* Mr. Mitzel told her in no uncertain terms that the Governor would not take executive action to help. SER 7. About a week later, the Governor issued the order requiring all non-essential works to shelter at home, which ran unabated until the expiration of the deadline for Reclaim Idaho to turn in all its signatures.[4]

The State's enforcement of these specific statutory provisions, and its refusal to make an accommodation during this continuing pandemic, has made it

---

[4]    The State tries to shoe-horn Reclaim Idaho's volunteers into a possible exception to the Governor's order for elections personnel and critical elections infrastructure workers. AOB at 16. The State wholly fails to explain how a group of private volunteer petition circulators fit within an exception meant for the people who are paid to assist the State in its elections.

impossible for Reclaim Idaho to exercise its First Amendment rights. The district court rightly found state action and a severe burden.[5]

### 3. As applied, the law fails strict scrutiny

In its brief, the State relies on the Governor's flexible authority to issue orders in an emergency, citing *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). AOB at 16, 42. Reclaim Idaho has no quarrel with that. It does not challenge the Governor's inherent authority in an emergency to protect the public. As the State repeatedly points out, Reclaim Idaho did not push to continue sending its volunteers, many of whom were seniors, into harm's way to gather signatures face-to-face. Reclaim Idaho's challenge is to the in-person signature gathering requirement and the lack of any reasonable accommodation from the State that would permit it to continue exercising its First Amendment rights after complying with the state statutes became impossible.

Somewhat in tension with its argument that the Governor has broad inherent powers to issue emergency orders in a time of crises, the State also asserts that it

---

[5] The State also tries to pin a concession on Reclaim Idaho's counsel that she did not make. It writes that, she "admitted that the fact that the Order to Self-Isolate did not contain an exception for First Amendment activities, did not make a difference." AOB at 36-37. It morphs this into a concession that state action was lacking. The context of this exchange with the district court was whether an exception for First Amendment activities in the Governor's *stay-at-home orders* would have made a difference. She admitted that, by then, it probably would not have mattered because of the severe health risk in personal contact. SER 89-92. But she did not admit anything close to "there was no state action."

had no authority to change these election requirements. AOB at 36, fn. 4. This is not accurate. By proclamation, the Governor closed all polling places for the primary election in May, ordered mail-in voting, altered five election deadlines, and suspended nine statutes. SER 25-29. He also delegated to the Secretary of State, as Idaho's chief election officer, the ability to suspend other statutory requirements. SER at 28.

It is the strict application by the State of the statutory initiative provisions without any flexibility that imposed the severe burden by making signature gathering impossible. Because the burden was severe, strict scrutiny applied. Under that standard, the State was required to narrowly tailor the statute's application in a way that furthered a compelling interest. Electronic signature gathering as a reasonable substitute and additional time would be one way to do that. The State did no tailoring, let alone narrow tailoring.

The State still does not see this, but the district court did. It wrote that the State's significant interest in its own processes "must be weighed against the effects of strict enforcement when an extraordinary situation arises that prevents its citizens from exercising a constitutional right." ER 30. It was the State's "refusal to make reasonable accommodations" that inhibited Reclaim Idaho's ability to place the Invest in Idaho initiative on the November 2020 ballot. ER 23.

The State may try to support its cause by pointing to a recent case out of the Eighth Circuit, *Miller v. Thurston*, 2020 WL 4218245 (8th Cir. July 23, 2020). Such reliance would be misplaced. There, the Eighth Circuit concluded that an in-person signature requirement affected the plaintiffs' First Amendment rights but that the scrutiny was less than strict because the burden on those plaintiffs was "less than severe." *Id*. at *6-8. Unlike Idaho, Arkansas is one of a handful of states that never had an official stay-at-home order. *See*, "An interactive map of the US cities and states still under lockdown — and those that are reopening," Business Insider, June 3, 2020, at https://tinyurl.com/yx4dg5j4. The plaintiffs in that case could continue canvassing, though under more burdensome conditions. The Eighth Circuit did not find those burdens to be severe, however. *Id*. at *8. Arkansas law had some exceptions for in-person signature gathering for those with a disability, and there is no indication that the plaintiffs ever asked state officials for broader accommodations. This case is distinguishable factually.

