## No. 20-35584

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

RECLAIM IDAHO, an Idaho Political Action Committee, and
LUKE MAYVILLE,

*Plaintiffs-Appellees*

v.

BRADLEY LITTLE, in his official capacity as Governor of Idaho,
and LAWERENCE DENNEY,
in his official capacity as Idaho Secretary of State,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court for the District of Idaho
Honorable B. Lynn Winmill
District Court Case No. 1:20-cv-00268-BLW

———————————

## SUPPLEMENTAL EXCERPTS OF THE RECORD

———————————

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho, 83702
T: (208) 484-2253
daf@fergusondurham.com
chd@fergusondurham.com
*Attorneys for Plaintiffs-Appellees*

**SUPPLEMENTAL EXERPTS OF RECORD**

**INDEX**

| Volume 1 Documents | Date | District Court Docket No. | Supplemental Excerpt Pages |
|---|---|---|---|
| Declaration of Rebecca Schroeder in Support of Motion for Preliminary Injunction | June 5, 2020 | Dkt. 2-3 | SER 001—SER 009 |
| Declaration of Deborah Silver in Support of Motion for Preliminary Injunction | June 5, 2020 | Dkt. 2-4 | SER010—SER 014 |
| Declaration of Ashley Prince in Support of Motion for Preliminary Injunction | June 5, 2020 | Dkt. 2-5 | SER 015—SER 017 |
| Declaration of Karen Lansing in Support of Motion for Preliminary Injunction and Exhibit A | June 5, 202 | Dkt. 2-7 | SER 018—SER 024 |
| Governor Little's April 1, 2020 Proclamation Modifying Idaho Election Laws | April 1, 2020 | Dkt. 9-1 | SER 025—SER 029 |
| Supplemental Declaration of Luke Mayville in Support of Motion for Preliminary Injunction and Exhibit A | June 21, 2020 | Dkt. 9-2 | SER 030—SER 039 |
| Declaration of Counsel in Support of Motion for Preliminary Injunction | June 21, 2020 | Dkt. 9-3 | SER 040—SER 042 |
| Second Supplemental Declaration of Luke Mayville in Support of Motion for Preliminary Injunction | June 22, 2020 | Dkt. 10 | SER 043—SER 045 |
| Status Report on Compliance with Court's June 30 Order and Exhibit A | July 10, 2020 | Dkt. 25; 25-1 | SER 046—SER 054 |
| Fourth Supplemental Declaration of Luke Mayville in Support of Motion for Preliminary Injunction and Exhibits 1 and 2 | July 10, 2020 | Dkt. 25-2; 25-3; 25-4 | SER 055—SER 088 |
| Transcript of Preliminary Injunction Hearing – Pages 17, 18, 19, 46 | June 23, 2020 | Dkt. 15 | SER 089—SER 092 |
| July 27, 2020 Status Report with Exhibits A and B, and Fifth Supplemental Declaration of Luke Mayville with Exhibit 1 | July 27, 2020 | Dkt. 26; 26-1; 26-2; 26-3; 26-4 | SER 093—SER 101 |
| District Court Docket as of July 27, 2020 | July 27, 2020 | N/A | SER 102—SER 106 |

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **RECLAIM IDAHO**, an Idaho Political Action Committee; **LUKE MAYVILLE** Plaintiffs,<br><br>v.<br><br>**BRADLEY LITTLE**, in his official capacity as Governor of Idaho; **LAWERENCE DENNEY**, in his official capacity as Idaho Secretary of State;<br><br>Defendants. | Case No. 1:20-cv-00268-BLW<br><br>**DECLARATION OF REBECCA SCHROEDER IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

I, Rebecca Schroeder, having first been duly sworn upon oath, declare as follows:

1.      My name is Rebecca Schroeder, and I am the Executive Director of Reclaim Idaho, a

Plaintiff in this case.

2.      I took the role of Executive Director of Reclaim Idaho on March 15th, 2019.

Declaration Of Rebecca Schroeder          p. 1

3.      During the spring and summer of 2019, my work was focused on advocating to keep Idaho's current ballot-initiative rules intact following a controversial legislative attempt to dramatically restrict the process for qualifying an initiative for the ballot.

4.      Early in the fall, we filed our "Invest in Idaho" K-12 funding initiative with the Idaho Secretary of State and we launched our first volunteer organizing tour in September 2019 to build support for the policy and grow volunteer teams for signature gathering.

5.      I hosted volunteer organizing meetings in the following Idaho locations on the dates listed. I was accompanied by my colleagues Alicia Abbott and Ashley Prince for most of these meetings. Meetings were held in private homes, cafes, and libraries. Between 2 and 20 volunteers attended each of these organizing meetings.

    9/14/19: Sandpoint, ID
    9/14/19: Port Hill, ID
    9/16/19: Bonners Ferry, ID
    9/17/19: Wallace, ID
    9/18/19: Lewiston, ID
    9/18/19: Moscow, ID
    9/19/19: Orofino, ID
    9/19/19: Grangeville, ID
    9/21/19: Nampa, ID
    9/24/19: Ketchum, ID
    9/24/19: Twin Falls, ID
    9/26/19: Salmon, ID
    9/26/19: Idaho Falls, ID
    9/27/19: Driggs, ID
    9/27/19: Pocatello, ID
    10/2/19: McCall, ID
    10/3/19: Weiser, ID
    11/4/19: Lewiston, ID (meeting 2)

6.      These events garnered some earned media coverage and laid the groundwork for our signature drive.

7.      At this point, we had identified volunteer leaders from communities all over Idaho.

Declaration Of Rebecca Schroeder          p. 2

8.  I felt confident that we were headed toward meeting Idaho's distribution requirement of signatures from 6% of registered voters in at least 18 Idaho Districts.

9.  After our first big week of signature gathering in early November, local volunteer teams continued to build volunteer capacity and host local signature gathering events.

10. The signature gathering process, in itself, helped us identify more supporters of the policy that often converted to volunteering.

11. The more signatures we gathered, the more our local volunteer teams grew.

12. Volunteer organizing meetings and signature gathering events continued in:

    11/18/19: Bonners Ferry Organizing (second meeting)
    12/3/19: Boise Run-off election signature gathering day at the polls
    12/6/19: Idaho Falls, ID Organizing meeting (second meeting)
    12/7/19: Pocatello, ID Organizing meeting (second meeting)
    12/7/19: Rexburg, ID Organizing meeting
    12/9/19: Kooskia, ID Organizing meeting
    12/15/19: Boise, ID Holiday signature gathering at the Egyptian Theater

13. Volunteers continued to collect signatures through the holiday season. In January, local teams began ramping up for higher volumes of signatures each week.

14. We had built relationships and consistent communications with established local teams by this time, and conducted countless phone calls, Zoom calls, and emails in between our in person visits, to support volunteer efforts and help set local goals for signature collection.

15. Signature gathering goals increased as teams built volunteer capacity and leadership, and as the campaign moved closer to the April 30th deadline.

16. The earned media, and volunteer team growth assisted our fundraising capability as well—which enabled us to provide resources like clipboards, banners, literature, and petitions to our local teams and increase the advertising opportunities for the Invest in Idaho campaign.

Declaration Of Rebecca Schroeder        p. 3

17.     In January, we continued to build the campaign by hosting a series of signature gathering events alongside established local teams.

> 1/19/20--Boise Meeting and Canvass
> 1/25/20--McCall Winter Festival signature gathering
> 1/30/20--Moscow Meeting and Canvass
> 2/1/20--Sandpoint Meeting and Canvass
> 2/3/20—Coeur d' Alene

18.     After the Coeur d' Alene canvassing event, my colleague Plaintiff Luke Mayville took on the rest of the event tour through central, southern, and eastern Idaho. I remained in the Idaho Panhandle to continue ramping up signature gathering events in north Idaho

19.      During the month of February 2020, local teams participated in more signature gathering events than ever—bringing in higher numbers of signatures each week.

20.      In my home District 4, we were hosting big signature gathering events every week, as well as scheduling volunteer signature gathering shifts on most days outside the Public Library.

21.     This increased level of activity was replicated by established local teams throughout the state in February and early March.

**Enter Covid-19 Pandemic**

22.     By the beginning of the second week of March, news of the coronavirus had begun to impair our campaign efforts and negatively impact volunteer signature-gathering and fundraising.

23.      With rapidly evolving information from the CDC, and a deep responsibility to the safety of our volunteers and the general public—Reclaim Idaho attempted to adapt to "clean signature gathering strategies" by recommending infection control guidelines and scrambling to provide extra supplies like disposable pens and hand sanitizer to our volunteers.

Declaration Of Rebecca Schroeder          p. 4

24.     During the week of March 8th-14th, I reached out by phone to local volunteer leaders to communicate our new guidelines for safer signature collection, and assess volunteer concerns about safety.

25.     A large percentage of Reclaim Idaho volunteers are retirees, in a high risk group for Covid-19 complications.  It became clear through those conversations that volunteers were fearful of contracting the virus.

26.     Volunteer-led door-to-door canvassing events were cancelled by concerned volunteers in communities all around the state that week.

27.     Signature gathering at large public events also ground to an immediate halt as events were cancelled.

28.     On March 12th, I removed my 12 year old son with cystic fibrosis from public school and began self-isolating on the recommendation of his pulmonologist. Many of our volunteers also received advice from their medical professionals to avoid interactions with the public.

29.     By Monday March 16th, it became abundantly clear that there was NO SAFE METHOD to continue to encourage tens of thousands of face-to-face conversations with voters.

30.     The CDC guideline of social distancing by at least 6 ft., made in-person signature gathering virtually impossible.

31.     On March 16th, I began communicating these concerns to Governor Little and the Idaho Secretary of State.

**Reclaim Idaho's Communications with Governor Little's Office Regarding Covid-19**

32.     At 8:02 am I emailed Andrew Mitzel, Senior Advisor to Gov. Little the following:

> Dear Andrew,
> As you know, we are facing the unprecedented circumstances of a public health crisis. Volunteers around the state have been working for months collecting signatures for the citizen ballot initiative to increase funds to Idaho K-12 schools. Collecting signatures

Declaration Of Rebecca Schroeder          p. 5

face-to-face puts both volunteers and the general public at risk, and goes against the guidelines that we are hearing from public health officials.

The result is that **Idahoans are no longer able to exercise their constitutional right to bring forward a ballot initiative.** Please give Reclaim Idaho co-founder Luke Mayville the opportunity to meet with the Governor about the safest way to move forward with our ballot initiative. We have already collected over 30K signatures, and were well on our way to qualifying the initiative. Hundreds of volunteers have already put in hundreds of hours. Along with the Governor, our priority is the health and safety of our Idaho communities. This extraordinary situation requires action by the Governor to ensure the public safety is maintained while we exercise our Constitutional rights. Sincerest thanks, Rebecca Schroeder

33.    Andrew Mitzel responded at 9:04 am and wrote:

Thanks for reaching out. I would encourage you to reach out to the Secretary of State's office with your concerns regarding ballot initiatives as they oversee that process.- Andrew

34.    I responded that:

We have been simultaneously consulting with the SOS office. They advised us that it would take a Legislative or Executive action to extend the signature deadline. We have communicated with them about **electronic signature gathering (the only safe method at this point)** also, and await their response. I hope that if Executive action is required-- that Governor Little would consider a meeting with one of us. I know you all are bombarded with trying to deal with this crisis...we are doing the same. Hundreds of volunteers have put their hearts into this effort. We understand that this is an extraordinary request--but we are certainly in extraordinary times.

35.     Andrew Mitzel again referred Reclaim to the Secretary of State's office, stating:

Rebecca: We understand your concerns about the limitations that the current situation presents. The Secretary of State's office is actively working on ways to make the election process move forward in light of the concerns about spreading coronavirus, and your organization may benefit from using some of their ideas. The Governor's Office is intently focused on the health and safety of the broader population right now, and we are referring you to the Secretary of State's office to resolve these concerns.

36.    I again wrote to Andrew Mitzel that we were being advised that the Secretary of State's

office did not have the jurisdiction to resolve this, and requested a meeting. I wrote:

Dear Andrew: The SOS has just informed us that a change to electronic signature gathering would require Executive or Legislative action. I understand that the Governor's office is very busy dealing with this crisis--but the SOS does not have jurisdiction to

Declaration Of Rebecca Schroeder          p. 6

resolve this--and it absolutely falls under the realm of protecting wider public safety. We request a meeting or phone call about this urgent matter please.

37.     Andrew Mitzel replied for the final time indicated the Governor would not take executive

action, stating:

> Given our intense focus on spending as much time and resources on protecting the health and safety of the broader population, the Governor's Office has no intention of taking executive action on this matter.

38.     I responded yet again, and indicated:

> that encouraging 100K face-to-face conversations as we exercise our constitutional rights **absolutely** falls into the category of protecting the wider public health, and requires the Governor's attention. Please consider at meeting or phone call to discuss this.

> One more important consideration--the Governor could face unintended liability for failing to address this urgent concern if people become ill due to his lack of action. We have an online petition circulating asking Governor Little to take action. I am speaking not just for our organization, but on behalf of the hundreds of folks who have volunteered time and energy on this. This is the right thing to do to protect public safety. Thank you.

**Reclaim Idaho's Communications with Idaho Secretary of State regarding Covid-19**

39.     On behalf of Reclaim, I also communicated with the Secretary of State. I emailed:

> Dear Mr. Denney: We are faced with a global pandemic. Idahoans are responding by cancelling public events and dramatically reducing face-to-face interactions. This reality creates extraordinary obstacles for Idaho's ballot initiative process and the constitutional right of every Idahoan to participate in that process. Idaho's initiative qualification laws, which are among the strictest in the country, require tens of thousands of face-to-face interactions. In the interest of safeguarding the health of the public and protecting the constitutional rights of Idahoans, we are asking to authorize temporary online petitioning for Idaho ballot initiatives. The state of Idaho conducts much of our public business online, from voter registration to campaign finance documentation to the registration of new corporations. It is well within our capacity as a state to process petition signatures online. During these extraordinary times, online petitioning is the most effective way to protect public safety while maintaining the constitutional right of Idahoans to participate in the ballot initiative process.
>  Please advise if this is within the realm of the SOS, or whether it would require
>  Legislative or Executive action.

> As the executive director of Reclaim Idaho, I have hundreds of volunteers (many retirees and "at risk" individuals) reaching out to me for guidance. At this point, electronic signature gathering is truly the only safe path forward. Over 30K signatures have already

Declaration Of Rebecca Schroeder          p. 7

been collected, and several districts have qualified with their 6% of voters. I understand that this is an extraordinary request--but we are obviously facing extraordinary times.

40.     A staff member of the Secretary of State replied that electronic signatures were not allowed per the Idaho Code:

> Thank you and your fellow supporters for sharing your concern with us via email.  While we understand the current situation we are in is unprecedented and can appreciate how the further efforts in attaining the remaining signatures for your petition will be complicated logistically, we are sorry to say that there is no statute allowing electronic signatures for petitions in Idaho Statutes 34 Chapter 18.  Sincerely, Sheryl

**Reclaim Idaho Forced to Suspend Campaign After State Refused to Modify Requirements**

41.     In one final attempt to salvage our signature drive, our team contacted Representative John Gannon on March 18th and asked him to propose legislation in the Idaho House of Representatives that would temporarily adjust Idaho's ballot initiative rules. After sharing a legislative proposal with at least one member of majority leadership, Rep. Gannon informed us that he was unable to find support for the bill and there was therefore no legislative path forward.

42.     Without accommodations from Governor Little, the Idaho SOS, or the Idaho Legislature, Reclaim Idaho was left with no choice but to suspend signature gathering for the Invest in Idaho ballot initiative.

43.     We had spent months building volunteer capacity, and were at the height of our signature gathering when COVID-19 arrived.

44.     We were ahead of the pace that we had kept on our successful Medicaid Expansion initiative when we were forced to suspend our efforts.

45.     Reclaim Idaho volunteers were on track to qualify the invest in Idaho initiative until Covid-19 hit.

Declaration Of Rebecca Schroeder          p. 8

46.    It was heartbreaking to suspend the campaign that volunteers had worked so hard to build. We launched an online petition urging Governor Little to intervene, but no action was taken by Governor Little's office.

47.    With signature gathering suspended—fundraising efforts also became impossible to sustain.

48.    Because of the COVID-19 pandemic and public health orders, Idahoans were unable to exercise their First Amendment constitutional rights.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON this 5th day of June 2020.

/s/Rebecca Schroeder

Declaration Of Rebecca Schroeder          p. 9

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **RECLAIM IDAHO**, an Idaho Political Action Committee, and **LUKE MAYVILLE,** | |
| Plaintiffs, | Case No. 1:20-cv-00268-BLW |
| v. | |
| **BRADLEY LITTLE**, in his official capacity as Governor of Idaho; **LAWERENCE DENNEY**, in his official capacity as Idaho Secretary of State; Defendants. | **DECLARATION OF DEBORAH SILVER IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

I,  Deborah Silver, having first been duly sworn upon oath, declare as follows:

1.      My name is Deborah Silver, and I am a resident of Twin Falls, ID and a Certified Public Accountant.  I became the volunteer treasurer for Reclaim Idaho in 2019, and am the Reclaim Idaho volunteer district leader for legislative district 24 (Twin Falls).

2.      We got a jump start the initiative by gathering signatures on November 5, election day. We collected over 300 signatures with the help of about eight volunteers.

3.      On January 3 of 2020, Abi Sanford and I began doorknocking.  We started around 4:30 pm and knocked on about twelve doors. Less than half of those had people at home.  We gathered 8 signatures in less than an hour.  It was fully dark before 5:30; and we went home.  Of the people who were home, everyone signed, and a couple had more than one voter who signed.

4.      We began doorknocking five-seven days a week.  After the first week, we strategized that after five o'clock, more people are home.  After darkness falls, fewer doors open. We decided that it is most effective to try to door knock up until total darkness, so we adjusted the start time as the sun set later and later. We were starting around 4:00 at the beginning and going until 5:30.

5.      Our goal was 100 signatures a week. My personal goal was 60 and Abi and other volunteers would make up the difference.  The verified signature goal for our district is 1356.

6.      We used an app which showed us maps of registered voters, and we had another app which allowed us to look up registered voters.

7.      We knew that some of the signatures we would collect would be people who had moved and not changed their voter registration or were not registered- so we were collecting far more than the required signatures.

8.      In January and February, we met our goal of over 800 signatures. (The county elections office has been slow in verifying signatures.  They verified the November and January petitions

with a combined verification rate around 80%. I turned in the February signatures around March 6. The county recently notified me that they have finished verifying those petitions, but I have yet to pick them up.)

9.     At the end of February, the interest shown by volunteers was really picking up. We held a new volunteer meeting the last week of February and had about eight new volunteers. About ten people signed up to collect signatures on election day in Twin Falls.

10.     Due to a health issue, I was sidelined the first week of March, but volunteers kept us on track collecting the 100 signatures per week as per our plan.

11.     Also, critically, the sun was setting just a little bit later each day, so that our shifts were beginning after 5 and continuing until dark at or around 6:30. We were anticipating daylight savings time on March 8, which would allow us to door knock for an additional hour each evening. This would potentially double the amount of doors and signatures collected per shift. I now had over ten people who volunteered to doorknock with me at least one day a week.

12.     March 10 was the presidential primary. Volunteers collected signatures in Twin Falls. Abi Sanford and I traveled to Hailey, Idaho (Blaine county) and gathered signatures outside the polling places there along with volunteers from the area. The success rate was incredible. This was occurring around the state.

13.     By Friday of that week, we realized that continuing the effort with covid-19 looming was endangering both our volunteers and the voters we were contacting. My husband and I self - quarantined because it was evident that Blaine county was the epicenter of the pandemic.

14.     From January through early March, our records show that in Twin Falls, we made 2377 attempts at the doors, with a 39% contact rate. I am especially proud of this because this was winter weather. We went in snow, wind, and cold.

15.     I am confident that with the increased participation of volunteers and with the change to Daylight Savings Time, our district goal would have been achieved by April 1.  Our local volunteers would then expand beyond the city of Twin Falls and continue to collect signatures in District 23-Jerome, Buhl and Kimberly.

16.     I had personally committed to moving to Blaine county for the month of April to help with the signature gathering and organizing there.

17.     The fundraising for Reclaim Idaho was also picking up steam. Reclaim Idaho has attracted hundreds of unique donors, which can be seen by our publicly filed campaign reports.

18.     January through March we were attracting between 50-75 new donors each month. These were people who had not donated to us in 2019.

19.     We were meeting our fundraising goals as well as attracting new donors.  We averaged 300 donations a month January-April from our online fundraising vendor ActBlue.  There were over 320 individual donations in March and April even after halting the signature gathering. For reference, May saw 106 donations through ActBlue.