Notably, *Thurston* rejects arguments that the State makes here. For one, the Eighth Circuit had no problem finding state action. *Id*. at *4. For another, it found that an in-person signature requirement implicated the First Amendment; it just disagreed about the severity of the burden on the facts before it. To the extent that it diverges from *Angle* in any way, *Angle* is more consistent with the Supreme Court precedent. And *Angle* is the law in this Circuit.

38

The facts and the law clearly support the district court's conclusion that Reclaim Idaho is likely to prove a First Amendment violation.

## II. The district court correctly found that Reclaim Idaho will be irreparably harmed in the absence of injunctive relief.

Because the deadline to qualify an initiative has already expired, there is no chance that Invest in Idaho will appear on the ballot without court-ordered relief. ER 31. Without an injunction, the harm is irreparable.

The "deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted). That Reclaim Idaho would continue to suffer irreparable harm absent relief "is demonstrated by a long line of precedent establishing that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (citation omitted); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")

The district court correctly determined that starting a new initiative for the next election cycle is no substitute for the injury that is ongoing this election cycle. ER 30. Delay until 2022 could impact tens of thousands of Idaho students over that time, "which strikes at the heart of Reclaim Idaho's First Amendment activity." *Id*. The delay is especially injurious in Idaho, which ranks last across the 50 states and

the District of Columbia in educational funding for its children. *See*, "No. 51, Again: IEA Decries Per-Pupil Spending," Idaho Education News, July 7, 2020, at https://tinyurl.com/yxk75lm5.

This Court should uphold the district court's finding of irreparable harm. The status quo was causing that harm. To the extent that the Court sees a need to parse whether the injunction was mandatory or prohibitory, the injunction was warranted either way.

### III. The balance of the equities tipped in Reclaim Idaho's favor, and the district court acted well within its discretion in fashioning temporary relief to remedy the harm.

The bulk of the State's brief is devoted to characterizing the district court's remedy as an extraordinary overreach. It writes that the court's remedy "seize[s] control of Idaho's initiative process." AOB at 3. That it "fundamentally altered" the initiative laws. *Id*. That it "eviscerated" the anti-fraud measures. *Id*. It did nothing of the sort. The district court was tasked with identifying the possible harm caused by the preliminary injunction against the possible harm by not issuing it. *University of Hawaii Prof. Asm. v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). Although the State peppers these claims throughout its brief, they are appropriately considered in this Court's assessment of whether the district court abused its discretion in balancing the equities and fashioning relief. It did not.

On one side of the ledger is the irreparable harm to Reclaim Idaho's First Amendment rights. If injunctive relief had not been granted, Reclaim Idaho's right to amplify discussion on a political matter of statewide importance would have been irretrievably lost. On the other side, any intrusion into Idaho's ability to regulate its initiatives is limited to one part of Idaho's election rules. It does not dictate who may vote, how they may vote, or when they may vote. It does not dictate that Idaho must put the initiative on the ballot. And, most importantly, it is a temporary fix tailored to the injury in this moment.

The rules governing injunctive relief are not "hard and fast rules, to be rigidly applied to every case regardless of its peculiar facts. The infinite variety of situations in which a court of equity may be called upon for interlocutory injunctive relief requires that the court have considerable discretion in fashioning such relief." *Tanner Motor Livery*, *Ltd. v. Avis*, *Inc.*, 316 F.2d 804, 809 (9th Cir. 1963). Federal courts have a long history exercising their discretion to order changes to remedy constitutional violations when needed. *Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 641 (9th Cir. 2004) (noting district court's "broad latitude in fashioning relief to remedy an established wrong."); *see also Coca-Cola Co. v. Overland*, *Inc.*, 692 F.2d 1250, 1256 (9th Cir. 1982) (affirming district court's permanent injunction enjoining the defendant and its employees from substituting

any beverage in response to Coca-Cola or Coke unless they first give notice to the customer). This case fits easily in that tradition.

Altogether, the district court's remedy strikes a balanced and appropriate compromise. In the short term, the State will be required to accept industry-standard electronic signatures for the half that remain to be collected, in the place of "wet ink" signatures signed in person. But everything else in Idaho's election laws remains the same. The State is not required to put Reclaim Idaho's initiative automatically on the ballot. Idaho's clerks must still check all signers' authenticating information to ensure that it matches an identified registered voter at the proper address within the correct legislative district. The Secretary of State, who does not verify the signatures, must still count them, to determine whether the petition includes the requisite number of signatures statewide, and in at least 18 districts.