20.     Reclaim Idaho raised approximately $115,000 for our K-12 funding initiative. By March 18th, we had expended approximately $98,000 on the signature drive and we had approximately $17,000 additional funds in the bank.

21.     Our fundraising, volunteer interest, and signature gathering events were reaching critical mass in early March.

22.     The event on election day was the most successful in Reclaim Idaho's history.

23.     The surge in volunteers and critically the change in weather and Daylight Savings Time would have boosted all the organizing efforts.

24.     It was necessary to suspend because of Covid-19, but there is no doubt we were within striking distance of qualifying this ballot initiative.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 5th day of June 2020.

/s/ Deborah Silver

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **RECLAIM IDAHO**, an Idaho Political Action Committee; **LUKE MAYVILLE**<br><br>Plaintiff,<br><br>v.<br><br>**BRADLEY LITTLE**, in his official capacity as Governor of Idaho; **LAWERENCE DENNEY**, in his official capacity as Idaho Secretary of State<br><br>Defendants. | Case No. 1:20-cv-00268-BLW<br><br>**DECLARATION OF ASHLEY PRINCE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

I, Ashley Prince, having first been duly sworn upon oath, declare as follows:

1.     My name is Ashley Prince, and I am the Field Director of Reclaim Idaho, the Plaintiff in this case.

2.     The Invest in Idaho campaign started with 143 volunteers in October 2019.

3. Throughout the signature drive, there were always a portion of our volunteers who collected signatures at a relatively high and frequent rate. I'll designate those volunteers here as "highly active."

4. Not including big events we had around 25 highly active volunteers around the state collecting an average of 12 signatures a week through December. By February we had around 80 highly active volunteers a week averaging 36 signatures a week.

5. By March 10th we had grown to 546 volunteers statewide with 150 being highly active, each with an average of 50 signatures per week.

6. Our volunteer network grew not only in terms of the sheer number of volunteers but also in geographic terms.

7. To give one example: On March 1st we activated a new team of volunteers in the town of Mountain Home, which is an area in which Reclaim Idaho had not previously organized. Within their first week, the newly organized Mountain Home team collected over 100 signatures.

8. We have a process to verify the signatures we collect by matching the signers of the petition against a list of registered Idaho voters provided by the Secretary of State. We have been able to do this work efficiently with the use of REACH, a smartphone app for data organization and grassroots organizing. We signed a contract for the use of REACH for $300 per month beginning in the fall of 2019.

9. The purpose of prescreening the signatures before submitting them to the local county clerks was to better keep track of how many signatures we collected so we knew as a campaign how close we were getting to the qualifying goal. This is a necessary step because the county clerks are not uniform on how quickly they verify signatures and certify petitions. The only deadline counties have to verify signatures is within 60 days of the petition turn-in deadline or no

later than June 30th of an election year. This deadline does not allow our campaign to change tactics to meet the goal or know how many signatures collected are valid until after the deadline.

10.     The process of internally validating signatures is to have volunteers match the signer. We look for 3 key things. 1. Is the voters name legible? If it is not legible the clerks cannot find the voters information to certify the signature 2. Are they registered to vote in Idaho? 3. Are they registered to vote at the same address that they signed the petition with? If a volunteer finds that all 3 of these metrics are met the signature is classified as likely valid and goes towards the total of signatures needed to meet the qualifying goal.

11.     Based on the campaign's internal verification of signatures we had qualified 5 legislative districts with another 7 expected to qualify by the end of March. The final 6 legislative districts were on pace to qualify in April before the deadline.

12.     We collected an estimated 33,000 signatures by March 18th. Our internal verification indicated that 86% of those signatures were valid.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.   EXECUTED ON this 5TH day of June 2020.

/s/ Ashley Prince

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| **RECLAIM IDAHO**, an Idaho Political Action Committee, and **LUKE MAYVILLE,** | Case No. 1:20-cv-00268-BLW |
| Plaintiffs, | |
| v. | **DECLARATION OF KAREN LANSING IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| **BRADLEY LITTLE**, in his official capacity as Governor of Idaho, and **LAWERENCE DENNEY**, in his official capacity as Idaho Secretary of State, | |
| Defendants. | |

I, Karen Lansing, having first been duly sworn upon oath, declare as follows:

1.  My name is Karen Lansing, and I am an active volunteer of Reclaim Idaho, the Plaintiff in this case.

2.  I formerly sat as a judge on Idaho Court of Appeals from 1993 to 2015.

3.      I became associated with Reclaim Idaho in January 2018 when I volunteered to gather signatures on the initiative petition to expand Medicaid in Idaho.

4.      When the organization launched its second initiative effort, this time to increase state funding for public schools, I again participated.  I began gathering petition signatures as soon as the new petition form was released in October, 2019.  I simultaneously gathered signatures for a separate, unrelated initiative to raise the minimum wage in Idaho.

5.      In October and November, 2020, I also composed for publication a guest opinion supporting the initiative which is attached to my declaration as Exhibit A.  To gather historical information and statistical data for the piece, I researched extensively on-line and at the Idaho Law Library.   This opinion piece was published in the November 17, 2019 issue of the Idaho Stateman newspaper.

6.      I gathered petition signatures in a number of ways.  These included going door-to-door in residential neighborhoods in Boise and Eagle, Idaho; standing in the vicinity of polling places on election days in November, 2019 and March 2020 to solicit signatures from voters, approaching people attending rallies and other political events; standing near entrances to public libraries and other public buildings in Boise and Nampa, Idaho; and requesting signatures of passers-by on public sidewalks.

7.      During the winter, obtaining signatures was very challenging because of the weather. Soliciting signatures in a rain or snow storm isn't practical because the petitions will get wet. When there was no precipitation, it was nevertheless difficult because I found that I often could stand outside no longer than about an hour before I my hands became too cold to continue.  I was impressed, however, by the number of people who were willing to pause in the bitter cold to write their names and addresses on the petition.

8.      As the weather improved in February and early March, 2020, I was able to greatly increase time devoted to signature gathering.  During that period, I spent several hours on most days gathering petition signatures and doing related data entry.

9.      It became impossible to continue, however, due to the spread of coronavirus cases in Idaho.

10.     Initially, when the coronavirus became a concern, Reclaim Idaho leaders considered whether we could continue the initiative effort by taking special steps to protect signature gatherers and petition signers.  Ideas included having the volunteers wear gloves and providing a separate ink pen for each signer to prevent virus transmission.  Ultimately it was decided that no such measures could assure participants' safety because participants would inevitably come into close contact and individuals could not sign the petition without touching the paper that had been touched by others.

11.     Moreover, one of the most productive means of gathering signatures—taking positions at public facilities with heavy foot traffic such as libraries and driver's licensing offices—would become impossible as those facilities were closing.

12.     For all of the above reasons, continuation of the signature drive was impossible.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON this 5th day of June 2020.

/s/Karen Lansing

# EXHIBIT A
# TO LANSING DECLARATION

# Idaho Statesman

## Let's stop starving our schools in Idaho

BY KAREN LANSING

NOVEMBER 17, 2019 07:00 AM

Our forebears who drafted the Idaho Constitution astutely recognized the importance of quality public education. In Article IX, Section 1 of that document they provided: "The stability of a republican form of government depending mainly upon the intelligence of the people, it shall be the duty of the Legislature of Idaho, to establish and maintain a general, uniform and thorough system of public free common schools."

Despite that constitutional mandate, many Idaho school districts are operating in financial crisis conditions. Forty-five of Idaho's 115 school districts have four-day school weeks because they cannot afford to heat school buildings and run school buses five days a week. Some schools have classrooms without a sufficient number of desks to seat all the students. Teachers are fleeing from rural districts to larger communities or to other states for better pay. This failure to invest in Idaho's public schools is nothing new. As a lifelong Idahoan (and a graduate of Orofino High School), I have watched with alarm for years as the adequacy of investment in our public schools has declined.

A few statistics illuminate the deficiency of this state's investment in education. According to the U.S. Census Bureau, Idaho ranked second-to-last nationally in per-pupil investment for the 2017-18 academic year. Idaho schools received $7,486 per student in state, local, and federal revenue compared to a national average of $12,201. Neighboring Montana invested about $4,000 more per student than Idaho. Wyoming expended about $9,000 more.

The perpetual inadequacy of state investment in Idaho schools is the impetus behind a new voter initiative launched by Reclaim Idaho, the group that got Medicaid Expansion on the 2018 ballot. The "Invest in Idaho" initiative would increase the corporate tax rate,

create a new marginal income tax rate for Idaho's wealthiest individuals, and place the resulting revenue into a fund earmarked for K-12 public education.

Currently, Idaho's tax rate for personal incomes over $7,500 is 6.925 percent. The initiative would add a new tax bracket, increasing the marginal rate to 9.925 percent for income exceeding $250,000 for individuals and income over $500,000 for couples. In other words, an individual making $250,000 or a couple making $500,000 would see no tax increase — only the income above those amounts would be taxed at the new rate. The initiative would also restore the corporate income tax rate to 8 percent, where it stood before 2001. If passed, this initiative will generate about $170 million annually to invest in K-12 schools.

Lest readers fear these enhanced rates for high-income Idahoans would be unfair, let's take a look at current tax burdens. First, Idaho's present income tax structure is virtually flat — people making less than $8,000 pay the same income tax rate as millionaires.

Second, low-wage earners pay a far higher percentage of their incomes for sales, excise, and property taxes than the rich do. According to the Institute on Taxation and Economic Policy, in 2018 the lowest-earning 20 percent of Idahoans paid out over 9 percent of their wages for such taxes. The top one percent of earners paid only 2.5 percent. Consequently, even when state income tax is added to those other state and local taxes, the poorest Idahoans expended a higher share of their wages for taxes (9.2%) than did the wealthiest Idahoans (7.2%). This regressive tax structure was made even worse in 2018 when the legislature altered state law to conform to federal tax changes that heavily favored the wealthy and corporations.

Lastly, consider the tax reductions enjoyed over the last several years by affluent Idahoans. Despite the financial struggles of public schools, the legislature has reduced the top income tax rates three times since 2004, when the highest rate was 8.2 percent. It was decreased to 7.8 percent in 2005, then to 7.4 percent in 2012, and to the current 6.925 percent in 2018. During that same period, Idaho left unfilled thousands of high-paying jobs worth hundreds of millions in unclaimed wages because Idaho cannot produce enough skilled workers. This is not a coincidence.

It is apparent that if our public schools are ever to be adequately funded, Idaho voters will have to create the mechanism to do it. That is why every Idahoan should get behind the

"Invest in Idaho" initiative. It's easy — just sign the initiative petition and vote for it on your 2020 ballot. Or better yet, volunteer to help with the effort!



*The Office of the Governor*

# *Proclamation*

     *WHEREAS, I issued a proclamation on March 13, 2020, declaring a state of emergency in the State of Idaho pursuant to Chapter 10, Title 46, Idaho Code, due to the occurrence and imminent threat to public health and safety arising from the effects of the 2019 novel coronavirus (COVID-19); and*

     *WHEREAS, President Trump issued a proclamation on March 13, 2020 declaring a national emergency due to the outbreak of COVID-19 in the United States and in order to implement additional measures to successfully contain and combat the virus in the United States; and*

     *WHEREAS, by proclamation dated March 25, 2020, I amended my proclamation dated March 13, 2020 and declared a state of extreme emergency in the State of Idaho pursuant to Chapter 6, Title 46, Idaho Code, due to the increasing occurrence and threat to public health and safety arising from the effects of COVID-19; and*

     *WHEREAS, each of those proclamations remain in effect today; and*

     *WHEREAS, on March 25, 2020, at my direction and in order to slow the spread of COVID-19, the Director of the Idaho Department of Health and Welfare issued a statewide Order directing all residents of Idaho to stay home and all businesses to close, with certain exceptions for Essential Activities, Businesses, and Government Functions; and*

     *WHEREAS, that Order remains effective today; and*

     *WHEREAS, federal, state, and local public health authorities continue to strongly recommend limited interaction between individuals in order to reduce the spread of COVID-19; and*

     *WHEREAS, citizen participation in the act of voting is essential to our republic; and*

EXHIBIT A

WHEREAS, the Idaho Secretary of State and Elected Clerks of Idaho's forty-four counties are currently preparing for the upcoming May 19, 2020 Primary and Consolidated Elections; and

WHEREAS, it takes approximately two (2) months to properly prepare for and execute an election; and

WHEREAS, Chapters 3 & 11, Title 34, Idaho Code, set out important requirements ensuring the establishment and conduct of elections via the use of polling places; and

WHEREAS, voting in polling places on May 19, 2020 (referred to hereafter as "Election Day") causes the mixed gathering of thousands of Idaho voters and poll workers, and poses a real and unacceptable risk to the lives of Idaho voters and poll workers and the spread of COVID-19 to other citizens; and

WHEREAS, the recommendations to limit interactions with others during this state of emergency has significantly decreased the availability of possible polling locations and willingness of poll workers to serve on Election Day; and

WHEREAS, according to the official information provided by the Idaho Department of Health and Welfare, as of the date of this proclamation, 525 Idahoans have tested positive for COVID-19 and 9 Idahoans have died due to COVID-19; and

WHEREAS, it is crucial to the health and safety of all Idahoans that the spread of COVID-19 be reduced so that the state's healthcare capacity is not overwhelmed by large number of cases arising simultaneously; and

WHEREAS, cases of COVID-19 have continued to increase in Idaho, necessitating additional measures to contain and combat the virus while protecting the constitutional rights of all Idahoans; and

WHEREAS, the Center for Disease Control and the State of Idaho Department of Health and Welfare have determined that individuals over the age of sixty-five (65) and individuals who are immunocompromised are more vulnerable to serious illness due to COVID-19; and

WHEREAS, I am informed by the Secretary of State that on average approximately 1,000 poll workers help carry out a primary election like this and that over sixty-five percent (65%) of those poll workers were over the age of sixty (60) as of 2019; and

WHEREAS, there is a real risk of virus spread at traditional polling places under normal election circumstances where a single precinct can see over 2,000 voters in a single day; and

WHEREAS, the equipment and supplies necessary to protect poll workers at traditional polling locations from COVID-19—such as face masks, face shields, gowns, hand sanitizer, and disinfectants—are in high demand and are needed in hospitals and health care facilities to keep

Idaho's health care workers safe, healthy and able to continue protecting and treating Idahoans at this time; and

WHEREAS, utilizing the existing statutory procedures for absentee voting by mail allows Idahoans to exercise their constitutional right to vote while keeping the public safe from the threats presented by the presence of COVID-19 in Idaho; and

WHEREAS, in addition to the use of paper application forms, the Secretary of State has already set up a website where Idaho voters can register to vote and request an absentee ballot electronically;

WHEREAS, I have worked with the Secretary of State and the elected County Clerks to ensure Idahoans have every opportunity to exercise their constitutional right to vote safely without risking exposure to COVID-19; and

WHEREAS, for all of the reasons stated herein and many others, I am convinced that the actions set out in this proclamation, including voting by mail, are necessary to protect the liberty, constitutional right to vote, lives and property of Idahoans, and to ensure necessary action to cope with the existing emergency is not prevented, hindered or delayed.

NOW, THEREFORE, I, Brad Little, Governor of the State of Idaho, by virtue of the authority vested in me by the Constitution of the United States, the Constitution of the State of Idaho, and the laws of this State, including Sections 46-601 and 46-1008, Idaho Code, do hereby find and therefore proclaim, declare, and order that:

1. The proclamations I issued on March 13, 2020 and March 25, 2020 are hereby amended to incorporate this proclamation.

2. This proclamation is issued in furtherance of and compliance with the Order issued at my direction by the Director of the Department of Health and Welfare on March 25, 2020.

3. The requirements of the following sections of Idaho Code are suspended entirely for the duration of the 2020 Primary and Consolidated Elections:

   a. 34-302. DESIGNATION OF PRECINCT POLLING PLACES,
   c. 34-1006. COUNTY CLERKS SHALL PROVIDE ONE OR MORE "ABSENT ELECTORS' VOTING PLACE,"
   d. 34-1012. ALTERNATIVE PROCEDURES FOR ABSENTEE VOTING – EARLY VOTING,
   e. 34-1101. OPENING AND CLOSING OF POLLS
   f. 34-1107. MANNER OF VOTING

4. In lieu of the use of polling places on Election Day, the May 19, 2020 Primary Election and Consolidated Elections shall be conducted in accordance with the existing absentee voting by mail process set out in Chapter 10, Title 34, Idaho Code except those provisions of

Chapter 10 that are suspended as outlined in paragraph two (2) above or as otherwise set out herein.

5.   The twenty-four (24) day requirement for the closing of the register of electors in section 34-408(1), Idaho Code, is suspended to provide for continuous registration up to and including Election Day.  This is to maintain compliance with Federal election law while allowing voters maximum time to register prior to requesting an absentee ballot under section 34-1002(7), Idaho Code.

6.   For the duration of the May 19, 2020 Primary Election and Consolidated Elections, the statutory requirement in section 34-1002(7), Idaho Code, below,

> "...The application for a mail-in absentee ballot shall be received by the county clerk not later than 5:00 p.m. on the eleventh day before the election."

is suspended and amended to read:
'
> "...The application for a mail-in absentee ballot shall be received by the county clerk not later than 8:00 p.m. on election day."

7.   For the duration of the May 19, 2020 Primary and Consolidated Elections, the statutory requirement in section 34-1005, Idaho Code, below,

> "...that an absentee ballot must be received by the issuing officer by 8:00 p.m. on the day of election before such ballot may be counted."

is suspended and amended to read:

> "...that an absentee ballot must be received by the issuing officer by 8:00 p.m. on Tues. June 2, 2020 before such ballot may be counted."

8.   The statutory requirement in section 34-1003(3), Idaho Code, requiring that all absentee ballot requests received prior to forty-five (45) days before an election be sent not later than forty-five (45) days prior to the election is suspended  for the duration of the May 19, 2020 Primary and Consolidated Elections.

9.   If any additional statutory requirements within Title 34, Idaho Code, conflict with orders or directives under the current state of emergency, those statutory requirements may be suspended by a directive of the Secretary of State as Idaho's chief elections officer.

10. All other requirements related to the administration of elections pursuant to Title 34, Idaho Code, and any other titles, remain intact and are not impacted by this action.

11. The Secretary of State and County Clerks are encouraged to take diligent steps to make all Idaho registered voters aware of these changes and ensure that every eligible Idahoan has ample opportunity to exercise his or her right to vote.

12. For the May 19, 2020 Primary and Consolidated Elections, the Canvass of votes, along with the counting of votes under Title 34, Chapter 12, may be delayed by a period not to exceed two additional weeks after the deadline for an absentee ballot to be received by the county clerk, at the discretion of and by directive of the Secretary of State.

13. Accordingly, the following deadlines for the May 19, 2020 Primary and Consolidated Elections apply:
   a. May 19, 2020, 8 p.m.: Deadline to register to vote.
   b. May 19, 2020, 8 p.m.: Deadline for county clerk to receive a request for absentee ballot by mail or by in person delivery.
   c. May 19, 2020 – 8 p.m.: Deadline for requesting an absentee ballot online.
   e. June 2, 2020 – 8 p.m.: Deadline for absentee ballots to be received by the county clerk.
   f. June 2, 2020 – 9 p.m. Mountain – Earliest time for results to be posted for May 19 Primary Election.

14. These actions are necessary to protect the liberty, constitutional right to vote, health and safety of voters, poll workers, and all citizens from COVID-19 and to ensure the necessary actions being taken to cope with the existing emergency is not prevented, hindered, or delayed and by reducing the sharing of materials and space caused by the conduct of elections in polling places.



IN WITNESS WHEREOF, I have hereunto set my hand and caused to be affixed the Great Seal of the State of Idaho at the Capitol in Boise on this 1st day of April in the year of our Lord two thousand and twenty.

_____

Brad Little

GOVERNOR

_____

Lawerence Denney

SECRETARY OF STATE

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **RECLAIM IDAHO**, a political action committee, and **LUKE MAYVILLE**, <br><br> Plaintiffs, <br><br> v. <br><br> **LAWERENCE DENNEY**, in his official capacity as Idaho Secretary of State; **BRADLEY LITTLE**, in his official capacity as Governor of Idaho <br><br> Defendants. | Case No. 1:20-cv-00268-BLW <br><br><br> **SUPPLEMENTAL DECLARATION OF LUKE MAYVILLE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

I, Luke Mayville, having first been duly sworn upon oath, declare as follows:

1. My name is Luke Mayville, and I am a Co-founder of Reclaim Idaho, the plaintiff in this case. This is my supplemental declaration in support of a preliminary injunction.