In its brief, the State lays out all the dates and deadlines leading up to the November election that it contends will be affected by the district court's order. It inserts a chart to illustrate its point. But none of the dates in August or September pertaining to the ballot in November need to be adjusted under the district court's order. Reclaim Idaho already has over half of the signatures it needs, about 10,000 of which have been verified and turned over to the Secretary of State. Another 20,000 "wet ink" petitions are in the clerk's hands. Reclaim Idaho has promised to

42

submit the other signatures to the clerks on a rolling basis as they come in. It has complied with the July 20 deadline and submitted an argument in favor of the initiative to the Secretary of State. The clerks will need to make room and adjust, but the State's rhetoric does not match the reality of processing the initiative. [6]

State officials may suffer administrative inconvenience and may need to divert resources to complete these tasks, but that is not irreparable harm. *E.g.* *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.") (emphasis in original) (citation omitted).

## A. The *Purcell* principle is inapplicable because nothing was changed on the "eve of the election," and there will be no voter confusion or undermining of voter confidence on November 3.

The State repeatedly claims that the district court has interfered in its election processes at the last minute, sowing confusion and uncertainty. In support, it cites *Purcell v. Gonzalez*, 549 U.S. 1 (2006). AOB at 22-23. Reclaim Idaho has no quibble with the general principle that "lower federal courts should ordinarily

---

[6]     Though the State declares "lest we forget" the August election, which also supposedly adds to its burden, AOB at 38, it does not say that these are school district levies in 9 of Idaho's 44 counties. SER 99. Normally, these elections have some of the lightest of all turnout. The State does not favor us with an explanation of how school district levy elections in a handful of counties, where only a subset of a county's electorate are eligible to vote, places such an insurmountable burden on the clerks that they cannot also process this initiative.

not alter election rules on the eve of an election." *E.g., Republican Nat'l Comm. v. Democratic Nat'l Comm.*, ("*RNC v. DNC*"), 140 S. Ct. 1205, 1207 (2020). But the *Purcell* principle has no applicability, as the district court neither altered the rules of how the election on November 3rd will be conducted nor did it make any changes on the "eve of an election."

In *Purcell*, the Supreme Court overturned a Court of Appeals' injunction that prevented enforcement of Arizona's law that required voter I.D. at the polls about a month before election day. 549 U.S. at 4-5. The Court of Appeals gave no reason for its decision. In vacating the order, this Court wrote that "orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id*. at 4-5.

The concerns that animated *Purcell* and the other recent cases in which the Supreme Court has granted a stay of a lower court's order or vacated a stay are not present here. The orders in each of those cases were issued by a district court much closer to election day, and each order altered the rules of how the election would be conducted. *See*, *e.g*., *RNC v. DNC*., 140 S. Ct. at 1206-07 (extending the date on which absentee ballots must be postmarked just days before the election); *Merrill v. Alabama*, 2020 WL 3604049 (July 2, 2020) (staying district court's order that made several substantive changes to the conduct of the election with fewer than 30

days to go); *People First of Alabama v. Merrill*, 2020 WL 3207824, *29 (N.D. Ala. June 15, 2020) (district court decision); *Texas Democratic Party v. Abbott*, 140 S. Ct. 2015 (2020) (upholding a stay of a district court's order that modified voting procedure about eight weeks before the election); *Texas Democratic Party v. Abbott*, 2020 WL 2541971 at *5, 6 (W.D. Tex. May 19, 2020) (district court decision).

Here, in contrast, the district court's order took effect nearly four and a half months before the election. The district court's order does not change how the general election will be conducted; it does not change who can vote, or when or where they can vote. The State does not explain why a temporary modification to the way signatures are gathered during a pre-election initiative drive will cause "voter confusion" or undermine "voter confidence" in the general election.

And there is recent evidence that their concerns are exaggerated. Public confusion in Idaho did not occur this past spring when the Governor made sweeping changes to the primary elections by executive order. SER 25-29. For the first time in Idaho's history physical polls were closed and voting was by absentee ballot only. *Id*. Further, numerous election deadlines were modified. Despite these many modifications, there was record voter turnout. *See* "Idaho state primary has highest recorded turnout in decades," A.P., June 22, 2020, at https://apnews.com/7669cbfffc9e896b686b8326bd35cbca. Nor is there any

45

evidence that the county clerks were overwhelmed implementing the Governor's many late changes.