Supplemental Declaration of Luke Mayville    1

2.      Defendants argue that our campaign was dilatory on the grounds that we did not begin the signature-collection process a full 18 months before the deadline. My experience with grassroots political organizing—including the experience of our successful Medicaid Expansion signature drive in 2018—tells me that it is the final two months of a signature drive that are by far the most productive for signature gathering. This is because the looming deadline gives volunteers a sense of urgency, and they grow more committed and more efficient in their work. Meanwhile, supporters who had remained on the sidelines in the early months are motivated by that same sense of urgency to volunteer for the first time.

3.      It is true that we would have collected more signatures had we began our signature drive several months earlier. But even with an early start, our drive still would have needed those precious final weeks in order to collect the required number of signatures. An early start would not have substituted for the loss of our final 48 days—days when the rate of signature collection was likely to accelerate dramatically.

4.      In fact, we began our "Invest in Idaho" signature drive at a much earlier date on the calendar than we had begun our Medicaid Expansion signature drive. Our Medicaid Expansion signature drive did not begin until December of the year prior to the election (the petition was officially certified for circulation by the Secretary of State on December 5th, 2017). By comparison, we began our "Invest in Idaho" education initiative significantly earlier, in late October of the year preceding the election (certified by the Secretary of State on October 25th, 2019). When planning our "Invest in Idaho" drive, we chose to begin the process earlier in order to increase our chances of success.

5.      However, we had learned from the Medicaid drive that the final months were by far the most productive for grassroots signature-collection, and we expected the pattern to be repeated

Supplemental Declaration of Luke Mayville     2

for our second initiative. Prior to the suspension of our "Invest in Idaho" signature drive, the pace of signature gathering very closely resembled that of our Medicaid Expansion drive, with our numbers ramping up dramatically beginning in late February and early March.

6. Defendants are very likely correct in their prediction that an earlier start would have yielded more signatures. But it would not have been enough. An early start would not have replaced those precious final seven weeks that were denied us.

7. Defendants also argue that our campaign lacked diligence on the grounds that we did not immediately file a court case prior to early June. Reclaim Idaho is a grassroots organization without a legal team or funding to hire legal representation. Since our inception, we have operated mainly on small donations of between $3 and $100. We began considering a lawsuit as early as March 16, 2020, which was the day we heard from the Governor's Senior Advisor Andrew Mitzel that the Governor did not intend to take action. At that point, we suspected that it was a violation of our rights to force us to choose between public safety and our constitutional right to petition our government. However, without legal know-how or funding to hire attorneys, we needed extra time to develop a plan for legal action.

8. As soon as we were able to articulate the outline of a legal argument, I immediately scheduled a meeting with Deborah Ferguson of Ferguson Durham PLLC for Monday, May 25th, 2020. Shortly thereafter, Ferguson Durham offered to represent Reclaim Idaho on a pro-bono basis. From that point forward, we worked swiftly with our attorneys and filed our case on June 6th, just twelve days after our initial meeting. Within the means at our disposal as a grassroots organization, we worked as swiftly as we could to file our motion.

9. Defendants argue that Reclaim Idaho willingly ended our signature drive on March 18th, prior to the March 25th Stay-at-Home order. In fact, we *suspended* our signature drive on March

18th but did not terminate all efforts to keep the effort alive. Between March 18th and the announcement of the Stay-at-Home order on March 25th, our campaign continued to explore potential means of safe signature gathering.

10.     After several days of deliberating with our Bonner County volunteer team about the challenge of collecting signatures during a pandemic, one highly active volunteer named Rebecca Holland drafted a plan for safe signature gathering that she emailed to me and other members of our statewide team on March 19th. The plan (attached as an exhibit) directed volunteers to drop off packets of petitions at the homes of local teachers, who were encouraged in turn to find friends and family members to sign the petition and then bring all signed petitions to a local volunteer leader in order to be notarized.

11.     Over the next several days, I discussed the plan at length with members of the Bonner County team. We discussed the practicality of the plan and whether we could possibly implement it statewide. We eventually concluded that the plan required extensive in-person contact and therefore posed too high a risk to the health of petitioners.

12.     On March 20th, we sent out a survey to our statewide email newsletter. The first question was simply to ask whether our supporters and volunteers were okay in the midst of the rapidly escalating public health crisis. Our second question was the following:

13.     *This past week we announced a suspension of our campaign for the Invest in Idaho ballot initiative. Do you have any ideas on how we might save the signature drive from being shut down by the coronavirus? [Note: We have already called on the Legislature to adjust the initiative rules; and we've already petitioned Governor Little to authorize online signature gathering. To date, neither the legislative majority nor the Governor is willing to take action].*

Supplemental Declaration of Luke Mayville     4

14.     Close to 600 Reclaim Idaho supporters responded to the survey.  Some recommended taking legal action, but none offered a clear plan for how we might build a legal case. Others urged us to collect electronic signatures or mail-in signatures, without providing a plan for how those signatures could be accepted as valid by the state. The most common response was merely to lament the unwillingness of the Legislature and Governor to take action, and many volunteers expressed hopelessness about the future of the Invest in Idaho initiative.

15.     All the way up until the announcement of the Stay-at-Home order on March 25th, we continued to carry out discussions with volunteers and supporters about how the campaign might be resumed. Once the Stay-at-Home order was issued, however, it became absolutely clear that collecting signatures in-person would be impossible.

16.     The Stay-at-Home order remained in full effect all the way through April 30th, which also happened to be the final day for collecting signatures. For the final 36 days before the official deadline, it was a misdemeanor in Idaho to engage in non-essential, in-person activities—including the collection of signatures.

17.     Defendants have argued that electronic signatures are not necessary for the safe collection of signatures. "The State of Idaho," Defendants declare, "is already in Stage 4 of the recovery from the pandemic."

18.     It is not at all clear what Defendants mean by the word "recovery." On Friday, June 19th, World Health Organization Director-General Dr. Tedros Adhanom Ghebreyesu announced that the global pandemic is accelerating rapidly. Dr. Tedros said: "The world is in a new and dangerous phase…We call on all countries and all people to exercise extreme vigilance."

Supplemental Declaration of Luke Mayville     5

19.     In Idaho, at the time of this writing on June 21ˢᵗ, 2020, we have seen 528 new cases in the past five days. This is the largest spike in cases since the early peak of the outbreak in April. During the past month, 16 deaths were attributed to COVID-19 in Idaho.

20.     All public health authorities are currently exhorting Idahoans to follow social distancing guidelines. On Tuesday, June 16ᵗʰ, during a statewide call-in with the AARP, Governor Little attributed the recent rise in COVID-19 cases to a failure of some Idahoans to follow guidelines to maintain social distance. (https://www.idahopress.com/coronavirus/worried-idahoans-quiz-little-about-rise-in-covid-19-cases/article_c519a4cd-f3c8-5fa4-9f92-33aa817c2635.html).

21.     In seven of the counties where our signature drive was most active, our volunteer leaders are over the age of 60 and at heightened risk of contracting COVID-19. These seven counties account for 13 of the 18 districts where we expected to qualify our initiative.

22.     We are certainly not in a period of "recovery" from the public health crisis brought about by COVID-19. In the summer of 2020, we continue to live in the midst of a once-in-a-century pandemic. If Reclaim Idaho is not provided with a safe, socially distant means of collecting signatures, we will again be forced to choose between our health and our constitutional right to petition our government.

23.     Defendants have argued that our request to collect e-signatures using DocuSign would be "a fundamental departure from Idaho law and its Constitution." In making their case, Defendants have misconstrued the role of DocuSign in our proposed plan. We are not proposing that the private entity DocuSign will "run the election"—as Defendants repeatedly suggest. DocuSign is merely a technology for the verification of the signatures Reclaim Idaho collects, nothing more.

24.     Under our proposal, the management of signature verification and the running of the election would remain entirely with the Secretary of State and the county clerks. Furthermore,

neither the DocuSign company nor its personnel would be the "circulator" of the petition. Designated Reclaim Idaho personnel—all of whom are residents of Idaho—would circulate the petition online. DocuSign would merely provide the technology required for the collection of authentic electronic signatures.

25.     Regarding the authenticity of DocuSign signatures, it should be noted that the process of collecting e-signatures via DocuSign is not substantially different from the process used by the Idaho Secretary of State to receive absentee ballot requests online. In order to verify the identity of a person requesting an absentee ballot, the Secretary of State collects a driver's license number and the last four digits of a social security number. It is well within the capacity of a DocuSign platform to collect these same pieces of information for the purpose of authenticating electronic signatures. (see https://www.docusign.com/blog/can-i-see-a-photo-of-your-id-digital-verification-of-real-world-ids/)

26.     Defendants have argued that the in-person requirement for signature gathering is important for the purpose of allowing citizens of Idaho "to exercise their legislative powers in an effective, valid, and informed manner." We fully agree with this principle. We are of the opinion that under ordinary conditions, the in-person requirement enhances the quality of civic engagement. This is why we are not requesting any permanent change to the in-person requirement. We are only requesting a temporary change in order to protect our First Amendment right during a once-in-a-century pandemic.

27.     By Monday, June 22nd, the vast majority of Reclaim Idaho's verified signatures will be in the hands of the Secretary of State, and the vast majority unverified signatures will be *en route* to the offices of the county clerks. This means that a large portion of the required signatures will be available immediately for processing by the Secretary of State and county clerks.

Supplemental Declaration of Luke Mayville     7

28.     Finally, I would like to suggest to the Court at least one alternative form of relief that would impose no burden on the Secretary of State and county clerks. Rather than permitting the collection of e-signatures with an extended deadline, the Court might simply reduce the requirements for the total amount of signatures and the geographic distribution of signatures, as has occurred in other states.

29.     On March 14th, 2020, in response to COVID-19, the Governor of New York reduced the signature requirements for candidates seeking ballot access to 30% of the statutory thresholds. Likewise, this Court might temporarily reduce Idaho's required number of signatures to 2% (down from 6%) of the qualified electors of the state at the November 6th, 2018 general election; and the Court might require signatures from 2% of the qualified electors at the November 6, 2018 general election in each of at least 6 legislative districts (down from 18 legislative districts).


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. EXECUTED ON this 21th day of June 2020.

/s/Luke Mayville

# K-12 Education Initiative with Reclaim Idaho

Citizens are scrambling to get enough signatures **before April 30** to qualify our ballot initiative. Statewide, we need 55,000 and we're currently now over 33,000. But we're unable to do face-to-face engagements due to COVID pandemic, so we're reaching out to educators to help us achieve this very important goal.

**FACT:** This Citizen-sponsored ballot initiative will raise $170-200 Million per year. That's around $600 for every student in public & charter schools awarded to their school district. Can you image the benefits for your school?

**LAW:** New "Quality Education Fund" will be established, when Citizens pass this initiative into law in November. The State Education Committee (?) will distribute funds directly to school districts for only these specified uses:

- Salaries for teachers and support staff
- Reduction of class sizes
- Classroom materials
- Full-day Kindergarten
- Art, music, drama programs
- Special education
- Career Technical Education

**NO** funding for administrative costs : "Moneys from the fund shall not be used to pay superintendents', principals' or other administrators' salaries or other compensation", by law proudly passed by Citizen lawmakers

**FUNDS:** Personal incomes above $250K per person or $500K per married couple, and from corporations by way of reinstatement to 2010 levels. This new funding has nothing to do with local property taxes or district levies. Only those at top of the income-ladder (estimate 5% population) will be impacted.

In 2019, Reclaim Idaho volunteers became Citizen Lawmakers passing Medicaid Expansion into law for Idaho residents. Now in 2020, we're working to increase State funding for K-12 Education a  R E A L I T Y !!

# Urgent  Action needed by Educators
## to help Reclaim Idaho
## put new State funding for K-12
## on November ballot

1-  **Print 2 copies of petition** at www.reclaimidaho.org (need all 5 pages)

2-  Ask another registered voter to help you. Each will **sign a petition** using black or blue ink. Next, print your legal name & address (where registered for voting) in a very legible manner (4th grade skill level)

3-  **Find 11 friends to sign your petition** (with good social distancing). Tell them they will helping your school receive an additional  $14,400 +/- for your classroom (based on the average of 22 students x $600 each). This is a dream that can come true for you ☺

4-  **Call our local co-ordinator** (title?) Linda Larson at (208) 255-XXXX or email her at larson.linda.f@gmail.com  to set-up time for delivering to her home in south Sandpoint (very convenient location )

5-  **Sign in front of Linda** to verify the signatures. A table is set-up on her outside walkway for good distancing. She'll notorize petition at no charge.

6-  **Deadline is Wed, April 29**  to give to Linda in order for her to deliver to elections office by Thursday, April 30

## Reclaim Idaho
## here with some final pitch

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **RECLAIM IDAHO**, a political action committee, and **LUKE MAYVILLE**, <br><br> Plaintiffs, <br><br> v. <br><br> **LAWERENCE DENNEY**, in his official capacity as Idaho Secretary of State; **BRADLEY LITTLE**, in his official capacity as Governor of Idaho <br><br> Defendants. | Case No. 1:20-cv-00268-BLW <br><br> **DECLARATION OF COUNSEL** |

I, Deborah A. Ferguson, declare under penalty of perjury as follows:

1.      I represent the Plaintiffs in this action, along with my law partner, Craig Durham.

2.      I make a proffer here of what the evidence would show if a registered voter in Idaho requests an absentee ballot on line based on my own request for an absentee ballot on the afternoon of June 21, 2020 while online at my office.

Declaration of Counsel

1

3.      I went to the following website:  https://idahovotes.gov/vote-early-idaho/.

4.      I  followed the links to request an absentee ballot for the upcoming August 2020

elections.

5.      I entered my personal information to allow the State's website to verify I am a registered

voter.

6.      The final step in the process was the confirmation page. A copy of the information on

that page is attached as Exhibit A to this declaration.

7.      In order to complete my online application I had to sign the application electronically by

checking a box which stated that I understood that: "By checking this box, I am personally

signing my application in accordance with I.C. 34-1002(7) and I.C. 28-50-102(B). I understand

that evidence of my personal signing of this application will be the combination of this mark and

my digital signature imposed from my voter registration record."


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON this 21th day of June 2020.


                                        /s/ Deborah A. Ferguson

## Confirmation

By checking this box, I certify that I am a citizen of the United States and that I shall have been a resident of Idaho and the county for 30 days before the election at which I vote; that I am at least 18 years of age on election day; and I declare under oath or affirmation that the information supplied herein is true.*

By checking this box, I understand that if I have given false information on this application, I may be subject to a fine of up to $50,000 and/or imprisonment under Federal and/or state law.*

By checking this box, I am personally signing my application in accordance with I.C 34-1002(7) and I.C. 28-50-102(B). I understand that evidence of my personal signing of the application will be the combination of this mark and my digital signature imposed from my voter registration record.*

EXHIBIT A

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **RECLAIM IDAHO**, a political action committee, and **LUKE MAYVILLE**, Plaintiffs, v. **LAWERENCE DENNEY**, in his official capacity as Idaho Secretary of State; **BRADLEY LITTLE**, in his official capacity as Governor of Idaho Defendants. | Case No. 1:20-cv-00268-BLW **SECOND SUPPLEMENTAL DECLARATION OF LUKE MAYVILLE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

I, Luke Mayville, having first been duly sworn upon oath, declare as follows:

1.      My name is Luke Mayville, and I am a Co-founder of Reclaim Idaho, the plaintiff in this

case. This is my second supplemental declaration in support of a preliminary injunction.

2.      Today I learned that of the 10,593 petition signatures that have been verified to date and returned to Reclaim Idaho, none were verified from Ada County.

3.      Reclaim Idaho dropped its first batch of signatures off at the Ada County Clerk's office on November 18, 2019.

4.      Reclaim Idaho then dropped off four more subsequent batches of signatures on the following dates: December 17, 2019, January 22, 2020, February 4, 2020, and in March 11, 2020.

5.      Lynn Lockhart, an employee of the Ada County Clerk's office provided me with the dates the signatures were dropped off by Reclaim Idaho at the Ada County clerk's office.

6.      I estimate that approximately 10,000 petition signatures have been turned in by Reclaim Idaho so far. Of that number, approximately 2,000 were turned in last year in November and December 2019.

7.      To date, Ada County has not returned any verified petitions to Reclaim Idaho.

8.      I called the Ada County Clerk's office to ask how many signatures had been verified to date and was advised to submit an Idaho Public Records request in order to obtain that information.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. EXECUTED ON this 22nd day of June 2020.


/s/Luke Mayville

**CERTIFICATE OF SERVICE**

I hereby certify on this 22nd day of June, 2020, I filed the foregoing electronically
through the CM/ECF system, which caused the following parties or counsel to be served by
electronic means, as more fully reflected on the Notice of Electronic Filing

 

    Robert A. Berry
    Megan Ann Larrondo
    robert.berry@ag.idaho.gov
    megan.larrondo@ag.idaho.gov

    Attorneys for Defendants

                      */s/ Deborah A. Ferguson*

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RECLAIM IDAHO, a political action committee registered with the Idaho Secretary of State,<br><br>          Plaintiff,<br><br>     v.<br><br>BRAD LITTLE, in his official capacity as the Governor of Idaho, and LAWERENCE DENNEY, in his official capacity as Idaho's Secretary of State,<br><br>          Defendants. | Case No. 1:20-cv-00268-BLW<br><br><br>**STATUS REPORT ON COMPLIANCE WITH COURT'S JUNE 30TH ORDER** |

Counsel for Reclaim Idaho, along with their client Luke Mayville, met and conferred on the phone with Mr. Robert Berry, counsel for the State, to present Reclaim Idaho's plan for collection and submission of authentic e-signatures as set forth in the Court's orders dated June 30th (Dkt. 19), and June 26th, (Dkt. 14). These meetings occurred on July 1, July 3, and July 7. In addition, a fourth meet and confer was scheduled by agreement for July 8. Immediately prior to that final and fourth meeting the undersigned provided counsel for the State with a written summary of the plan presented by Reclaim Idaho and responses to the State's concerns that had been discussed with him. A copy of that letter is attached as Exhibit A. Reclaim Idaho's plan as set forth in Exhibit A details the process established, and in bolded font, the changes made by Reclaim Idaho in response to the concerns raised on behalf of the State.

The particulars of the plan had already been discussed with counsel for the State at the previous meet and confer meetings. Throughout these conferences, counsel reviewed and referred to the visual example of Reclaim Idaho's proposed landing page and the DocuSign process to walk counsel through the experience of signing the petition electronically in great detail. These documents are attached to Luke Mayville's Declaration (Dkt. 2-2).

After counsel for the State received this written summary, counsel and Luke Mayville waited an hour on July 8 for counsel to join the final meet and confer, but the State never joined the call. Instead, on the following day the State filed its "Notice Re: Dkt. 19" (Dkt. 23) which now lists myriad new concerns that were never voiced. As set forth in Luke Mayville's Fourth Declaration, many of these could have been easily addressed had the State raised them. Now they have been.

Yesterday's "Notice" is much like the State's choice to wait until the deadline to decide on a remedy by June 26, and then instead file its Notice [that it did not intend to choose] and

2

Motion to Stay (Dkt.16). At no time during these discussions did the State make any alternative electronic signature gathering proposals for Reclaim Idaho to consider. And in the end it has not accepted a single part of the process Reclaim Idaho has proposed. Reclaim Idaho's good faith effort to reach an agreement on these matter is outlined in the correspondence attached as Exhibit A. Further, Luke Mayville addresses the latest scattershot of the State's complaints in his fourth declaration. Attached to his declaration as Exhibits 1 and 2 are two DocuSign white papers: *Electronic Signatures and Transactions in the United States* and *Court Support for Electronic Signatures in the United States* which provide the Court with further information about the common usage and reliability of electronic signatures.

Accordingly, Reclaim Idaho will proceed as the Court has directed under these circumstances, and according to the plan it has developed as set forth in Exhibit A.

RESPECTFULLY SUBMITTED on this 10th day of July 2020.

/s/
Deborah A. Ferguson
Craig H. Durham

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify on this 10th day of July, 2020, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing

> Robert A. Berry
> Megan Ann Larrondo
> robert.berry@ag.idaho.gov
> megan.larrondo@ag.idaho.gov
>
> Attorneys for Defendants

*/s/ Deborah A. Ferguson*

Exhibit A to Status Report

# FERGUSON DURHAM, PLLC

Deborah A. Ferguson      223 North 6th Street, Suite 325      Telephone
Craig H. Durham      Boise, Idaho 83702      (208) 484-2253
     Facsimile
Email: daf@fergusondurham.com      (208) 906-8663
         chd@fergusondurham.com

July 8, 2020

**Via email**

Robert Berry
Deputy Attorney General
Civil Litigation Division

Re: *Reclaim Idaho v. Gov. Bradley Little and Secretary of State Lawerence Denney*,
Case No. 20-cv-00268- BLW

Dear Robert:

Today will be our fourth meet and confer meeting to address the State's concerns over Reclaim Idaho's plan for collection and submission of authentic e-signatures as set forth in the Court's orders dated June 30th (Dkt. 19), and June 26th, (Dkt. 14). We have already addressed these points with you at our numerous meet and confer meetings, but wanted to provide the written summary as well as we have discussed a lot of detailed information.