**B.    The process and protocol to collect the remaining signatures is safe, reliable, and verifiable.**

Reclaim Idaho did not "unilaterally modify" the process. AOB at 33. The district court gave the State an opportunity to confer with Reclaim Idaho on an acceptable process and protocol. The State made no alternative electronic signature gathering proposals. Reclaim Idaho responded to the State's concerns and modified the process in response. SER 46-54. Because the State did not agree to any electronic signature gathering protocol, the district court's order permitted Reclaim Idaho to "implement an industry standard process and protocol…[that] must ensure the highest available standards are used to verify a signer's identity, legislative district, and the authenticity of the signature." ER 4.

Reclaim Idaho has developed a process and protocol that meets the court's order. The State introduced no evidence that the method that Reclaim Idaho has put together with the assistance of industry leader DocuSign is unreliable or subject to fraud. Reclaim Idaho's evidence on that score stands undisputed. This system was not created in nine days, as the State inaccurately claims. AOB at 24. Reclaim Idaho worked on a solution prior to the filing of the district court case to propose a path forward, realizing the onus would be upon it to suggest a secure alternative system. It made a detailed proposal for the use of electronic signatures

46

through DocuSign, "a company trusted by financial institutions with an impeccable tradition for reliability in gathering electronic signatures," ER 3, when it filed for a preliminary injunction. ER 189-196.

DocuSign is officially certified by the Federal Risk and Authorization Management program (FedRAMP) a federal government service that vets technology providers for security and risk. SER 56. DocuSign has been used in other jurisdictions such as Massachusetts for petition signatures. SER 57. More than 775,000 signatures a day are verified by DocuSign. ER 190.

The State emphasizes how greatly the electronic signature gathering and validation process differs from the wet ink requirement in Idaho's statutes established over a century ago, when no alternative existed. Idaho, though, has recognized that electronic signatures have the full force and effect of a handwritten signature for the past twenty years. In fact, the provisions that the State relies upon requiring a hand-written signature are inconsistent with the Uniform Electronic Transactions Act, Idaho Code § 28-50-101, *et seq*. ("If a law requires a signature, an electronic signature satisfies the law." Idaho Code § 28-50-107 (D) and "A record or signature may not be denied legal effect or enforceability solely because it is in electronic form." Idaho Code § 28-50-107 (A)). There is no merit to the contention that electronic signatures are not functionally real and legally binding signatures or that by using one, the signer does not "sign" the petition. This denies

the reality that electronic signatures are widespread and an accepted protocol of the 21st century.

Their position is also disingenuous. Idaho allows for voter registration and requests for absentee ballots online with the use of an electronic signature. SER 40-42. Signing a single citizen's initiative petition is less impactful to the State than indefinitely registering a voter who can cast a ballot in all future elections and sign all future petitions.

Numerous fraud protections are in place. Reclaim Idaho's DocuSign initiative petition form confirms each signer's intent to sign and their consent to do business electronically. These are the essential measures that must be taken to ensure that signatures are authentic and legally binding under the federal electronic signatures act. *See* 15 U.S.C. § 7001 *et seq*. They must provide the last four digits of their social security number. They must sign under penalty of perjury. *See, e.g.*, *Meyer*, 486 U.S. at 426–27 (finding that provisions like these "seem adequate to the task of minimizing the risk of improper conduct in the circulation of a petition, especially since the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting.")

For every signature Reclaim Idaho collects, it is storing a certificate of completion. SER 54. This certificate is a legally binding document that provides an audit trail. *Id.* The audit trail includes a time stamp for when the person signed

48

along with their GPS location and IP address. *Id*. Once the signing process is complete, all documents are digitally sealed using Public Key infrastructure, an industry-standard technology. SER 84. Reclaim has offered to provide a certificate for each signature collected to the State. Contrary to the State's assertion that Reclaim Idaho has refused to provide the personal authenticating data to the State it collects, it has offered to provide exactly that (pending a protective order). SER 53.