- Collection of signatures

  - Reclaim Idaho will establish a dedicated website for on-line signature collection. **Note: As you requested, we have confirmed the website will be secure, with encryption built into it. It will be connected through https:// as opposed to http://.**

  - The landing page will ask for support to place the issue on the ballot to increase funding for K-12 education. The page will provide a link for the person to read the full text at this initial juncture. The potential signers will see the full screen and the long and short titles. They will have the option of clicking a "start" button that will take them to the bottom of the page , or they can scroll to the bottom manually. **Note: As you requested, at any point they can scroll up and down to see the full text of the entire initiative. In sum, the first page, with the short and long titles ballot titles will be easily viewable to all signers. Moreover,**

2

**Reclaim can commit to sharing a link on the landing page where potential signers can review the full petition before entering their information, in response to your request for this feature.**

o Before a person can proceed, they will be required to check a box verifying that they are a registered voter and that they have not previously signed this petition. **Note: In response to your concerns about informing potential signers that they are leaving Reclaim Idaho's landing page, we modified the language above the form to specifically indicate Docusign's involvement in the process as follows, with the following message: "Please fill out the form below. After you fill out the form, you will be redirected to a DocuSign form where you will sign the official petition."**

o If the person elects to proceed, they will enter their name, voter registration address, city and zip code, last 4 digits of their social security number, and their email address. **Note: The person will not be asked to enter their driver's license number. Docusign has informed Reclaim that a driver's license is not essential for meeting industry standards. In light of that, and the fact that such a requirement would overly restrict the pool of registered voters who are eligible to sign, there appears no need for this requirement.**

o They will hit 'next' and be directed to a PDF of the petition that looks exactly like the paper version except that: 1. It will have only one signature line, 2. It will have fields for the last 4 digits of their SSN and the county where the elector resides, and 3. The circulator statement will have additional wording due to the on-line nature. **Note: This PDF document will contain the Short and Long Ballot titles, which the person can read in full before signing the initiative as you have requested.**

o All of the fields in the PDF document will populate from the information provided by the person on the landing page and they will be asked to confirm the information and authorize the placing of their signature on the petition. If they elect to proceed, a cursive version of their signature will be affixed to the signature field. **Note: You have also expressed concerns about the ability to cancel the transaction, should someone chose to do so. There is also a separate button to cancel the transaction in the event a person declines to sign.**

o If a transaction is cancelled no information is retained. **Note: In response to your concern over the data entered by individuals who chose not to sign, no signer data will be retained, or even accessed by Docusign.**

o A few notes on authentication:

3

- The DocuSign form will capture the person's IP address and GPS location. The form will also capture the person's *intent to sign* by requiring that they check a box confirming their intention to provide an electronic signature. These three factors (IP address, GPS location, and intent to sign) all provide additional authentication. **Note: Taken together with the requirement to provide the last 4 digits of a social security number, these measures will place Reclaim Idaho's petition well above industry standards for authentication.**

- For every signature Reclaim Idaho collects, it will have on file a certificate of completion. This certificate is a legally binding document that provides an audit trail in case the authenticity of a signature needs to be reviewed. The audit trail includes a time stamp for when the person signed along with their GPS location and IP address. **Note: As set forth above, Reclaim Idaho will provide the Secretary of State with a certificate for each e-signature collected if requested, once a protective order is in place. Should the Secretary of State decide to review the authenticity of any signature, he can do so by reviewing the audit trail.**

- <u>Submission and verification of signatures</u>

  o Each signer's name, address, and city or zip code will be collected in CSV file format. This is the same information the county clerks currently are provided in connection with initiative petitions (absent a wet signature). It will be formatted as a spread sheet and be organized as follows:

  First name/Last name/ street address/ city/ zip code

  **Note: You requested that the county clerks also be provided with the last four digits of the social security number of each signer. Reclaim declines this request for several reasons. First, the clerks have never been provided this information on petitions and have no practical use for it. Second, you have indicated that the State may have a duty to release this information in response to a Public Records Act request. According to our research the petition becomes an official public record pursuant to IC § 34-1806, as we have previously discussed with you. As such, we do not want to include these public identifiers beyond the information required by statute and inadvertently expose it to disclosure.**
  **However, to address your concerns and make the process as transparent as possible, we will provide this information to the State once a protective order is in place, if requested. This simple measure should protect the State from an obligation to disclose the last four digits of the social security numbers as a public record, as currently it is our understanding that the current exemptions upon which the Secretary of State relies -IC § 106 (25) and (34) - would not protect this information from disclosure.**

4

- o Reclaim Idaho will submit CSV files to each county via email, containing only the signatures collected in that county. County clerks will then verify whether each signer is a registered voter at the provided address. Clerks will also match a Legislative District to each signer, as they have always done. If this information cannot be confirmed the clerk will strike the signature, just as they have done in the past. **Note: Because the information will be provided in a typewritten spread sheet, this should facilitate an easier and faster review than the handwritten entries usually provided.**

- o In order to further lighten the burden on county clerks, Reclaim Idaho will submit signatures periodically throughout the 48-day drive. At the close of each week during the signature drive, Reclaim Idaho intends to email to each county a CSV file containing all signatures collected from signers in that county during the previous seven days.

- o Reclaim Idaho will take the following measures to meet the highest industry standards for verifying the identity and authenticity of each signature.

    - ▪ Reclaim Idaho's DocuSign form will confirm each signer's intent to sign and their consent to do business electronically (these are the essential measures that must be taken to ensure that signatures are authentic and legally binding under the ESIGN Act).
    - ▪ For every signature Reclaim Idaho collects, it will store a certificate of completion. This certificate is a legally binding document that provides an audit trail. The audit trail includes a time stamp for when the person signed along with their GPS location and IP address.

Thank you for working with us on compliance with the Court's orders.

Very truly yours,

/s/

Deborah A. Ferguson

5

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **RECLAIM IDAHO**, a political action committee, and **LUKE MAYVILLE**, <br><br> Plaintiffs, <br><br> v. <br><br> **LAWERENCE DENNEY**, in his official capacity as Idaho Secretary of State; **BRADLEY LITTLE**, in his official capacity as Governor of Idaho <br><br> Defendants. | Case No. 1:20-cv-00268-BLW <br><br> **FOURTH DECLARATION OF LUKE MAYVILLE** |

I, Luke Mayville, having first been duly sworn upon oath, declare as follows:

1.       My name is Luke Mayville, and I am a Co-founder of Reclaim Idaho, and a plaintiff in this case. This is the fourth declaration I have provided to the Court. My prior declarations were my first declaration (Dkt. 2-2), my supplemental declaration (Dkt. 9-2), and my second supplemental declaration (Dkt. 10).

SER - 055

2.      Prior to our first meet and confer with counsel for Governor Little and Secretary of State Denney, Reclaim Idaho developed a process and protocol for the collection, verification, and submission of electronic signatures. That process and protocol was developed in cooperation with DocuSign, the nation's leading company for execution of electronic signatures on legal documents.

3.      Attached as Exhibits 1 and 2 to this declaration are two of DocuSign's white papers: *Court Support for Electronic Signatures in the United States* and *Electronic Signatures and Transactions in the United States.* These provide useful information about the reliability and common use of electronic signatures.

4.      During several meetings with counsel for the State, Reclaim Idaho received the State's input and adjusted our process and protocol in response to the State's concerns. Unfortunately, on July 9th the State submitted to this Court several complaints regarding our process and protocol that the State did not mention during our multiple meetings. Had the State chose instead to discuss these complaints with Reclaim Idaho, each complaint would have been readily answered. Below I will provide answers to the State's most significant complaints.

5.      The State argues that our online petition form was "developed in a matter of days" and is therefore unlikely to detect fraud. The truth is that the form we are using is an industry-standard form supplied by DocuSign. DocuSign forms have been officially certified by the Federal Risk and Authorization Management Program (FedRAMP), a government-wide service of the United States federal government that vets technology providers for security and risk. DocuSign forms that closely resemble our form are now used by 800 federal, State, and local government agencies, including the Federal Communications Commission (FCC), the State of North Carolina, the Nevada Department of Transportation, and 400 California cities.

6.       The State suggests that the language of the petition that is provided on our online form is not accurate and may not comply with Idaho law. This is a perplexing suggestion, considering that the format of our online petition is identical in every aspect to the physical petition.

7.       The State claims that our compressed schedule for meeting and conferring did not provide the State adequate time to evaluate a number of important issues with our process and protocol. The State then mentions several questions that have gone unanswered due to our compressed schedule. Yet, each of the State's unanswered questions were not raised by the State during any of our several meetings. Furthermore, each question listed is easily answerable.

8.       The State asks: Has DocuSign ever accepted signatures for a ballot initiative? Yes. To give a recent example, DocuSign has accepted signatures for at least two different ballot initiatives in the State of Massachusetts.

9.       Has DocuSign accepted signatures from persons it has no prior information about? Yes. It is common practice for DocuSign to accept signatures from persons without prior information.

10.      The State asks: How is DocuSign being compensated? Reclaim Idaho has signed a contract for $50,162.50. To date, nearly 1,000 contributors have made donations to help cover this expense.

11.      It is regretful that the State appears to doubt the very possibility of an industry standard for the authentication of electronic signatures. Reclaim Idaho has diligently worked to develop a process and protocol that meets the highest industry standards. Over the course of several meetings with the State, we received the State's input and made adjustments in response to reasonable concerns regarding security, authentication, and transparency.

Fourth Declaration of Luke Mayville                                                   3

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. EXECUTED ON this 10th day of July 2020.


/s/Luke Mayville



## CERTIFICATE OF SERVICE

I hereby certify on this 10th day of July, 2020, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing


Robert A. Berry
Megan Ann Larrondo
robert.berry@ag.idaho.gov
megan.larrondo@ag.idaho.gov

Attorneys for Defendants

*/s/ Deborah A. Ferguson*

# DocuSign®

# Court support for electronic signatures in the United States

**A DocuSign White Paper**

EXHIBIT 1

# Table of Contents

Overview of applicable case law   3

**DocuSign eSignature audit trail relied upon as key evidence**   **4**

IO Moonwalkers, Inc. v. Banc of Am. Merch. Servs., LLC (2018)   4

Alliant Credit Union v. Abrego (2018)   4

Obi v. Exeter Health Resources, Inc. (2019)   5

In re Henriquez (2016)   5

Designs for Health, Inc. v. Miller (2019)   5

ADHY Investments Properties, LLC v. Garrison Lifestyle Pierce Hill LLC (2013)   5

**DocuSign eSignature acknowledged as legally binding**   **6**

Perez-Tejada v. Mattress Firm, Inc. (2019)   6

Guidotti v. Legal Helpers Debt Resolution, LLC (2014)   6

Woods v. Vector Mktg. Corp. (2014)   6

Newton v. Am. Debt Servs. (2012)   7

Pavlov v. Debt Resolvers USA, Inc. (2010)   7

**Use of e-signature for court filings**   **8**

Thomas v. Credit Mgmt., LP (2018)   8

In re Mayfield (2016)   8

Saechao v. Landry's Inc. (2016)   8

Derrick Fenley v. Rite Aid Corp. (2014)   8

**Use of DocuSign for class actions and related matters**   **9**

Joseph v. Velocity, the Greatest Phone Company Ever, Inc. (2019)   9

Weckesser v. Knight Enters. S.E., LLC (2018)   9

United States v. Real Prop. Located at 6340 Logan St. (2018)   9

Titus v. The Martin-Brower Company, LLC (2018)   9

Brandenburg v. Cousin Vinny's Pizza, LLC (2017)   9

In re Anthem, Inc. Data Breach Litig. (2017)   9

# Overview of applicable case law

## Background: electronic signatures are well established as legally binding

Judicial opinions addressing a challenge to the legality of e-signatures in the United States are relatively rare. This is likely a function of the widespread adoption of electronic signatures (over one billion signing transactions with DocuSign alone) combined with the effectiveness of the Uniform Electronic Transactions Act (UETA) and the Electronic Signatures in Global and National Commerce Act (ESIGN) in confirming their legal validity around the start of the millennium.

For the vast majority of use cases, and in nearly all jurisdictions, a properly executed electronic signature carries the same legal effect as a "wet" signature. Indeed, as the court declared in *Keller v. Pfizer, Inc.*, 2018 WL 5841865 (M.D. Pa. Nov. 8, 2018):

> "Plaintiff's argument that she should not be bound by the arbitration agreement simply because she did not sign a physical paper contract is as archaic today as the notion that James Joyce is unlawfully obscene."

## Analysis of U.S. case law involving DocuSign

DocuSign surveyed reported cases across all United States jurisdictions (through June 2019) where the court indicated that the DocuSign eSignature service was used. *In none of these rulings was a DocuSign signature denied the same legal effect as a paper-and-ink signature for any use case covered by ESIGN.*

DocuSign also surveyed published court orders specifying the use of DocuSign as an approved means of participating in certain kinds of legal proceedings; several such court orders have appeared from 2017 to 2019.

In effect, these cases and court orders fall into four categories:

1 **Cases where a DocuSign signature was ruled legally binding in the face of a direct challenge by a signer,** underscoring the evidentiary value of the DocuSign audit trail, which effectively logs the who, what, when, and how of the signing

2 **Cases in which the court acknowledged that DocuSign was used to create a binding contract,** although the electronic signature was not central to the issues of enforceability for the underlying agreement in dispute

3 **Cases where electronically signed court filings were deemed inadmissible based on local court rules** specifically requiring a paper-based process or other procedural requirements (such use cases are expressly excluded from ESIGN)

4 **Court orders approving DocuSign as an accepted methodology for participation in certain legal proceedings,** including class actions and settlements, Fair Labor Standards Act (FLSA) collective actions, and the interlocutory sale of real property

Below are brief summaries of these opinions and court orders, categorized as described above.

This white paper was most recently updated in June 2019. It is offered for general information purposes only; it is not intended as legal advice and is not a substitute for professional legal advice.

## DocuSign eSignature audit trail relied upon as key evidence

**In these opinions, the DocuSign audit trail was relied upon as evidence of a binding, enforceable agreement in the face of allegations by a party that it did not actually sign the agreements or did not intend to be bound by the terms contained therein.**

---

### IO Moonwalkers, Inc. v. Banc of Am. Merch. Servs., LLC

814 S.E.2d 583 (N.C. Ct. App. 2018)

**Court affirmed summary judgment that plaintiff had ratified the agreement, relying on DocuSign audit trail as evidence of intent.**

In this business banking dispute, the CEO of plaintiff IO Moonwalkers asserted that he had not signed defendant's agreement for credit card services. The North Carolina Court of Appeals affirmed the lower court's grant of summary judgment against plaintiff on the basis that he had ratified the agreement. In so doing, the court relied on the DocuSign audit trail showing that someone with access to the corporate email account had accessed, signed, and reviewed the agreement at specific times:

> "Were this a more traditional contract negotiation, in which the parties had mailed proposed contracts back and forth, a sworn affidavit stating that Moonwalkers never reviewed or signed the contracts might be sufficient to create a genuine issue of material fact…But this case is different because [defendant] presented evidence from the DocuSign records… Simply put, the electronic trail created by DocuSign provides information that would not have been available before the digital age…." (at 586-587)

As plaintiff had ratified the agreement, the court ruled, there was no need to rule on any further question of the signer's identity. The court also noted that plaintiff's CEO had used DocuSign previously and was thus familiar with the eSignature process, suggesting the additional value of using an industry-leading signature service.

---

### Alliant Credit Union v. Abrego

No. 76669-4-1, 2018 Wash. App. LEXIS 2964 (Ct. App. Dec. 31, 2018)

**Allegation of forged DocuSign eSignature for an auto loan was not enough to create a genuine issue of material fact as to the existence of an enforceable contract.**

In this unpublished opinion, the Washington Court of Appeals affirmed summary judgment for plaintiff on a breach of contract claim over defendant's default on a 2014 auto loan. Defendant issued a series of allegations challenging the existence of a valid loan, including that the e-signature had somehow been forged. The court highlighted the extensive authentication process employed by DocuSign, agreeing that no genuine issue of material fact exists as to the existence of an enforceable agreement.

## Obi v. Exeter Health Resources, Inc.

**WL2142498 (D.N.H. Ct. 2019)**

**Plaintiff's claim of forgery was rejected in light of the fact that she had reviewed and executed the documents from her DocuSign account, creating a binding and enforceable contract.**

In a breach of contract claim in the context of employment at a hospital, Plaintiff Dr. Obi alleged that one or another of the defendants had "forged" her signature onto a Placement Order, even though she did not challenge the authenticity of her signature on an overarching Client Services Agreement. In an unpublished opinion, the U.S. District Court for the District of New Hampshire granted summary judgment to the defendants, finding the plaintiff's "somewhat vague claim" of forgery to be "wholly unsupported by the record," as she had reviewed and signed the relevant documents via her DocuSign account.

## In re Henriquez

**559 B.R. 900 (Bankr. C.D. Cal. 2016)**

**Court relied on DocuSign audit trail as evidence of the signer's intent to be bound by the terms of the agreement.**

In this bankruptcy matter, the court ordered the payment of legal fees to plaintiff (i.e. did not except them from discharge), rejecting Defendant Henriquez's argument that he had believed he would only need to pay if plaintiff had been successful in modifying a loan. The court relied, in part, on the DocuSign audit trail showing when plaintiff accessed and signed the documents — including initialing each page — in concluding that he was well on notice that he would need to pay even if the loan modification were unsuccessful.

## Designs for Health, Inc. v. Miller

**187 Conn. App. 1 (2019)**

**Evidence that defendant had DocuSigned an agreement containing a forum selection clause was sufficient to establish the court's personal jurisdiction over defendant.**

In this breach of contract matter pertaining to an agreement to sell plaintiff's health care products, the Connecticut trial court granted dismissal on the basis that plaintiff had not met its burden to establish the court's personal jurisdiction over defendant. The appellate court reversed the dismissal in light of the forum selection clause in the DocuSigned agreement, finding that the DocuSign Certificate of Completion and other evidence provided by plaintiff met its prima facie burden to establish personal jurisdiction over defendant, who (the court noted) had used DocuSign previously to sign agreements.

## ADHY Investments Properties, LLC v. Garrison Lifestyle Pierce Hill LLC

**41 Misc. 3d 1211(A) (N.Y. Sup. Ct. 2013)**

**DocuSigned agreement, including arbitration clause, was ratified by plaintiff, rendering moot the question of whether his agent had signed the agreement without proper authorization.**

Garrison Lifestyle sought to enforce a contractual requirement to arbitrate after ADHY refused to close on the purchase of real properties won in a successful bid on Auction.com. ADHY claimed that its principal did not sign the sales agreements, which contained a requirement to arbitrate. To reach its decision, the New York state trial court reviewed Auction.com's practice of using DocuSign to secure signatures for the relevant contracts. The court reasoned that, although petitioner did not sign the agreements (his assistant did), petitioner ratified or adopted as his own the acts of his agent, his assistant.

# DocuSign eSignature acknowledged as legally binding

**In these opinions, the use of DocuSign eSignature was not central to the dispute over enforceability of the contract terms but was acknowledged by the court as part of the facts surrounding the legal agreement.**

---

## Perez-Tejada v. Mattress Firm, Inc.

**2019 WL 830450 (D. Mass. February 21, 2019)**

**Arbitration clause in an employment agreement was part of a binding contract executed using DocuSign.**

In this effort by plaintiffs to initiate an overtime wages class action against their employer, defendant Mattress Firm, Inc. was granted its motion to compel individual arbitration instead. All but one plaintiff had accepted the arbitration clause via a DocuSign eSignature process. The remaining plaintiff had accepted the terms via inaction, after multiple warnings that failing to affirmatively opt out of the provision would indicate acceptance. Applying Massachusetts law, the court found that the arbitration provision was not unconscionable and met other requirements for an enforceable agreement.

---

## Guidotti v. Legal Helpers Debt Resolution, LLC

**74 F. Supp. 3d 699 (D.N.J. Dec. 3, 2014)**

**DocuSign had been used to form a binding contract, although the arbitration provision of the underlying agreement was struck down as unconscionable.**

In a customer's dispute with various related debt resolution services, the trial court denied defendant's motion to compel arbitration, after which, the case went to the Third Circuit Court of Appeals. The court did not question that a binding contract had been formed but found that there were real questions about whether defendants had presented plaintiff with an agreement to arbitrate. The appeals court vacated the order denying arbitration and remanded the case to the trial court to oversee limited discovery relating to defendant's motion to compel arbitration. After additional discovery and briefing, the trial court found the arbitration requirements to be unconscionable and thereby unenforceable. However, the court agreed that when plaintiff signed agreements using DocuSign, a binding contract was formed.