The State did not provide a scintilla of evidence in the district court questioning DocuSign's verification process. It also offered no evidence that its process of having untrained county clerks and their staff visually review petition signatures to authenticate them is superior to a state-of-the-art electronic signature verification process. There are many reasons a voter's signature might appear differently on their voter registration card versus an initiative petition. The clerks simply strike any signature they deem does not look "right." As the Eleventh Circuit has noted, "even if election officials uniformly and expertly judged signatures, rightful ballots still would be rejected just because of the inherent nature of signatures . . .. [T]he writer's body position, writing surface, type of pen, and mental and physical states, as well as the surrounding noise, can alter a person's signature and produce mismatches." *Democratic Exec. Comm. of Fla.,* 915 F.3d at 1320; *see also Fla. Democratic Party v. Detzner,* 4:16CV607-

49

MW/CAS, 2016 WL 6090943, at *7 (N.D. Fla. Oct. 16, 2016) (holding that signature matching disenfranchised voters "arguably for no reason other than they have poor handwriting or their handwriting has changed over time.")

Contrary to the State's concerns about a technological tool replacing the manual task of visually matching hand-written signatures to those on file, signing electronically is a safe, reliable, and commonly used method to legally bind parties. All federal courts have long accepted declarations with an electronic signature signed under penalty of perjury in the place of a hand-written one.

The State misconstrues *In Re Mayfield*, 2016 WL 3958982, at *2. (Bankr. E.D. Cal. Jul 15, 2016). AOB at 24. The court there held that the DocuSign signature could be used in court filings so long as a local court rule was satisfied that required debtor's counsel to maintain original signed documents of these filings. The court in *Mayfield* specifically acknowledged that electronic signatures "may have a place in certain commercial and other transactions." *Id*. at *3.

DocuSign has surveyed reported cases across all United States jurisdictions (through June 2019) where the court indicated that the DocuSign electronic signature service was used. SER 59-67. "In none of these rulings was a DocuSign signature denied the same legal effect as a paper-and-ink signature for any use case covered by ESIGN." SER 61.

In short, the State has never explained how having hundreds of different staffers in far-flung counties across the state fly-speck hand-written signatures in the absence of a uniform standard is *more* likely to ferret out fraud than accepting an electronic signature that requires the last four digits of the signer's social security number, that is signed under penalty of perjury, and that can be confirmed through an audit trail.[7]

### C. The only temporary change is to permit electronic signature gathering for the remaining signatures needed. State and county officials retain all other statutory duties.

The State complains that the court has outsourced its vital electoral responsibilities to a private party while also inconsistently complaining about the allegedly huge burden on clerks to process these petitions under a "new" protocol on a tight timeline. They omit that approximately 30,000 hand-written signatures were collected before the pandemic, roughly half of the signatures needed. Despite the fact that Reclaim Idaho began delivering batches of petition as early as last November, it appears that the county clerk of Idaho's most populated county – Ada County – never began the verification process. SER 44. Other clerks throughout the state have already verified 10,000 signatures and Reclaim Idaho has delivered

---

[7]     Reclaim Idaho's volunteers check the information provided by petition signers with a digital application before submission to the county clerks, and as a result of this diligence, the rejection rate is 14%, SER 16-17, far lower than the 30% to 40% rate asserted by the State as typical. SER 144.

those to the Secretary of State's office, as Idaho law provides. SER 36, 44. The county clerks need to complete the verification of the remaining 20,000 handwritten petition signatures just as they have always done.

As to the electronic signatures, the State ignores that the county clerks will still be required to verify that the signers of the petition are registered voters in their county and that the address provided on the petition matches the address for which they are registered to vote. If not, these names will be stricken from the petition by the clerks, as in the past. The county clerks will still be provided with the same information they have always been provided for other petitions: name, address, and city or zip code, only without a wet signature. SER 53. Because the names and addresses of the electronic signatures will be submitted in typewritten form, this will simplify and accelerate the clerks' validation process. This will eliminate the need for clerks to compare physical signatures with the voter's registration card and decipher the signers' hand-printed names and addresses, as they must do with physical petitions. This will reduce the administrative burden on the clerks, of which the State complains.

The State protests that the clerks will not be given the last four digits of the social security number of a signer but Reclaim Idaho has already offered to share this information with the Secretary of State. SER 53.

The clerks have already verified or have had the opportunity to verify one half of the signatures Reclaim Idaho has submitted to them. The verification of the balance can be accomplished by the August 26 deadline. The State has provided no evidence of why this statutory duty is "near impossible' given the extra time allowed, the reduction in the task (no handwritten signatures to compare) and the fact that Reclaim Idaho is providing the clerks with the petitions on a rolling basis. SER 54. Moreover, the State offered as evidence the opinion of a single clerk that the clerks' tasks are "near impossible" under the court's order. This opinion was from just one of Idaho's forty-four county clerks.[8] Likewise, the district court made no adjustments to the deadlines concerning the ballot printing and mailing, as these deadlines will still be met.