---

## Woods v. Vector Mktg. Corp.

**2014 U.S. Dist. LEXIS 121165 (N.D. Cal. Aug. 28, 2014)**

**Arbitration clause in a sales representation agreement ruled an enforceable part of a binding contract executed using DocuSign.**

Plaintiff Woods and others sought to bring a class action over alleged failures to pay minimum wages. Defendant Vector argued that the court should enforce the agreement to arbitrate (on an individual basis) contained in the contracts signed by plaintiffs. The federal trial court reasoned that because the defendant's Sales Representative Agreement (SRA) included an agreement to arbitrate disputes on an individual basis, defendant's motion to compel arbitration should be granted. In reaching its decision, the court reviewed defendant's onboarding process and determined that the SRA, which plaintiffs had signed using DocuSign, resulted in binding contracts that the court should enforce.

## Newton v. Am. Debt Servs.

854 F.Supp.2d 712 (N.D. Cal. 2012)

**DocuSign had been used to form a binding contract, although the arbitration provision of the underlying agreement was struck down as unconscionable.**

Plaintiff Newton alleged that American Debt Services (ADS) had promised to cut her credit card debt in half but never contacted her creditors and did not settle any of her debts. Newton brought several claims and sought to establish a class action. ADS sought to compel arbitration based on Newton's DocuSigned agreement. Newton challenged the validity of the agreement, arguing she did not see or read the agreement to arbitrate, so it should not apply or, alternatively, should be voided for unconscionability. Citing the ESIGN Act and noting that an electronic signature that complies with the Act is legally binding, the federal court for the Northern District of California found that Newton "assented to the contract and the arbitration clause, and that the arbitration clause is binding on all parties to the contract." However, the court refused to enforce the arbitration clause on grounds of unconscionability.

## Pavlov v. Debt Resolvers USA, Inc.

907 N.Y.S.2d 798 (N.Y. Civ. Ct. 2010)

**DocuSign had been used to form a binding contract, although the underlying agreement was unenforceable due to defendant's lack of a required service license.**

Plaintiff Pavlov sought a refund of money he paid to a debt resolution service, Debt Resolvers, which argued that Pavlov was not entitled to a refund because the agreement he signed using DocuSign did not permit him to obtain one. The New York City Civil Court found that the parties, who used DocuSign to apply signatures to some or all of their agreements, had formed a binding contract. However, the court voided the contract as unlawful because defendant provides services that require a license in NY, and defendant was not licensed.

## Use of e-signature for court filings

**As indicated above, court filings are expressly not covered under ESIGN. Whether electronic signatures are appropriate to use for documents filed in court may depend on local court and evidentiary rules that, as these opinions show, litigating parties should always heed.**

---

**Thomas v. Credit Mgmt., LP**

**2018 U.S. Dist. LEXIS 83685 (N.D. Ind. May 17, 2018)**

**While the DocuSign audit trail may have provided sufficient evidence of the date of signature of a declaration, it could not overcome statutory requirement for "under penalty of perjury" language.**

In a case alleging violations of the Fair Debt Collection Practices Act, plaintiff submitted a DocuSigned affidavit from her sister in support of her motion for summary judgment. Defendant challenged the admissibility of the affidavit as undated and unsworn. The court evaluated the affidavit under 28 U.S.C. § 1746 ("Unsworn declarations under penalty of perjury") and ruled that, although the DocuSign audit trail provided evidence of the date of signature, the declaration was nonetheless inadmissible as it lacked the requisite language indicating that it had been signed "under penalty of perjury."

---

**In re Mayfield**

**Nos. 16-22134-D-7, UST-1, 2016 Bankr. LEXIS 2613 (Bankr. E.D. Cal. July 15, 2016)**

**DocuSign could not be used to satisfy local court rule requiring debtor's counsel to maintain and provide original signed documents, excluding "software-generated" electronic signatures.**

Counsel for the debtor seeking bankruptcy status filed various documents to the court with client signatures via DocuSign. The court penalized counsel for not adhering to Local Bankruptcy Court Rules 9004-1(c) (1) (C) and (D), which, it said, require that counsel maintain "originally signed" paper court documents rather than exclusively rely on "software-generated electronic signature." Though the court acknowledged that, under ESIGN, DocuSign and other electronic signature services may be appropriately used in various commercial and other transactions, it determined that "they do not comply with this court's local rule." (Note: Judge Bardwil goes on to suggest that an electronic signature may be more easily forged than a paper-based signature. This comment may best be regarded as *dictum*; it was not based on expert testimony about electronic signatures and was not required for the ruling.)

---

**See also:**

**Saechao v. Landry's Inc.**

**No. C 15-00815 WHA, 2016 U.S. Dist. LEXIS 33409 (N.D. Cal. Mar. 15, 2016)**

**DocuSign could not be used to satisfy court rules for a declaration filed in the context of a class action.**

**Derrick Fenley v. Rite Aid Corp.**

**2014 Cal. Super. LEXIS 156 (Cal. Super. Ct. July 2014)**

**DocuSigned declarations may meet California Code of Civil Procedure requirements that they be "subscribed" (signed with one's own hand), but California Rules of Court require declarants to sign a printed document first.**

# Use of DocuSign for class actions and related matters

**Despite the general limitation of using electronic signatures in the context of court filings, the court orders below reflect the approved use of DocuSign for participation in class actions, FLSA collective actions, and related legal actions.**

## Joseph v. Velocity, the Greatest Phone Company Ever, Inc.

**Case No. 3:18-cv-01174 (S.D. Ohio Jan. 14, 2019)**

Approved the use of DocuSign to opt in to a class action.

## Weckesser v. Knight Enters. S.E., LLC

**Civil Action No. 2:16-cv-02053-RMG, 2018 U.S. Dist. LEXIS 144981 (D.S.C. Aug. 27, 2018)**

Approved the use of DocuSign to participate in collective actions under the FLSA.

## United States v. Real Prop. Located at 6340 Logan St.

**No. 2:16-CV-02259-KJM-CKD, 2018 U.S. Dist. LEXIS 19061 (E.D. Cal. Jan. 23, 2018)**

Approved the use of DocuSign in the context of interlocutory sale of real property.

## Titus v. The Martin-Brower Company, LLC

**Case No. 2:17-cv-00558-JAM-GGH (E.D. Cal. Feb. 27, 2018)**

Approved the use of DocuSign to participate in class action settlement agreement.

## Brandenburg v. Cousin Vinny's Pizza, LLC

**No. 3:16-cv-516, 2017 U.S. Dist. LEXIS 129955 (S.D. Ohio Aug 14, 2017)**

Approved the use of DocuSign to participate in collective actions under the FLSA.

## In re Anthem, Inc. Data Breach Litig.

**No. 15-MD-02617-LHK, 2017 U.S. Dist. LEXIS 137281 (N.D. Cal. Aug. 25, 2017)**

Approved the use of DocuSign to participate in class action settlement agreement.

**Visit the DocuSign E-Signature Legality Guide** to learn about current electronic signature laws, local legal systems, and technology preferences for countries around the world.

**About DocuSign**
DocuSign helps organizations connect and automate how they prepare, sign, act on, and manage agreements. As part of the DocuSign Agreement Cloud, DocuSign offers eSignature: the world's #1 way to sign electronically on practically any device, from almost anywhere, at any time. Today, more than 500,000 customers and hundreds of millions of users in over 180 countries use DocuSign to accelerate the process of doing business and to simplify people's lives.

**DocuSign, Inc.**
221 Main Street, Suite 1550
San Francisco, CA 94105

**docusign.com**

**For more information**
sales@docusign.com
+1-877-720-2040

**DocuSign**®

**Whitepaper**

# Electronic signatures and transactions in the United States

## An overview of key legislation and legal factors.

EXHIBIT 2

# Table of contents

| | |
|---|---|
| **Introduction** | 3 |
| **Part 1: Legislation** | 4 |
| Federal law: The Electronic Signatures in Global and National Commerce Act (ESIGN) | 4 |
| State law: Uniform Electronic Transaction Act (UETA) | 6 |
| **Part 2: Electronic contracting in practice** | 10 |
| Common methods of electronic contracting | 10 |
| Common considerations about electronic contracting | 12 |
| **Appendix A: Notable case law** | 14 |
| **Appendix B: Outlier states – Illinois, New York, and Washington** | 17 |
| **Appendix C: Comparison of ESIGN and UETA** | 20 |

This whitepaper was drafted by the staff of DocuSign, Inc. and most recently updated in August 2019.
It is intended as educational material only and is not a substitute for professional legal advice.
© 2017-2019. All rights reserved.

# Introduction

Electronic signatures are common in the United States, but confusion still persists regarding the law at a state and federal level. This document provides an overview of:

1   Legislation enabling electronic signature usage.

2   Key legal factors related to electronic transactions.

### What is an electronic contract?

Before addressing the specifics of electronic signature legislation, it may be helpful to first emphasize one point: **under U.S. law, it is absolutely possible to form a contract electronically.** The ESIGN Act and UETA (discussed below) have helped cement this conclusion, but in most scenarios, this would have been true even without this legislation. Electronic contracting is essentially contracting, and contract law fundamentals apply.

Any contract, electronic or not, requires:

– An offer

– Acceptance

– Consideration (some promised exchange of value)

– No defenses (a contract, electronic or not, will not be enforced if a successful defense can be raised; for example, if an element of the contract is unconscionable or violates public policy, or if one of the contracting parties is too young to create a contract)

The most important contribution of ESIGN and UETA is establishing that electronic records satisfy the legal requirement that certain documents be in writing.

# Part 1: Legislation

## Federal Law: The Electronic Signatures in Global and National Commerce Act (ESIGN)

On October 1, 2000, the ESIGN Act became effective in the United States and is codified at 15 USC § 7001. ESIGN implements a national uniform standard for all electronic transactions and encourages the use of electronic signatures, electronic contracts, and electronic records by providing legal certainty for these instruments when parties comply with its standards. ESIGN preempts any state laws to the extent they aren't consistent with it.

The ESIGN Act establishes that electronic communication and contracts are equivalent to their paper counterparts. At a high level, the key elements are:

– A contract may not be denied legal effect or enforceability solely because of its electronic form.

– If a law requires a record to be in writing, an electronic record satisfies the law.

– If a law requires a signature, an electronic signature satisfies the law.

ESIGN is intentionally neutral regarding the type of technology used, and even goes so far as to specifically preempt any state law that prescribes specific technology.

### General rule regarding electronic transactions and records

ESIGN provides as follows:

"(1) a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form; and (2) a contract relating to such transaction may not be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was used in its formation."

This establishes a baseline rule that electronic transactions are no less valid than their paper counterparts. Still courts that have examined ESIGN have consistently confirmed its broad effect.[1] Examples of relevant case law are provided in Appendix A to this document.

### Electronic signatures

Electronic signature is defined in ESIGN as "an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record."

The broad definition of "electronic signature" was intended to allow many types of technology and methods for signing electronically. An electronic signature can be nearly anything produced by electronic means (for example, a symbol, result, or consequence) that has been created in order to demonstrate a party's intent to sign an electronic record.

---

1   See, for example, Specht v. Netscape Comm'cns Corp., 306 F.3d 17, 26 n.11 (2d Cir. 2002) (assessing whether clicking to download software created enforceable agreement to arbitrate, and noting that the matter of whether "the agreement is a 'written provision' despite being provided to users in a downloadable electronic form… has been settled by [the ESIGN Act]," although ultimately finding that consumers clicking "yes" in the context presented in that case did not manifest assent to license terms).

Examples of electronic signing include:

– Entering a password or personal information number (PIN)[2]

– Typing a name where indicated (or prompted) via computer keyboard[3]

– Responding to telephone keypad instructions (for example, press 3 to agree or 5 to hear this menu again)[4]

– Clicking a button or checkbox[5]

– Responding to an email thread in a manner that manifests assent[6]

It is important to note that while all of these methods (and potentially many others) are equally valid as signatures under ESIGN, they are not necessarily as useful in the context of enforcing an agreement. See the section titled "Common Methods of Electronic Contracting" for a discussion of some of the distinctions between electronic signature methods.

## Consumer disclosures

In some transactions between businesses and consumers, the business has a statutory obligation to provide information to the consumer in writing (for example, Truth-in-Lending-Act disclosures). ESIGN permits businesses to make these disclosures electronically, so long as they meet the requirements set out in the Act.

Where a consumer would otherwise be entitled to receive information in writing, electronic information will satisfy the requirement, so long as the consumer:

– Is provided clear and conspicuous notice of the consumer's ability to receive the information on paper.

– Is provided with information about the hardware and software needed to access the information electronically.

– Affirmatively consents to receive the information electronically.

Consumers must provide this consent in a manner that "reasonably demonstrates" that the consumer can access information in the electronic form that will be used to provide the relevant information.[7] A literal

reading of ESIGN indicates that the consent itself must reasonably demonstrate the consumer's ability to access the information, but the legislative history indicates that the requirement might also be met by the consumer responding affirmatively to a provider's question about their ability to access, or by showing that the consumer actually accessed the relevant information electronically.[8]

If there is a change to the hardware or software requirements to access the relevant information that creates a material risk whereby a consumer could lose access to the information, the consumer must be notified of the new requirements and of their right to withdraw consent to receive the information electronically. The reasonable demonstration requirement discussed above must also be met with respect to the new system requirements.

Though consumers may withdraw consent to receive information electronically, such withdrawal does not affect the legal effectiveness of any transactions already completed.

Also, while it is advisable to comply with the consumer disclosure requirements set out in ESIGN to the extent they apply, ESIGN states that a failure to meet those requirements will not render any contract invalid or unenforceable solely on that ground.

## Electronic records

ESIGN provides that if any other law requires contracts or other records to be retained, that requirement may be met by retaining an electronic record of the applicable contract or record — so long as the electronic record accurately reflects the contract or other record and the record remains accessible to those entitled to access it in a form that can be accurately reproduced for later reference.

If a contract or record is required by law to be in writing (for example, if it is subject to the Statute of Frauds), ESIGN permits it to be completed electronically so long as the electronic record is in a form that can be retained and accurately reproduced by all parties who are entitled to retain the contract or record for future reference.

---

2   See, for example, the Internal Revenue Service ("IRS") Fact Sheet 2011-07 (http://www.irs.gov/uac/Taxpayers-Who-File- Electronically-Must-Use-e-Signatures), explaining the use of a PIN as e-signature on a tax return.
3   See, for example, Haywood Securities, Inc. v. Ehrlich, 149 P.3d 738 (Ariz. 2007).
4   See, for example, opinion number 04-08-15 of the Office of the General Counsel of New York, issued August 18, 2004, interpreting ESIGN to allow a life insurance agent to have an applicant sign a life insurance application by the entry of their Social Security number into an interactive voice response (IVR) system using a telephone keypad. http://www.dfs.ny.gov/insurance/ ogco2004/rg040815.htm
5   See, for example, United States v. Hair, 178 Fed. Appx 879, 882 n.3 (11th Cir. 2006).
6   See, for example, Int'l Casings Grp., Inc. v. Premium Standard Farms, Inc., 358 F.Supp.2d 863, 873 (W.D.Mo. 2005).
7   15 USC §7001 (c)(1)(C)(ii).
8   146 Cong. Rec. S5282 (daily ed. June 16, 2000) (colloquy between Senators Abraham and McCain).

# State Law: Uniform Electronic Transactions Act (UETA)

The Uniform Electronic Transactions Act (UETA) was adopted in 1999 by the National Conference of Commissioners on Uniform State Law.

Forty-seven states, the District of Columbia, Puerto Rico, and the Virgin Islands have adopted UETA.[9] Most of these states have made few, if any, modifications to the model law (the most notable in terms of exceptions being California).

Only three states, New York, Illinois, and Washington, have maintained their own independently developed laws (which pre-date UETA), but all three have amended or interpreted them to be consistent with UETA in their effect. A discussion of each of these "outlier" state laws is set out in Appendix B.

Despite the slight differences among the states, there is enough consistency to permit most businesses to adopt a single process for electronically signing agreements across the country.

## Preemption—which law applies?

As noted above, ESIGN preempts state laws (including those representing an adoption of UETA) to whatever extent such laws are inconsistent with ESIGN.

ESIGN also specifically preempts inconsistent state laws that are technology-centric. This eliminated or forced modification of state laws containing specific digital signature requirements which could be met only with the use of PKI-based digital certificates.

Although ESIGN and UETA provisions are similar, there are a handful of differences. Perhaps most notably, ESIGN includes additional requirements for contracting with consumers (discussed above) and is different in scope from UETA. ESIGN applies to "any transaction in or affecting interstate commerce," whereas UETA only encompasses transactions arising out of business, commercial, and governmental matters.

In practice, the requirements of the state and federal laws are so similar that businesses generally need not determine which law applies, because they can easily comply with both.

See Appendix C for an in-depth analysis of how ESIGN and UETA differ.

---

9   Uniform Law Commission, http://www.uniformlaws.org/Act.aspx?title=Electronic%20Transactions%20Act

# Exceptions to ESIGN and UETA, and the role of other laws

While ESIGN and UETA generally promote electronic contracting, a few categories of documents are excluded from the legislation. **This does not mean these documents may not be completed electronically.** It simply means that they are not covered by ESIGN and/or UETA. As discussed on the next page, many of the documents not covered by ESIGN and UETA may be electronically completed under other legislation specific to those documents.

## Exceptions

ESIGN does not apply to contracts governed by:

– Laws overseeing the creation and execution of wills, codicils, or testamentary trust.

– Laws overseeing adoption, divorce, or other matters of family law.

– The Uniform Commercial Code, as in effect in any U.S. state, other than sections 1-107 and 1-206 and Articles 2 (Sale of Goods) and 2A (Leases of Goods)

In addition, ESIGN does not apply to:

– Court orders or notices, nor official court documents (including briefs, pleadings, and other writings), required to be executed in connection with court proceedings (as these types of documents generally are governed by court rules, and **many courts permit electronically signed documents pursuant to their court rules**[10])

– Any notice of:

  · The cancellation or termination of utility services (including water, heat, and power)

  · Default, acceleration, repossession, foreclosure, or eviction, or the right to cure, under a credit agreement secured by, or a rental agreement for, a primary residence of an individual.

  · The cancellation or termination of health insurance/benefits or life insurance benefits (excluding annuities)

  · Recall of a product, or material failure of a product, that risks endangering health or safety.

– Any document required to accompany any transportation or handling of hazardous materials, pesticides, or other toxic or dangerous materials.

Most state electronic signature laws (whether or not modeled on UETA) contain similar exceptions.

## Does state law ever apply to electronic transactions?

The ESIGN Act applies to "*any* transaction in or affecting interstate commerce" (emphasis added). This raises the question of what kind of transactions would not fall into its reach. The courts have historically taken a very broad view as to what "affects" interstate commerce, including many transactions where all parties are located in the same state. For example, if a transaction is part of a "class" of transactions that affect interstate commerce, the entire class can be regulated, even if many of the individual transactions occur solely in one state.[11] Even the local real estate market has been found to be within the scope of the federal government's power to regulate commerce.[12]

In theory, it is possible that a transaction could exist that does not affect interstate commerce and thus would not be subject to ESIGN, but for practical purposes, it will likely apply to most contracts entered by companies.

---

10  See, for example, the "Administrative Procedures for Filing, Signing, and Verifying" provided by the U.S. District Court for the Western District of Virginia at http://www.vawd.uscourts.gov/media/3355/ecfprocedures.pdf, permitting electronic attorney signatures.

11  See Perez v. United States, 402 U.S. 146 (1971) (sustaining the application of a federal "loan-sharking" law to a local culprit because the practice of loan-sharking, in general, impacted interstate commerce).

12  Russell v. United States, 471 U.S. 858, 862 (1985) (holding that an apartment rental "unquestionably" affects interstate commerce, and that "the local rental of an apartment unit is merely an element of a much broader commercial market in real estate").

**DocuSign**  Electronic signatures and transactions in the United States

## UCC exclusions and transferable records

One of the more notable exceptions in both ESIGN and UETA are contracts governed by the Uniform Commercial Code (UCC), other than sections 1-107 and 1-206 and Articles 2 (Sale of Goods) and 2A (Leases of Goods). This exclusion reflects the fact that the UCC had already been revised to include provisions for electronic processes for the categories of transactions excluded.