## D. Voting on election day in November is unchanged.

Voting will not be affected in any way by Reclaim Idaho's use of electronic signature gathering, so it will not cause voter confusion or undermine voter confidence. If Reclaim Idaho's army of volunteers can work to qualify its citizen initiative under Idaho's rigorous process, then it will appear on the ballot for the consideration of the electorate in November. Because Idaho has some of the most

---

[8] This is the same county clerk that has not returned any of Reclaim Idaho's petitions as verified, even though approximately 10,000 petition signatures have been dropped off at his office since last November. SER 44. His sense of "near impossibility" may be unique to himself and of his own making.

difficult initiative requirements in the country this is hardly a forgone conclusion. If Reclaim Idaho can qualify its initiative for the ballot, then voters still have an opportunity to reject it or accept it.

### E.    The district court's relief is remedial and proper.

The State argues that the district court's remedy is retrospective rather than prospective. AOB at 36. It frames this argument by asserting that Reclaim Idaho challenged the Governor's stay-at-home order. *Id*. Because that order expired before Reclaim Idaho filed this lawsuit, according to the State, the relief is designed to correct an injury that occurred in the past. *Id*.

The State again misapprehends the nature of this challenge. It is to the strict application of certain statutory provisions under these facts, without an accommodation, that made compliance with these statutes impossible. The State appears to be putting forward some type of mootness argument, contending that injunctive relief cannot fix an injury that no longer exists. But this is a live case or controversy. Without the remedy, the harm to Reclaim Idaho's First Amendment rights would be *ongoing*, and it would continue to be *ongoing* through election day. *E.g.*, *Williams on Behalf of J.E. v. Reeves*, 954 F.3d 729, 738 (5th Cir. 2020) ("As long as the claim seeks prospective relief for ongoing harm, the fact that a current violation can be traced to a past action does not bar relief under *Ex parte Young*.")

Equitable relief should be "remedial in nature; that is, it must be designed as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.'" *Milliken v. Bradley*, 433 U.S. 267, 280 (1977) (citing *Brown v. Board of Education*, 349 U.S. 294 (1955) ("*Brown II*"). The district court's order is remedial. It is intended to put Reclaim Idaho as close as possible to the position it would have occupied absent the constitutional violation. It is intended to fix an ongoing violation and is therefore appropriate.

* * *

The State had an opportunity to assist in fashioning a remedy. It declined. Nothing has been "seized." Nothing has been "eviscerated." Nothing is changed permanently. This Court should find that the district court did not abuse its discretion balancing the equities and fashioning a remedy.

## IV. The public interest supports the injunctive relief.

It is in the public interest to allow Idaho citizens an opportunity to engage in a robust debate on funding for public school education, a matter of great civic importance. Tens of thousands of Idahoans have signed Reclaim Idaho's petition and have expressed their support to place this initiative on the ballot. The absence of an injunction will disenfranchise those voters on this issue as well as violate Reclaim Idaho's First Amendment rights. "[I]t is always in the public interest to

55

prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002.

## CONCLUSION

For all these reasons, this Court should affirm the district court.

Respectfully submitted on this 29th day of July, 2020.

*/s/ Deborah A. Ferguson*
Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho, 83702
T: (208) 484-2253
daf@fergusondurham.com
chd@fergusondurham.com
*Attorneys for Plaintiffs-Appellees*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)**  | 20-35584

The undersigned attorney or self-represented party states the following:

○  I am unaware of any related cases currently pending in this court.

○  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

●  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

> The Court initially consolidated this case for oral argument with People Not Politicians v. Clarno, Case No. 20-35630. It then de-consolidated the cases, which will be argued on the same day but not as part of the same oral argument.

**Signature** | s/Deborah A. Ferguson  **Date** | July 29, 2020

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 17**                     57                     *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 20-35584

I am the attorney or self-represented party.

**This brief contains** | 12,846 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Deborah A. Ferguson | **Date** | July 29, 2020

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      58      *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 20-35584

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are __NOT__ Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Answering Brief of Appellees Reclaim Idaho and Luke Mayville

**Signature** | s/Deborah A. Ferguson    **Date** | July 29, 2020

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**      *Rev. 12/01/2018*