The following table summarizes the Articles of the UCC and how electronic records relate to each:

| UCC Code | Electronic Records Use | Example Transaction |
|---|---|---|
| Article 1. General Provisions | N/A | General |
| § 1-107[13] (renunciation) | Covered by ESIGN/UETA | Waiver of rights after a breach of contract |
| § 1-206[14] (statute of frauds for personal property other than "goods") | Covered by ESIGN/UETA | Sale of personal property other than goods (for example, IP) |
| Article 2. Sales | Covered by ESIGN/UETA | Sales contract |
| Article 2A. Leases | Covered by ESIGN/UETA | Lease agreements |
| Article 3. Negotiable Instruments | Duplicated in ESIGN Title 2, and UETA § 16 | Mortgage notes |
| Article 4. Bank Deposits | N/A | Checks |
| Article 4A. Funds Transfers | N/A | EFT systems |
| Article 5. Letters of Credit | Allowed under UCC Art. 5-104 | Bank letter of credit |
| Article 6. Bulk Transfers | N/A | Liquidation notice |
| Article 7. Warehouse Receipts/Bill of Lading and Other Documents of Title | Allowed under Rev. Art. 7-102[15] | Vehicle title |
| Article 8. Investment Securities | N/A | Securities |
| Article 9. Secured Transactions | Allowed under Rev. Art. 9-105 | Chattel paper |

As noted in the chart above, UCC provisions permit electronic records for certain document types. For example, section 9-105 sets out the rule for electronic chattel paper, including a list of requirements for the electronic system employed to evidence the transfer of interests in the chattel paper. The UCC stipulates that if the system enables such management of the note in electronic format, the electronic record shall have the same rights and defenses as equivalent paper records under the UCC.

---

13  This section was renumbered as section 1-306 following the 2001 amendments to Article 1 of the UCC. See http://www.uniformlaws.org/shared/docs/ucc1/ucc1_am01.pdf
14  This section was removed from the UCC in the 2001 revision to Article 1, but the provision still exists in many states' adoption of the UCC.
15  See discussion of the revisions to Article 7 dealing with electronic records at http://www.uniformlaws.org/ActSummary.aspx?title=UCC%20Article%207,%20Documents%20of%20 Title%20%282003%29. The revisions have been adopted by most states.

**Government exclusions**

ESIGN generally applies to government actors, but some special provisions apply to them.

ESIGN permits federal and state agencies with rulemaking authority to interpret the Act in connection with statutes they administer. However, any such "regulation, order, or guidance" issued by an agency must be "consistent" with the general principles of ESIGN, may not impose additional requirements, and must be supported by a substantial justification. Agencies are permitted to require retention of paper records only if doing so is essential to attaining a compelling governmental interest relating to law enforcement or national security.

Some agencies have interpreted ESIGN as expressly excluding government filings. For example, the SEC released guidance in 2001 indicating that it did not believe ESIGN applied to SEC filings, but nonetheless authorized the use of electronic records and signatures for most purposes.[16]

In practice, government agencies take a variety of approaches to electronic records, with some agencies accepting nearly everything electronically, and others accepting only selected documents, or establishing regulations that require special treatment of certain documents. For example, the IRS has adopted a framework for the use of electronic signatures by Income Verification Express Services Participants, permitting electronic signatures on forms 4506-T and 4506T-EZ. The framework involves, among other things, taking steps to authenticate the signer, obtain their consent, and obtain third-party verification of the quality of the electronic signature process.[17] The IRS also permits a number of other forms to be submitted with electronic signatures, including individual income tax returns, which may be signed using a PIN.[18]

ESIGN also permits government actors to impose specific technical requirements in order to do business electronically with them as a market participant (for example, government procurement standards). This is discussed further in Part 2 below.

---

16  Application of the Electronic Signatures in Global and National Commerce Act to Record Retention Requirements Pertaining to Issuers Under the Securities Act of 1933, Securities Exchange Act of 1934 and Regulation S-T, 66 FR 33175 (June 21, 2001).
17  Accessed at https://www.irs.gov/individuals/income-verification-express-services-ives-electronic-signature-requirements.
18  IRS Publication 1345.

# Part 2: Electronic contracting in practice

## Common methods of electronic contracting

### Clickwrap

With "clickwrap" agreements, end users are required to click a button or checkbox indicating their agreement to a set of terms before being able to proceed with an electronic transaction or gaining access to services or products.[19] Courts generally enforce clickwrap agreements even when the user has not read the contract terms, because clicking indicates that the user had actual and constructive knowledge that certain agreement terms apply to the offered products and services.[20]

In determining whether to enforce a clickwrap agreement, a court may scrutinize a website's design, how the button is labeled (for example, "continue" or "next" versus "I Agree"), use of all caps, use of colors or formatting that encourage or dissuade action, font size, important terms being visually obscured by advertisements, or even what the "reasonable Internet user" would conclude were the terms of the agreement.[21] These and other considerations should be taken into account when implementing a clickwrap process, especially as clickwrap is most often employed with contracts of adhesion – "take-it-or-leave-it" contracts which are not negotiable by the customer. Nevertheless, for the right use case, an appropriately configured clickwrap solution can be a highly effective way to achieve a valid, binding, admissible and enforceable agreement.[22]

### Browsewrap

"Browsewrap" terms are typically posted on a website and accessible via a hyperlink. These agreements may not involve an electronic signature at all, but instead rely on some action of the user (like continuing to visit the website) to demonstrate "acceptance" of the terms.

While the enforceability of browsewrap is much less certain than clickwrap, it may be considered "accepted" when the end user (1) has actual and constructive notice of the applicable terms; and (2) takes some action to avail herself of the products and services that are subject to those terms.[23] Enforceability will turn on the particular facts, particularly the extent to which the website operator provided notice of the terms.

For example, in *Nguyen v. Barnes & Noble, Inc.*,[24] the court found that the plaintiff had not agreed to the arbitration provision in Barnes & Noble's browse-wrap agreement, because Barnes & Noble "did not position any notice even of the existence of its 'Terms of Use' in a location where website users would necessarily see it, and certainly did not give notice that those Terms of Use applied, except within the Terms of Use" (emphasis in original). Conversely, in *Cairo, Inc. v. Crossmedia Services, Inc.*,[25] the court determined that users had actual and constructive notice because they were presented with text that read: "[b]y continuing past this page and/or using this site, you agree to abide by the [t]erms of [u]se for this site…"

---

19 Kwan, et. al., v. Clearwire Corporation, No. C09-1392JLR, 2011 U.S. Dist. LEXIS 150145, at *1 (W.D. Wash. Dec. 28, 2011).
20 See, generally, I-Systems, Inc. v. Software, Inc. Quantum Management Systems, LLC, No. 02-1951 (JRT/FLN), 2005 U.S. Dist. LEXIS 47592 (D. Minn. Mar. 7 2005).
21 See Berkson v. GoGo LLC, 97 F.Supp.3d 359 (E.D.N.Y. 2015) (establishing general principles for enforceability of internet agreements: (1) the evidence must show that the user had notice of the agreement, (2) the link to the terms is located where users are likely to see it and (3) a "user is encouraged by the design and content of the website and the agreement's webpage to examine the terms clearly available through hyperlinkage.") In this case, the court required that "the offeror must show that a reasonable person in the position of the consumer would have known what he was assenting to" and accordingly distinguished the noticeably smaller hyperlink for the contract terms from the large, colored "Sign In" button.
22 See The Effectiveness of Clickwrap for Legally Enforceable Agreements, available at https://www.docusign.com/sites/default/files/resource_event_files/Click-Legality-Whitepaper-US-May-2019.pdf.
23 Specht v. Netscape Communications Corp., 306 F.3d 17, 25 (2d Cir. 2002) citing Windsor Mills, 25 Cal App. 3d at 992 (2001) quoting Restatement (Second) of Contracts §19 (1981). See also, Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 429 (2d Cir. 2004) (holding that provisions disclosed solely through browse-wrap agreements are typically enforced if the website user had actual and constructive knowledge of the site's terms and conditions, and has manifested assent to them).
24 Nguyen v. Barnes & Noble, Inc., No. 8:12-cv-0812-JST (RNBx), 2012 U.S. Dist. LEXIS 122455 (C.D. Cal. Aug. 28, 2012).
25 Cairo, Inc. v. Crossmedia Services, Inc., No. 04-04825, 2005 U.S. Dist. LEXIS 8450 (N.D. Cal. Apr. 1, 2005).

**Signing with an electronic signature system**

The method of electronic signature that most closely resembles the familiar paper contracting process is signing with an electronic signature system. Documents are prepared by the sender within the system, then presented to the intended signer. The signer may then review the document and will be prompted to sign in the appropriate location(s). The form of the signature may be a free-form mark made with a stylus or touch screen, or may be a text version of the person's name, in a font selected by them as part of the signing process.

Case law is strongly in support of the validity of this type of process, with a range of reported cases confirming the legally binding effect of electronically signed agreements.[26] Further, the breadth of evidence collected by this process has been shown in a number of cases to be of dispositive legal value even in the face of a party's sworn allegations that they did not sign the agreements in question, leading to summary judgment for the party seeking to enforce the agreement.[27]

---

26 See, for example, Newton v. American Debt Service, 854 F.Supp.2d 712 (N.D. Cal. Feb 22, 2012) (finding the plaintiff had entered into a binding contract that she had signed using DocuSign, though declining to enforce an underlying provision of the contract on other grounds).
27 See, for example, IO Moonwalkers, Inc. v. Banc of Am. Merch. Servs., LLC, 814 S.E.2d 583 (N.C. Ct. App. 2018) (affirming summary judgment that plaintiff had ratified the agreement in question, relying on DocuSign audit trail as evidence of intent).

# Common considerations about electronic contracting

Most of the factors that may arise in enforcing and interpreting electronic agreements are not unique to the electronic sphere. However, they may manifest themselves somewhat differently, or cause more concern than they would otherwise, because lawyers and judges may be less familiar with the technology.

The following sections attempt to shed some light on common considerations raised by attorneys about electronic signature.

## Admissibility as evidence

It is important to begin by emphasizing that electronic records are absolutely admissible as evidence. Like any evidence, they must be authenticated, or the parties must agree to their authenticity.

In the federal court system, Federal Rules of Evidence 901 and 902 govern authentication. Courts have permitted electronic data to be admitted under Fed. R. Evid. 901(b)(4), which allows authentication through distinctive characteristics of the document ("Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances"),[28] and Fed. R. Evid. 902(7), which allows business emails to be self-authenticating with information showing the origin of the transmission or other identifying marks (for example, company logos and email addresses).[29]

Confusion sometimes arises in connection with requirements that an "original" document be produced, since the concept of an "original" is not very meaningful in the electronic context. Fortunately, this is addressed in Fed. R. Evid. 1001(d), which provides in pertinent part that "For electronically stored information, 'original' means any printout – or other output readable by sight – if it accurately reflects the information."

## Delivery: when an electronic record is "sent" and "received"

ESIGN is largely silent regarding delivery of electronic records; however, UETA provides a set of default rules that can be modified by agreement of the parties.

*An electronic record is considered "sent" when the following criteria are met:*

– The record is addressed or directed to an information processing system designated or used by the recipient for receiving records of the type transmitted and from which the recipient is able retrieve the record.

– The information is in a form the recipient's system is capable of processing.

– The information enters an information system outside the sender's control or, if the sender and the recipient are using the same system, enters a part of the system under the recipient's control.[30]

*An electronic record is considered "received" when the following criteria are met:*

– It actually arrives at a system to which the recipient has access for retrieving the record.

– The system has been designated or actually used by the recipient for receipt of the type of record in question.

– The system is capable of processing the record.

It is not necessary for the recipient to actually open or view the electronic record in order for it to be considered received.[31]

UETA also provides that if one of the parties to a transmission is aware that a record was not actually sent or actually received, even though it met the criteria of UETA's default rules, then the effect of the electronic record and its transmission is determined by other law[32] This provision cannot be modified by agreement of the parties. A few states have expanded on this provision, adding that

---

28 United States v. Safavian, 435 F. Supp. 2d 36, 40 (D.D.C. 2006), rev'd on other grounds, 528 F.3d 957 (D.C. Cir. 2008) (admitting emails based on the email addresses contained in the "to" and "from" fields, and other identifiable material such as the subject matter, signatures, and other personal and professional references).
29 Scheuplein v. City of W. Covina, No. B206203, 2009 Cal. App. Unpub. LEXIS 7805, at *26–27 (Cal. Ct. App. 2d Dist. Sept. 29, 2009) (finding emails to be authenticated when accompanied with a declaration that the emails were retrieved from the company's computers and the printouts were accurate representations of the retrieved messages).
30 UETA §15(a).
31 UETA §15(e).
32 UETA §15(f).

a "bounceback" message will automatically prevent a message from being deemed sent or received.[33]

Most judicial decisions considering delivery of information via email, whether or not they relied on the UETA rules, have determined that if the sender's business records establish that an email was transmitted to the correct email address, a "rebuttable presumption" of delivery arises.[34]

## Proving the identity of the signer

As with any contract, an electronic contract will not be enforced if the identity of the party to the contract cannot be established. This can be challenging when parties are contracting remotely, either through electronic means, or by mail.

The identity of the signer is an evidentiary issue, and can be proven in a variety of ways.[35] For example, in *Zulkiewski v. Am. Gen. Life Ins. Co.*, the court found that the insurance company's authentication process, which involved association with an email address, and knowledge of certain personal information (for example, mother's maiden name) were sufficient to establish the identity of the signer.

Electronic security may also play a role in establishing identity. For example, in *Kerr v. Dillard Store Services*, the court declined to enforce an arbitration agreement purportedly signed by the plaintiff, because the defendant "did not have adequate procedures to maintain the security of intranet passwords, to restrict authorized access to the screen which permitted electronic execution of the arbitration agreement, to determine whether electronic signatures were genuine or to determine who opened individual emails."[36]

Similarly, in *Ruiz v. Moss Brothers*, the employer was unable to enforce an arbitration agreement where the court found that they failed to demonstrate how an electronically signed document had been generated, leaving it unclear whether reasonable measures were in place to verify the signer's identity.[37]

It is worth noting that, although there are potential pitfalls with an electronic signature process, it is often still superior to a paper-based system from an evidentiary standpoint.

An electronic signature will frequently be associated with an email address, IP, or other elements associated with the signer, where a contract sent by mail will only be associated with a physical location (where others may reside) and a written signature (which may be forged).

## Using electronic signatures with government agencies

ESIGN is made applicable to federal and state governments.[38] In practice, however, government agencies often decline to accept electronic records, or impose additional requirements upon them.[39] ESIGN does not grant a right to make electronic filings with the government, and it permits agencies to interpret ESIGN through the issuance of regulations. Some agencies have chosen to impose specific technical requirements, such as the use of public key cryptography, upon the agency's use of electronic signatures.

Over time, government agencies appear to be moving toward greater acceptance of electronic contracting and electronic signatures, though they are generally doing so more slowly than the private sector.

That said, the federal government appears poised to leap forward in its adoption of electronic signatures. On December 20, 2018, the 21st Century Integrated Digital Experience Act ("21st Century IDEA") was signed into federal law. The Act requires all executive agencies to modernize their websites, forms, and processes for improved user experience and compliance with appropriate legal standards. It specifically requires that, "[n]ot later than 180 days after the date of enactment of this Act, the head of each executive agency shall submit to the Director and the appropriate congressional committees a plan to accelerate the use of electronic signatures standards established under the Electronic Signatures in Global and National Commerce Act (15 U.S.C. 7001 et seq.)."[40]

The 21st Century IDEA can be seen as a strong endorsement of the value of modern digital services, including electronic signature, for a broad range of government use cases.[41]

---

33 See, for example, Pa. Stat. Ann., tit. 73 § 2260.115.
34 See, for example, American Boat Co., Inc. v. Unknown Sunken Barge, 418 F.3d 910, 914 (8th Cir. 2005) (holding that the same presumption of delivery applicable to paper communications should apply to email); Kennell v. Gates, 215 F.3d 825, 829 (8th Cir.2000) (absent evidence to the contrary, emails properly dispatched via a generally reliable method are presumed delivered and received).
35 Zulkiewski v. Am. Gen. Life Ins. Co., No. 299025, 2012 Mich. App. LEXIS 1086 (Mich. Ct. App. June 12, 2012).
36 Kerr v Dillard Store Services, Inc., 2009 WL 385863 (D. Kan. Feb. 17, 2009).
37 Ruiz v. Moss Bros. Auto Group, Inc. (2014) 232 Cal. App. 4th 836.
38 15 U.S.C. § 7004.
39 For example, the Food and Drug Administration has released regulations regarding electronic creation, maintenance, and submission of information subject to FDA regulations, which are set out at 21 CFR Part 11.
40 21st Century IDEA Act, Public Law 115-336, Sec. 5, available at https://www.congress.gov/bill/115th-congress/house-bill/5759/text].
41 For more information on the 21st Century IDEA Act, see https://www.docusign.com/21st-century-idea-act].

# Appendix A

## Notable case law

For a summary of all U.S. case law addressing the use of the DocuSign eSignature service, see the DocuSign white paper "**Court Support for the Use of Electronic Signatures in the United States**."[42]

For a summary of key case law surrounding clickwrap agreements, see the DocuSign white paper "**The Effectiveness of Clickwrap for Legally Enforceable Agreements**."[43]

Below are examples of instructive case law addressing a range of issues related to electronic contracting.

### Signed writing requirements

#### Buckles Management, LLC v. InvestorDigs, LLC
**No. 10-cv-00508-LTB-BNB, 728 F.Supp.2d (D. Colo. 2010)**

Though email may be sufficient to meet the signed writing requirement under the statute of frauds, in this case it did not qualify as an electronic signature under ESIGN because the sender did not intend to be bound by the terms.

#### Kaufman v. American Family Mut. Ins. Co.
**No. 05–cv–02311–WDM–MEH, 2007 WL 437641 (D. Colo. 2007)**

An automated signature on a written letter could meet the statute of fraud requirement, precluding dismissal.

#### Barwick v. GEICO
**2011 Ark. 128 (Ark. 2011)**

The plain language of Arkansas UETA authorized the use of electronic records and signatures to satisfy the requirement under Arkansas insurance law that medical benefits coverage could only be rejected by a signed "writing."

#### Naldi v. Grunberg
**80 A.D.3d 1 (N.Y. App. Div. 1st Dep't 2010)**

New York Statute of Frauds may be satisfied by an electronic writing and electronic signature because, among other reasons, the Electronic Signatures and Records Act (ESRA) incorporated the substantive provisions of ESIGN, which allow for such electronic records and signatures.

#### Johnson v. Astrue
**No. CIV S-08-0182 GGH 2009 U.S. Dist. LEXIS 130558 (E.D. Cal. June 18, 2009)**

Electronic signatures are not "rubber stamp signatures" as prohibited in the Code of Federal Regulations and, as such, electronic signatures meet the requirements for submitting examination reports under CFR for disability insurance claimants.

42 "Court Support for Electronic Signatures in the United States" is available at https://www.docusign.com/white-papers/court-support-for-electronic-signatures-in-the-united-states.
43 White paper is available at https://www.docusign.com/white-papers/the-effectiveness-of-clickwrap-for-legally-enforceable-agreements.

## Attribution of electronic signature and proof of consent

### Espejo v. Southern California Permanente Medical Group

**246 Cal. App. 4th 1047 (2016)**

Use of a unique username and password is sufficient to establish the identity of the signer in the context of an employee arbitration agreement.

### Labajo vs. Best Buy Stores L.P.

**478 F.Supp.2d 523 (2007)**

Although a valid electronic signature existed, it was not clear whether the signer had actual knowledge of the contract terms to which the signature purportedly evidenced agreement.

### Kerr v. Dillard Store Services

**No. 07-2604-KHV, 2009 WL 385863 (D. Kan. Feb. 17, 2009)**

Court declined to enforce an arbitration agreement because the defendant "did not have adequate procedures to maintain the security of intranet passwords, to restrict authorized access to the screen which permitted electronic execution…, to determine whether electronic signatures were genuine or to determine who opened individual emails."

### Ruiz v. Moss Bros. Auto Group, Inc.

**232 Cal. App. 4th 836 (2014)**

Court declined to enforce an employee arbitration agreement where the employer failed to demonstrate how the employee was authenticated and how the record was produced and maintained.

### Zulkiewski v. Am. Gen. Life Ins. Co.

**No. 299025, 2012 Mich. App. LEXIS 1086 (Mich. Ct. App. June 12, 2012)**

An insurance company's authentication process, which involved association with an email address and knowledge of certain personal information (for example, mother's maiden name), was sufficient to establish the identity of the signer.

### Adams v. Superior Court [Adams v. Quicksilver, Inc.]

**No. G042012 2010 Cal. App. Unpub. LEXIS 1236 (Cal. App. 4th Dist. Feb. 22, 2010)**

An electronic signature could not be attributed to an employee because the system used did not have sufficient controls (that is, it did not require a password, the record could be modified after the fact, it did not include an audit trail, etc.).

## Email as electronic signature

### JBB Investment Partners Ltd. v. Fair

**232 Cal. App. 4th 974 - Cal: (Court of Appeal, 1st Appellate Dist., 2nd Div. 2014)**

Although a typed name in an email may be an electronic signature, it must meet the other elements of an "electronic signature" under UETA; in this case, there was no evidence of intent to sign.

### Int'l Casings Grp., Inc. v. Premium Standard Farms Inc.

**358 F.Supp.2d 863, 873 (W.D. Mo. 2005)**

Email messages including "a header with the name of the sender" were sufficient to satisfy the signature requirement under Missouri's version of the UCC and UETA.

### Cunningham v. Zurich Am. Ins. Co.

**352 S.W.3d 519, 530 (Tex. App. 2011)**

Court declined to hold the mere sending of an email containing a signature block to be an enforceable electronic signature "when no evidence suggests that the information was typed purposefully rather than generated automatically, that [the sender] intended the typing of her name to be her signature, or that the parties had previously agreed that this action would constitute a signature."

## Admissibility of electronic evidence

### Hook v. Intelius, 10-CV-239(MTT)

**2011 U.S. Dist. LEXIS 31879 (M.D. Ga. Mar. 28, 2011)**

Screenshots regenerated from archive data (not actual images) were deemed admissible and offered probative value in enforcing an online agreement.

### Lorraine v. Markel American Ins. Co.

**241 F.R.D. 534, 538 (D. Md. 2007)**

Established generally that electronic evidence can be admitted, subject to a showing of reliability.[44]

## Delivery of electronic records.

### Roling v. E*Trade Sec. LLC

**860 F. Supp. 2d 1035, 1043 (N.D. Cal. 2012)**

Court found that an email notice sent within a reasonable time before a fee increase was sufficient notice.

### In re Leventhal

**No. 10 B 12257, 2012 WL 1067568 (Bankr. N.D. Ill. Mar. 22, 2012)**

Court extended to email the concept that "a properly addressed item mailed to someone is presumed to have been received."

### Abdullah v. Am. Exp. Co.

**No. 3:12-CV-1037-J-34MCR, 2012 WL 6867675 (M.D. Fla. Dec. 19, 2012)**

Court found, based on presented evidence showing proper delivery of email to the plaintiff, that "a rebuttable presumption was created that Plaintiff received that email."

### Ball ex rel. Hedstrom v. Kotter

**746 F. Supp. 2d 940, 953 n. 10 (N.D. Ill. 2010)**

Court found presumption that, because no evidence was presented to the contrary, the plaintiff had received and had knowledge of information sent to him by the defendant via email.

### SEC v. Global Online Direct, Inc.

**No. 1:07-cv-0767-WSD, 2007 WL 4258231 (N.D. Ga. Nov. 29, 2007)**

Email notices to investors are appropriate if the process creates a reasonable expectation that the investors will (1) receive notice, (2) understand what it relates to, and (3) make a knowing and deliberate decision to read or disregard the communication.

---

44 For more information on the case, see http://www.lexisnexis.com/applieddiscovery/LawLibrary/whitePapers/ADI_WP_LorraineVMarkel.pdf.

# Appendix B

## Outlier states: Illinois, New York, and Washington

Illinois, New York, and Washington have not adopted UETA, but have passed their own legislation to support ecommerce. Each state's law is summarized below.

### Illinois

The Illinois legislature adopted the Electronic Commerce Security Act[45] (ECSA) in 1998. Although it has not been updated to mirror the language of UETA or ESIGN, it is similar to both in its approach. Most importantly, the ECSA provides that electronic records and signatures shall not be denied legal effect, validity, or enforceability solely on the grounds that they are in electronic form.

ECSA also explicitly provides for the admission of electronic records and signatures as evidence in legal proceedings, prohibiting the denial of admissibility on the sole basis that the record or signature is in electronic form.

The ECSA states that it aims to "facilitate electronic communications by means of reliable electronic records," "facilitate and promote electronic commerce, by eliminating barriers resulting from uncertainties over writing and signature requirements," "minimize the incidence of forged electronic records, intentional and unintentional alteration of records, and fraud in electronic commerce," and "promote public confidence in the integrity and reliability of electronic records and electronic commerce."[46]

The exceptions to the ECSA are somewhat different than those to ESIGN and UETA. As with the other signature laws, this does not mean that electronic signatures are prohibited, but they must be supported by some other law or common law principle. The exceptions to ECSA are:

(1)When it would be "clearly inconsistent with the manifest intent of the lawmaking body or repugnant to the context of the same rule of law[.]" (the "manifest intent" referred to in the Act requires more than a mere showing of a requirement of a "signature" or that the document be "signed")

(2)The "creation or execution of a will or trust, living will, or healthcare power of attorney"

(3)"[A]ny record that serves as a unique and transferable instrument of rights and obligations"

The law goes on, however, to state that electronic signature may suffice under the ECSA for a negotiable instrument or other conveyance when an electronic version of the record exists, is "stored and transferred in a manner that allows for the existence of only one unique, identifiable, and unalterable original"; and "can be possessed by only one person, and which cannot be copied except in a form that is readily identifiable as a copy."

Furthermore, ECSA differs from ESIGN and UETA in its narrower definition of electronic signature and its distinct definition of electronic and digital signatures. An electronic signature is defined as "a signature in electronic form attached to or logically associated with an electronic record."

A digital signature is defined as:

[A] type of electronic signature created by transformingan electronic record using a message digest function and encrypting the resulting transformation with asymmetric cryptosystem using the signer's private key such that any person has the initial untransformed electronic record, the encrypted transformation, and the signer's corresponding public key can accurately determine whether the transformation was created using the private key and whether the initial electronic record has been altered since the transformation was made. A digital signature is a security procedure.

---

45  5 ILCS 175.
46  5 ILCS 175/1-105.

Although ECSA includes an extensive discussion of digital signatures, they are not required for enforceability or admissibility into evidence. Like many states, Illinois may require digital signatures in some cases when contracting directly with the government or submitting documentation to government agencies.

## New York

New York adopted the Electronic Signatures and Records Act (ESRA) in 2000. ESRA is technology neutral, supports use of electronic signature and electronic records for business and personal use, and provides for the admissibility of electronic records into evidence. As described on the website of the New York State Office of Information Technology Services (ITS), "[ESRA] provides that 'signatures' made via electronic means will be legally binding just as hand-written signatures now are.... There is now no doubt that electronic records have the same legal force as those produced in other formats such as paper and microfilm."

Similar to ESIGN, ESRA defines electronic signature as "an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with intent to sign the record."

ESRA originally did not apply to electronic transactions involving transfer of title due to death or incompetence, or to the appointment of fiduciaries, but the legislature expanded the scope of ESRA to include such transactions in 2012. As noted on the ITS website sited above: "Effective September 23, 2012, ESRA will allow the use and acceptance of electronic signatures and records with conveyances and other instruments recordable under Article Nine of the Real Property Law, and permit recording officers to electronically accept for recording or filing digitized paper documents or electronic records of real property instruments such as deeds, mortgages and notes, and accompanying documents."

In the case of *Naldi v. Grunberg*,[47] the New York Appellate Division confirmed that the New York Statute of Frauds may be satisfied by an electronic writing and electronic signature because, among other reasons, ESRA has incorporated the substantive provisions of the ESIGN Act.

---

47  80 A.D.3d 1 (NY App Div 2010).

**DocuSign** Electronic signatures and transactions in the United States

# Washington

From 1997 to mid-2019, electronic signatures in Washington were primarily governed by the Washington Electronic Authentication Act (WEAA). The state repealed WEAA in its entirety effective July 28, 2019, essentially finding the law outdated (in the context of a legal and business climate that has actively embraced e-signature) and confusing (in light of inconsistencies across Washington state law arising from evolving e-signature provisions).

While the repeal of WEAA arguably leaves Washington without a singular overlay statute regarding electronic signatures, it is plainly not intended to negatively impact e-signature acceptance or enforceability in the state. The totality of legislative and judicial activity manifests Washington's recognition of ESIGN and alignment with the federal law's core principles:

– A broad definition of "electronic signature."

– The legal equivalency of electronic and wet signatures.

– Technology neutrality, that is, a lack of any legal preference for any particular e-signature methodology over any other.

Passed well before UETA or ESIGN, WEAA was originally limited in scope, conferring legal enforceability only on "digital signatures" (electronic signatures that use PKI-based digital certificates) and establishing standards for Certificate Authorities (entities that create and maintain digital certificates).[48] The emphasis on digital certificates was intended to encourage the public to become more comfortable with electronic commerce.[49] However, the use of digital certificates failed to emerge as a standard means of transacting business, mostly due to the common consensus that the limited extra assurance provided by digital certificates was not worth the added time, expense, and hassle of requiring signers to procure them.[50]

In 1999 and 2011, amendments to WEAA were passed with the intent of expanding the scope of the law to embrace a broader range of electronic signatures and to relax restrictions on government agencies that previously had limited their acceptance to only digital signatures.[51]

Then, in 2015, came new e-signature legislation, embodied in the Revised Code of Washington (RCW) as 19.360.000 et seq. This new law formally recognized that ESIGN "applies to federal and state transactions, including certain government transactions, in or affecting interstate or foreign commerce relating to [Washington] state."[52] While the law still allows state and local agencies to decide whether to accept electronic signatures for particular government use cases, it nonetheless affirms that electronic signatures carry the same force and effect as wet signatures.[53] Notably, the definition of "electronic signature" in RCW 19.360.030[54] is identical to that in ESIGN, which created a discrepancy in Washington state law between this definition and the legacy definition in WEAA.

The 2019 bill that repealed WEAA, according to state congressional reports, "cleans up confusion in existing law"[55] and recognizes the fact that the "[p]rivate sector has put [WEAA] out of business."[56] The bill also amends several other Washington statutes that previously referenced different sections of WEAA (for example, RCW 43.07.120, RCW 43.07.173, RCW 48.185.005, RCW 58.09.050, RCW 58.09.110).[57] Some of these amendments insert a definition of "electronic signature" into the amended statutes by referring the reader to RCW 19.360.030 (where the ESIGN definition of "electronic signature" was formally adopted).

Though Washington e-signature law has taken an atypical approach, its consistent trend toward recognizing and aligning with ESIGN provides a compelling legal foundation for the continued full recognition of electronic signatures for private intrastate transactions—just as ESIGN ensures the legality of e-signatures for transactions affecting interstate and foreign commerce.

As for state and local government use cases, RCW 19.360.000 et seq. still controls; it declares that wherever the use of a written signature is authorized or required by a state or local agency, an electronic signature may be used with the same force and effect as a wet signature unless specifically provided otherwise by law or agency rule.[58]

48 Stephanie Curry, Washington's Electronic Signature Act: An Anachronism in the New Millennium, 88 Wash. L. Rev. 559 (2013), available at http://digital.law.washington.edu/dspace-law/bitstream/handle/1773.1/1252/88WLR559.pdf?sequence=1
49 Id.
50 Id.
51 Id.
52 RCW 19.360.010, available at https://app.leg.wa.gov/RCW/default.aspx?cite=19.360.010
53 RCW 19.360.020, available at https://app.leg.wa.gov/RCW/default.aspx?cite=19.360.020
54 RCW 19.360.030, available at https://app.leg.wa.gov/RCW/default.aspx?cite=19.360.030
55 H.B. Rep. No. 1908 (2015), available at http://lawfilesext.leg.wa.gov/biennium/2019-20/Pdf/Bill%20Reports/House/1908%20HBR%20PL%20.pdf
56 H.B. Rep. No. 5501 (2019), available at http://lawfilesext.leg.wa.gov/biennium/2019- 20/Pdf/Bill%20Reports/Senate/5501%20SBR%20APS%2019.pdf
57 Id.
58 RCW 19.360.020, available at https://app.leg.wa.gov/RCW/default.aspx?cite=19.360.020

**DocuSign**  Electronic signatures and transactions in the United States

# Appendix C

## Comparison of ESIGN and UETA
## (as drafted by the Uniform Law Commission)

### 1 Excluded state laws

ESIGN explicitly excludes more state laws from its reach, but UETA gives the states the flexibility to exclude additional state laws. Compare ESIGN 103 with UETA 3(a)-(c).

### 2 Government affairs

UETA covers government affairs, rather than just the commercial transactions covered by ESIGN. Compare ESIGN 101(a), 106(13) and UETA 2(16). Its inclusion of government affairs would appear to provide the state's agencies with the enabling legislation that they may need should they choose to conduct their own business electronically. Because many state statutes and regulations implicitly or explicitly require that the government conduct its business in writing, and the enabling legislation for state agencies is silent with respect to electronic activity, UETA provides an essential foundation for the transition to e-government.

### 3 Consumer protections

UETA does not contain explicit consumer protection provisions as set forth in section 103 of ESIGN, but it leaves in place existing consumer protection laws and makes clear that they will still apply in electronic transactions (UETA 5(b), (e); 8(a), (b), (d)(1)-(2); 15). ESIGN anticipates some of the consumer problems unique to electronic transactions, and deals with them explicitly, while UETA does not.

### 4 Record retention

UETA enables parties who are required to keep written records to have an agent keep the records for them (UETA 12(c)). ESIGN lacks such a provision.

### 5 Electronic agents

UETA is clearer and more specific with respect to this topic. Compare ESIGN 101(h) and UETA 14.

### 6 Insurance

ESIGN provides a liability exemption for agents or brokers; see ESIGN 1010(j). UETA does not.

### 7 Record retention

ESIGN forbids states to impose written record keeping requirements on persons required to keep records of particular transactions, unless the requirement of a written record serves a compelling government interest related to national security or public safety (ESIGN 101(b)(1); 101(d)(1); 101(d)(3); 101(d)(4); 102(c); 104(c)(1); 104(b)(3)(B)). UETA would permit states to require paper record keeping, but only if they pass a law after UETA is enacted specifically permitting the same (UETA 7(c)(d); 12(f); 12(a)(1)-(2); 12(d)-(e)). Given the preemptive effect of ESIGN, any such after-adopted legislation would probably have to meet ESIGN's test for written record requirements.

20

## 8  Additional provisions

ESIGN does not contain provisions addressing the following issues, which are addressed in UETA:

– Temporal application, that is, what transactions the statute will apply to (UETA 4)

– Parties' ability to vary some of the terms of UETA by agreement (UETA 5, 8(d), 10(4), 15(g))

– Attribution of electronic signatures (UETA 9(a)-(b))

– Change or error in electronically conducted transactions (UETA 10)

– Rules governing the time and place of sending and receipt of electronic records (UETA 15)

– Admissibility of electronic records and signatures as evidence (UETA 13)

## 9  Transferable records

ESIGN limits transferable records to notes secured by real estate, while UETA would apply to a broader range of commercial paper. Compare ESIGN Title II and UETA 16.

## 10  Federally mandated vs. voluntary state e-procurement

ESIGN appears to require government entities to use or accept electronic records and signatures in the procurement process where they engage in transactions affecting interstate or foreign commerce with private parties who choose to conduct business electronically (except with respect to a contract to which the state is a party). See ESIGN 101(b)(2).

In other words, ESIGN appears to require that state governments accept electronic records and signatures on all documents related to procurement processes except for contracts to which the state is a party (ESIGN 101(b)(2); 102(b); 104(b)(4)). This follows because ESIGN indicates implicitly in section 101(b)(2) that states are required to accept electronic records or signatures except with respect to contracts to which states are

parties. Furthermore, ESIGN explicitly exempts state procurement from only one of the two requirements that it imposes on states that have not adopted UETA and want to specify alternative means of conducting electronic transactions (see ESIGN 102(b)) and only one of the three requirements imposed on states exercising their interpretive authority by interpreting their laws and regulations in light of ESIGN. See ESIGN 104(b)(4). Both of these explicit exemptions for state procurement extend only to ESIGN's requirement that states adhere to technological neutrality. Thus, provisions of state procurement laws mandating the use of written documents "relating to" procurement transactions are preempted to the same extent as other laws and regulations requiring written documents, except to the extent that they apply to contracts entered by a state and/or specify the technology to be used in the conduct of the procurement process.

By comparison, UETA gives states the option to use and accept electronic records in such circumstances (UETA 5(a)(c), 18). Therefore, UETA provides states with far more flexibility in determining the degree to which they want to conduct business transactions electronically, and the time frame during which they will migrate to electronic commerce.

## 11  Enabling e-government

In addition, optional provisions of UETA, which do not appear in ESIGN, pertain specifically to states' creation and retention of their own electronic records, conversion of their written records to electronic records, acceptance and distribution of electronic records, and the interoperability of systems adopted by state governments to facilitate e-government (UETA 17-19). While section 17 of UETA does not appear to be appropriate because it could result in multiple interpretations of records retention laws by different agencies, sections 18 and 19 may provide needed guidance to state agencies faced with questions about their authority to conduct their own business electronically after UETA.

**About DocuSign**
DocuSign helps organizations connect and automate how they prepare, sign, act on, and manage agreements. As part of the DocuSign Agreement Cloud, DocuSign offers eSignature: the world's #1 way to sign electronically on practically any device, from almost anywhere, at any time. Today, more than 500,000 customers and hundreds of millions of users in over 180 countries use DocuSign to accelerate the process of doing business and to simplify people's lives.

**DocuSign, Inc.**
221 Main Street, Suite 1550
San Francisco, CA 94105

**docusign.com**

For more information
sales@docusign.com
+1-877-720-2040

1   reading these -- these cases, reading *Angle* and other cases

2   about initiatives when they arise in the context of the

3   government, state legislatures making it more difficult and then

4   the courts grasping -- you know, looking at, you know, how

5   severe is this burden.

6          Well, we have got a totally different paradigm here.

7   I mean, the burden with the stay-at-home order subject to

8   criminal misdemeanor penalties is -- is absolute.

9   It's -- it's -- it's severe.  So I don't think there is

10  any -- any doubt that this has inflicted just an incredible

11  burden and really made it impossible for Reclaim Idaho to

12  continue to get this important initiative on the ballot.

13         THE COURT:  All right.  One of the comments that were

14  made in the briefing was that the governor did not make an

15  exception for First Amendment activities.

16         I guess I was a little skeptical whether that would

17  have made any difference because just people -- well, I mean,

18  maybe it's belied by the fact that people were willing to go out

19  and protest, obviously, after the Black Lives Matter issue

20  arose.  But it's a little bit different to collect signatures

21  than to take to the streets to protest something as dramatic as

22  what occurred in Minneapolis.

23         (Inaudible) had exempted First Amendment activity from

24  his stay-at-home order?

25         MS. FERGUSON:  In all candor, no.  I don't think so.

1    I think that -- but I think the important take-home message is

2    that these volunteers shouldn't have to choose between their

3    physical safety and perhaps their life or expressing their First

4    Amendment rights.  I think there -- there should be a reasonable

5    accommodation made for these extraordinary circumstances, and we

6    don't have to have one or the other.

7             THE COURT:  One other question:  In terms of

8    irreparable harm, you know, it's -- I guess I'm echoing a

9    Chicago Cubs fan:  Wait until next year.

10            You know, why can't we just wait until 2022?  Being

11   from -- an ISU fan, the Idaho State Bengals pretty much we say

12   that every year as well.  But why not wait until 2022 and pick

13   up the mantle then?  Why does that not kind of undermine your

14   argument that it's irreparable injury that you're suffering?

15            MS. FERGUSON:  Well, it is irreparable because it's a

16   violation of our constitutional rights.  And that just

17   inherently is.  And this is an extreme -- a severe violation, an

18   extreme burden.

19            In terms of, on a practical matter, why not wait until

20   the next general election, two more years, this is a -- an issue

21   that Reclaim volunteers feels incredibly passionate about, as --

22   as witnessed by their diligence.  And the governor is already

23   talking about cuts that will take place, education.

24            So if we're already in last place in the country, we

25   feel that the need for this initiative is more pressing now than

1    ever.  And the response should not be, you know, like some of

2    our favorite sports teams, let's wait until next year.

3         THE COURT:  And I guess thinking about my analogy and

4    how bad the analogy was, assuming that you're successful in

5    getting it on the ballot, it passes, and it, in fact, has the

6    effect of law, presumably it will change the funding for

7    education and all the children attending school.  And delaying

8    that by two years means a -- two classes will leave the Idaho

9    public schools without the funding that your group thinks should

10   be made available.

11        So I assume maybe that's part of the argument, as

12   well, is the loss of a few years is a real loss for children of

13   Idaho.

14        MS. FERGUSON:  That's -- that's correct.  All -- all

15   children of Idaho who attend public schools K through 12.

16        THE COURT:  All right.

17        MS. FERGUSON:  And I think I will just reserve my

18   time.  I think I have about 5 minutes remaining.

19        THE COURT:  Yes, you do.  That's great.

20        All right.  Then, Mr. Berry.

21        MR. BERRY:  Thank you, Your Honor, Counsel.

22        You know, as a starting point, I just wanted to go

23   back up to the signature verification.  There was a question

24   about how many signatures would be rejected or accepted.  And

25   Phil McGrane has a different point of view.  If you look at

1           So since the state had the ability and, in fact, had

2     demonstrated that through the way it had conducted the most

3     recent primary election, there -- I think there has been

4     a -- there is a likelihood of success on the merits for the

5     plaintiffs; and therefore, some remedy has to be considered.

6           Addressing the other requirements under Rule 65, I

7     would indicate that clearly the irreparable harm standard -- we

8     had the discussion during oral argument about why not wait until

9     2022.  And I think the real answer lies in the fact that the

10    plaintiffs want -- seek a change in the law concerning the

11    funding of public education.  And this is one of those instances

12    where one could say that justice delayed would be justice

13    denied, or perhaps a constitutional delay in protecting a

14    constitutional right is a true denial of that right.

15          Two classes, presumably, two years -- a delay in this

16    process by two years will affect tens of thousands of Idaho

17    students, which has been the plaintiffs' concern here.  And

18    therefore, it strikes right at the heart of their advocacy under

19    the First Amendment.

20          The third requirement, I see no real harm to others,

21    as we discussed here.  This is not an issue in which I am

22    compelling in any way that the state approve what the proponents

23    of the initiative seek.  I am simply indicating that their

24    rights to have something placed on a ballot for the Idaho

25    citizens to vote on is -- is what needs to be protected.  And

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RECLAIM IDAHO, a political action committee registered with the Idaho Secretary of State,<br><br>Plaintiff,<br><br>v.<br><br>BRAD LITTLE, in his official capacity as the Governor of Idaho, and LAWERENCE DENNEY, in his official capacity as Idaho's Secretary of State,<br><br>Defendants. | Case No. 1:20-cv-00268-BLW<br><br>**JULY 27th STATUS REPORT** |

     Counsel for Reclaim Idaho submits this status report on Reclaim Idaho's citizen's initiative petition.

     1.     On July 17, 2020, undersigned counsel wrote to Mr. Robert Berry requesting that he confirm that Secretary of State Denney as the State's Chief Election Officer has instructed the county clerks that verification of Reclaim Idaho's petitions should resume effective the date of the Court's order and must be completed by August 26. Further, Reclaim Idaho expressed concern about the verification of the approximate 10,000 written signatures in the possession of Ada County Clerk Phil McGrane's office, some of which have been in the Ada County Clerk's Office since November, 2019. To date, counsel for the State Defendants has not responded to this request. A copy of that letter is attached as Exhibit A.

     2.     Reclaim Idaho began the collection of electronic signatures on Monday, July 13. Reclaim Idaho transmitted its first electronic files to county clerks on July 24, with instructions describing the format of the data for the electronic signatures the clerks can expect to receive from Reclaim Idaho, to aid the county clerks' verification of registered voter status and address information for each signer. A copy of that email is attached as Exhibit B.

     3.     Also submitted with this status report is the Fifth Declaration of Luke Mayville.


     RESPECTFULLY SUBMITTED on this 27th day of July 2020.

                    /s/
                    Deborah A. Ferguson
                    Craig H. Durham

                    Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify on this 27th day of July, 2020, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing

      Robert A. Berry
      Megan Ann Larrondo
      robert.berry@ag.idaho.gov
      megan.larrondo@ag.idaho.gov

      Attorneys for Defendants

                                           */s/ Deborah A. Ferguson*

# FERGUSON DURHAM, PLLC

| | | |
|---|---|---|
| Deborah A. Ferguson | 223 North 6th Street, Suite 325 | Telephone |
| Craig H. Durham | Boise, Idaho 83702 | (208) 484-2253 |
| | | Facsimile |
| Email: daf@fergusondurham.com | | (208) 906-8663 |
| chd@fergusondurham.com | | |

July 17, 2020

**Via email**

Robert Berry
Deputy Attorney General
Civil Litigation Division

Re: *Reclaim Idaho v. Gov. Bradley Little and Secretary of State Lawerence Denney*,
Case No. 20-cv-00268- BLW

Dear Robert:

Reclaim Idaho has received indications from various county clerks that they have received no clear instruction from the Secretary of State's office regarding Judge Winmill's order granting Reclaim Idaho's preliminary injunction dated June 30 . Can you please confirm that Secretary of State Denney as the State's Chief Election Officer has instructed the county clerks that verification of Reclaim Idaho's petitions should resume effective the date of the Court's order and must be completed by August 26 ?

We are especially concerned about the verification of the approximate 10,000 written signatures in the possession of Ada County Clerk Phil McGrane's office. To date, none have been returned to Reclaim Idaho. As you know Reclaim began dropping off batches to the Ada County Clerk's Office in November, 2019. Can you provide reassurance that verification of these signatures has resumed pursuant to the Court's order?

Reclaim Idaho began the collection of electronic signatures on Monday, July 13. I have asked my client to prepare a simple informational sheet, describing the format of the data for the electronic signatures the clerks can expect to receive from Reclaim Idaho, to aid the county clerks' verification of registered voter status and address information for each signer.

Thank you for confirmation that the Secretary of State has instructed the county clerks to complete verification of Reclaim Idaho's original and electronic petitions by August 26.

Very truly yours,

/s/Deborah A. Ferguson

## Instructions to County Clerks

Luke Mayville <lukegmayville@gmail.com>
Mon 7/27/2020 2:58 PM
**To:** Deborah Ferguson <DAF@fergusondurham.com>

---

**From:** Reclaim Idaho [mailto:reclaimidaho@gmail.com]
**Sent:** Friday, July 24, 2020 4:03 PM
**To:** Patty Weeks <PattyWeeks@co.nezperce.id.us>
**Subject:** K-12 Education Petition eSignatures

Dear County Clerk,

I write on behalf of Reclaim Idaho, the organization currently circulating the initiative petition to increase funding for K-12 education. As you are likely aware, a federal court has ordered the state of Idaho to accept electronic signatures, collected online, for our initiative. We are allowed to collect e-signatures until August 26th.

Attached is a file containing names, addresses, and other information for the registered voters in your county who have signed our initiative so far. In compliance with the U.S. District Court for the District of Idaho, we have developed a process and protocol for the collection and validation of signatures. According to this process and protocol, County Clerks are required to

• Validate (or invalidate) each signature by verifying that the signer is a qualified elector and registered to vote at the address provided on the petition, and

• Assign a legislative district for each signature.

Between now and August 26th, we will send you a CSV file each Friday that contains the signatures collected during the week prior. **Please do not accept as valid any electronic signatures emailed to you from any email address other than this one.**

Please confirm that you have received this email and the attached file.

Thank you,

Jesse Wakeley
Digital Operations Director
Reclaim Idaho

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
daf@fergusondurham.com
chd@fergusondurham.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **RECLAIM IDAHO**, a political action committee, and **LUKE MAYVILLE**,<br><br>Plaintiffs,<br><br>v.<br><br>**LAWERENCE DENNEY**, in his official capacity as Idaho Secretary of State; **BRADLEY LITTLE**, in his official capacity as Governor of Idaho<br><br>Defendants. | Case No. 1:20-cv-00268-BLW<br><br><br>**FIFTH DECLARATION OF LUKE MAYVILLE** |

I, Luke Mayville, having first been duly sworn upon oath, declare as follows:

1. My name is Luke Mayville, and I am a Co-founder of Reclaim Idaho, and a plaintiff in this case. This is the fifth declaration I have provided to the Court. My prior declarations were my first declaration (Dkt. 2-2), my supplemental declaration (Dkt. 9-2), and my second supplemental declaration (Dkt. 10), and my fourth declaration (Dkt. 25-2).

Fifth Declaration of Luke Mayville              1

2.     We collected nearly 7,000 signatures during our first week of signature collection. So far, we've very likely qualified between 3 and 5 additional districts, meaning that we've now qualified roughly half of the 18 districts needed.

3.     We also succeeded in activating teams of volunteers at least 10 different counties. Volunteers are now planning local outreach strategies for the final four weeks before our deadline.

4.     The affidavit that will be printed, filled out, signed, and mailed to each county clerk by me, as co-founder of Reclaim Idaho and administrator of the DocuSign account being used to process all signatures, is attached as Exhibit 1 to my declaration.

5.     It is my understanding that 9 of Idaho's 44 counties will have school district levy elections on August 25th.  These are typically limited elections in which only a subset of the county's electorate are eligible to vote.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON this 27th day of July 2020.


/s/Luke Mayville

## CERTIFICATE OF SERVICE

I hereby certify on this 27th day of July, 2020, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing

    Robert A. Berry
    Megan Ann Larrondo
    robert.berry@ag.idaho.gov
    megan.larrondo@ag.idaho.gov

    Attorneys for Defendants

                                        */s/ Deborah A. Ferguson*

**STATEMENT OF CIRCULATOR**

I, _____, declare under penalty of perjury that I am a resident of the State of Idaho and at least eighteen (18) years of age: that all electronic signatures received by your office from the email address reclaimidaho@gmail.com were made online at https://www.reclaimidaho.org/ on the date set opposite each respective name. I believe that each has stated his or her name, address and residence correctly, that each signer is a qualified elector of the State of Idaho, and a resident of the county of _____.

_____
(Signed)

_____
(Address of circulator's permanent residence)
Number and Street

_____
City

_____
State                                    Zip Code

APPEAL,LC16

# U.S. District Court
# District of Idaho (LIVE Database)Version 6.3 (Boise - Southern)
# CIVIL DOCKET FOR CASE #: 1:20-cv-00268-BLW

Reclaim Idaho et al v. Little et al
Assigned to: Judge B. Lynn Winmill
Case in other court:  USCA, 20-35584
Cause: 42:1983 Civil Rights Act

Date Filed: 06/06/2020
Jury Demand: None
Nature of Suit: 950 Constitutional - State
Statute
Jurisdiction: Federal Question

**Plaintiff**

**Reclaim Idaho**
*an Idaho political action committee*

represented by **Craig Durham**
Ferguson Durham, PLLC
223 N. 6th Street, Suite 325
Boise, ID 83702
208-724-2617
Fax: 208-906-8663
Email: chd@fergusondurham.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Deborah A Ferguson**
Ferguson Durham, PLLC
223 N. 6th Street
Suite 325
Boise, ID 83702
208-484-2253
Fax: 208-906-8663
Email: daf@fergusondurham.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Luke Mayville**

represented by **Craig Durham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Deborah A Ferguson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Bradley Little**
*in his official capacity as Governor of Idaho*

represented by **Megan Ann Larrondo**
Office of the Attorney General
954 W. Jefferson- Second Floor

Boise, ID 83720
208-332-3548
Email: megan.larrondo@ag.idaho.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Arthur Berry**
Office of the Attorney General
Civil Litigation
954 W. Jefferson Street
PO BOX 83720
Boise, ID 83720-0010
(208) 334-2400
Fax: 208-854-8073
Email: robert.berry@ag.idaho.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lawrence Denney**
*in his official capacity as Idaho Secretary of State*

represented by **Megan Ann Larrondo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Arthur Berry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/06/2020 | 1 | COMPLAINT *for Declaratory Judgment and Preliminary Injunction* against All Defendants ( Filing fee $ 400 receipt number 0976-2057610.), filed by All Plaintiffs. (Attachments: # 1 Cover Sheet, # 2 Summons Governor LIttle, # 3 Summons Secretary of State Denney)(Durham, Craig) |
| 06/06/2020 | 2 | Expedited MOTION for Preliminary Injunction Craig Durham appearing for Plaintiffs Luke Mayville, Reclaim Idaho. Responses due by 6/29/2020 (Attachments: # 1 Memorandum in Support, # 2 Exhibit Declaration of Luke Mayville, # 3 Exhibit Declaration of Rebecca Schroeder, # 4 Exhibit Declaration of Deborah Silver, # 5 Exhibit Declaration of Ashley Prince, # 6 Exhibit Declaration Linda Larson, # 7 Exhibit Declaration of Karen Lansing)(Durham, Craig) |
| 06/08/2020 | 3 | Summons Issued as to All Defendants. (Print attached Summons for service.) (Attachments: # 1 Summons)(jp) |
| 06/08/2020 | 4 | DOCKET ENTRY ORDER: The Court hereby sets the following briefing schedule on Plaintiffs' Expedited Motion for Preliminary Injunction 2 : Defendants must file a response **on or before June 18, 2020** and any reply must be filed **on or before June 22, 2020**. A hearing on the motion will be set via forthcoming notice of hearing. Signed by Judge B. Lynn Winmill. (ah) |
| 06/08/2020 | | Set/Reset Deadlines as to 2 Expedited MOTION for Preliminary Injunction . Per Order dkt 4, Responses due by 6/18/2020 Replies due by 6/22/2020. (jp) (Entered: 06/09/2020) |

| 06/10/2020 | 5 | NOTICE of Appearance by Megan Ann Larrondo on behalf of Lawerence Denney, Bradley Little (Larrondo, Megan) |
|---|---|---|
| 06/10/2020 | 6 | NOTICE of Availability of Magistrate Judge and Requirement for Consent sent to counsel for Lawerence Denney, Bradley Little, Luke Mayville, Reclaim Idaho re 1 Complaint, 5 Notice of Appearance. Consent/Objection to Magistrate due by 8/10/2020. (jp) |
| 06/10/2020 | 7 | DOCKET ENTRY NOTICE OF HEARING regarding 2 Expedited MOTION for Preliminary Injunction: A Video Motion Hearing is set for 6/23/2020 at 2:00 PM (Mountain Time) before Judge B. Lynn Winmill. The Parties may be provided a link to connect to video separately. The public may listen to the hearing by phone using the following information: 1-669-254-5252; Meeting ID: 161 049 1843; Password: 595473. Members of the public are reminded to mute their phones and that recording the proceedings is prohibited.(jlb) |
| 06/18/2020 | 8 | MEMORANDUM in Opposition re 2 Expedited MOTION for Preliminary Injunction filed by Lawerence Denney, Bradley Little. Replies due by 7/2/2020. (Attachments: # 1 Declaration of Phil McGrane, # 2 Declaration of Jason Hancock, # 3 Exhibit A to Hancock Declaration, # 4 Declaration of Sheryl Millard, # 5 Exhibit A to Millard Declaration, # 6 Declaration of Andrew Mitzel, # 7 Exhibit A to Mitzel Declaration, # 8 Declaration of Counsel, # 9 Exhibit A to Counsel Declaration)(Berry, Robert) |
| 06/21/2020 | 9 | REPLY to Response to Motion re 2 Expedited MOTION for Preliminary Injunction filed by Luke Mayville, Reclaim Idaho.Motion Ripe Deadline set for 6/22/2020. (Attachments: # 1 Exhibit A, # 2 Supplemental Declaration of Luke Mayville, # 3 Declaration of Counsel)(Durham, Craig) |
| 06/22/2020 | 10 | AFFIDAVIT in Support by Luke Mayville re 2 Expedited MOTION for Preliminary Injunction *2nd Supplemental Declaration of Luke Mayville* filed by Reclaim Idaho. (Ferguson, Deborah) |
| 06/23/2020 | 11 | SUPPLEMENT by Defendants Lawerence Denney, Bradley Little re 8 Memorandum in Opposition to Motion,, *Supplemental Declaration of Counsel*. (Attachments: # 1 Exhibit A to Declaration of Counsel, # 2 Supplemental Declaration of Jason Hancock, # 3 Supplemental Declaration of Phil McGrane)(Berry, Robert) |
| 06/23/2020 | 12 | ERRATA by Defendants Lawerence Denney, Bradley Little re 11 Supplement, . (Attachments: # 1 Corrected Supplemental Declaration of Phil McGrane)(Berry, Robert) |
| 06/23/2020 | 13 | Minute Entry for proceedings held before Judge B. Lynn Winmill: A Video Motion Hearing was held on 6/23/2020 re 2 Plaintiff's Expedited Motion for Preliminary Injunction. Motion GRANTED. An order is forthcoming. (Court Reporter Tammy Hohenleitner.) (jlb) |
| 06/26/2020 | 14 | MEMORANDUM DECISION AND ORDER- It is ORDERED that: 1. Plaintiffs' Expedited Motion for Preliminary Injunction (Dkt. 2 ) is GRANTED. 2. On or before June 26, 2020 at 5:00 p.m. M.S.T., Defendants must file with the Court a notice detailing the reasonable accommodation they have chosen to make to preserve Plaintiffs' core political speech rights as detailed in this Memorandum Decision and Order. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (jp) |
| 06/26/2020 | 15 | Notice of Filing of Official Transcript of Proceedings held on 6/23/20 before Judge B. Lynn Winmill. Court Reporter/Transcriber Tamara I. Hohenleitner, Email tammy_hohenleitner@id.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This |

| | | transcript is not available to the general public and as such is sealed until release of transcript restriction re 13 Motion Hearing,. Redaction Request due 7/17/2020. Redacted Transcript Deadline set for 7/27/2020. Release of Transcript Restriction set for 9/24/2020. (th) |
|---|---|---|
| 06/26/2020 | 16 | MOTION to Stay re 14 Memorandum Decision,,, Order,,, Terminate Motions,, Robert Arthur Berry appearing for Defendants Lawrence Denney, Bradley Little. Responses due by 7/17/2020 (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Berry, Robert) |
| 06/29/2020 | 17 | ORDER DENYING MOTION TO STAY - Defendants Notice And Motion To Stay Pursuant To F.R.C.P. 62(D) and F.R.A.P. 8 (Dkt. 16 ) is DENIED. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (jd) |
| 06/29/2020 | 18 | Expedited MOTION to Enforce Court's Order , Craig Durham appearing for Plaintiffs Luke Mayville, Reclaim Idaho. Responses due by 7/20/2020 (Durham, Craig) |
| 06/30/2020 | 19 | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO ENFORCE THE COURT'S ORDER - Plaintiffs Expedited Motion to Enforce the Courts Order (Dkt. 18 ) is GRANTED IN PART and DENIED IN PART as explained in this decision. The 48-day period provided for Reclaim Idaho to resume its petition gathering activities begins July 9, 2020. Signed by Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (jd) |
| 06/30/2020 | 20 | NOTICE OF APPEAL as to 14 Memorandum Decision,,, Order,,, Terminate Motions,, 19 Order on Motion for Miscellaneous Relief,, by Lawrence Denney, Bradley Little. Filing fee $ 505, receipt number 0976-2069893. (Notice sent to Court Reporter & 9th Cir) (Attachments: # 1 Representation Statement)(Berry, Robert) |
| 07/01/2020 | 21 | USCA Case Number 20-35584 for 20 Notice of Appeal, filed by Bradley Little, Lawrence Denney. (kt) |
| 07/02/2020 | 22 | ORDER of USCA (20-35584) as to 20 Notice of Appeal, filed by Bradley Little, Lawrence Denney (Attachments: # 1 Mediation Questionnaire)(kt) (Main Document 22 replaced on 7/7/2020) (jp). (Attachment 1 replaced on 7/7/2020) (jp). (Entered: 07/06/2020) |
| 07/09/2020 | 23 | NOTICE by Lawrence Denney, Bradley Little re 19 Order on Motion for Miscellaneous Relief,, (Larrondo, Megan) |
| 07/09/2020 | 24 | ORDER of USCA as to 20 Notice of Appeal, filed by Bradley Little, Lawrence Denney. The court sua sponte expedites this appeal. The opening brief is due July 17, 2020. The answering brief is due July 29, 2020. The optional reply brief is due August 3, 2020. (Attachments: # 1 Dissent)(jp) (Entered: 07/10/2020) |
| 07/10/2020 | 25 | STATUS REPORT *on Compliance with Court's June 30th Order* by Reclaim Idaho. (Attachments: # 1 Exhibit A to Status Report, # 2 Affidavit 4th Mayville Declaration, # 3 Exhibit 1 to 4th Mayville Declaration, # 4 Exhibit 2 to 4th Mayville Declaration) (Ferguson, Deborah) |
| 07/27/2020 | 26 | STATUS REPORT by Reclaim Idaho. (Attachments: # 1 Exhibit A to Status Report, # 2 Exhibit B to Status Report, # 3 Affidavit Mayville 5th Declaration, # 4 Exhibit 1 to Mayville 5th Declaration)(Ferguson, Deborah) |

**PACER Service Center**

| Transaction Receipt | | | |
|---|---|---|---|
| 07/27/2020 17:00:11 | | | |
| **PACER Login:** | daferguson6960:4011590:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-00268-BLW |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |